UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILD FISH CONSERVANCY, a Washington non-profit corporation, | No. 2:20-cv-00417 |
| Plaintiff, | **COMPLAINT** |
| v. | |
| BARRY THOM, in his official capacity as Regional Administrator of the National Marine Fisheries Service; CHRIS OLIVER, in his official capacity as the Assistant Administrator for Fisheries of the National Marine Fisheries Service; NATIONAL MARINE FISHERIES SERVICE; WILBUR ROSS, JR., in his official capacity as Secretary of the United States Department of Commerce; and UNITED STATES DEPARTMENT OF COMMERCE, | |
| Defendants. | |

## I.   **INTRODUCTION**

1.      In 1995, there were 98 Southern Resident Killer Whales. Today, there are 72. The Southern Resident Killer Whales have been listed under the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, as an endangered species since 2005.

2.      In July of 2018, the nation watched spellbound as one grieving Southern Resident Killer Whale mother, Tahlequah, carried the body of her dead calf, who had died less than an hour after birth, for seventeen days and across hundreds of miles before finally letting him sink. Shortly

COMPLAINT - 1
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

thereafter in September, one of the few remaining females of reproductive age, Scarlet, was presumed dead after disappearing from view. She is believed to have sunk to the seafloor due to extreme emaciation.

3.      In January and May of 2019, the first two calves to survive more than a few days after birth since 2015 were born. Despite this glimmer of hope, in August three more Southern Residents perished. In January of this year, another Southern Resident Killer Whale disappeared and is believed dead.

4.      The primary cause of this rapid population decline is the declining availability of Southern Resident Killer Whale's primary prey, adult Chinook salmon, many populations of which are themselves listed as threatened species under the ESA. This lack of prey has resulted in starvation for existing Southern Residents, and a dearth of live births to sustain the population of Southern Resident Killer Whales. In addition to starvation, the Southern Residents are also adversely and cumulatively affected by toxic contaminants in their environment, vessel noise, and other disturbances.

5.      Defendants the Secretary of Commerce and the National Marine Fisheries Service ("NMFS"), to which the Secretary has delegated duties, are responsible for managing fisheries within the Exclusive Economic Zones of the United States. Because Chinook salmon populations are migratory and regularly cross international borders, commercial fishing of Chinook salmon populations has been restricted by the Pacific Salmon Treaty between the United States and Canada since 1985. This Treaty has been regularly renegotiated, including in 1992, 1998, 2008, and 2019. The Pacific Salmon Treaty sets an upper limit on harvest levels in coastal and inland marine waters from Southeast Alaska to Oregon and in the Columbia and Snake Rivers. The fishery regimes established in the 2019 Pacific Salmon Treaty are effective for ten years; through 2028. Defendants are empowered to further restrict harvests under applicable federal laws, including as necessary to protect imperiled species under the ESA.

6.      NMFS recently prepared a biological opinion to consider the effects of its ongoing management over, and delegation of certain authority to the State of Alaska for, the salmon

COMPLAINT - 2
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

fisheries within the Exclusive Economic Zone of Southeast Alaska pursuant to the renegotiated Pacific Salmon Treaty entitled *the Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response, Consultation on the Delegation of Management Authority for Specified Salmon Fisheries to the State of Alaska, NMFS Consultation Number: WCR-2018-10660* (April 5, 2019) ("2019 SEAK BiOp").

7.      Those fisheries harvest wild- and hatchery-origin salmon originating in rivers from Oregon to Alaska, including four Chinook salmon evolutionary significant units ("ESU") that are listed as threatened under the ESA: Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon. These four Chinook salmon ESU's are failing to meet recovery standards, including those set for spawning escapement, and the fisheries in the Exclusive Economic Zone of Southeast Alaska will continue to contribute to that failure.

8.      With respect to the Southern Resident Killer Whale, the 2019 SEAK BiOp did not disguise the issue. It explicitly acknowledged that the Southern Resident Killer Whale has a high risk of extinction due largely to low fecundity rates. It attributed this reduced fecundity to reduced prey abundance; primarily, Chinook salmon. It plainly stated "[u]nder the existing management and recovery regimes over the last decade, salmon availability has not been sufficient to support Southern Resident population growth." It acknowledged that a recent population viability assessment indicated that effects of prey abundance has the largest impact on the population growth rate and that Chinook abundance would need to increase by 15% to achieve the recovery target growth rate set for the Southern Resident Killer Whale.

9.      The 2019 SEAK BiOp explained that attempts were made during the recent negotiations between the United States and Canada that culminated in the 2019 Pacific Salmon Treaty to reduce harvests to conserve the Southern Resident Killer Whale and Puget Sound Chinook salmon, but that those efforts were unsuccessful.

COMPLAINT - 3
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

10.     The 2019 SEAK BiOp found that Chinook salmon harvests within the Exclusive Economic Zone of Southeast Alaska contemplated under the 2019 Pacific Salmon Treaty will continue to reduce Chinook salmon prey available to Southern Resident Killer Whales in various seasons and locations. NMFS estimated such reductions of prey available in coastal waters to range from 0.2% to 12.9%, with the greatest reductions occurring in July through September. Reductions in the inland waters were estimated to range from 0.1% to 2.5%, with the greatest reductions similarly occurring from July through September. Some of the Chinook salmon caught in the fishery have been identified by NMFS as priority stocks for Southern Resident Killer Whales. NMFS estimated that the fisheries in the Exclusive Economic Zone of Southeast Alaska reduce the larger Chinook salmon—those from 3 to 5 years old—from the Southern Resident's critical habitat by 0.1% to 2.5%. Available data indicate that Southern Resident Killer Whales consume mostly these larger and older Chinook salmon.

11.     Instead of reducing the commercial salmon fisheries in the Exclusive Economic Zone of Southeast Alaska to protect Southern Resident Killer Whales and Puget Sound Chinook salmon, the 2019 SEAK BiOp relies on massive new and ill-defined mitigation proposals in a supposed effort to offset negative impacts of reduced prey availability to the Southern Residents. The hypothetical mitigation includes substantial increases in hatchery production of Chinook salmon, primarily in Puget Sound but also in the Columbia River and on the Washington Coast. These mitigation measures are all undeveloped and unfunded. Further, the hatchery programs themselves pose threats to wild salmonids and will suppress recovery of threatened Chinook salmon ESUs, including Puget Sound Chinook salmon. The mitigation measures that the 2019 SEAK BiOp relies upon thus require various reviews and authorizations, including under the ESA, before they can be implemented. These mitigation measures therefore may never be implemented or may be substantially altered.

12.     NMFS's 2019 SEAK BiOp nonetheless assumes that the mitigation measures will meaningfully increase prey available to Southern Resident Killer Whales to support a conclusion that the Southeast Alaska salmon fisheries contemplated under the 2019 Pacific Salmon Treaty

COMPLAINT - 4
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

are not likely to jeopardize the continued existence of the Southern Resident Killer Whales or result in the adverse modification or destruction of its critical habitat. NMFS similarly found that the fisheries are not likely to jeopardize Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon. NMFS therefore included an incidental take statement in the 2019 SEAK BiOp authorizing, without reduction, the full extent of Chinook salmon harvest within the Exclusive Economic Zone of Southeast Alaska allowed under the 2019 Pacific Salmon Treaty.

13.     Plaintiff Wild Fish Conservancy challenges Defendants' failure to ensure that their management and authorization of salmon fisheries within the Exclusive Economic Zone of Southeast Alaska is not likely to jeopardize threatened or endangered species or result in the adverse modification or destruction of such species' critical habitat as required under section 7(a)(2) of the ESA. Wild Fish Conservancy further challenges Defendants' failure to comply the ESA and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12, in issuing the 2019 SEAK BiOp. Wild Fish Conservancy seeks declaratory and injunctive relief requiring Defendants to comply with the ESA and NEPA and to protect imperiled Southern Resident Killer Whales and Chinook salmon.

## II.     PARTIES

14.     Plaintiff Wild Fish Conservancy is a membership-based 501(c)(3) nonprofit organization incorporated in the State of Washington with its principal place of business in Duvall, Washington. Wild Fish Conservancy is dedicated to the preservation and recovery of Washington's native fish species and the ecosystems upon which those species depend. Wild Fish Conservancy brings this action on behalf of itself and its approximately 2,400 members. Wild Fish Conservancy changed its name from "Washington Trout" in 2007. As an environmental watchdog, Wild Fish Conservancy actively informs the public on matters affecting water quality, fish, and fish habitat in the State of Washington through publications, commentary to the press, and sponsorship of educational programs. Wild Fish Conservancy also conducts field research on wild fish populations and has designed and implemented habitat restoration projects. Wild Fish

COMPLAINT - 5
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Conservancy has lobbied, litigated, and publicly commented on federal and state actions that affect the region's native fish and ecosystems. Wild Fish Conservancy routinely seeks to compel government agencies to follow the laws designed to protect native fish species, particularly threatened and endangered species. Wild Fish Conservancy's members and representatives have met, negotiated, and worked closely with NMFS personnel concerning salmon populations, harvesting, and habitat restoration, and Southern Resident Killer Whales.

15.     Wild Fish Conservancy's members regularly spend time in areas in and around the waters occupied by Southern Resident Killer Whales, including waters around the San Juan Islands, Strait of Juan de Fuca, and along the Pacific Coast. Wild Fish Conservancy's members also regularly spend time in and around waters occupied by Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon. Wild Fish Conservancy' members intend to continue to visit these areas on a regular basis, including in the coming months and beyond. These members observe, study, photograph, and appreciate wildlife and wildlife habitat in and around these waters. These members also fish in and around these waters. Wild Fish Conservancy's members would like to fish in these waters for wild Chinook salmon if those species were able to recover to a point where such activities would not impede the species' conservation and restoration.

16.     Wild Fish Conservancy's members derive scientific, educational, recreational, health, conservation, spiritual, and aesthetic benefits from the Southern Resident Killer Whales and wild native Chinook species in those waters and from the existence of natural, wild and healthy ecosystems.

17.     The past, present, and future enjoyment of Wild Fish Conservancy's interests and those of its members, including the recreational, aesthetic, spiritual, and scientific interests, have been, are being, and will continue to be harmed by Defendants' failures to comply with the ESA and NEPA as described herein and by Wild Fish Conservancy's members' reasonable concerns related to Defendants' violations. These injuries include reduced enjoyment of time spent in and around these areas, fewer visits to those areas than would otherwise occur, and refraining from

COMPLAINT - 6
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

engaging in certain activities while visiting these areas, such as fishing, than would otherwise occur. These injures also include an inability or unwillingness to fish for wild salmonids due to their depressed status.

18.     Wild Fish Conservancy and its members have suffered procedural and informational harms connected to their substantive, conservation, recreational, and scientific activities resulting from Defendants' violations. Wild Fish Conservancy and its members rely, in part, on adequate ESA consultation and NEPA evaluation processes to provide information, protect threatened and endangered species, and prevent environmental harms. Defendants' failure to comply with these statutes has deprived Wild Fish Conservancy and its members of public comment opportunities and information, thereby harming their efforts to effectively advocate for and protect their interests.

19.     Wild Fish Conservancy's injuries and those of its members are actual, concrete and/or imminent, and are fairly traceable to Defendants' violations of the ESA and NEPA as described herein that the Court may remedy by declaring that Defendants' actions are illegal and issuing statutory and injunctive relief vacating Defendants' actions and requiring Defendants to comply with their statutory obligations.

20.     Defendant Barry Thom is the West Coast Regional Administrator of NMFS and is being sued in that official capacity. Regional Administrator Thom has responsibility at the regional level for ensuring that NMFS complies with applicable legal requirements. NMFS's West Coast Region issued the 2019 SEAK BiOp challenged herein.

21.     Chris Oliver is the Assistant Administrator for Fisheries of the NMFS and is being sued in that official capacity. Assistant Administrator Oliver is responsible for ensuring that NMFS complies with applicable legal requirements.

22.     Defendant NMFS is an office within the National Oceanic and Atmospheric Administration, which is an agency within the United States Department of Commerce. NMFS has been delegated responsibilities by the Secretary of Commerce to manage fisheries and to protect imperiled species under the Magnuson-Stevens Fishery Conservation and Management

COMPLAINT - 7
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Act ("Magnuson-Stevens Act"), 16 U.S.C. §§ 1801–1891d, and the ESA. NMFS issued the 2019 SEAK BiOp challenged herein.

23.     Defendant Wilbur Ross is the Secretary of Commerce and is being sued in that official capacity. The Secretary is vested with authority to manage fisheries and to protect imperiled species under the Magnuson-Stevens Act and the ESA. The Secretary has the duty and authority to conserve and recover the Southern Resident Killer Whales and threatened Chinook salmon and is responsible for the violations alleged in this case. Secretary Ross is responsible for ensuring that the United States Department of Commerce, including the agencies within the Department, complies with applicable legal requirements.

24.     The United States Department of Commerce in an executive department of the United States. The Department of Commerce, through its Secretary, is responsible for managing fisheries and protecting imperiled species under the Magnuson-Stevens Act and the ESA.

### III.     JURISDICTION & VENUE

25.     This Court has jurisdiction under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, section 11(g) of the ESA, 16 U.S.C. § 1540(g), and 28 U.S.C. § 1331 (federal question). The requested relief is proper under the ESA, 16 U.S.C. § 1540(g)(1)(A), the APA, 5 U.S.C. § 706, 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C. § 2202 (injunctive relief). As required by the ESA citizen suit provision, 16 U.S.C. § 1540(g)(2)(A)(i), Wild Fish Conservancy provided sixty days' notice of its intent to sue through a letter dated and postmarked January 9, 2020. A copy of that letter is attached as Exhibit 1 to this Complaint.

26.     The ESA, 16 U.S.C. § 1540(g)(1)(A), and the APA, 5 U.S.C. § 702, waive the sovereign immunity of the Defendants for these claims.

27.     The Western District of Washington is the proper venue under 28 U.S.C. § 1391(e) and 16 U.S.C. § 1540(g)(3)(A) because the violations alleged, and/or substantial parts of the events and omissions giving rise to the claims, occurred and are occurring within such District. For example, Defendants actions jeopardize the continued existence of the endangered Southern Resident Killer Whales and will adversely modify its critical habitat within the Salish Sea in the

COMPLAINT - 8
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Western District of Washington. Likewise, Defendants' actions jeopardize the continued existence of, among others, threatened Puget Sound Chinook salmon that rear in rivers within the Western District of Washington. Additionally, the 2019 SEAK BiOp challenged herein requires massive increases in Chinook salmon production in Puget Sound within the Western District of Washington, programs that would themselves hinder recovery of the threatened Puget Sound Chinook salmon ESU.

## IV.   FACTS

### A.   Statutory Background

#### 1.   The Endangered Species Act

28.   When Congress enacted the Endangered Species Act, it recognized that some species of fish, wildlife, and plants have been "so depleted in numbers that they are in danger of or threatened with extinction." 16 U.S.C. § 1531(a)(2). It stated that "these species of fish, wildlife, and plants are of esthetic, ecological, educational, historical, recreational, and scientific value to the Nation and its people." *Id.* § 1531(a)(3).

29.   Congress enacted the ESA, in part, to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." *Id.* § 1531(b). The ESA established that it is "the policy of Congress that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act." *Id.* § 1531(c)(1). The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." *Id.* § 1532(3).

30.   The ESA charges the Secretaries for the United States Departments of Commerce and Interior with administering and enforcing the ESA, who have delegated such responsibilities to NMFS and the United States Fish and Wildlife Service ("FWS"), respectively. 50 C.F.R. § 402.01(b). NMFS generally has ESA authority for marine and anadromous species, while FWS has jurisdiction over terrestrial and freshwater species. *See id.* §§ 17.11, 223.102, 224.101.

COMPLAINT - 9
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1
2
3
4
5

31.     The ESA seeks to protect imperiled species, defined to include a "distinct population segment of any vertebrate species that interbreeds when mature," by listing them as "endangered" or "threatened" and by designating their critical habitat. 16 U.S.C. §§ 1532(16), 1533(a); 50 C.F.R. § 424.02. A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).

6
7
8
9
10

32.     Section 9 of the ESA generally makes it unlawful for "any person" to "take" an endangered species. *Id.* § 1538(a)(1). The take prohibition has been applied to certain species listed as threatened under the statute though regulations promulgated by NMFS under section 4(d) of the ESA, 16 U.S.C. § 1533(d). *See* 50 C.F.R. §§ 223.102, 223.203(a). Section 9 of the ESA prohibits a violation of those regulations. 16 U.S.C. § 1538(a)(1)(G).

11
12
13
14
15
16
17

33.     A "person" includes private parties as well as local, state, and federal agencies. 16 U.S.C. § 1532(13). The ESA defines "take" to mean "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id.* § 1532(19). "Harm" is defined broadly by regulation as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 222.102.

18
19
20
21
22
23

34.     Section 7 of the ESA imposes a substantive obligation on all federal agencies to "*insure* that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of" habitat that has been designated as critical for such species. *See* 16 U.S.C. § 1536(a)(2) (emphasis added); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).

24
25

35.     ESA regulations define "[j]eopardize the continued existence of" as "to engage in an action that reasonably would be expected, either directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. Destruction or adverse

COMPLAINT - 10
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1 modification of critical habitat occurs where there is a direct or indirect alteration that appreciably
2 diminishes the value of critical habitat for both the survival and recovery of a listed species. *Id.*
3 Recovery is defined as "improvement in the status of listed species to the point at which listing is
4 no longer appropriate." *Id.*

5   36. When an agency (the "action agency") determines that its proposed action "may
6 affect listed species," section 7(a)(2) of the ESA requires that it consult with NMFS and/or FWS
7 (the "consulting agency") for the species at issue using "the best scientific and commercial data
8 available." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). This interagency consultation process
9 is intended to assist the action agencies in complying with their substantive section 7(a)(2) duty
10 to guard against jeopardy to listed species or destruction or adverse modification of critical habitat.

11   37. Consultation under section 7(a)(2) of the ESA requires the consulting agency to
12 review all relevant information; evaluate the current status of the listed species and/or critical
13 habitat; evaluate the effects of the action and cumulative effects on the listed species and/or critical
14 habitat; formulate a biological opinion as to whether the action, taken together with cumulative
15 effects, is likely to jeopardize the continued existence of listed species and/or result in the
16 destruction or adverse modification of critical habitat; identify reasonable and prudent alternatives
17 if such jeopardy or adverse modification is found; and formulate an incidental take statement
18 ("ITS"). 50 C.F.R. § 402.14(g); *see also* 16 U.S.C. § 1536(b)(3)(A), (b)(4).

19   38. The jeopardy analysis requires the consulting agencies to consider the aggregate
20 effect of past and ongoing human activities that affect the current status of the species and its
21 habitat ("environmental baseline"); the indirect and direct effects of the proposed action, including
22 the effects of interrelated and interdependent activities ("effects of the action"); and the effects of
23 future state and private activities that are reasonably certain to occur ("cumulative effects"). 50
24 C.F.R. §§ 402.02, 402.14(g).

25   39. The consulting agency's biological opinion must include a summary of the
information upon which the opinion is based, a detailed discussion of the effects of the action, and

COMPLAINT - 11
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

if jeopardy or adverse modification is found, reasonable and prudent alternatives to the action that will avoid jeopardy and/or adverse modification. 50 C.F.R. § 402.14(h).

40.     If the consulting agency concludes the action will not jeopardize listed species or adversely modify their critical habitat, the consulting agency must include with the biological opinion an incidental take statement. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1). An incidental take statement must specify the impact of the action by setting a numeric limit on take (or an appropriate surrogate if a numeric cap is impractical to establish), identify "reasonable and prudent measures" that will minimize impacts to protected species, and "terms and conditions" to implement these measures. 16 U.S.C. § 1536(b)(4)(C)(i)–(ii), (iv); 50 C.F.R. § 402.14(i)(1)(i)–(ii), (iv). The incidental take statement must including monitoring and reporting requirements for the incidental take resulting from the action. *See* 50 C.F.R. § 402.14(i)(3); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531–32 (9th Cir. 2010).

41.     The take of a listed species in compliance with the terms of a valid incidental take statement is not prohibited under Section 9 of the ESA. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

42.     Section 7 of the ESA imposes a continuing duty on the agencies following consultation to insure that the action will not jeopardize species. *See Wild Fish Conservancy*, 628 F.3d at 525. Agencies must reinitiate consultation for actions where "discretionary Federal involvement or control over the action has been retained or is authorized by law" if, *inter alia*, "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered . . . [,]" or where "a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. § 402.16(a)–(d).

2.     **The National Environmental Policy Act**

43.     The purpose of NEPA is, inter alia, to declare a national policy that will encourage productive and enjoyable harmony between man and his environment, to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and

COMPLAINT - 12
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

welfare of man, and to enrich the understanding of the ecological systems and natural resources important to the Nation. 42 U.S.C. § 4321.

44.     NEPA requires federal agencies to undertake processes to "insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken" and that are "intended to help public officials make decisions that are based on understanding of environmental consequences." 40 C.F.R. §§ 1500.1(b) and (c).

45.     To accomplish these purposes, NEPA requires federal agencies to prepare a "detailed statement" regarding all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

46.     The "detailed statement," commonly known as an environmental impact statement ("EIS"), must describe the environmental impact of the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, alternatives to the proposed action, the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

47.     If a proposed action is neither one that normally requires an EIS or that normally does not require an EIS, the agency must prepare an environmental assessment ("EA") to determine whether an EIS is required. 40 C.F.R. § 1501.4(a), (b).

48.     If the agency determines through the EA process that an EIS is not required for the proposed action, then the agency is required to issue a finding of no significant impact ("FONSI"). 40 C.F.R. § 1501.4(e).

49.     Regulations promulgated by the Council on Environmental Quality ("CEQ") direct agencies to consider certain factors when considering whether a particular proposed action requires preparation of an EIS, including, inter alia, whether the action may adversely affect an endangered or threatened species listed under the ESA or its critical habitat. 40 C.F.R. § 1508.27.

COMPLAINT - 13
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

50.     NEPA further provides that agencies "shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).

51.     Agencies must supplement a prior EIS or EA if there are "substantial changes in the proposed action that are relevant to environmental concerns" or "significant new circumstances or information relevant to environmental concerns and bearing on the action or its impacts." 40 C.F.R. § 1502.9(c)(1); *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1152 (9th Cir. 1998), *overruled on other grounds*, *Lands Council v. McNair*, 537 F.3d 981, 997 (9th Cir. 2008). "As a rule of thumb . . . , if the EIS concerns an ongoing problem, EISs that are more than 5 years old should be carefully reexamined to determine if the criteria in [the NEPA regulations on supplementation] compel preparation of an EIS supplement." Council on Envtl. Quality, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,035 (Mar. 23, 1981).

### 3.     The Magnuson-Stevens Act

52.     The Magnuson-Stevens Act seeks to "conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1).

53.     The statute establishes exclusive federal management over fisheries within the Exclusive Economic Zones of the United States. *Id.* § 1811(a). The Exclusive Economic Zone, referred to as "federal waters," generally consists of those waters from three nautical miles from the coastline to 200 nautical miles from the coastline. *See id.* § 1802(11); Presidential Proclamation 5030, 48 Fed. Reg. 10,605 (Mar. 14, 1983).

54.     The statute assigns implementation responsibilities to the Secretary of Commerce, who has generally delegated responsibilities to NMFS. *See, e.g.,* 16 U.S.C. §§ 1854, 1855(d); U.S. Dep't of Commerce, *Department Organization Order* 10-15, § 3.01(aa) (Dec. 12, 2011);[1] U.S.

---

[1] *Available at* http://www.osec.doc.gov/opog/dmp/doos/doo10_15.html.

COMPLAINT - 14
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Dep't of Commerce, *NOAA Organizational Handbook Transmittal No. 61*, Part II(C)(26).[2] The statute also provides for Regional Fishery Management Councils. 16 U.S.C. § 1852(a)(1).

55.     The Regional Fishery Management Councils are to prepare fishery management plans and amendments to such plans for each fishery under their respective jurisdiction and submit the plans to NMFS. *Id.* § 1852(h)(1). The fishery management plans must contain, inter alia, management measures necessary to prevent overfishing and that are consistent with other applicable laws. *Id.* § 1853(a)(1).

56.     NMFS must review all fishery management plans, including amendments thereto, to determine whether they are consistent with the Magnuson-Stevens Act "and any other applicable law." *Id.* § 1854(a)(1)(A). The fishery management plans are to be approved, disapproved, or partially approved by NMFS. *Id.* § 1854(a)(3).

57.     The Regional Fishery Management Councils are also to submit proposed regulations to NMFS designed to implement the fishery management plans, which NMFS will promulgate if it deems them to be consistent with the plans and other applicable laws. *Id.* §§ 1853(c), 1854(b).

58.     The statute assigns primary responsibility in carrying out and implementing fishery management plans to NMFS. *See id.* § 1855(d).

59.     The Magnuson-Stevens Act provides that a State may regulate a fishing vessel outside the boundaries of the State—i.e., in the Economic Exclusive Zone—where a fishery management plan delegates such authority to the State and the State's fishing laws and regulations are consistent with the fishery management plan. *Id.* § 1856(a)(3)(B). If NMFS determines that the State's laws or regulations do not comply with the fishery management plan, NMFS shall provide the State notice and an opportunity to correct the deficiency. *Id.* If the inconsistency is not corrected, the delegation of authority to the State "shall not apply until [NMFS] and the appropriate Council find that the State has corrected the inconsistencies." *Id.*

---

[2] A*vailable at* http://www.corporateservices.noaa.gov/ames/delegations_of_authority/.

COMPLAINT - 15
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

4.      **The Administrative Procedure Act**

60.     The APA governs the judicial review of certain federal agency actions. 5 U.S.C. §§ 701–706.

61.     Under the APA, courts shall "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, or conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or made "without observance of procedure required by law." *Id.* § 706(2)(A), (D). Agency action includes an agency's "failure to act." *Id.* § 551(13).

62.     An agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

63.     Under the APA, a court must also "hold unlawful and set aside" any agency action taken that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

B.      **The Endangered and Threatened Species**

1.      **Southern Resident Killer Whales**

64.     Southern Resident Killer Whales, also known as orcas, are charismatic black and white marine mammals that are an icon of the Pacific Northwest. They are intelligent, social animals that live in highly organized groups known as pods. These killer whales form strong social bonds and have been observed sharing the responsibilities of caring for the young, sick, and injured.

65.     NMFS listed the Southern Resident Killer Whales as an endangered species in 2005. 70 Fed. Reg. 69,903 (Nov. 18, 2005); *see also* 50 C.F.R. § 224.101(h). Critical habitat was

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1   designated for this species the following year. 71 Fed. Reg. 69,054 (Nov. 29, 2006); *see also* 50

2   C.F.R. § 226.

3       66.    This salmon-dependent whale population typically congregates in the inland

4   waters of Puget Sound in the summer, fall, and late spring months but it also ranges all along the

5   coast of Washington, Oregon, and California, as far south as Monterey Bay, particularly in the

6   winter and spring in search of Chinook salmon, its preferred prey.

7       67.    In 2008, NMFS issued a recovery plan for Southern Resident Killer Whales under

8   section 4(f) of the ESA, 16 U.S.C. § 1533(f). The recovery plan identified prey availability as a

9   threat to the killer whales. The plan prioritized the management of this threat through salmon

10  restoration efforts in the region, including habitat, harvest, and hatchery management

11  considerations, and the continued use of existing authorities under the ESA and Magnuson-

12  Stevens Act "to ensure an adequate prey base." The 2008 recovery plan specified that an important

13  criteria for evaluating whether recovery has been achieved will be if NMFS has sufficient

14  knowledge of the foraging ecology of Southern Residents "to determine that established fishery

15  management regimes are not likely to limit the recovery of the whales." The plan elaborates that

16  this would include "[f]isheries management programs that adequately account for predation by

17  marine mammal populations when determining harvest limits, hatchery practices, and other

18  parameters."

19      68.    Today, fifteen years since their listing, and twelve years since the institution of the

20  recovery plan, the Southern Resident Killer Whale population continues to decline, and remain in

21  a perilous state. This decline is so significant that in 2016 NMFS announced that the Southern

22  Resident Killer Whale is one of eight "Species in the Spotlight," a designation designed to call

23  special attention to marine species most likely to go extinct in the near future, unless immediate

24  action is taken. As this designation made clear, the threats that led to the whales' initial listing

25  persist, and indeed have worsened.

        69.    In this context, federal agencies' careful and thorough consideration of potential

impacts to the species is of paramount importance. Indeed, in biological opinions prepared for

COMPLAINT - 17
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

other activities, NMFS has repeatedly concluded that "the loss of a single individual, or the decrease in reproductive capacity of a single individual, is likely to reduce the likelihood of survival and recovery of the species." *See, e.g.*, "Biological Opinion and Conference Opinion on the Long-Term Operations of the Central Valley Project and State Water Project" at 573 (June 4, 2009).

70.     Southern Resident Killer Whales are distinct from other killer whales. They are residents of the Salish Sea and have a unique dialect and diet. Their diet consists entirely of fish, primarily mature Chinook salmon.

71.     The major threats that led to the Southern Resident Killer Whale's population decline and subsequent listing under the ESA are (1) the decline of salmon, their primary prey; (2) noise and vessel impacts; and (3) habitat destruction and pollution including the presence of toxins in the environment and in their food.

72.     Scientists have concluded that insufficient availability of prey is a critical factor causing poor body condition, nutritional stress, and the decline of the Southern Resident Killer Whale. Nutritional stress leads to fat metabolism and the subsequent release of stored toxins, which can contribute to further stress and reproductive failure.

73.     In 2017, scientists conducted a population viability assessment that considered the sub-lethal effects and cumulative impacts of contaminants, acoustic disturbance, and prey abundance and tested a range of scenarios. They concluded that the effects of prey abundance on fecundity and survival had the largest impact on the Southern Resident Killer Whale's population growth rate.

**2.     Chinook Salmon**

74.     Chinook salmon are the largest of the Pacific salmon, with some individuals growing to more than 100 pounds.

75.     Chinook salmon are found from the Arctic, northwest to northern Pacific: drainages from Point Hope, Alaska down to Ventura River, California. They are also found in Honshu Japan, the Sea of Japan, the Bering Sea and the Sea of Okhotsk.

COMPLAINT - 18
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

76.     The Puget Sound Chinook salmon evolutionary significant unit ("ESU") has been listed as a threatened species under the ESA since 1999. 64 Fed. Reg. 14,308 (March 24, 1999); *see also* 50 C.F.R. § 223.102(e).

77.     The Lower Columbia River Chinook salmon ESU was listed as a threatened species in 1999. 64 Fed. Reg. 14,308 (March 24, 1999); *see also* 50 C.F.R. § 223.102(e).

78.     The Upper Willamette River Chinook salmon ESU was also listed as threatened species in 1999. 64 Fed. Reg. 14,308 (March 24, 1999); *see also* 50 C.F.R. § 223.102(e).

79.     The Snake River fall-run Chinook salmon ESU was listed as a threatened species in 1992. 57 Fed. Reg. 14,653 (April 22, 1992); *see also* 50 C.F.R. § 223.102(e).

80.     All four of these ESUs are failing to meet recovery standards.

81.     All four of these ESUs spend at least part of their life cycle in the Southern Resident Killer Whale's primary hunting grounds.



C.     **The Southeast Alaska Salmon Fisheries**

82.     The North Pacific Fishery Management Council ("Council"), created under the Magnuson-Stevens Act, is assigned certain fishery responsibilities for the Arctic Ocean, Bering

COMPLAINT - 19
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1   Sea, and Pacific Ocean seaward of Alaska. 16 U.S.C. § 1852(a)(1)(G). The Council first developed

2   a salmon fishery management plan for Alaska in 1979 and has since issued numerous amended

3   plans, the most recent of which was completed in 2018. Fishery Management Plan for the Salmon

4   Fisheries in the Exclusive Economic Zone Off Alaska i–ii (Oct. 2018) ("2018 Fishery

5   Management Plan").

6       83.    The 2018 Fishery Management Plan provides for two salmon fisheries: a

7   commercial troll salmon fishery and a sport fishery. *Id.* at 8–9. Both fisheries are conducted in

8   Southeast Alaska; there are no longer commercial salmon fisheries in the Western Alaska area.

9   *Id.* at 9.

10      84.    The 2018 Fishery Management Plan delegates management authority over these

11  fisheries to the State of Alaska. *E.g.*, *id.* at 14. NMFS, however, retains ongoing oversight

12  authority of the State of Alaska's management of these federal fisheries. *Id.* at 54–58. For example,

13  the State of Alaska must provide NMFS with information on the State's fishery management

14  measures, NMFS must determine whether the measures are consistent with the Fishery

15  Management Plan, the Magnuson-Stevens Act, and other applicable laws, and NMFS is to take

16  appropriate corrective action, if necessary. *Id.* NMFS also provides funds to the State of Alaska

17  to manage and monitor the fisheries.

18      85.    The commercial troll fishery harvests primarily Chinook and coho salmon,

19  although chum, sockeye, and pink salmon are also harvested. 2018 Fishery Management Plan 33.

20  The commercial Chinook salmon fishery is divided into two seasons: a winter season and a general

21  summer season; the summer season is further divided into a spring fishery and a summer fishery.

22  *Id.* The winter troll season is defined as October 11 through April 30 and is managed not to exceed

23  a guideline harvest level of 45,000 Chinook salmon. *Id.* The spring troll fishery, which begins

24  after the winter season closes, does not occur within the Exclusive Economic Zone and is not

25  subject to the Fishery Management Plan. *Id.* The summer troll fishery opens on July 1 and targets

all remaining Chinook salmon available under the annual quota set pursuant to the Pacific Salmon

COMPLAINT - 20
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Treaty between the United States and Canada. *Id.* at 34. The regulatory period for coho salmon retention in the troll fishery is June 15 through September 20. *Id.*

86.     Salmon fisheries in Alaska are also subject to the Pacific Salmon Treaty, first entered in March of 1985 between the United States and Canada to cooperate in the management, research and enhancement of Pacific salmon stocks of mutual concern. The Treaty was intended to prevent overfishing, provide for optimum production, and ensure that countries receive benefits equal to the production of salmon originating in their waters.

87.     The Treaty expired in 1992, and was reauthorized in 1999, establishing 10-year fishery regimes.

88.     Following completion of the 1999 Pacific Salmon Treaty, NMFS prepared a programmatic EIS under NEPA to evaluate, inter alia, the effects of its ongoing delegation of authority to the State of Alaska to manage salmon fisheries, NMFS's ongoing review of the State of Alaska's fishery decisions, and the effects of NMFS's issuance of an incidental take statement for the 10-year fishery regimes set in the 1999 Pacific Salmon Treaty. Final Programmatic Environmental Impact Statement for Pacific Salmon Fisheries off the Coasts of Southeast Alaska, Washington, Oregon, and California, and in the Columbia River Basin (Nov. 2003) ("2003 Programmatic EIS"); *see id.* at 1-6 ("The primary federal action being considered under [the North Pacific Fishery Management Council's] jurisdiction in the Southeast Alaska fishery is the annual decision regarding continuing deferral of management to the State and the issuance of an [incidental take statement] through the Section 7 consultation process.").

89.     The current iteration of the Pacific Salmon Treaty became effective in 2019 and amended Chapters 1, 2, 3, 5, 6, and Attachment E to Chapter 7 of Annex IV. Treaties and Other International Acts Series 19-503. These amendments are effective from 2019 through 2028. Chapter 3 of Annex IV to the 2019 Pacific Salmon Treaty defines a management regime for the Chinook salmon fisheries.

COMPLAINT - 21
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

**D.     The 2019 SEAK BiOp**

90.     NMFS's 2019 SEAK BiOp consulted under section 7(a)(2) of the ESA on the effects of NMFS's ongoing management over, and delegation of authority to Alaska for, the salmon fisheries within the Exclusive Economic Zone of Southeast Alaska. This intra-agency consultation, where NMFS was both the action agency and the consulting agency, evaluated the impacts of the 10-year fishery regime established in the 2019 Pacific Salmon Treaty.

91.     These fisheries harvest wild- and hatchery-origin salmon originating in rivers from Oregon to Alaska, including threated Puget Sound Chinook salmon, threatened Lower Columbia River Chinook salmon, threatened Upper Willamette River Chinook salmon, and threatened Snake River fall-run Chinook salmon. The fisheries in the Exclusive Economic Zone of Southeast Alaska will continue to contribute to the failure of these threatened species to meet recovery goals.

92.     The 2019 SEAK BiOp explains that attempts were made during the recent negotiations that culminated in the current 2019 Pacific Salmon Treaty to reduce harvests to conserve Puget Sound Chinook salmon and the Southern Resident Killer Whales. Those efforts were unable to achieve the reductions needed to protect those species: "[T]here was a practical limit to what could be achieved through the bilateral negotiation process. As a consequence, and in addition to the southeast Alaska, Canada, and SUS fishery measures identified in the 2019 [Pacific Salmon Treaty], the U.S. Section generally recognized that more would be required to mitigate the effects of harvest and other limiting factors that contributed to the reduced status of Puget Sound Chinook salmon and [Southern Resident Killer Whale] . . . ." 2019 SEAK BiO at 10.

93.     NMFS repeatedly explains in the 2019 SEAK BiOp that the Pacific Salmon Treaty merely sets an upper limit on harvest limits and that NMFS can further restrict harvests in the Exclusive Economic Zone of Southeast Alaska to protect imperiled species under the ESA.

94.     NMFS's 2019 SEAK BiOp nonetheless includes an incidental take statement that authorizes incidental take of ESA-listed species from the fisheries in the Exclusive Economic Zone of Southeast Alaska in a manner that enables the full extent of Chinook salmon harvest allowed under the Pacific Salmon Treaty.

COMPLAINT - 22
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

95.     The 2019 SEAK BiOp does not adequately disclose or analyze the impact of the fisheries on the spawning escapement for the four threatened Chinook salmon ESUs, leaving unclear the extent to which these fisheries are harming the survival and recovery of Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon.

96.     The 2019 SEAK BiOp did find that the Southern Resident Killer Whale has a high risk of extinction due largely to low fecundity rates. This reduced fecundity is primarily attributed to reduced prey abundance; largely, Chinook salmon. "Under the existing management and recovery regimes over the last decade, salmon availability has not been sufficient to support Southern Resident population growth." A recent population viability assessment indicated that effects of prey abundance has the largest impact on the population growth rate and that Chinook abundance would need to increase by 15% to achieve the recovery target growth rate set for the Southern Resident Killer Whales.

97.     The 2019 SEAK BiOp indicates that the fisheries in the Exclusive Economic Zone of Southeast Alaska will continue to reduce Chinook salmon prey available to the Southern Resident Killer Whales in various seasons and locations. The 2019 SEAK BiOp estimates such reductions of prey available in coastal waters to range from 0.2% to 12.9%, with the greatest reductions occurring in July through September. Reductions in the inland waters are estimated to range from 0.1% to 2.5%, with the greatest reductions similarly occurring from July through September. Some of the Chinook salmon caught in the fishery are identified by NMFS as priority stocks for the Southern Resident Killer Whales. NMFS estimates that the fisheries in the Exclusive Economic Zone of Southeast Alaska reduce the larger Chinook salmon—those from 3 to 5 years old—from the Southern Resident's critical habitat by 0.1% to 2.5%. Available data indicate that Southern Residents consume mostly these larger and older Chinook salmon.

98.     The 2019 SEAK BiOp nonetheless concludes that the Southeast Alaska fisheries in federal waters are not likely to jeopardize the continued existence of the Southern Resident Killer Whale or result in the adverse modification or destruction of its critical habitat. The 2019

COMPLAINT - 23
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

SEAK BiOp similarly finds that the fisheries are not likely to jeopardize Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon.

99.    In reaching these conclusions, the 2019 SEAK BiOp relies on mitigation measures consisting of three funding initiatives.

100.    First, NMFS proposes to provide $3.06 million per year would for Puget Sound Chinook salmon "conservation" hatcheries; specifically, there would be increased funding for existing hatchery programs on the Nooksack, Dungeness, and Stillaguamish Rivers and funding for a new program in mid-Hood Canal.

101.    Second, NMFS proposes to provide approximately $31.2 million for habitat recovery projects intended to benefit Puget Sound Chinook salmon in the Nooksack, Dungeness, and Stillaguamish Rivers and Hood Canal.

102.    Third, NMFS proposes to fund dramatic increases in Chinook salmon hatchery production to provide a "meaningful increase"—4% to 5%—in prey availability for Southern Resident Killer Whales. NMFS estimates this will cost "no less than $5.6 million per year" and generate 20 million hatchery smolts each year, with five to six million released from Puget Sound hatcheries and the remainder from facilities on the Columbia River and the Washington Coast. *Id.* at 11.

103.    These mitigation proposals are unfunded, are to be implemented by entities over whom NMFS has no control, lack any specifics or deadlines, are generally undeveloped, and require reviews and authorizations that may result in the projects being denied or substantially altered. The hatchery programs proposed as mitigation will themselves have harmful impacts on wild salmon populations, including threatened Chinook salmon ESU's, which NMFS has yet to analyze under the ESA or NEPA; such "mitigation" may result in greater harm than benefit. The mitigation measures may never be implemented or may be significantly changed from that contemplated in the 2019 SEAK BiOp. NMFS's reliance on mitigation measures in the 2019 SEAK BiOp was arbitrary, capricious, an abuse of discretion, and inconsistent with the ESA.

COMPLAINT - 24
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

104.    The 2019 SEAK BiOp also fails to use the best available scientific and commercial data available and it does not fully and adequately evaluate the effects of the entire action, interrelated and interdependent actions, and the cumulative actions. For example, NMFS fails to appropriately address climate change impacts and impermissibly assumes the benefits from proposed increases to hatchery production without also addressing the harmful impacts to ESA-listed species from such increases. NMFS also fails to adequately evaluate whether the fisheries will harm the Southern Resident Killer Whales by threatening the survival and recovery of Chinook salmon populations that spawn in Canadian waters, such as those in the Fraser River.

105.    The 2019 SEAK BiOp does not adequately evaluate whether the Southeast Alaska salmon fisheries will, directly or indirectly, reduce appreciably the likelihood of both the survival and recovery of ESA-listed species in the wild by reducing the reproduction, numbers, or distribution of the species.

106.    The 2019 SEAK BiOp does not adequately summarize the information on which the opinion is based or adequately detail the effects the Southeast Alaska salmon fisheries have on listed species and their critical habitat.

107.    NMFS failed to draw a rational connection in the 2019 SEAK BiOp between the facts found and its determination that the salmon fisheries are not likely to jeopardize the continued existence of ESA-listed species or result in the destruction or adverse modification of their critical habitat.

108.    The incidental take statement included in the 2019 SEAK BiOp is legally deficient because, inter alia, it does not adequately specify the impact or extent of the incidental taking of species, relies on inappropriate surrogates in lieu of numeric take limits, does not include appropriate reasonable and prudent measures to minimize impacts, does not include adequate terms and conditions to implement reasonable and prudent measures, and does not include requirements sufficient to monitor the incidental take of ESA-listed species or to trigger the reinitiation of consultation if the anticipated impacts are exceeded. For example, NMFS impermissibly set the take limit for the Southern Resident Killer Whales to be coextensive with

COMPLAINT - 25
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1   the Southeast Alaska salmon fisheries themselves such that even if more take than anticipated

2   occurred, the safe harbor provisions of the incidental take statement would remain in effect and

3   there would not be an obligation to reinitiate consultation.

4          109.    Following issuance of the 2019 SEAK BiOp, NMFS adopted and is implementing

5   that BiOp and the incidental take statement included therewith with respect to its ongoing

6   management over salmon fisheries in the Exclusive Economic Zone of Southeast Alaska,

7   including NMFS's ongoing delegation of authority and funding to the State of Alaska for

8   management and monitoring of the fisheries. For example, the State of Alaska exercised its

9   delegated authority on or about February 11, 2020 in setting the 2020 salmon catch limits for

10  Southeast Alaska to the full extent permitted under the 2019 Pacific Salmon Treaty.[3] Consistent

11  with the 2019 SEAK BiOp, NMFS has not taken any action with respect to that announcement,

12  thereby allowing those limits to become effective under the 2018 Fishery Management Plan.

13         110.    NMFS's issuance of the incidental take statement included in the 2019 SEAK BiOp

14  is a major federal action significantly affecting the quality of the human environment for which

15  an EIS was required under NEPA before the incidental take statement was issued; at a minimum,

16  an EA was required to evaluate whether an EIS is needed.

17         111.    NMFS's adoption and implementation of the 2019 SEAK BiOp and the incidental

18  take statement is a major federal action significantly affecting the quality of the human

19  environment for which an EIS was required; at a minimum, an EA was required to evaluate

20  whether an EIS is needed. Notably, the incidental take statement in the 2019 SEAK BiOp requires

21  that NMFS fund initiatives for massive new hatchery programs that will significantly affect wild

22  salmonids, including ESA-listed Chinook salmon ESUs. Similarly, in adopting the 2019 SEAK

23  BiOp, NMFS has decided to exercise its authority to manage fisheries in the Exclusive Economic

24  Zone of Southeast Alaska to allow the full extent of harvest permitted under the 2019 Pacific

25  Salmon Treaty for the 10-year regime, as it has done with respect to the State of Alaska's February

---

[3] *See* https://www.adfg.alaska.gov/index.cfm?adfg=pressreleases.pr&release=2020_02_11; *and* https://www.adfg.alaska.gov/static/applications/dcfnewsrelease/1133944615.pdf.

COMPLAINT - 26
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

11, 2020 catch limit announcement, which will significantly affect Southern Resident Killer Whales.

112.   There have been significant new circumstances and information relevant to environmental concerns and bearing on the salmon fisheries in the Exclusive Economic Zone of Alaska and the fisheries' impacts since the 2013 Programmatic EIS. These include the 2019 SEAK BiOp and its incidental take statement, NMFS's adoption of the new 10-year fishery regimes in the 2019 Pacific Salmon treaty, the listing and precipitous decline of the Southern Resident Killer Whale, studies on the cause of that decline and on the impacts of climate change, and NMFS's massive mitigation proposals required under the 2019 SEAK BiOp.

113.   NMFS did not prepare a new or supplemental EIS, EA, FONSI, or any other NEPA document for its issuance or adoption of the 2019 SEAK BiOp and the incidental take statement.

## FIRST CAUSE OF ACTION

### Failure to Ensure No Jeopardy Under Section 7(a)(2) of the ESA

114.   Defendants Barry Thom, Chris Oliver, NMFS, Wilbur Ross, and the United States Department of Commerce (collectively, "Defendants") are violating of section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), by adopting and implementing the 2019 SEAK BiOp and its incidental take statement and by continuing to authorize and manage salmon fisheries in the Exclusive Economic Zone of Alaska without ensuring that such fisheries will not jeopardize the continued existence of the endangered Southern Resident Killer Whale, the threatened Puget Sound Chinook salmon ESU, the threatened Lower Columbia River Chinook salmon ESU, the threatened Upper Willamette River Chinook salmon ESU, and the threatened Snake River fall-run Chinook salmon ESU, or destroy or adversely modify the endangered Southern Resident Killer Whale's critical habitat.

115.   These violations of the ESA are reviewable under section 11(g) of the ESA, 16 U.S.C. § 1540(g).

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## SECOND CAUSE OF ACTION

**The 2019 SEAK BiOp is Arbitrary, Capricious, and Not in Accordance with Law**

116.     NMFS's 2019 SEAK BiOp, including the incidental take statement provided therewith, does not comply with ESA standards and is arbitrary, capricious, an abuse of discretion and not in accordance with law.

117.     These violations are reviewable under the APA, 5 U.S.C. §§ 701–706.

## THIRD CAUSE OF ACTION

**NMFS's Failure to Conduct NEPA Analyses for Issuance/Adoption of 2019 SEAK BiOp**

118.     NMFS violated NEPA by issuing and/or adopting and implementing the 2019 SEAK BiOp and the incidental take statement included therein without preparing a new or supplemental EIS. Alternatively, NMFS violated NEPA by issuing and/or adopting and implementing the 2019 SEAK BiOp and the incidental take statement included therein without preparing a new or supplemental EA to evaluate whether an EIS is required.

119.     This violation is reviewable under the APA, 5 U.S.C. §§ 701–706.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Wild Fish Conservancy prays for the following relief:

A.     Issue a declaratory judgment declaring that Defendants are in violation of section 7(a)(2) of the ESA by adopting and implementing the 2019 SEAK BiOp and its incidental take statement and by continuing to authorize and manage salmon fisheries in the Exclusive Economic Zone of Alaska without ensuring that such fisheries will not jeopardize the continued existence of the endangered Southern Resident Killer Whale, the threatened Puget Sound Chinook salmon ESU, the threatened Lower Columbia River Chinook salmon ESU, the threatened Upper Willamette River Chinook salmon ESU, and the threatened Snake River fall-run Chinook salmon ESU, or destroy or adversely modify the endangered Southern Resident Killer Whale's critical habitat;

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

B.      Issue a declaratory judgment declaring that NMFS's 2019 SEAK BiOp, including the incidental take statement provided therewith, does not comply with ESA standards and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law;

C.      Issue a declaratory judgment declaring that NMFS violated NEPA by issuing and/or adopting and implementing the 2019 SEAK BiOp and the incidental take statement included therein without preparing a new or supplemental EIS, or, alternatively, without preparing a new or supplemental EA to evaluate whether an EIS is required;

D.      Issue a mandatory injunction requiring Defendants to comply with the ESA and NEPA;

E.      Set aside NMFS's 2019 SEAK BiOp, including the incidental take statement issued therewith;

F.      Enjoin NMFS from authorizing take associated with salmon fisheries in the Exclusive Economic Zone of Alaska until NMFS complies with the ESA and NEPA;

G.      Enjoin Defendants from continuing to delegate authority to the State of Alaska to manage salmon fisheries in the Exclusive Economic Zone of Alaska, from continuing to allow the State of Alaska to implement salmon fisheries in the Exclusive Economic Zone of Alaska, from providing funding to the State of Alaska to manage and monitor salmon fisheries in the Exclusive Economic Zone of Alaska, and from otherwise continuing to allow salmon fisheries in the Exclusive Economic Zone of Alaska until Defendants comply with the ESA and NEPA;

H.      Grant such preliminary and/or permanent injunctive relief as Wild Fish Conservancy may from time to time request during the pendency and resolution of this case;

I.      Award Wild Fish Conservancy its reasonable litigation expenses, including attorney fees, expert witness fees, Court costs, and other expenses as necessary for the preparation and litigation of this case under section 11(g)(4) of the ESA, 16 U.S.C. § 1540(g)(4), the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and/or as otherwise authorized by law; and

J.      Grant such additional relief as the Court deems just and proper.

COMPLAINT - 29
Case No. 2:20-cv-00417

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1      RESPECTFULLY SUBMITTED this 18th day of March, 2020.

2

3    KAMPMEIER & KNUTSEN, PLLC              CORR CRONIN, LLP

4    By: s/ Brian A. Knutsen                By: s/ Eric A. Lindberg
     Brian Knutsen, WSBA No. 38806          Eric A. Lindberg, WSBA No. 43596
5    221 S.E. 11th Avenue, Suite 217        Benjamin C. Byers, WSBA No. 52299
     Portland, Oregon 97214                 1001 Fourth Avenue, Suite 3900
6    Tel: (503) 841-6515                    Seattle, Washington 98154
     Email: brian@kampmeierknutsen.com      Tel: (206) 625-8600
7                                           Email: elindberg@corrcronin.com
                                                   bbyers@corrcronin.com
8    Paul A. Kampmeier, WSBA No. 31560
     811 First Avenue, Suite 468
9    Seattle Washington 98104
     Tel: (206) 858-6983
10   Email: paul@kampmeierknutsen.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 1

# KAMPMEIER & KNUTSEN PLLC

## ATTORNEYS AT LAW

BRIAN A. KNUTSEN
Licensed in Oregon & Washington
503.841.6515
brian@kampmeierknutsen.com

January 9, 2020

**Via Certified Mail – Return Receipt Requested**

Regional Administrator Barry Thom          Assistant Administrator for Fisheries Chris Oliver
National Marine Fisheries Service           National Marine Fisheries Service
1201 Northeast Lloyd                         1315 East-West Highway
Portland, OR 97232                           Silver Spring, MD 20910
Email: barry.thom@noaa.gov                   Email: chris.w.oliver@noaa.gov

National Marine Fisheries Service            U.S. Department of Commerce
1315 East-West Highway                       1401 Constitution Ave. N.W.
Silver Spring, MD 20910                       Washington, D.C. 20230

Secretary Wilbur L. Ross, Jr.
U.S. Department of Commerce
1401 Constitution Ave. N.W.
Washington, D.C. 20230

**RE:    Notice of Intent to Sue U.S. Department of Commerce and National Marine
        Fisheries Service for Failing to Ensure that their Authorization of the Southeast
        Alaska Salmon Fisheries does not Jeopardize the Continued Existence of the
        Southern Resident Killer Whale and Four Chinook Salmon Species**

Dear Honorable Civil Servants:

This letter provides notice of Wild Fish Conservancy's ("Conservancy") intent to sue
the United States Department of Commerce and its Secretary (collectively, "Commerce") and
the National Marine Fisheries Service, its Assistant Administer for Fisheries, and its West
Coast Regional Administrator (collectively, "NMFS") for violations of section 7 of the
Endangered Species Act ("ESA").[1] Commerce and NMFS are violating section 7 of the ESA
by failing to ensure that the salmon fisheries in the Exclusive Economic Zone of Southeast
Alaska are not likely to jeopardize the continued existence of the Southern Resident Killer
Whale, Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper
Willamette River Chinook salmon, and Snake River fall-run Chinook salmon or destroy or
adversely modify the Southern Resident Killer Whale's critical habitat. This letter is provided
under section 11(g) of the ESA.[2] If the ESA violations described herein are not remedied
before the expiration of the sixty day notice period, the Conservancy intends thereafter to file
suit to protect these species.

---

[1] 16 U.S.C. § 1536.
[2] *Id.* § 1540(g).

## I.     <u>Legal Framework.</u>

When the ESA was passed in 1973 it "represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation."[3] The purpose of the statute is to conserve threatened and endangered species and to protect the ecosystems upon which those species depend.[4]

The ESA assigns implementation responsibilities to the Secretaries for Commerce and the U.S. Department of Interior, who have delegated duties to NMFS and the United States Fish and Wildlife Service ("FWS"), respectively.[5] NMFS generally has ESA authority for marine and anadromous species, while FWS has jurisdiction over terrestrial and freshwater species.[6]

Section 4 of the ESA prescribes mechanisms by which NMFS and FWS list species as endangered or threatened and designate "critical habitat" for such species.[7] Species is defined to include "any distinct population segment of any vertebrate species that interbreeds when mature."[8] Section 9 of the ESA makes it unlawful to "take" ESA-listed species.[9] "Take" is defined broadly to include harass, harm, wound, kill, trap, or capture a protected species.[10]

Section 7 of the ESA imposes a substantive obligation on each federal agency to "*insure* that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of" habitat that has been designated as critical for such species.[11] Jeopardy results where an action reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species.[12] Destruction or adverse modification of critical habitat occurs where there is a direct or indirect alteration that appreciably diminishes the value of critical habitat for both the survival and recovery of a listed species.[13]

In fulfilling the substantive mandates of section 7 of the ESA, federal agencies planning to fund, authorize, or undertake an action (the "action agency") that "may affect" ESA-listed species or their critical habitat are required to consult with NMFS (the "consulting agency") regarding the effects of the proposed action.[14] Formal consultation concludes with

---

[3] *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978).
[4] 16 U.S.C. § 1531(b).
[5] *See* 50 C.F.R. § 402.01(b).
[6] *See id.* §§ 17.11, 223.102, 224.101.
[7] 16 U.S.C. §§ 1532(16), 1533(a).
[8] 50 C.F.R. § 424.02.
[9] *See* 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 223.203(a).
[10] 16 U.S.C. § 1532(19).
[11] *See id.* § 1536(a)(2) (emphasis added); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).
[12] 50 C.F.R. § 402.02.
[13] *Id.*
[14] *Id.* § 402.14(a).

NMFS's issuance of a biological opinion determining whether the action is likely to jeopardize ESA-protected species or result in the destruction or adverse modification of critical habitat.[15] If NMFS determines that jeopardy is not likely, or that reasonable and prudent alternatives to the proposed action will avoid jeopardy and that any taking of listed species incidental to the proposed action will not violate section 7(a)(2) of the ESA, NMFS must issue an incidental take statement with its biological opinion.[16] The incidental take statement includes reasonable and prudent measures considered by NMFS as necessary or appropriate to minimize impacts on ESA listed species.[17]

Federal agencies have a continuing duty under section 7 of the ESA after consultation is concluded to insure that their actions will not jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat. The agencies must reinitiate consultation whenever "the amount or extent of taking specified in the incidental take statement is exceeded," "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered," where the action in question is "subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion," or where "a new species is listed or critical habitat designated that may be affected by the identified action."[18] "The duty to reinitiate consultation lies with both the action agency and the consulting agency."[19]

## II.   Factual Background.

### A.   Affected Species and its Critical Habitat.

NMFS listed the Southern Resident Killer Whale distinct population segment as an endangered species under the ESA in 2005.[20] Critical habitat was designated for this species the following year.[21] NMFS is currently proposing a rule that would expand critical habitat for the endangered Southern Resident Killer Whale.[22]

"[T]he Southern Resident [Killer Whale] population has declined to historically low levels."[23] The three pods that make up this species—the J, K, and L pods—consist of only 74 whales as of December 2018.[24] "There are currently 26 reproductive age females (aged 11–42

---

[15] *Id.* § 402.14(h)(3).
[16] 16 U.S.C. § 1536(b)(4).
[17] *Id.* § 1536(b)(4)(C)(ii); 50 C.F.R § 402.14(i)(1)(ii).
[18] 50 C.F.R. § 402.16(a)–(d).
[19] *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008).
[20] 70 Fed. Reg. 69,903 (Nov. 18, 2005).
[21] 71 Fed. Reg. 69,054 (Nov. 29, 2006).
[22] 84 Fed. Reg. 49,214 (Sept. 19, 2019).
[23] Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response, Consultation on the Delegation of Management Authority for Specified Salmon Fisheries to the State of Alaska, NMFS Consultation Number: WCR-2018-10660, p. 84 (April 5, 2019) ("2019 SEAK BiOp").
[24] *Id.*

years), of which only 14 have successfully reproduced in the last 10 years, and there have been no viable calves since the beginning of 2016."[25]

A primary limiting factor for this species is prey availability.[26] In addition to contributing to premature mortality, limited prey availability reduces fecundity of Southern Resident Killer Whales.[27] Southern Resident females are producing a low number of surviving calves over the course of their reproductive life span, with late onset of sexual maturity and a long average reproductive interval of 6.1 years.[28] "[T]his reduced fecundity is largely due to nutritional limitation."[29] Indeed, a recent population viability assessment found that "the effects of prey abundance on fecundity and survival had the largest impact on the population growth rate" for this species.[30]

While Southern Resident Killer Whales consume a variety of fish species and one species of squid, Chinook salmon are their primary prey.[31] Available data indicate that salmon and steelhead make up to 98 percent of the whales' diet.[32] Moreover, the whales consume mostly larger (i.e., older) Chinook salmon; with upwards of around 80 to 90 percent of the species' diet consisting of Chinook salmon.[33] This preference for Chinook salmon persists despite much lower abundance than other salmonids in some areas and during certain periods.[34]

The Puget Sound Chinook salmon evolutionary significant unit ("ESU"), the Lower Columbia River Chinook salmon ESU, and the Upper Willamette River Chinook salmon ESU were each listed as threatened species in 1999.[35] NMFS listed the Snake River fall-run Chinook salmon ESU as a threatened species in 1992.[36] NMFS has applied the ESA's take prohibition to each of these four Chinook salmon ESUs.[37]

B.   **Commerce's and NMFS's Management of Salmon Fisheries in the Exclusive Economic Zone of Southeast Alaska.**

The Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act") was enacted to "conserve and manage the fishery resources found off the coasts of the United States.[38] The statute establishes exclusive federal management over fisheries

---

[25] *Id.* at 242.
[26] *Id.* at 90.
[27] *Id.* at 84, 94–95, 242.
[28] *Id.* at 84.
[29] *Id.*
[30] *Id.* at 86.
[31] *Id.* at 90–91.
[32] *Id.* at 91.
[33] *Id.*
[34] *Id.*
[35] 64 Fed. Reg. 14,308 (March 24, 1999); *see also* 70 Fed. Reg. 37,160 (June 28, 2005); 79 Fed. Reg. 20,802 (April 14, 2014); 50 C.F.R. § 223.102(e).
[36] 57 Fed. Reg. 14,653 (April 22, 1992); *see also* 70 Fed. Reg. 37,160 (June 28, 2005); 79 Fed. Reg. 20,802 (April 14, 2014); 50 C.F.R. § 223.102(e).
[37] *See* 50 C.F.R. § 223.203(a).
[38] 16 U.S.C. § 1801(b)(1).

Notice of Intent to Sue for ESA Violations - 4

within the Exclusive Economic Zones of the United States.[39] The Exclusive Economic Zone, sometimes referred to as "federal waters," generally consists of those waters from 3 nautical miles from the coastline to 200 nautical miles from the coastline.[40]

The statute assigns various implementation responsibilities to the Secretary of Commerce.[41] The Secretary has generally delegated such responsibilities to NMFS, a division of the National Oceanic and Atmospheric Administration, which is itself an agency within the U.S. Department of Commerce.[42] The Magnuson-Stevens Act also provides for the creation of Regional Fishery Management Councils, including the North Pacific Fishery Management Council.[43]

The Councils are to prepare fishery management plans and amendments to such plans for each fishery under their respective jurisdiction and submit the plans to NMFS.[44] The fishery management plans must contain, *inter alia*, management measures necessary to prevent overfishing and that are consistent with other applicable laws.[45] NMFS must review all fishery management plans, including amendments thereto, to determine whether they are consistent with the Magnuson-Stevens Act "and any other applicable law."[46] The fishery management plans are to be approved, disapproved, or partially approved by NMFS.[47] The statute also directs the Councils to submit proposed regulations to NMFS to implement the fishery management plans, which NMFS will promulgate if it deems them to be consistent with the plans and other applicable laws.[48] The statute assigns primary responsibility in carrying out and implementing fishery management plans to NMFS.[49]

The Fishery Management Plan for the Salmon Fisheries in the Exclusive Economic Zone Off Alaska, developed by the North Pacific Fishery Management Council, provides for two salmon fisheries: a commercial troll salmon fishery and a sport fishery.[50] Both fisheries are conducted in Southeast Alaska; there are no longer commercial salmon fisheries in the Western Alaska area.[51] The Fishery Management Plan has been amended numerous times, most recently in October 2018, and approved by NMFS.[52] The Fishery Management Plan delegates management authority over these fisheries in the Exclusive Economic Zone of

---

[39] *Id.* at § 1811(a).

[40] *See id.* at § 1802(11); Presidential Proclamation 5030 (March 10, 1983); 48 Fed. Reg. 10,605 (March 14, 1983).

[41] *See, e.g., id.* at §§ 1854, 1855(d).

[42] *See* U.S. Dep't of Commerce, *Department Organization Order* 10-15, § 3.01(aa) (Dec. 12, 2011), *available at* http://www.osec.doc.gov/opog/dmp/doos/doo10_15.html; U.S. Dep't of Commerce, *NOAA Organizational Handbook Transmittal No. 61*, Part II(C)(26), *available at* http://www.corporateservices.noaa.gov/ames/delegations_of_authority/.

[43] *Id.* at § 1852(a)(1)(F).

[44] *Id.* at § 1852(h)(1).

[45] *Id.* at § 1853(a)(1).

[46] *Id.* at § 1854(a)(1)(A).

[47] *Id.* at § 1854(a)(3).

[48] *Id.* at §§ 1853(c), 1854(b).

[49] *See id.* at § 1855(d).

[50] Fishery Management Plan for the Salmon Fisheries in the Exclusive Economic Zone Off Alaska 8–9 (Oct. 2018) ("2018 Fishery Management Plan").

[51] *Id.* at 9.

[52] *E.g., id.* at 1–5; 2019 SEAK BiOp 6.

Southeast Alaska to the State of Alaska.[53] NMFS, however, retains ongoing oversight authority of the State of Alaska's management of these federal fisheries.[54] The State of Alaska must provide NMFS with information on the State's fishery management measures, NMFS must determine whether the measures are consistent with the Fishery Management Plan, the Magnuson-Stevens Act, and other applicable laws, and NMFS is to take appropriate corrective action, if necessary.[55] NMFS also provides funds to the State of Alaska to manage and monitor the fisheries.[56]

The commercial troll fishery harvests primarily Chinook and coho salmon, although chum, sockeye, and pink salmon are also harvested.[57] The commercial Chinook salmon fishery is divided into two seasons: a winter season and a general summer season; the summer season is further divided into a spring fishery and a summer fishery.[58] The winter troll season is defined as October 11 through April 30 and is managed not to exceed a guideline harvest level of 45,000 Chinook salmon.[59] The spring troll fishery, which begins after the winter season closes, does not occur within the Exclusive Economic Zone and is not subject to the Fishery Management Plan.[60] The summer troll fishery opens on July 1 and targets all remaining Chinook salmon available under the annual quota set pursuant to the Pacific Salmon Treaty between the United States and Canada.[61] The regulatory period for coho salmon retention in the troll fishery is June 15 through September 20.[62]

## C.    NMFS's 2019 Biological Opinion on Southeast Alaska Salmon Fisheries.

NMFS recently prepared a biological opinion to consider the effects of its ongoing management over, and delegation of authority to Alaska for, the salmon fisheries within the Exclusive Economic Zone of Southeast Alaska: the Endangered Species Act (ESA) Section 7(a)(2) Biological Opinion and Magnuson-Stevens Fishery Conservation and Management Act Essential Fish Habitat Response, Consultation on the Delegation of Management Authority for Specified Salmon Fisheries to the State of Alaska, NMFS Consultation Number: WCR-2018-10660 (April 5, 2019) ("2019 SEAK BiOp"). Those fisheries harvest wild- and hatchery-origin salmon originating in rivers from Oregon to Alaska, including Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon.[63] These four Chinook salmon ESU's are failing to meet recovery standards, including those set for spawning escapement, and the fisheries in the Exclusive Economic Zone of Southeast Alaska will continue to contribute to that failure.

---

[53] *E.g.*, 2018 Fishery Management Plan 14.
[54] *E.g., id.* at 54–58.
[55] *Id.* at 54–58.
[56] 2019 SEAK BiOp 6.
[57] 2018 Fishery Management Plan 33.
[58] *Id.*
[59] *Id.*
[60] *Id.*
[61] *Id.* at 34.
[62] *Id.*
[63] *See, e.g.*, 2019 SEAK BiOp 12.

The 2019 SEAK BiOp explains that attempts were made during the recent negotiations that culminated in the current iteration of the Pacific Salmon Treaty, entered into in 2019 between the United States and Canada, to reduce harvests to conserve Puget Sound Chinook salmon and the Southern Resident Killer Whale.[64] Those efforts were unable to achieve the reductions needed to protect those species:

> [T]here was a practical limit to what could be achieved through the bilateral negotiation process. As a consequence, and in addition to the southeast Alaska, Canada, and SUS fishery measures identified in the 2019 [Pacific Salmon Treaty], the U.S. Section generally recognized that more would be required to mitigate the effects of harvest and other limiting factors that contributed to the reduced status of Puget Sound Chinook salmon and [Southern Resident Killer Whales] . . . .[65]

NMFS repeatedly explains in the 2019 SEAK BiOp that the Pacific Salmon Treaty merely sets an upper limit on harvest limits and that NMFS can further restrict harvests in the Exclusive Economic Zone of Southeast Alaska to protect imperiled species under the ESA.[66] NMFS nonetheless continues to authorize and manage the fisheries in the Exclusive Economic Zone of Southeast Alaska in a manner that enables the full extent of Chinook salmon harvest allowed under the Pacific Salmon Treaty.

Unfortunately, the 2019 SEAK BiOp does not adequately disclose or analyze the impact of the fisheries on the spawning escapement for the four threatened Chinook salmon ESU's. It is therefore unclear in the 2019 SEAK BiOp the extent to which these fisheries are harming the survival and recovery of Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon.

NMFS's 2019 SEAK BiOp found that the Southern Resident Killer Whale has a high risk of extinction due largely to low fecundity rates.[67] This reduced fecundity is primarily attributed to reduced prey abundance; primarily, Chinook salmon.[68] "Under the existing management and recovery regimes over the last decade, salmon availability has not been sufficient to support Southern Resident population growth."[69] A recent population viability assessment indicated that effects of prey abundance has the largest impact on the population growth rate and that **Chinook abundance would need to increase by 15%** to achieve the recovery target growth rate set for the Southern Resident Killer Whale.[70]

The 2019 SEAK BiOp indicates that the fisheries in the Exclusive Economic Zone of Southeast Alaska will continue to **reduce Chinook salmon prey available** to the Southern

---

[64] *Id.* at 9–10.
[65] *Id.* at 10.
[66] *E.g., id.* at 2, 20
[67] *E.g., id.* at 84–86, 242.
[68] *Id.* at 84, 242.
[69] *Id.* at 311.
[70] *Id.* at 86, 311.

Resident Killer Whale in various seasons and locations.[71] NMFS estimates such reductions of prey available in coastal waters to range from 0.2% to 12.9%, with the greatest reductions occurring in July through September.[72] Reductions in the inland waters are estimated to range from 0.1% to 2.5%, with the greatest reductions similarly occurring from July through September.[73] Some of the Chinook salmon caught in the fishery are identified by NMFS as priority stocks for the Southern Resident Killer Whale.[74] NMFS estimates that the fisheries in the Exclusive Economic Zone of Southeast Alaska reduce the larger Chinook salmon—those from 3 to 5 years old—from the Southern Resident's critical habitat by 0.1% to 2.5%.[75] Available data indicate that Southern Resident Killer Whales consume mostly these larger and older Chinook salmon.[76]

NMFS's 2019 SEAK BiOp nonetheless concludes that the Southeast Alaska fisheries are not likely to jeopardize the continued existence of the Southern Resident Killer Whale or result in the adverse modification or destruction of its critical habitat.[77] NMFS similarly found that the fisheries are not likely to jeopardize Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon.[78] In reaching these conclusions, NMFS relies on mitigation in the form of funding proposed for increased hatchery production and habitat restoration, both of which are supposed to eventually increase salmon, including Puget Sound Chinook salmon, available to the Southern Resident Killer Whale.[79] However, no decisions have been made as to location, timing, or scope of these supposed mitigation efforts, required authorizations have not been issued, and there is uncertainty as to whether Congress will fund them.[80] Moreover, the hatchery programs proposed as mitigation will themselves have harmful impacts on wild salmon populations, including the four threatened Chinook salmon ESU's, which NMFS has yet to analyze; such "mitigation" may result in greater harm than benefit.

Additionally, even though the 2019 SEAK BiOp acknowledges that "salmon availability has not been sufficient to support Southern Resident population growth,"[81] the mitigation effects "will not take place for at least four to five years."[82] Instead of accounting for this delay in mitigation, and the un-mitigated reduction in prey availability during the first few years of the proposed action, the 2019 SEAK BiOp does not anticipate heightened negative impacts during the first few years of the proposed action.[83] As the Southern Resident Killer Whales continue to be adversely affected by prey availability, Commerce and NMFS have failed to announce the location, timing, or scope of the supposed mitigation and delayed effects.

---

[71] *E.g., id.* at 244.
[72] *Id.* at 247–48.
[73] *Id.* at 248.
[74] *Id.* at 251–53.
[75] *Id.* at 315.
[76] *Id.* at 91.
[77] *Id.* at 310–16, 325.
[78] *Id.* at 298, 302, 305, 309.
[79] *Id.* at 305–16.
[80] *See, e.g., id.* at 11, 255.
[81] *Id.* at 311.
[82] *Id.* at 11.
[83] *Id.* at 314–16.

NMFS provided an incidental take statement with the 2019 SEAK BiOp allowing take of Southern Resident Killer Whales, Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, Snake River fall-run Chinook salmon, and two other species resulting from the Southeast Alaska fisheries.[84]

## III.   **Commerce's and NMFS's Violations of the ESA**.

Commerce and NMFS are in violation of section 7(a)(2) of the ESA for failing to insure that their ongoing actions on the Southeast Alaska salmon fisheries are not likely to jeopardize the endangered Southern Resident Killer Whale, Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon or destroy or adversely modify the Southern Resident Killer Whale's critical habitat. Such actions include all those by Commerce and NMFS authorizing, managing, funding, and enabling the salmon fisheries in the Exclusive Economic Zone of Southeast Alaska, including: (1) implementation, funding, and oversight of the Fishery Management Plan for the Salmon Fisheries in the Exclusive Economic Zone Off Alaska; (2) delegation of management over the fisheries to the State of Alaska; and (3) issuance of an incidental take statement with the 2019 SEAK BiOp authorizing take from the fisheries.

Commerce and NMFS are in violation of their substantive obligation under Section 7 of the ESA to *insure* that their actions on the Southeast Alaska salmon fisheries do not jeopardize ESA-listed species or adversely modify their critical habitat.[85] The agencies cannot abrogate this obligation merely by relying on a biological opinion; rather, their decision to rely on NMFS's 2019 SEAK BiOp must not itself be arbitrary or capricious.[86] The 2019 SEAK BiOp is legally deficient in manners that are readily discernable and Commerce and NMFS's reliance on that biological opinion is therefore itself arbitrary and capricious.[87] Some of those legal deficiencies are summarized below; however, this description in not meant to be exhaustive.

Perhaps the most egregious deficiency with the 2019 SEAK BiOp is NMFS's reliance on supposed future mitigation—funding for increases in hatchery production and habitat restoration—that is entirely speculative, undefined, and that does not adequately address the immediate threats to protected species from the Southeast Alaska fisheries.[88] The 2019 SEAK BiOp also fails to use the best available scientific and commercial data available and it does not fully and adequately evaluate the effects of the entire action, interrelated and interdependent actions, and the cumulative actions. For example, NMFS fails to appropriately address climate change impacts and impermissibly assumes the benefits from proposed increases to hatchery production without also addressing the harmful impacts to ESA-listed species from such increases. NMFS also fails to adequately evaluate whether the fisheries will

---

[84] *Id.* at 325–32.
[85] *See* 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02; *Pyramid Lake Paiute Tribe of Indians*, 898 F.2d at 1415.
[86] *See Pyramid Lake Paiute Tribe of Indians*, 898 F.2d at 1415.
[87] *See Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010).
[88] *See, e.g., Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935–36 (9th Cir. 2008) ("absent specific and binding plans," proposed mitigation may not be considered to offset "certain immediate negative effects").

harm the Southern Resident Killer Whale by threatening the survival and recovery of Chinook salmon populations that spawn in Canadian waters, such as those in the Fraser River. The 2019 SEAK BiOp does not adequately evaluate whether the Southeast Alaska salmon fisheries will, directly or indirectly, reduce appreciably the likelihood of both the survival and recovery of ESA-listed species in the wild by reducing the reproduction, numbers, or distribution of the species. The 2019 SEAK BiOp does not adequately summarize the information on which the opinion is based or adequately detail the effects the Southeast Alaska salmon fisheries have on listed species and their critical habitat. NMFS failed to draw a rational connection between the facts found and its determination that the salmon fisheries are not likely to jeopardize the continued existence of ESA-listed species or result in the destruction or adverse modification of their critical habitat.

The incidental take statement included in the 2019 SEAK BiOp is legally deficient because, *inter alia*, it does not adequately specify the impact or extent of the incidental taking of species, relies on inappropriate surrogates in lieu of numeric take limits, does not include appropriate reasonable and prudent measures to minimize impacts, does not include adequate terms and conditions to implement reasonable and prudent measures, and does not include requirements sufficient to monitor the incidental take of ESA-listed species or to trigger the reinitiation of consultation if the anticipated impacts are exceeded. For example, NMFS impermissibly set the take limit for the Southern Resident Killer Whale to be coextensive with the Southeast Alaska salmon fisheries themselves such that even if more take than anticipated occurred, the safe harbor provisions of the incidental take statement would remain in effect and there would not be an obligation to reinitiate consultation.[89] The incidental take statement was also issued without compliance with the National Environmental Policy Act; i.e., without preparing or supplementing an environmental assessment, a finding of no significant impact, an environmental impact statement, or an alternative analysis.

In sum, Commerce and NMFS have failed to insure that their actions on the Southeast Alaska salmon fisheries are not likely to jeopardize the continued existence of the Southern Resident Killer Whale, Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon, or adversely modify or destroy the Southern Resident Killer Whale's critical habitat.

## IV.   Party Giving Notice of Intent to Sue.

The full name, address, and telephone number of the party giving notice is:

Wild Fish Conservancy
15629 Main Street N.E.
P.O. Box 402
Duvall, WA 98019
Tel: (425) 788-1167

---

[89] *See* 2019 SEAK BiOp 327; *Or. Natural Res. Council v. Allen*, 476 F.3d 1031, 1039–40 (9th Cir. 2007).

V.    **Attorneys Representing Wild Fish Conservancy.**

The attorneys representing Wild Fish Conservancy in this matter are:

Brian A. Knutsen
Emma Bruden
Kampmeier & Knutsen, PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
Tel: (503) 841-6515 (Knutsen)
       (503) 719-5641 (Bruden)
Email: brian@kampmeierknutsen.com
          emma@kampmeierknutsen.com

Eric Lindberg
Benjamin Byers
Corr Cronin, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
Tel: (206) 652-8655 (Lindberg)
       (206) 501-3512
Email: elindberg@corrcronin.com
          bbyers@corrcronin.com

Paul A. Kampmeier
Kampmeier & Knutsen, PLLC
811 First Avenue, Suite 468
Seattle, Washington 98104
Tel: (206) 858-6983
Email: paul@kampmeierknutsen.com

VI.    **Conclusion.**

This letter provides notice under section 11(g) of the ESA[90] of the Conservancy's intent to sue Commerce and NMFS for the violations of the ESA discussed herein. Unless these ongoing and imminent violations described herein are corrected within sixty days, the Conservancy intends to file suit to protect the Southern Resident Killer Whale, Puget Sound Chinook salmon, Lower Columbia River Chinook salmon, Upper Willamette River Chinook salmon, and Snake River fall-run Chinook salmon and to enforce the ESA.

Very truly yours,

KAMPMEIER & KNUTSEN, PLLC

By: _____
      Brian A. Knutsen

CORR CRONIN, LLP

By: _____
      Eric Lindberg

---

[90] 16 U.S.C. § 1540(g).

## CERTIFICATE OF SERVICE

I, Brian A. Knutsen, declare under penalty of perjury of the laws of the United States that I am counsel for Wild Fish Conservancy and that on January 9, 2020, I caused copies of the foregoing to be served on the following by depositing them with the U.S. Postal Service, postage prepaid, via certified mail, return receipt requested:

Regional Administrator Barry Thom
National Marine Fisheries Service
1201 Northeast Lloyd
Portland, OR 97232
Email: barry.thom@noaa.gov

National Marine Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910

Secretary Wilbur L. Ross, Jr.
U.S. Department of Commerce
1401 Constitution Ave. N.W.
Washington, D.C. 20230

Assistant Administrator for Fisheries Chris Oliver
 National Marine Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910
Email: chris.w.oliver@noaa.gov

 U.S. Department of Commerce
1401 Constitution Ave. N.W.
Washington, D.C. 20230

Brian A. Knutsen