HONORABLE MICHELLE L. PETERSON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY, )
 )
    Plaintiff, )
 )
v. )
 )
BARRY THOM, in his official capacity as )
Regional Administrator for the National )
Marine Fisheries Service, *et al.*, )
 )
    Defendants. )
 )
_____ )

Case No. 2:20-cv-00417-MLP

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION

NOTE ON MOTION CALENDAR:
May 8, 2020[1]

---

[1] Plaintiff is not requesting oral argument in an effort to avoid any delay in the Court's consideration of this motion associated with the Coronavirus outbreak. Plaintiff welcomes the opportunity to provide oral argument remotely consistent with General Order 02-20 if the Court is inclined to hold such a hearing.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 1
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

## <u>TABLE OF CONTENTS</u>

I.      MOTION ............................................................................................................. 9

II.     INTRODUCTION ............................................................................................... 9

III.    LEGAL FRAMEWORK ..................................................................................... 10

  A.   The Endangered Species Act .............................................................................. 10

  B.   The National Environmental Policy Act ............................................................ 11

  C.   The Magnuson-Stevens Act ............................................................................... 12

IV.     STATEMENT OF FACTS ................................................................................... 13

  A.   Endangered Southern Resident Killer Whale and Threatened Salmonids. ................... 13

  B.   The Pacific Salmon Treaty. ................................................................................ 14

  C.   The Fishery Management Plan for Salmon Fisheries in Alaska ......................... 14

  D.   NMFS's 2019 BiOp on Management of Southeast Alaska Salmon Fisheries .............. 15

V.      STANDARD OF REVIEW ................................................................................. 18

VI.     ARGUMENT ...................................................................................................... 19

  A.   The Conservancy Will Succeed on its Challenge to the 2019 SEAK BiOp ................. 19

    1.   NMFS's no jeopardy opinion relies on uncertain mitigation .......................... 19

      a.   The mitigation is unfunded and not subject to NMFS's control ................... 20

      b.   The mitigation that lacks specific and binding plans ................................. 21

      c.   The mitigation requires ESA and NEPA review and approval ..................... 23

      d.   Conclusion on NMFS's unlawful reliance on mitigation ............................ 26

    2.   The ITS fails to adequately limit take of Southern Residents ......................... 26

  B.   The Conservancy will Succeed on its Substantive ESA section 7 Claim ..................... 28

  C.   The Conservancy will Succeed on its NEPA Claim ..................................... 28

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

D.      The Requested Injunction Is Needed to Prevent Likely Irreparable Injury ................... 29

E.      The Equities Favor an Injunction .................................................................... 31

F.      No Bond (or a Nominal Bond) Is Appropriate ............................................... 32

VII.    CONCLUSION .................................................................................................. 32

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 3
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

## **TABLE OF AUTHORITIES**

**Cases**

*Alaska v. Andrus*, 591 F.2d 537 (9th Cir. 1979) ................................................................ 25

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) ............................... 19

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) .............................................. 32

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229 (9th Cir. 2001) .................. 27

*Bennett v. Spear*, 520 U.S. 154 (1997) .............................................................................. 25

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319 (9th Cir. 1985) ...... 33

*California v. Block*, 690 F.2d 753 (9th Cir. 1982) ............................................................ 26

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 417 F. Supp. 3d 1354 (W.D. Wash. 2019) ....................................................................................................................... 20

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015) ................ 12, 31

*Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139 (D. Ariz. 2002) ........... 21, 22, 24

*Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000 (9th Cir. 2011) ..... 26

*Defs. of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 1999) ............................................... 32

*Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174 (N.D. Cal. 2004) .......................... 30

*Fed. Election Comm'n v. Akins*, 524 U.S. 11 (1998) ........................................................ 20

*Found. on Econ. Trends v. Heckler*, 756 F.2d 143 (D.C. Cir. 1985) ................................. 32

*Friends of the Earth v. Brinegar*, 518 F.2d 322 (9th Cir. 1975) ...................................... 33

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ........... 20, 33

*Hale v. Norton*, 476 F.3d 694 (9th Cir. 2007) ................................................................. 13

*High Sierra Hikers' Ass'n v. Blackwell*, 390 F.3d 630 (9th Cir. 2004) ............................ 32, 33

*Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549 (9th Cir. 2006) ...................... 30

*Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008) ................................................. 32, 33

*League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014) ................................................................................................................. 32, 33

*Metcalf v. Daley*, 214 F.3d 1135, 1138 (9th Cir. 2000) ................................................... 26

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917 (9th Cir. 2008) ........... passim

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 4
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803 (9th Cir. 2018) ............ passim

*Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 992 F. Supp. 2d 1095 (D. Or. 2014) ...... 26, 30

*Northcoast Envtl. Ctr. v. Glickman*, 136 F.3d 660 (9th Cir. 1998) ............................................... 13

*Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005) ................... 20, 30

*Or. Nat. Res. Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007).......................................... 27, 28, 29

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150 (9th Cir. 2011) 30

*Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520 (9th Cir. 2015)........ 20

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410 (9th Cir. 1990)12

*Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996)................................................................. 25, 29, 30

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)........................................... 13

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014)....................... 30

*Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007) ............................................................ 33

*Tenn. Valley Auth. v. Hill*, 437 U.S. 153 (1978) ........................................................................ 10

*Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985)...................................................................... 12

*Wash. Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1035 (9th Cir. 2005) ....................... 19

*Wild Fish Conservancy v. Nat'l Park Serv.*, 8 F. Supp. 3d 1289 (W.D. Wash. 2014) ........... 26, 27

*Wild Fish Conservancy v. Salazar*, 628 F.3d 513 (9th Cir. 2010).................................... 12, 23, 24

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................................................... 19

**Statutes**

16 U.S.C. § 1531(b) ..................................................................................................................... 11

16 U.S.C. § 1532(16) ................................................................................................................... 11

16 U.S.C. § 1532(19) ................................................................................................................... 12

16 U.S.C. § 1533(a) ..................................................................................................................... 11

16 U.S.C. § 1536(a)(2)............................................................................................................. passim

16 U.S.C. § 1536(b)(4)(C) ........................................................................................................... 12

16 U.S.C. § 1536(o)(2) ................................................................................................................. 12

16 U.S.C. § 1538(a)(1).................................................................................................................. 12

16 U.S.C. § 1802(11) ................................................................................................................... 13

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 5
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

16 U.S.C. § 1852(a)(1)............................................................................................ 13, 16

16 U.S.C. § 1852(h)(1) ............................................................................................... 13

16 U.S.C. § 1853(a)(1)................................................................................................ 14

16 U.S.C. § 1853(c) .................................................................................................... 14

16 U.S.C. § 1854 ........................................................................................................ 13

16 U.S.C. § 1854(a)(1)(A) .......................................................................................... 14

16 U.S.C. § 1854(a)(3)................................................................................................ 14

16 U.S.C. § 1854(b) ................................................................................................... 14

16 U.S.C. § 1855(d) .............................................................................................. 13, 14

16 U.S.C. § 1856(a)(3).......................................................................................... 14, 16

16 U.S.C. § 1856(a)(3)(B) .......................................................................................... 14

16 U.S.C. § 226.206 .................................................................................................... 14

16 U.S.C. §1811(a) ..................................................................................................... 13

42 U.S.C. § 4332(2)(C)(i) ........................................................................................... 13

5 U.S.C. § 706(2)(A).................................................................................................... 20

50 C.F.R. § 402.03 ...................................................................................................... 12

50 C.F.R. § 402.14(a).................................................................................................. 12

50 C.F.R. 222.102 ....................................................................................................... 12

**Other Authorities**

U.S. Dep't of Commerce, *Department Organization Order* 10-15, § 3.01(aa) (Dec. 12, 2011),
   https://www.osec.doc.gov/opog/dmp/doos/doo10_15.html........................................ 13

U.S. Dep't of Commerce, *NOAA Organizational Handbook Transmittal No. 61* (Jan. 26, 2015)),
   http://www.corporateservices.noaa.gov/ames/delegations_of_authority/ (Part II(C)(26)) ........ 13

**Regulations**

40 C.F.R. § 1501.2 ...................................................................................................... 26

40 C.F.R. § 1501.4 ...................................................................................................... 13

40 C.F.R. § 1501.4(e)................................................................................................... 13

40 C.F.R. § 1502.9(c)(1) ............................................................................................. 30

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 6
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

40 C.F.R. § 1506.1(a)........................................................................................................ 26, 30

40 C.F.R. § 1508.13 ................................................................................................................ 13

40 C.F.R. § 1508.27(b) .......................................................................................................... 30

40 C.F.R. § 1508.27(b)(1)...................................................................................................... 30

48 Fed. Reg. 10,605 (March 14, 1983) .................................................................................. 13

50 C.F.R § 402.14(*i*)(1)(ii)..................................................................................................... 12

50 C.F.R § 402.14(*i*)(1)(iv)..................................................................................................... 12

50 C.F.R § 402.14(*i*)(3).......................................................................................................... 12

50 C.F.R. § 223.203(a)...................................................................................................... 12, 26

50 C.F.R. § 402.01(b) ............................................................................................................. 11

50 C.F.R. § 402.02........................................................................................................... 12, 19

50 C.F.R. § 402.14(h)(3) ........................................................................................................ 12

50 C.F.R. § 402.14(*i*)(1)(i)...................................................................................................... 12

50 C.F.R. § 402.14(*i*)(5).......................................................................................................... 12

50 C.F.R. § 402.16(a)(1) ........................................................................................................ 27

50 CFR § 17.11 ....................................................................................................................... 11

50 CFR § 223.102 ............................................................................................................. 11, 15

50 CFR § 224.101 ............................................................................................................. 11, 14

57 Fed. Reg. 14,653 (Apr. 22, 1992) ..................................................................................... 15

64 Fed. Reg. 14,308 (Mar. 24, 1999)..................................................................................... 15

70 Fed. Reg. 69,903 (Nov. 18, 2005)..................................................................................... 14

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 7
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

### **GLOSSARY OF ACRONYMS**

| | |
|---|---|
| BiOp | Biological Opinion |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| ESU | Evolutionary Significant Unit |
| FONSI | Finding of No Significant Impact |
| FWS | U.S. Fish and Wildlife Service |
| ITS | Incidental Take Statement |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 8
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

## I.   MOTION.

Plaintiff Wild Fish Conservancy ("Conservancy") hereby moves under Rule 65(a) for a preliminary injunction and respectfully requests the Court enter an order staying the National Marine Fisheries Service's ("NMFS") authorizations of commercial Chinook salmon fisheries in federal waters off the coast of Southeast Alaska, set to commence on July 1, to protect imperiled Southern Resident Killer Whales while this matter is pending and while NMFS complies with the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA").

## II.   INTRODUCTION.

In 2018, the nation watched spellbound as a grieving Southern Resident Killer Whale, Tahlequah, carried the body of her dead calf, who had died less than an hour after birth, for seventeen days across hundreds of miles before letting him sink. That episode was emblematic of the plight faced today by the killer whale population whose home is the Salish Sea. The Southern Residents are unable to produce enough live offspring to sustain the population due primarily to a lack of Chinook salmon, their principal prey. Thus, despite being listed under the ESA as an endangered species since 2005, the Southern Resident population has declined to a near-historic low of 72 whales with, only 26 reproductive aged females.

The Supreme Court has explained that, in enacting the ESA, Congress sought to "halt and reverse the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978). Central to achieving that objective is the requirement of section 7 of the ESA for each federal agency to ensure that any action authorized by such agency is not likely to jeopardize a protected species or adversely modify its critical habitat. 16 U.S.C. § 1536(a)(2).

Despite that mandate, NMFS has authorized commercial salmon harvests in federal waters off the coast of Southeast Alaska at levels that will lead to the continued starvation of Southern Residents, causing the species to hasten its decline towards extinction. NMFS does not dispute that the authorized harvest levels are inconsistent with section 7 of the ESA; indeed, NMFS candidly admits that the fishery "is likely to adversely affect designated critical habitat"

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

for Southern Residents. *See* Decl. of Brian A. Knutsen ("Knutsen Decl.") 339. Instead, NMFS assumes that, despite being unable to do so for the last fifteen years, it will be able to develop, fund, and implement mitigation measures to offset impacts from the salmon harvests before the Southern Residents go extinct. Ninth Circuit precedent prohibits NMFS from gambling on such non-existent future mitigation to offset concrete and immediate harm to imperiled species.

NMFS approved the commercial salmon harvests in violation of the ESA and without completing procedures required by NEPA, such as evaluating alternative harvest levels. Because the Conservancy is likely to prevail, the requested relief should be issued to prevent irreparable injury to Southern Residents and to the Conservancy's and its members' interests in protecting that species. Absent such relief, the unlawfully-approved harvests will ensure that the Southern Residents continuing declining toward extinction, edging closer to the point of no return. In these circumstances, the ESA compels an injunction because Congress has made clear that "endangered species to be afforded the highest of priorities" and it is "for the courts to enforce [such Congressional priorities] when enforcement is sought." *See Hill*, 437 U.S. at 168, 174, 194.

## III.   LEGAL FRAMEWORK.

### A.   The Endangered Species Act.

Congress enacted the ESA to conserve imperiled species and protect the ecosystems upon which they depend. 16 U.S.C. § 1531(b). The statute assigns implementation responsibilities to the Secretaries for the Departments of Commerce and the Interior, who have delegated duties to NMFS and the United States Fish and Wildlife Service ("FWS"), respectively. *See* 50 C.F.R. § 402.01(b). NMFS generally has ESA authority for marine and anadromous species, while FWS has jurisdiction over terrestrial and freshwater species. *See id.* §§ 17.11, 223.102, 224.101.

Section 4 of the ESA prescribes mechanisms by which NMFS and FWS list "species," defined to include a "distinct population segment of any species of vertebrate . . . . [that] interbreeds when mature," as endangered or threatened and designate "critical habitat" for such species. 16 U.S.C. §§ 1532(16), 1533(a). Section 9 of the ESA makes it unlawful to "take" listed

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 10
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

species. *See* 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 223.203(a). "Take" includes to harm, kill, or capture a protected species. 16 U.S.C. § 1532(19). Harm includes "significant habitat modification" that "kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning . . . , [or] feeding . . . ." 50 C.F.R. 222.102.

Section 7 of the ESA imposes substantive and procedural requirements on federal actions. *See* 50 C.F.R. § 402.03. Substantively, it mandates that federal agencies "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered . . . or threatened species or result in the destruction or adverse modification" of such species' critical habitat. 16 U.S.C. § 1536(a)(2); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). Procedurally, it requires an agency planning an action that "may affect" listed species (the "action agency") to consult with NMFS and/or FWS (the "consulting agency"). 50 C.F.R. § 402.14(a). Such consultation is intended to facilitate compliance with the substantive mandate. *See Thomas v. Peterson*, 753 F.2d 754, 763–65 (9th Cir. 1985), *abrogated on other grounds*, *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091–92 (9th Cir. 2015).

Consultation results in the consulting agency's issuance of a biological opinion ("BiOp") determining whether the action is likely to jeopardize listed species or adversely modify critical habitat. 50 C.F.R. § 402.14(h)(3); *see id.* § 402.02. If jeopardy and adverse modification are not likely, the BiOp includes an incidental take statement ("ITS") defining the "take" anticipated from the action. 16 U.S.C. § 1536(b)(4)(C)(i); 50 C.F.R. § 402.14(*i*)(1)(i). The ITS also includes requirements to minimize impacts to species and to monitor the take that occurs. 16 U.S.C. § 1536(b)(4)(C)(iii), (iv); 50 C.F.R § 402.14(*i*)(1)(ii), (*i*)(1)(iv), (*i*)(3); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531–32 (9th Cir. 2010). Take in compliance with an ITS is exempt from liability under section 9 of the ESA. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(*i*)(5).

**B.** **The National Environmental Policy Act.**

NEPA directs federal agencies to "include in every recommendation or report on . . .

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 11
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

major Federal actions significantly affecting the quality of the human environment, a detailed

statement . . . on the environmental impact of the proposed action . . . ." 42 U.S.C. §

4332(2)(C)(i). This environmental impact statement ("EIS") ensures that the agency considers

detailed information on environmental impacts when reaching decisions and that the information

will be made available to the larger audience that may also play a role in the decision making

process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

NEPA requires the environmental information be available *before* decisions are made and

*before* actions are taken. 40 C.F.R. § 1500.1(b), (c). An EIS is required for any major federal

action having a significant impact on the environment. *See Northcoast Envtl. Ctr. v. Glickman*,

136 F.3d 660, 666 (9th Cir. 1998). An environmental assessment ("EA") must be prepared to

determine whether an action meets this threshold if it is neither one that normally does or does

not require an EIS. *Hale v. Norton*, 476 F.3d 694, 700 (9th Cir. 2007); 40 C.F.R. § 1501.4. If it is

determined that no significant impact will occur, the agency must issue a "finding of no

significant impact" ("FONSI"). 40 C.F.R. §§ 1501.4(e), 1508.13.

## C.   The Magnuson-Stevens Act.

The Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens

Act") establishes exclusive federal management over fisheries within the Exclusive Economic

Zones of the United States; i.e., the "federal waters" generally located from three nautical miles

from the coastline to 200 nautical miles from the coastline. 16 U.S.C. §§ 1802(11), 1811(a); 48

Fed. Reg. 10,605 (March 14, 1983). The Secretary of Commerce is charged with implementing

the statute and has delegated responsibilities to NMFS. *See* 16 U.S.C. §§ 1854, 1855(d).[2] The

statute also provides for Regional Fishery Management Councils. 16 U.S.C. § 1852(a)(1).

The Regional Councils are to prepare fishery management plans and amendments thereto

for each fishery under their jurisdiction and submit the plans to NMFS. *Id.* § 1852(h)(1). The

---

[2] *See also* U.S. Dep't of Commerce, *Department Organization Order* 10-15, § 3.01(aa) (Dec. 12, 2011),
https://www.osec.doc.gov/opog/dmp/doos/doo10_15.html; U.S. Dep't of Commerce, *NOAA Organizational
Handbook Transmittal No. 61* (Jan. 26, 2015),
http://www.corporateservices.noaa.gov/ames/delegations_of_authority/ (Part II(C)(26)).

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 12
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

plans must contain, *inter alia*, management measures to prevent overfishing and be consistent with other applicable laws. *Id.* § 1853(a)(1). NMFS must review the plans, including amendments, to determine whether they are consistent with the Magnuson-Stevens Act "and any other applicable law." *Id.* § 1854(a)(1)(A). NMFS then approves, disapproves, or partially approves the plans. *Id.* § 1854(a)(3). The Regional Councils are also to submit proposed regulations to NMFS to implement the plans, which NMFS will then promulgate if the proposed regulations are consistent with the plans and other applicable laws. *Id.* §§ 1853(c), 1854(b).

The Magnuson-Stevens Act provides that a State may regulate fishing outside its boundaries if authorized by a fishery management plan and the State's fishing regulations are consistent with the applicable fishery management plan. *Id.* § 1856(a)(3)(B). However, NMFS remains primarily responsible for implementing all fishery management plans. *See id.* § 1855(d).

## IV.   STATEMENT OF FACTS.

### A.   <u>Endangered Southern Resident Killer Whale and Threatened Salmonids.</u>

NMFS listed the Southern Resident Killer Whale distinct population segment as endangered under the ESA in 2005 and designated its critical habitat in 2006. 70 Fed. Reg. 69,903 (Nov. 18, 2005); 71 Fed. Reg. 69,054 (Nov. 29, 2006); 50 C.F.R. §§ 224.101(h), 226.206.

"[T]he Southern Resident population has declined to historically low levels." Knutsen Decl. 108. As of December 2018, there were only 74 whales. *Id.*[3] In early 2019, there were 26 reproductive age females (aged 11–42 years), of which only 14 had successfully reproduced in the prior 10 years, and there had been no viable calves since the beginning of 2016. *Id.* at 266.

A primary limiting factor for Southern Residents is prey availability, with limited prey contributing to premature mortality and reduced fecundity. *Id.* at 108, 114, 118–19, 266. Females are producing a low number of surviving calves during their reproductive life span and experiencing late onset of sexual maturity and a long average reproductive interval (6.1 years). *Id.* at 108. "[T]his reduced fecundity is largely due to nutritional limitation." *Id.* at 108, 266.

---

[3] As of the date of this motion, that population has declined to 72 whales.

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Indeed, a recent assessment found that "the effects of prey abundance on fecundity and survival had the largest impact on the population growth rate." *Id.* at 110.

Southern Residents consume a variety of fish species and one squid species. *Id.* at 114–15. However, salmon and steelhead make up 98 percent of their diet. *Id.* at 115. Specifically, the whales consume mostly larger (i.e., older) Chinook salmon, with 80 to 90 percent of the species' diet consisting of Chinook salmon. *Id.* This preference for Chinook salmon persists despite much lower abundance than other salmonids in some areas and during certain periods. *Id.*

NMFS listed the Snake River fall-run Chinook salmon evolutionary significant unit ("ESU") as a threatened species in 1992 and the Puget Sound, the Lower Columbia River, and the Upper Willamette River Chinook salmon ESUs as threatened species in 1999. 57 Fed. Reg. 14,653 (Apr. 22, 1992); 64 Fed. Reg. 14,308 (Mar. 24, 1999); 50 C.F.R. § 223.102(e).

**B.**     **The Pacific Salmon Treaty.**

The United States and Canada first ratified the Pacific Salmon Treaty in 1985. Knutsen Decl. 472. A primary objective of the treaty was to ensure that each county receive equitable benefits from the Pacific salmon stocks originating in its waters. *Id.*

The Pacific Salmon Treaty establishes upper limits on "intercepting fisheries," defined as fisheries in one country that harvest salmon originating in another country. *Id.* at 26. These fishing regimes are contained in Annex IV to the Pacific Salmon Treaty. *Id.* The original agreed-upon regimes expired in 1992. *Id.* A new comprehensive agreement was reached in 1999 that established 10-year fishery regimes, with the next set of regimes agreed upon in 2009. *Id.* at 26–27. The current set of agreements became effective in 2019. *See id.* at 27; *id.* at 490. Chapter 3 of Annex IV to the 2019 Pacific Salmon Treaty defines the management regime for the Chinook salmon fisheries and is effective from 2019 through 2028. *See id.* at 27; *id.* at 513.

**C.**     **The Fishery Management Plan for Salmon Fisheries in Alaska.**

The North Pacific Fishery Management Council ("Council"), created under the Magnuson-Stevens Act, is assigned fishery responsibilities for Alaska. 16 U.S.C. §

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 14
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1852(a)(1)(G). The Council first developed a salmon fishery management plan for Alaska in 1979 and has since issued numerous amendments, the most recent of which NMFS approved in 2018. Knutsen Decl. 451–52; 83 Fed. Reg. 31,340 (July 5, 2018).

The Council's Fishery Management Plan provides for two salmon fisheries, both of which occur in Southeast Alaska: a commercial troll salmon fishery and a sport fishery. Knutsen Decl. 463–64. The Fishery Management Plan delegates management authority over these fisheries to the State of Alaska under the Magnuson-Stevens Act. *E.g.*, *id.* at 469–70 (citing 16 U.S.C. § 1856(a)(3)). NMFS, however, retains ongoing oversight authority of Alaska's management of these federal fisheries. *Id.* at 484–88. For example, Alaska must provide NMFS with information on the State's fishery management measures, NMFS must determine whether the measures are consistent with the Fishery Management Plan, the Magnuson-Stevens Act, and other applicable laws, and NMFS is to take appropriate corrective action, if necessary. *Id.* NMFS also provides funding to Alaska to manage and monitor the fisheries. *Id.* at 30.

The commercial fishery harvests primarily Chinook and coho salmon. *Id.* at 477. The fishery is divided into two seasons: a winter season and a general summer season; the summer season is further divided into spring and summer fisheries. *Id.* The winter troll season is from October 11 through April 30 and is managed not to exceed a harvest level of 45,000 Chinook salmon. *Id.* The spring troll fishery does not occur within the Exclusive Economic Zone and is not subject to the Fishery Management Plan. *Id.* The summer troll fishery opens on July 1 and targets all remaining Chinook salmon available under the annual quota set pursuant to the Pacific Salmon Treaty. *Id.* at 478. NMFS and Alaska thereby manage the fishery to harvest all fish allowed under the Pacific Salmon Treaty. On February 11, 2020, Alaska announced this year's Chinook salmon harvest limits consistent with the 2019 Pacific Salmon Treaty. *Id.* at 530–31.

### D.  NMFS's 2019 BiOp on Management of Southeast Alaska Salmon Fisheries.

NMFS first consulted under the ESA on the Alaska salmon fisheries in 1993, followed by annual consultations through 1998. *Id.* at 27. NMFS then consulted in 1999 and again in 2009 on

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 15
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

the 10-year fishery regimes set under the Pacific Salmon Treaty. *Id.* at 27–28. NMFS reinitiated

consultation following completion of the 2019 Pacific Salmon Treaty and issued a new BiOp on

April 5, 2019 ("2019 SEAK BiOp"). *Id.* at 5–447. The federal actions addressed in the 2019

SEAK BiOp included NMFS's ongoing delegation of authority to Alaska over the salmon

fisheries in the Exclusive Economic Zone of Southeast Alaska and NMFS's funding to the State

for its management and monitoring of the fisheries. *Id.* at 29–33.

      The 2019 SEAK BiOp acknowledges that the Southern Resident Killer Whale is at a high

risk of extinction due largely to low fecundity rates, which are primarily attributable to reduced

prey abundance; namely, Chinook salmon. *Id.* at 108–10, 266. NMFS explains that, "[u]nder the

existing management and recovery regimes over the last decade, salmon availability has not been

sufficient to support Southern Resident population growth." *Id.* at 335. NMFS cites the finding in

Dr. Robert Lacy's 2017 population viability assessment that prey abundance has the largest

impact on population growth and that **Chinook abundance would need to increase by 15%** to

achieve the recovery target growth rate set for the Southern Residents. *Id.* at 110, 335.

      Attempts were made during negotiations on the 2019 Pacific Salmon Treaty to reduce

harvests to conserve Southern Residents and Puget Sound salmon, but they were unsuccessful:

> [T]here was a practical limit to what could be achieved through the bilateral
> negotiation process. As a consequence . . . , the U.S. Section generally recognized
> that **more would be required to mitigate the effects of harvest** and other limiting
> factors that contributed to the reduced status of Puget Sound Chinook salmon and
> [Southern Resident Killer Whales] . . . .

*Id.* at 33–34 (emphasis added). The fisheries in the federal waters of Southeast Alaska under the

2019 Pacific Salmon Treaty will therefore continue to reduce prey available to the Southern

Residents. *E.g.*, *id.* at 268. NMFS estimates that prey availability reductions in coastal waters

will range from 0.2% to an astonishing **12.9%** and in inland waters from 0.1% to 2.5%. *Id.* at

271–72. NMFS estimates that the fisheries reduce the larger Chinook salmon—those from 3 to 5

years old—from the Southern Resident's critical habitat by 0.1% to 2.5%. *Id.* at 339. Southern

Resident Killer Whales consume mostly these larger and older Chinook salmon. *Id.* at 115.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 16
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

NMSF repeatedly explains in the 2019 SEAK BiOp that the Pacific Salmon Treaty merely sets an upper limit on harvests and that NMFS can further restrict the fisheries to protect imperiled species under the ESA. *Id.* at 26, 44, 200, 268. However, instead of limiting harvest to ensure the fisheries do not jeopardize ESA-listed species, NMFS relies upon a hypothetical federal "funding initiative" in a supposed effort to mitigate harm to Puget Sound Chinook salmon and Southern Residents. *Id.* at 33–35. This initiative includes three elements. *Id.* at 34. First, $3.06 million per year for Puget Sound Chinook salmon conservation[4] hatcheries; specifically, for increased funding for existing programs on the Nooksack, Dungeness, and Stillaguamish Rivers and for funding a new program in Hood Canal. *Id.* at 34, 252. Second, around $31.2 million for habitat projects intended to benefit Chinook salmon populations in those same four Puget Sound watersheds. *Id.* at 34, 251–52. The third component is for dramatic increases in Chinook salmon hatchery production to provide a "meaningful increase"—4% to 5%—in prey availability for the Southern Resident Killer Whale. *Id.* at 34–35. NMFS proposes spending "no less than $5.6 million per year" on this third component to generate 20 million hatchery smolts each year, with five to six million released at Puget Sound hatcheries and the remainder from facilities on the Columbia River and the Washington Coast. *Id.* at 35.

The 2019 SEAK BiOp found that the Southeast Alaska salmon fishery "**is likely to adversely affect designated critical habitat**" for Southern Residents "[d]uring the time it takes for… hatchery fish [produced under the mitigation package] to return as adults to critical habitat areas…." *Id.* at 339 (emphasis added). It is unclear how long NMFS believes that will be, as the funding initiative "is not anticipated to be implemented immediately." *Id.* at 267. Further, any hatchery fish produced would not be available to Southern Residents until "several years" after release because the whales "prefer to consume larger (i.e., older) Chinook salmon." *Id.* at 339.

NMFS nonetheless assumed that this aspirational "mitigation package" will eventually

---

[4] A conservation hatchery is designed to preserve the genetic resources of a salmon population, as opposed to a program designed to provide other benefits, such as harvests. *See* Knutsen Decl. 252.

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

produce beneficial effects via returning adult hatchery fish when evaluating whether the Southeast Alaska salmon fisheries are likely to jeopardize ESA-listed species or adversely modify critical habitat under section 7(a)(2) of the ESA. *See, e.g.*, *id.* at 332–33, 338–39. NMFS ultimately concluded that the fisheries are not likely to jeopardize the Southern Resident or adversely modify its critical habitat. *See id.* at 340; 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of"). NMFS similarly concluded that the actions will not jeopardize the four affected Chinook salmon ESUs (including Puget Sound Chinook salmon), the Mexico Humpback Whale, or the Western Steller Sea Lions. Knutsen Decl. 317–33, 340–49.

The 2019 SEAK BiOp thus includes an ITS allowing for salmon fisheries in federal waters of Southeast Alaska to harvest up to the limits allowed under the 2019 Pacific Salmon Treaty. *Id.* at 350. The ITS authorizes take of Southern Residents, four threatened Chinook salmon ESUs, Mexico Humpback Whales, and Western Steller Sea Lions. *Id.* at 350–51.

## V.    STANDARD OF REVIEW.

Generally, a party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) ("serious questions" test).

However, "Congress intended endangered species to be afforded the highest of priorities" and once Congress has so "decided the order of priorities in a given area, it is . . . for the courts to enforce them . . . ." *Hill*, 437 U.S. at 174, 194. Thus, "[w]hen considering an injunction under the ESA, we presume . . . that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018) ("*Nat'l Wildlife Fed'n III*"); *see also Wash. Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1035 (9th Cir. 2005) ("the balance of hardships always tips sharply in favor of the endangered or threatened species").

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 18
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

## VI.   ARGUMENT.[5]

### A.   The Conservancy Will Succeed on its Challenge to the 2019 SEAK BiOp.

The Conservancy is likely to succeed on its challenge to the 2019 SEAK BiOp. The 2019 SEAK BiOp is inconsistent with the ESA in several significant respects, only two of which are addressed herein. First, NMFS unlawfully relied on uncertain future mitigation to offset certain and immediate harm from the fisheries. Second, NMFS failed to adequately define the amount of take of Southern Residents that can lawfully result before it must reinitiate ESA consultation on the fisheries. Given the seriousness of these deficiencies, NMFS will not be able to overcome the Administrative Procedure Act's presumptive remedy requiring that the 2019 SEAK BiOp be set aside. *See* 5 U.S.C. § 706(2)(A); *Pollinator Stewardship Council v. U.S. Envtl. Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (vacatur standard); *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 417 F. Supp. 3d 1354, 1368–69 (W.D. Wash. 2019).

### 1.   NMFS's no jeopardy opinion relies on uncertain mitigation.

Perhaps the most disconcerting deficiency in the 2019 SEAK BiOp is NMFS's reliance on uncertain, unfunded, and unapproved future mitigation. The Southern Resident population is at an increasingly high risk of extinction primarily due to insufficient prey. Knutsen Decl. 108–10, 266. NMFS nonetheless approved salmon harvests that will continue to reduce prey to far below what is necessary to recover or sustain the species. *See id.* at 110, 272–73, 335. To provide ESA authorization for these fisheries, NMFS had to manufacture new and vaguely-defined mitigation proposals and presume the hypothetical projects will produce additional Chinook salmon available to the Southern Residents before the whales go extinct. That violates the ESA.

Section 7 of the ESA requires that each federal agency "insure" that any action it funds or authorizes "is not likely to jeopardize" a protected species or result in the "adverse modification"

---

[5] The Conservancy has constitutional and prudential standing. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (constitutional requirements); *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (injury to organization); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859–61 (9th Cir. 2005) (procedural injury and prudential requirements); Decl. of Kurt Beardslee ¶¶ 2–4, 10–11; Decl. of William John McMillan ¶¶ 2–25; Decl. of Peter W. Soverel ¶¶ 2–17.

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

of critical habitat. 16 U.S.C. § 1536(a)(2). To satisfy the duty to **insure** no jeopardy, future mitigation measures cannot be relied upon to offset certain negative impacts absent "**solid guarantees that they will actually occur**." *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d 917, 935 (9th Cir. 2008) ("*Nat'l Wildlife Fed'n II*") (emphasis added).

In *National Wildlife Federation II*, a "2004 BiOp explicitly found that the proposed [dam] operations would have significant negative impacts on each affected species' critical habitat through 2010…." *Id.* at 934–35. NMFS nonetheless found that critical habitat would not be adversely modified because "habitat conditions would improve during the 2010–2014 period of operations" through "future installation of Removable Spillway Weirs… and other structural improvements…." *See id.* at 935. The Ninth Circuit rejected reliance on these proposals: "we are not persuaded that even a sincere general commitment to future improvements may be included in the proposed action in order to offset its certain immediate negative effects, **absent specific and binding plans**;" rather, there must be a "**clear, definite commitment of resources for future improvements**." *Id.* at 935–36 (emphasis added); *see also Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1152 (D. Ariz. 2002). The proposed federal funding initiative relied upon by NMFS in formulating the 2019 SEAK BiOp falls far short of these standards.

a.   <u>The mitigation is unfunded and not subject to NMFS's control</u>.

NMFS cannot rely on the mitigation because it is uncertain when, or if, it will receive the necessary funding. Further, even if NMFS obtains the funding, it has no control over those who would actually implement the projects and NMFS therefore cannot rely on implementation.

NMFS concedes that "there is a degree of uncertainty regarding whether Congress will [timely] provide the [mitigation] funding, in whole or in part…." Knutsen Decl. 35. The 2019 SEAK BiOp explains that the mitigation "effects assumed in the analysis… will not take place for at least four to five years into the future as funding is attained, fish from the conservation hatchery programs reach maturity in the oceans and productivity improvements are realized from the habitat mitigation." *Id.* However, there is no deadline for funding or implementation. Instead,

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 20
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

the 2019 SEAK BiOp vaguely suggests that if "funding is not provided in time for actions to take effect during the [10-year] agreement" set in the 2019 Pacific Salmon Treaty, that "**may** constitute a modification" requiring new ESA consultation. *Id.* (emphasis added). Far from the required "clear, definite commitment of resources," it is unclear when, if ever, these projects will funded. *See Nat'l Wildlife Fed'n II*, 524 F.3d at 936; *see also Rumsfeld*, 198 F. Supp. 2d at 1152 (there "must be . . . deadlines or otherwise-enforceable obligations").

Even if funding was available, there is no guarantee that mitigation will be designed or implemented as contemplated by NMFS. NMFS does not intend to implement the projects itself, but instead hopes to disburse grants to parties over whom it has no control—namely, States and Tribes—to implement the hatchery and habitat programs. *See, e.g.*, Knutsen Decl. 35, 265, 279 ("Because the funding . . . would be received by NMFS and administrated through a grant program in the future, we are limited in our ability to fully understand the efficacy or predict the performance of the program . . . ."). Such aspirations do not constitute the required "solid guarantees." *See Nat'l Wildlife Fed'n II*, 524 F.3d at 935; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 254 F. Supp. 1196, 1213–14 (D. Or. 2003) ("*Nat'l Wildlife Fed'n I*") (NMFS's reliance on mitigation to be implemented by third-parties, States and Tribes, where there was no authority or binding agreements to compel implementation, was impermissible).

### b.    The mitigation that lacks specific and binding plans.

NMFS's reliance on mitigation is also impermissible because of the lack of specific and binding plans. In addition to generating uncertainty as to whether the mitigation will be implemented, the lack of specific plans prevents NMFS from actually analyzing whether the mitigation will be sufficient to satisfy the "no jeopardy" standard of section 7 of the ESA. *See Rumsfeld*, 198 F. Supp. 2d at 1152 ("Mitigation measures must . . . address the threats to the species in a way that satisfies the jeopardy and adverse modification standards.").

NMFS concedes that "[t]he **specific details** of how the three activities for which funding would be used **have not been developed**…." Knutsen Decl. 35 (emphasis added). Far from

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

"specific and binding plans," the 2019 SEAK BiOp directs NMFS to come up with a plan: "NMFS shall design the prey increase program using the best available information to provide for the best chance of increasing prey availability . . . from the funding initiative." *Id.* at 357; *Nat'l Wildlife Fed'n II*, 524 F.3d at 935–36; *see also Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1004 (D. Ariz. 2011) (A BiOp cannot rely on a "promise—no matter how well-intended—to develop a plan in the future to mitigate the impacts of its proposed action.").

NMFS's proposal to fund new hatchery production that will annually release 20 million Chinook salmon throughout the Pacific Northwest is entirely devoid of specifics. *See* Knutsen Decl. 34–35, 147, 264–65. The only detail available is that it must "increase prey availability by 4-5 percent in areas that are most important to [Southern Residents]." *Id.* at 147; *see also id.* at 34–35. Thus, NMFS knows the outcome needed to support its "no jeopardy" opinion, but not how that outcome will be achieved; e.g., what hatcheries will be used; what Chinook salmon stocks will be used; who will operate the programs; where the fish will be released; the life stages at which fish will be released; the smolt to returning adult ratio; the number of fish needed for broodstock; or when, where, or how many adult salmon will be made available to the Southern Residents. *See, e.g.*, *id.* at 147 (this mitigation "is less well defined and does not lend itself to further specification"); *id.* at 265 ("the details needed to conduct site-specific assessments have not been worked out"). Instead, NMFS optimistically predicts that it will be able "to work collaboratively with the state and tribal co-managers [that operate hatcheries] . . . to develop a program that meets the goal related to increasing prey abundance." *Id.* at 265.

The proposal to fund four Puget Sound conservation hatcheries is slightly more defined in that it identifies three existing hatcheries. *See id.* at 252. However, that is the extent of details. For example, the 2019 SEAK BiOp does not specify how many additional fish will be produced; where the fish would be released; at what life stage fish would be released, the number of adult fish needed for broodstock; or when, where, or how many adult salmon will be made available to the Southern Residents. *See id.* at 252–59. In fact, NMFS cannot even confirm that additional

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 22
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

fish will be produced. *See id.* at 252 (funding will "most likely include increased production").

With respect to the habitat restoration component, NMFS admits that "while a list of potential habitat restoration projects . . . exists, it has not been decided which projects would be funded . . . ." *Id.* at 35; *see also id.* at 252 ("site specific details" for habitat restoration "are not yet available"). Moreover, even the "original project [sic] listed may change." *Id.* at 259. NMFS does not provide any details about what projects will be implemented, where they are located, who will implement them, when they would be implemented, or the extent to which they will supposedly produce additional prey for Southern Residents. *See id.* at 259–64. NMFS cannot rely on a "laundry list of possible mitigation measures," only some of which may be implemented. *See Salazar*, 804 F. Supp. 2d at 1002 (quoting *Rumsfeld*, 198 F. Supp. 2d at 1153).

### c.      The mitigation requires ESA and NEPA review and approval.

Perhaps most problematic with NMFS's reliance on the undefined mitigation is that those measures still require review and approval under the ESA and NEPA. *See, e.g.*, *Nat'l Wildlife Fed'n I*, 254 F. Supp. 2d at 1208, 1213–16 (NMFS improperly relied on mitigation that had not undergone ESA consultation, including habitat and hatchery measures). NMFS cannot rely on these proposals to offset harvest impacts because, as the Tribes explained in *National Wildlife Federation I*, the mitigation "may never occur, may be substantially modified, or may be found to jeopardize the species upon closer scrutiny during future [ESA] consultation." *Id.* at 1208.

NMFS has long-recognized that hatchery programs harm wild salmonids. *See, e.g.*, *Nat'l Wildlife Fed'n II*, 524 F.3d at 935 ("NMFS explicitly found that continued reliance on the hatchery operation itself threatens [the salmon's] chances of recovery . . . ."). Fish raised in a hatchery environment become less fit to survive and reproduce in the wild through natural selection processes occurring in an unnatural environment. Knutsen Decl. 255. This domestication harms wild populations when the hatchery fish, released *en masse*, reproduce with wild fish and thereby transfer maladapted genes to the wild population. *Id.* Hatchery fish also harm wild fish through competition for resources, including food and spawning sites. *See id.* at

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 23
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

256–57. Nonetheless, "NMFS believes that hatchery intervention is a legitimate and useful tool **to alleviate short-term extinction risk, but otherwise managers should seek to limit interactions between hatchery and natural-origin fish** . . . ." *Id.* at 254 (emphasis added).

NMFS concedes that the hatchery programs proposed as mitigation require ESA consultation: "[o]nce the details are known" for the plan to release 20 million hatchery Chinook salmon annually, "NMFS would complete site-specific [ESA] consultations on the [sic] each production program…." *Id.* at 265; *see also id.* at 252 (funding four Puget Sound Chinook salmon conservation hatcheries will also require "further consultation once the site specific details are fully described"); *id.* at 260 (the habitat restoration proposals may require approval by the United States Army Corps of Engineers or site-specific ESA consultation).

NMFS's consultation on these hatchery programs may determine that they are likely to jeopardize threatened Chinook salmon. *See* 16 U.S.C. § 1536(a)(2). That would require NMFS to prescribe "reasonable and prudent alternatives," such as smaller programs, or, if such alternatives are unavailable, to prevent the programs by withholding take authorization. *See Bennett v. Spear*, 520 U.S. 154, 158, 169–70 (1997). Even if jeopardy is not likely, NMFS will impose conditions to minimize impacts to listed species. *See id.* at 158. NMFS cannot rely on hatchery releases as mitigation because the proposed releases may be significantly modified or rejected when reviewed under the ESA. *See Nat'l Wildlife Fed'n I*, 254 F. Supp. 2d at 1208, 1213–16.[6]

NMFS is also required to comply with NEPA before it commits to authorize or fund the hatchery programs. *See Ramsey v. Kantor*, 96 F.3d 434, 443–44 (9th Cir. 1996) (NMFS "was required by law to comply with the requirements of NEPA *before* issuing the [incidental take] statement." (emphasis in original))[7]; *Alaska v. Andrus*, 591 F.2d 537, 540 (9th Cir. 1979)

---

[6] NMFS cannot, as it suggests, bifurcate consultation on mitigation by presuming the benefits from hatchery releases, while deferring evaluation of harm. *See* Knutsen Decl. 252; *Nat'l Wildlife Fed'n II*, 524 F.3d at 936 (NMFS improperly relied on hatcheries as mitigation without also considering the "impact of prolonging the [salmon's] hatchery dependence on its eventual prospects for recovery").

[7] NMFS generally authorizes take from hatcheries under a "4(d) Rule"; i.e., a rule issued under section 4(d) of the ESA to apply section 9's take prohibition, which automatically applies to endangered species, to threatened species.

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

(federally funded projects are subject to NEPA). A "touchstone" of NEPA is proper "selection and discussion of alternatives [to] foster[] informed decision-making…." *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982). To facilitate consideration of alternatives, NEPA documents must be prepared before the "go-no go" stage and before any irretrievable commitment of resources. *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011); 40 C.F.R. § 1506.1(a); *see also* 40 C.F.R. § 1501.2 ("at the earliest time possible").

NMFS cannot rely on the hatchery programs as mitigation because it cannot lawfully commit to providing funding or ESA approval before completion of NEPA procedures; such a commitment would unlawfully predetermine the outcome of the NEPA process. *See e.g.*, *Metcalf v. Daley*, 214 F.3d 1135, 1138, 1143–44 (9th Cir. 2000) (NMFS, et al., unlawfully predetermined NEPA by committing to support a whale harvest quota before preparing EIS or EA). Further, NMFS's NEPA process must consider a reasonable range of alternatives, including smaller hatchery releases that will pose less harm to wild salmonids. *See Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 992 F. Supp. 2d 1095, 1110 (D. Or. 2014) (NMFS violated NEPA by failing to consider smaller hatchery releases); *Wild Fish Conservancy v. Nat'l Park Serv.*, 8 F. Supp. 3d 1289, 1299–1301 (W.D. Wash. 2014) (same). NMFS therefore cannot now commit to large hatchery releases as mitigation in the 2019 SEAK BiOp. *See* 40 C.F.R. § 1506.1(a)

The need to comply with NEPA and the ESA before implementing the hatchery programs poses enormous uncertainty, as review processes take time and often result in reduced programs. For example, the Conservancy settled a lawsuit in 2003 requiring Washington State to submit plans for Puget Sound hatcheries to NMFS for review. *See* Knutsen Decl. 559–64. NMFS then announced its intent to conduct ESA and NEPA review in 2004 and again in 2011, finally released a draft EIS in 2014, only to withdraw the draft EIS in 2015 with an announcement that it

---

*See* 16 U.S.C. §§ 1533(d), 1538(a)(1)(B), (G). NMFS has promulgated a 4(d) Rule that prohibits take of threatened salmonids, subject to exceptions known as the "4(d) Limits." *See* 50 C.F.R. § 223.203(a)–(b). Limits 5 and 6 authorize take from hatchery programs where NMFS has approved a Hatchery and Genetic Management Plan. *See id.* § 223.203(b)(5)–(6). NMFS's approval of such plan is subject to NEPA. *See* Knutsen Decl. 543, 550–51; *Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 992 F. Supp. 2d 1095, 1107–09 (D. Or. 2014).

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

would instead conduct review on a "watershed" basis. *See* 80 Fed. Reg. 15,986 (Mar. 26, 2015); *see also* 81 Fed. Reg. 2,196 (Jan. 15, 2016) (NMFS announced intent to prepare an EIS for Columbia River hatcheries in 2004, completed the EIS ten years later, and issued its final decision in 2016). Any prediction that NMFS will quickly approve hatchery programs not only unlawfully predetermines the NEPA process, but is also not supported by the agency's record.

### d.   Conclusion on NMFS's unlawful reliance on mitigation.

The mitigation is unfunded, to be implemented by entities over whom NMFS has no control, lacks any specifics, and requires approvals that may result in the projects being denied or substantially altered. NMFS cannot rely on such nonexistent mitigation to satisfy its duty to ensure that its actions do not jeopardize the Southern Residents. *See Nat'l Wildlife Fed'n II*, 524 F.3d at 935–36. The Conservancy is likely to succeed on its challenge to the 2019 SEAK BiOp.

### 2.   The ITS fails to adequately limit take of Southern Residents.

Another significant deficiency is that the 2019 SEAK BiOp's ITS lacks a lawful cap on the extent of harm that can be inflicted on the Southern Residents before NMFS must reinitiate consultation. Instead, the ITS authorizes whatever amount of take of Southern Residents happens to result from harvests under the 2019 Pacific Salmon Treaty, regardless of whether that take far exceeds what NMFS assumed when preparing the 2019 SEAK BiOp. That violates the ESA.

An ITS must "set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring the parties to re-initiate consultation." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1249 (9th Cir. 2001); 50 C.F.R. § 402.16(a)(1). Preferably, the ITS specifies a numerical limit for the "trigger," but if that is not practical, the ITS may specify a surrogate that performs the same functions of a numerical limitation—namely, to monitor harm and determine when the predicted amount of take has been exceeded. *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1038 (9th Cir. 2007); *Wild Fish Conservancy*, 628 F.3d at 531. Surrogate triggers are rejected if they fail to perform this function. *E.g.*, *Wild Fish Conservancy*, 628 F.3d at 531–32; *Allen*, 476 F.3d at 1038–41.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 26
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

In *Allen*, the Ninth Circuit rejected an ITS for a timber harvest because the level of take authorized was coextensive with the project. 476 F.3d at 1038–41. The ITS authorized the take of "all spotted owls associated with the removal . . . of 22,227 acres of suitable . . . habitat," which was the amount of removal for the entire project; the ITS thereby allowed whatever amount of take resulted from the harvest project. *Id.* at 1034, 1039. "Even if the actual number of takings of spotted owls that occurred during the project was considerably higher than anticipated, the Incidental Take Statement would not permit the FWS to halt the project and reinitiate consultation." *Id.* at 1039. This ITS was "so indeterminate" that it rendered the monitoring and reinitiation provisions meaningless and eliminated the trigger function. *Id.* at 1041.

The 2019 SEAK BiOp's ITS suffers from that same flaw. Rather than specify a numeric take limit for Southern Residents, the ITS uses salmon catch as a surrogate. Knutsen Decl. 351. Specifically, it authorizes whatever take of Southern Residents results from the fisheries allowed under the 2019 Pacific Salmon Treaty. *Id.* ("The extent of take for [Southern Residents] is . . . described by the provisions of . . . [the 2019 Pacific Salmon Treaty] that define annual catch or total mortality limits on Chinook salmon . . . ."). Just like in *Allen*, this surrogate is "coextensive with the project's own scope." *See* 476 F.3d at 1039. So long as harvests do not exceed the quotas set under the 2019 Pacific Salmon Treaty, there is no obligation to halt harvests and reinitiate ESA consultation even if considerably more take of Southern Residents occurs than NMFS predicted in formulating its "no jeopardy" opinion.

The reason such a surrogate is inconsistent with the ESA is evident here. As an example, the harm to Southern Residents resulting from the allowable harvest will vary from year to year. Knutsen Decl. 271–72. During years with low salmon abundance, the proportion of reduction in prey availability from the harvests increases, meaning the fisheries have a greater adverse impact on Southern Residents. *See id.* at 271–73. In reaching its "no jeopardy" opinion, NMFS assumed that salmon abundance trends from 1999 to 2014 would persist during the fisheries set by the 2019 Pacific Salmon Treaty. *Id.* at 272–73; *see also id.* at 338–39 (NMFS "do[es] not anticipate

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 27
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

that the highest impacts of fisheries couple with multiple consecutive low abundance years will occur in the first few years of the proposed action…"). If that assumption proves inaccurate, due to warming ocean conditions or other factors, the actual take of Southern Residents could be significantly higher than expected. Yet, even if the fisheries drive the Southern Residents to the brink of extinction, there is no obligation to halt harvests and reinitiate consultation so long as harvests do not exceed the limits of the 2019 Pacific Salmon Treaty.

The Conservancy is likely to succeed on its challenge to the 2019 SEAK BiOp because the ITS fails to adequately trigger re-initiation of consultation if impacts to Southern Residents from the fisheries are greater than expected. *See Allen*, 476 F.3d at 1041.

**B.**     **The Conservancy will Succeed on its Substantive ESA section 7 Claim.**

Section 7 of the ESA imposes a substantive duty on NMFS to ensure that any action it authorizes is not likely to jeopardize species or destroy their critical habitat. *See* 16 U.S.C. § 1536(a)(2). The Conservancy is likely to succeed on its claim that NMFS is in violation of that obligation because the agency is relying on the 2019 SEAK BiOp, which contains the legal flaws discussed above, to support its continued authorization of salmon fisheries in the federal waters of Southeast Alaska. *See Wild Fish Conservancy*, 628 F.3d 532.

**C.**     **The Conservancy will Succeed on its NEPA Claim.**

NMFS violated NEPA by issuing the ITS without preparing any NEPA documents.

The Ninth Circuit held in 1996 that NMFS violated NEPA by issuing an ITS authorizing take associated with salmon fisheries without first preparing an EIS. *Ramsey*, 96 F.3d at 438, 443–44 (EIS needed for ITS issued on the Columbia River Fish Management Plan, used by Oregon and Washington to set fishing regulations). NMFS responded with a programmatic EIS in 2003 that evaluated, *inter alia*, the effects of its ongoing delegation of authority to Alaska to manage fisheries and the effects of NMFS's issuance of BiOp with an ITS for fisheries under the 1999 Pacific Salmon Treaty. Knutsen Decl. 595, 599–600. Inexplicably, NMFS disregarded the lessons of *Ramsey* and issued the 2019 SEAK BiOp and its ITS without any NEPA process.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 28
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

As was the case in *Ramsey*, the ITS issued with the 2019 SEAK BiOp acts as a federal permit allowing state implementation of salmon fisheries that will take ESA-listed species. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 643–44 (9th Cir. 2014). This new ITS authorizes fisheries in the federal waters of Southeast Alaska through 2028 under the regimes delineated in the 2019 Pacific Salmon Treaty. *See* Knutsen Decl. 26–27, 36, 350. Moreover, the ITS commits NMFS to a massive new federal funding initiative to offset harvest impacts. *Id.* at 358. NMFS violated NEPA by issuing this new ITS, thereby limiting alternatives, without first completing NEPA processes. *Ramsey*, 96 F.3d at 443–44; 40 C.F.R. § 1506.1(a).[8, 9]

The Conservancy is likely to succeed on its claim that NMFS violated NEPA by issuing the ITS without first completing any NEPA process. *See Ramsey*, 96 F.3d at 443–44.

### D.   The Requested Injunction Is Needed to Prevent Likely Irreparable Injury.

To remedy the specific harm at issue, the Conservancy requests an order staying NMFS's take authorization and delegation of authority to Alaska for commercial salmon fisheries in the Exclusive Economic Zone of Southeast Alaska and directing NMFS to take any additional steps needed to halt such fisheries before commencement of the fishing season on July 1. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011). Irreparable injury is likely absent such relief. *See Nat'l Wildlife Fed'n III*, 886 F.3d at 818.

Courts should evaluate irreparable injury with reference to the statute being enforced. *Id.* "The 'plain intent' of Congress in enacting the ESA was 'to halt and reverse the trend toward

---

[8] NMFS's prior NEPA efforts, absent supplementation, do not satisfy its obligations here because, *inter alia*, those efforts did not address take authorized by the new ITS, impacts to Southern Residents, or NMFS's purported commitment to the mitigation funding initiative. *See* 40 C.F.R. § 1502.9(c)(1).

[9] Further, a full EIS is required because, at a minimum, there are substantial questions as to whether the actions *may* have significant effects. *See, e.g., Ocean Advocates*, 402 F.3d at 864–865. "This is a low standard" that can require an EIS even where the agency believes that, on balance, effects will be beneficial. *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006); 40 C.F.R. § 1508.27(b)(1); *Envtl. Prot. Info. Ctr. v. Blackwell*, 389 F. Supp. 2d 1174, 1197 (N.D. Cal. 2004). An EIS is required here because of the substantial adverse effects to ESA-listed species and because NMFS's proposal to mitigate harm from the fisheries using hatcheries, which themselves harm wild salmonids, is extremely controversial. *See, e.g.*, Knutsen Decl. 254, 265, 281; 40 C.F.R. § 1508.27(b)(4)–(5), (9); *Native Fish Soc'y*, 992 F. Supp. 2d at 1107–09 (FONSI for hatchery programs was insufficient).

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

species extinction, whatever the cost.'" *Id.* (citation omitted). This is achieved through "incremental steps" that include protecting individual members of species; "[h]arm to those members is irreparable because 'once a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult.'" *Id.* (citation omitted). An extinction-level threat—though present here—is not required for an injunction. *Id.* at 819; *see Cottonwood*, 789 F.3d at 1091 ("In light of the stated purposes of the ESA . . . , establishing irreparable injury should not be an onerous task for plaintiffs."). Further, the activity to be enjoined need not be the exclusive cause of harm, and a showing that the requested injunction would forestall the irreparable injury is sufficient. *Nat'l Wildlife Fed'n III*, 886 F.3d at 819.

Irreparable injury is likely if the unlawfully authorized harvests go forward, further depriving starving Southern Residents of their prey based on NMFS's ill-advised gamble that its mitigation ideas may someday materialize. NMFS identifies the Southern Resident as "a species whose extinction is almost certain in the immediate future because of rapid population decline or habitat destruction." Decl. of Deborah Giles, Ph.D. ("Giles Decl.") ¶ 6. The species has shrunk from 88 whales when listed in 2005 to only 72 whales today. *Id.*; *see also* Knutsen Decl. 242. The decline in population size is due to a steep decline in pregnancies and live births by pregnant whales. Giles Decl. ¶ 7; *see also* Knutsen Decl. 108–110, 266. This reduced fecundity is primarily attributable to a lack of sufficient Chinook salmon available as prey. Giles Decl. ¶¶ 8–9; Decl. of Robert Lacy, Ph.D. ("Lacy Decl.") ¶ 6.b; Knutsen Decl. 108, 115, 266.

Dr. Lacy, cited in the 2019 SEAK BiOp, finds that prey available to Southern Residents must increase by 10% over past levels merely to sustain the current population size. Lacy Decl. ¶ 21; Knutsen Decl. 110. To achieve NMFS's recovery goal of a 2.3% growth rate, a prey increase of 35% is needed. Lacy Decl. ¶ 22; Knutsen Decl. 110. Under the harvests authorized by NMFS in the 2019 SEAK BiOp, there will be an estimated 0.5% increase in prey availability relative to past levels, thereby ensuring the Southern Resident will rapidly continue its decline toward extinction. Lacy Decl. ¶¶ 26, 32 (black line on the graph shows population decline predicted

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 30
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

under harvests authorized by 2019 SEAK BiOp). Indeed, NMFS concedes that the approved

harvest levels are inadequate to conserve the Southern Residents and are likely to adversely

affect the species' critical habitat absent the non-existent mitigation. *See* Knutsen Decl. 33–34,

339. The continued reduction in population size and associated increase in extinction risk that

will result from the authorized harvests constitute irreparably injury under the ESA, requiring an

injunction. *See Nat'l Wildlife Fed'n III*, 886 F.3d at 818–19; *see also Defs. of Wildlife v. Bernal*,

204 F.3d 920, 925 (9th Cir. 1999). The requested relief is needed to, at a minimum, "forestall"

the loss of this species. *See Nat'l Wildlife Fed'n III*, 886 F.3d at 819; Lacy Decl. ¶ 33.e.

"In the NEPA context, irreparable injury flows from the failure to evaluate the

environmental impact of a major federal action." *High Sierra Hikers' Ass'n v. Blackwell*, 390

F.3d 630, 642 (9th Cir. 2004). "The NEPA duty is more than a technicality; it is an extremely

important statutory requirement to serve the public and the agency *before* major federal actions

occur." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985). Here, NMFS

authorized salmon fisheries to the full extent allowed by the 2019 Pacific Salmon Treaty, and,

instead of reducing harvest to protect imperiled species, NMFS committed to massive new

federally-funded hatchery programs that would themselves harm threatened salmon, were they

ever funded and implemented. NMFS made these decisions without the consideration of

alternatives and public participation opportunities required under NEPA. Allowing the fisheries

to go forward before NEPA compliance constitutes irreparable injury to the Conservancy and its

interests in imperiled species. *See, e.g.*, *League of Wilderness Defs./Blue Mountains Biodiversity

Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) ("Environmental injury, by its nature,

can seldom be adequately remedied by money damages and is often permanent or at least of long

duration, i.e., irreparable.") (quoting *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir.

2008) and *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).

### E.    The Equities Favor an Injunction.

The balance of hardships and public interests always favor an injunction for ESA

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 31
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

violations. *Nat'l Wildlife Fed'n III*, 886 F.3d at 817. For NEPA, "[i]f environmental injury is sufficiently likely, the balance of harms will usually favor . . . an injunction . . . ." *Blackwell*, 390 F.3d at 642. The Conservancy recognizes the hardship on the commercial fishing industry from the injunction. However, the harm posed by the unlawfully approved harvest is substantial. The Ninth Circuit has repeatedly "held that the public interest in preserving nature and avoiding irreparable environmental injury outweighs economic concerns in cases where plaintiffs were likely to succeed on the merits . . . ." *McNair*, 537 F.3d at 1005. An injunction is warranted because of "the public interest in careful consideration of environmental impacts before major federal projects go forward…." *Cottrell*, 632 F.3d at 1138. "[S]uspending such projects until that consideration occurs 'comports with the public interest.'" *Id.*; *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007) ("The balance of equities and the public interest favor issuance of an injunction because allowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of NEPA.").

## F.   No Bond (or a Nominal Bond) Is Appropriate.

The Conservancy requests that the bond requirement be waived, which is within the Court's discretion "where requiring security would effectively deny access to judicial review." *See Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985); *see Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975). It is "well established" that, in cases like this, no or nominal bond is appropriate because the Conservancy is a small organization seeking to enforce public rights, has no financial stake in the litigation, and a substantial bond would effectively deny access to judicial review and have a chilling effect on future efforts to vindicate public interests. *See Cent. Or. Landwatch v. Connaughton*, 905 F. Supp. 2d 1192, 1198 (D. Or. 2012); *Van de Kamp*, 766 F.2d at 1325–26; Beardslee Decl. ¶¶ 3–9.

## VII.   CONCLUSION.

Wherefore, the Conservancy respectfully requests that the Court enter an order establishing the preliminary injunctive relief requested herein.

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 32
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Respectfully submitted this 16th day of April, 2020.

KAMPMEIER & KNUTSEN, PLLC

By: s/ Brian A. Knutsen
Brian Knutsen, WSBA No. 38806
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
Tel: (503) 841-6515
Email: brian@kampmeierknutsen.com

Paul A. Kampmeier, WSBA No. 31560
811 First Avenue, Suite 468
Seattle Washington 98104
Tel: (206) 858-6983
Email: paul@kampmeierknutsen.com

CORR CRONIN, LLP

By: s/ Benjamin C. Byers
Eric A. Lindberg, WSBA No. 43596
Benjamin C. Byers, WSBA No. 52299
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
Tel: (206) 625-8600
Email: elindberg@corrcronin.com
       bbyers@corrcronin.com

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 33
Case No. 2:20-cv-00417-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

**CERTIFICATE OF SERVICE**

I hereby certify that on April 16, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the attorneys of record.

 s/ Brian A. Knutsen
Brian A. Knutsen, WSBA No. 38806
Attorney for Plaintiff
Kampmeier & Knutsen, PLLC
221 S.E. 11th Ave., Suite 217
Portland, Oregon 97214
Telephone: (503) 841-6515
Email: brian@kampmeierknutsen.com

PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 34
Case No. 2:20-cv-00417-MLP

WFC 01 kd16fv12qy

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600