HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY,               )
                                     )     Case No. 2:20-cv-00417-RAJ-MLP
        Plaintiff,                   )
                                     )     PLAINTIFF'S OBJECTIONS TO
v.                                   )     MAGISTRATE JUDGE'S REPORT
                                     )     AND RECOMMENDATION
BARRY THOM, in his official capacity as )
Regional Administrator for the National )   NOTE ON MOTION CALENDAR:
Marine Fisheries Service, *et al.*,  )     July 3, 2020
                                     )
        Defendants,                  )
                                     )
and                                  )
                                     )
ALASKA TROLLERS ASSOCIATION,         )
                                     )
        Defendant-Intervenor.        )
_____)

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 1
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................2

TABLE OF AUTHORITIES..........................................................................................3

GLOSSARY OF ACRONYMS......................................................................................5

I.      INTRODUCTION................................................................................................6

II.     OBJECTIONS.....................................................................................................7

III.    STANDARD OF REVIEW.................................................................................7

VI.    ARGUMENT.......................................................................................................7

       A.    The Claims Are not Reviewed under 16 U.S.C. § 1855(f)............................7

            1.    *Turtle Island* extended § 1855(f) to a "very specific
                 class" of claims challenging MSA fisheries, while
                 leaving "many" others "untouched"...........................................7

            2.    The Conservancy was not required to file claims
                 pertaining to the 2019 SEAK BiOp within 30 days
                 of the 2012 Regulations...........................................................11

            3.    The Conservancy was not required to file its claims
                   within 30 days of issuance of the 2019 SEAK
                 BiOp........................................................................................13

            4.    16 U.S.C. § 1855(f) is not selectively applied...........................15

       B.    The Conservancy Has Standing to Pursue its Claims...................................16

V.      CONCLUSION..................................................................................................17

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 2
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

# TABLE OF AUTHORITIES

**<u>Cases</u>**

*Associated Gen. Contractors of Am. v. Metro. Water Dist.*,
    159 F.3d, 1178 (9th Cir. 1998)……………………………………………………..17

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988)……………………………………………………...14

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015)……………………………………………………...10

*Ecological Rights Found. v. Pac. Lumber Co.*,
    230 F.3d 1141 (9th Cir. 2000)……………………………………………………...17

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*,
    255 F.3d 1073 (9th Cir. 2001)……………………………………………………….7

*Fishing Co. of Alaska v. United States*,
    195 F. Supp. 2d 1239 (W.D. Wash. 2002),
    *aff'd*, 333 F.3d 1045 (9th Cir. 2003)………………………………………………..8

*Fleck & Assocs. v. City of Phoenix*,
    471 F.3d 1100 (9th Cir. 2006)……………………………………………………...16

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    545 U.S. 409 (2005)…………………………………………………………….10, 13

*Humane Soc'y of the U.S. v. Hodel*,
    840 F.2d 45 (D.C. Cir. 1988)……………………………………………………….17

*Johnson v. United States*,
    544 U.S. 295 (2005)………………………………………………………………...11

*Klamath Siskiyou Wildlands Ctr. v. Boody*,
    468 F.3d 549 (9th Cir. 2006)……………………………………………………….10

*McDonnell Douglas Corp. v. Commodore Bus. Machines, Inc.*,
    656 F.2d 1309 (9th Cir. 1981)……………………………………………………….7

*Nw. Envtl. Def. Ctr. v. Brennen*,
    958 F.2d 930 (9th Cir. 1992)……………………………………………………….14

*Or. Trollers Ass'n v. Gutierrez*,
    452 F.3d 1104 (9th Cir. 2006)………………………………………………….13, 14

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 3
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

*Pac. Rivers Council v. Thomas*,
    30 F.3d 1050 (9th Cir. 1994)………………………………………………………10

*Presidio Golf Club v. Nat'l Park Serv.*,
    155 F.3d 1153 (9th Cir. 1998)………………………………………………...17

*Turtle Island Restoration Network v. U.S. Dept. of Commerce*,
    438 F.3d 937 (9th Cir. 2006)………………………………………………..*passim*

**Statutes**

16 U.S.C. § 1536…………………………………………………………..13, 14

16 U.S.C. § 1540…………………………………………………………7, 13

16 U.S.C. § 1854……………………………………………………………14

16 U.S.C. § 1855…………………………………………………………*passim*

16 U.S.C. § 1861……………………………………………………………..8

28 U.S.C. § 636…………………………………………………………..7, 17

**Regulations**

40 C.F.R. § 1502.9…………………………………………………………10

50 C.F.R. § 402.14…………………………………………………………14

50 C.F.R. § 402.16…………………………………………………………10

50 C.F.R. § 660.408………………………………………………………...14

50 C.F.R. § 660.411………………………………………………………...14

**Other Authorities**

84 Fed. Reg. 19,729 (May 6, 2019)………………………………………...14

Fed. R. Civ. P. 72………………………………………………………….7

Merriam-Webster Dictionary………………………………………………17

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 4
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

## GLOSSARY OF ACRONYMS

APA            Administrative Procedure Act

BiOp           Biological Opinion

ESA            Endangered Species Act

ITS            Incidental Take Statement

MSA            Magnuson-Stevens Fishery Conservation and Management Act

NEPA           National Environmental Policy Act

NMFS           National Marine Fisheries Service

R&R            [Magistrate Judge's] Report and Recommendation

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 5
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

Plaintiff Wild Fish Conservancy ("Conservancy") hereby objects to the Magistrate Judge's Report and Recommendation, Dkt. No. 51 ("R&R"), and respectfully requests the Court reject the R&R and grant Plaintiff's Motion for Preliminary Injunction, Dkt. No. 14 ("Motion").

**I.      INTRODUCTION.**

The Conservancy requests a preliminary injunction staying the National Marine Fisheries Service's ("NMFS") authorizations of commercial Chinook salmon fisheries in federal waters off the coast of Southeast Alaska to protect imperiled Southern Resident Killer Whales while this lawsuit is pending. NMFS authorized the fisheries at levels that will continue to starve Southern Residents, heightening the risk of extinction for this critically endangered species, in violation of the Endangered Species Act ("ESA") and the National Environmental Policy Act ("NEPA").

The Conservancy's claims focus on NMFS's issuance and adoption of an April 5, 2019 biological opinion ("2019 SEAK BiOp") evaluating and authorizing take of ESA-listed species from the fisheries from 2019 through 2028 under harvest regimes set in the 2019 Pacific Salmon Treaty. The R&R found that the claims are time-barred under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") because they were not brought within thirty days of issuance of certain MSA regulations in 2012 or, in the alternative, within thirty days of issuance of the 2019 SEAK BiOp. Those holding are contrary to the MSA's judicial review provisions and Ninth Circuit precedent. The Court should reject the R&R's unprecedented application of a statute of limitations as barring claims seven years before they even accrued.

The Motion provides detailed descriptions of the statutory background, relevant facts, standard of review for a preliminary injunction, and arguments in support of the requested relief. Dkt. No. 14; *see also* Dkt. No. 44. Those efforts are not repeated here, but instead incorporated by this reference. The Conservancy respectfully requests that the Court reject the time-bar ruling in the R&R and enter the relief requested in the Motion. The Conservancy requests such relief even if not entered before commencement of the summer season on July 1, as harvest extends through August and even into September and the winter harvest season commences in October.

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 6
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

## II.   OBJECTIONS.

The Conservancy makes the following objections to the R&R:

1.   As described in more detail below, the R&R erroneously found that 16 U.S.C. § 1855(f) applies to the claims alleged herein;

2.   The R&R erroneously found that the Conservancy seeks review of all claims under the Administrative Procedure Act ("APA"). Dkt. No. 51 at 2. The First Cause of Action alleges that NMFS is in violation of the substantive obligation of section 7(a)(2) to ensure that its actions do not jeopardize ESA-listed species. Dkt. No. 1 ¶ 114. That claim is properly alleged under the ESA citizen suit provision, 16 U.S.C. § 1540(g), and not the APA. *Id.* ¶ 115; *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1078–79 (9th Cir. 2001).

## III.   STANDARD OF REVIEW.

This Court reviews the R&R de novo and may accept, reject, or modify, in whole or in part, the R&R. Fed. R. Civ. P. 72(b)(3); 28 U.S.C. § 636(b)(1)(C); *McDonnell Douglas Corp. v. Commodore Bus. Machines, Inc.*, 656 F.2d 1309, 1313 (9th Cir. 1981).

## VI.   ARGUMENT.

### A.   <u>The Claims Are not Reviewed under 16 U.S.C. § 1855(f).</u>

  1.   <u>*Turtle Island* extended § 1855(f) to a "very specific class" of claims challenging MSA fisheries, while leaving "many" others "untouched".</u>

The MSA includes provisions governing judicial review of regulations and certain actions issued under the statute. The Ninth Circuit has applied those provisions to claims that NMFS violated the ESA and NEPA in promulgating MSA regulations; i.e., claims that accrue with the issuance of regulations. The court emphasized that it was not eliminating effective environmental enforcement of commercial fisheries because its holding applies to a very specific class of claims and not to other ESA and NEPA that accrue after the regulations. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 438 F.3d 937, 948–49 (9th Cir. 2006).

The MSA provision governing review of regulations sets a limitations period as follows:

(1) **Regulations promulgated** by [NMFS] under [the MSA] and **actions described**

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 7
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

**in paragraph (2)** shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of title 5, . . . if a petition for such review is filed within **30 days after the date on which the regulations are promulgated or the action is published in the Federal Register**, as applicable; . . .

\*\*\*\*   \*\*\*\*               \*\*\*\*   \*\*\*\*               \*\*\*\*   \*\*\*\*

(2) The actions referred to in paragraph (1) are **actions that are taken by [NMFS] under regulations which implement a fishery management plan**, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

16 U.S.C. § 1855(f) (emphases added). The judicial review provisions also prohibit preliminary injunctions, require expedited production of the administrative record, and require proceedings be expedited "in every possible way" upon request. *Id.* § 1855(f)(1)(A), (f)(3), (f)(4). These provisions apply to two types of actions: promulgation of regulations under the MSA and actions taken by NMFS "under regulations which implement a fishery management plan" that are published in the Federal Register. *Id.* § 1855(f)(1), (f)(2).

Section 1855(f) does not govern every claim related to a MSA fishery. For example, another provision of the MSA provides jurisdiction over various enforcement claims. *Id.* § 1861(d). Parties may collaterally attack regulations issued under the MSA in such actions without complying with the 30-day limitations period of § 1855(f). *Fishing Co. of Alaska v. United States*, 195 F. Supp. 2d 1239, 1246–47 (W.D. Wash. 2002), *aff'd*, 333 F.3d 1045 (9th Cir. 2003). Thus, § 1855(f) does not apply to every attack on the implementation of MSA regulations.

The Ninth Circuit found that § 1855(f) does apply to challenges to NEPA and ESA documents prepared in support of the promulgation of a MSA regulation. *See Turtle Island*, 438 F.3d at 939. At issue was a regulation reopening a fishery. *Id.* at 939–40. NMFS consulted under ESA section 7 on the proposed regulation and issued a biological opinion ("BiOp") on reopening the fishery. *Id.* at 941. Under NEPA, NMFS prepared an environmental impact statement on alternatives and issued a record of decision ("ROD") electing to promulgate the regulation. *Id.* at 941–42. Consistent with the MSA, there were opportunities for public involvement throughout the process, including notices, hearings, and comment opportunities. *Id.* at 940–41.

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 8
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Plaintiff did not file suit within thirty days of the regulation. *Id.* at 942. The complaint did not allege a MSA claim, but instead alleged that NMFS violated NEPA, the ESA, and the Migratory Bird Treaty Act when it reopened the fishery. *Id.* However, "[t]he essence of [the] complaint was not in dispute—it challenge[d] the reopening of the swordfish fishery," which "came about as a result of the regulations . . . ." *Id.* at 944. The NEPA claim challenged the ROD electing to reopen the fishery, which was "the foundation for those regulations." *Id.* at 945. The ESA claim alleged that, because reopening the fishery violated NEPA, the BiOp's incidental take statement ("ITS") violated the ESA by authorizing "take" from an otherwise unlawful activity. *Id.* This claim was also "premised on the issuance of regulations reopening the fishery." *Id.*

The court found that "all of the claims flow[ed] from the reopening of the fishery" through promulgation of the regulations and were therefore subject to 16 U.S.C. § 1855(f). *Id.* at 943, 945. The challenges to the ROD and ITS could not be pursued as "stand alone challenge[s] to agency action" and were dismissed as time-barred under the MSA. *Id.* at 945, 949. The court noted that its application of § 1855(f) was consistent with the MSA's "highly detailed and public process leading up to the adoption of regulations," a process that interweaves development of regulations with ESA and NEPA processes supporting the regulation. *See id.* at 947–48 (describing Federal Register notices, public hearings, and comment periods).

The court carefully limited its holding in *Turtle Island*, explaining that its application of 16 U.S.C. § 1855(f) will **not "eliminate effective enforcement of environmental laws in commercial fisheries**." *Id.* at 948 (emphasis added). Rather, "**Section 1855(f) applies only to a very specific class of claims**—those that clearly challenge regulations promulgated under the [MSA]"—**it does "not . . . affect every claim that may arise later**." *Id.* (emphasis added).

> For example, [§ 1855(f)] would not encompass claims that NMFS failed to reinitiate consultation when the taking specified in the [ITS] is exceeded or a new species is listed or "new information reveals effects of the action that may affect listed species . . . to an extent not previously considered" in the [BiOp]. Similarly, NEPA imposes a continuing duty to supplement an existing EIS in response to "significant new circumstances or information relevant to environmental concerns bearing on the proposed action or its impacts. **We do not intend these examples**

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 9
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

**to serve as an exhaustive list, but rather as illustrative of the many claims left untouched by § 1855(f).**

*Id.* at 948–49 (internal citations omitted, emphasis added).

With respect to the ESA example, reinitiation of a consultation is required where the federal agency retains control over the underlying action and a triggering event occurs; e.g., there is new information on impacts. *See* 50 C.F.R. § 402.16. Typical relief includes an injunction of the underlying action pending completion of a new consultation. *See, e.g.*, *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1056–57 (9th Cir. 1994); *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088–92 (9th Cir. 2015). For the NEPA example, an agency is required to supplement a prior NEPA document where there are, *inter alia*, "significant new circumstances or information relevant to environmental concerns . . . ." 40 C.F.R. § 1502.9(c)(1). Typical relief includes enjoining the underlying action pending completion of supplemental NEPA processes. *See, e.g.*, *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

*Turtle Island* thus explicitly provides that parties may bring claims outside of the judicial review provisions of § 1855(f), including the 30-day limitations period, alleging that NMFS must reinitiate ESA consultation and undertake supplemental NEPA processes to evaluate the ongoing effects of a MSA-regulated fishery in light of changed circumstances. The relief available would include an injunction against the fishery pending a new BiOp and NEPA document. These claims do not arise with the promulgation of regulations, but instead from events that "arise later," and are therefore "untouched" by § 1855(f). *See Turtle Island*, 438 F.3d at 948–49.

*Turtle Island* is consistent with the rule that Congress drafts statutes of limitations to begin when the plaintiff has a complete and present cause of action. *See Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 545 U.S. 409, 418 (2005). Claims challenging NMFS's ESA and NEPA efforts supporting the promulgation of a regulation accrue with issuance of the regulation and can be filed within thirty days thereof as required under § 1855(f). ESA and NEPA claims that accrue after, and are unrelated to, the issuance of regulations generally cannot be filed within thirty days of the regulations. It is "highly doubtful" that

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 10
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Congress intended the statute of limitations of § 1855(f) to apply to ESA and NEPA claims that accrue at a time when they would already be time-barred by § 1855(f). *See Johnson v. United States*, 544 U.S. 295, 305 (2005) (rejecting argument that "the statute of limitations may begin to run (and may even expire) before the . . . claim and its necessary predicate even exist").

### 2. The Conservancy was not required to file claims pertaining to the 2019 SEAK BiOp within 30 days of the 2012 Regulations.

Under this framework, it is apparent that the claims here are not subject to 16 U.S.C. § 1855(f). The 2019 SEAK BiOp is not "the foundation for [the 2012] regulations," and the claims challenging the BiOp did not "flow from," or come about through, issuance of the 2012 MSA regulations; i.e., they did not accrue with the promulgation of regulations. *See Turtle Island*, 438 F.3d at 943–45. Rather, the claims arose through events after and unrelated to the 2012 issuance of regulations and are therefore "untouched" by § 1855(f). *Id.* at 948–49. The R&R's findings to the contrary would accomplish precisely what the Ninth Circuit sought to prevent—"eliminate effective enforcement of environmental laws in commercial fisheries." *See id.* at 948.

The R&R held that the claims are time-barred because they were not filed within thirty days of NMFS's promulgation of MSA regulations in 2012, which facilitated delegation of authority to Alaska to manage the fishery. Dkt. No. 51 at 17. Those regulations, implementing Amendment 12 to the Fishery Management Plan, were subjected to an ESA consultation and a NEPA process. Dkt. No. 14-1 at 29 (describing consultation); Dkt. No. 43-1 at 938–1207 (2012 NEPA document). Under *Turtle Island*, challenges to those 2012 ESA and NEPA efforts would have been reviewed under 16 U.S.C. § 1855(f), but the Conservancy does not assert such claims.

The Conservancy's claims accrued through subsequent events unrelated to promulgation of MSA regulations. NMFS had previously consulted on the 10-year fishery regimes set in the 2009 Pacific Salmon Treaty. Dkt. No. 14-1 at 28. When that agreement was replaced by the 2019 Pacific Salmon Treaty, NMFS "reinitiate[ed] . . . consultation on delegation of management authority" to Alaska to address, *inter alia*, impacts of the fishery from 2019 through 2028. *Id.* at 29–30. That reinitiated consultation culminated in NMFS's issuance and adoption of the 2019

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 11
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

SEAK BiOp. Importantly, the 2019 SEAK BiOp was not prepared to consult on proposed

regulations, NMFS did not provide any public notices or hearings as required for proposed MSA

regulations, and no new MSA regulations were issued. Instead, NMFS consulted on the ongoing

effects of the fishery as authorized by preexisting regulations in light of changed circumstances.

The Conservancy's claims all relate to NMFS's issuance and adoption of the 2019 SEAK

BiOp triggered by the 2019 Pacific Salmon Treaty. The Conservancy alleges that: (1) by

adopting and implementing the 2019 SEAK BiOp, NMFS is failing to ensure that its actions do

not jeopardize ESA-listed species as required by section 7(a)(2) of the ESA; (2) the 2019 SEAK

BiOp is arbitrary and not in accordance with law; and (3) NMFS violated NEPA by issuing and

adopting the 2019 SEAK BiOp without preparing new or supplemental NEPA documents. Dkt.

No. 1 ¶¶ 114–19. These are among "the many claims left untouched by § 1855(f)," as they did

not arise with the promulgation of a regulation. *See Turtle Island*, 438 F.3d at 948–49.

In fact, the Conservancy's ESA claims are very similar to the failure to reinitiate claim

that the court held out in *Turtle Island* as an example of what is not subject to § 1855(f). *Id.*

Here, NMFS did reinitiate consultation to address the ongoing impacts of the fishery under

existing regulations, so the Conservancy is not alleging a failure to reinitiate claim, but is instead

challenging the result of NMFS's reinitiated consultation—the 2019 SEAK BiOp. That is a

distinction without a difference: the failure to reinitiate claim and the Conservancy's claims

challenging the product of a reinitiation are not related to, and do not accrue with, the

promulgation of a regulation. The Conservancy's NEPA claim is directly aligned with the

example provided in *Turtle Island* as not subject to § 1855(f)—the Conservancy alleges that

NMFS must undertake new or supplemental NEPA efforts to address ongoing effects of the

fishery under existing regulations in light of changed circumstances.

In sum, the Conservancy is not challenging NMFS's ESA and NEPA efforts supporting

promulgation of a regulation. Instead, the Conservancy's ESA and NEPA claims arose after, and

are unrelated to, the issuance of any MSA regulations and are therefore "untouched" by 16

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 12
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

U.S.C. § 1855(f). The R&R therefore erred in finding the claims barred for not being filed within thirty days of NMFS's 2012 promulgation of regulations—seven years before the 2019 SEAK BiOp was issued. *See* Dkt. No. 51 at 17. Indeed, it would be unprecedented to apply a statute of limitations to time-bar claims before they even accrued. *See Graham Cty.*, 545 U.S. at 418.[1]

### 3. The Conservancy was not required to file its claims within 30 days of issuance of the 2019 SEAK BiOp.

The R&R also stated that "[e]ven if the Court were to construe the issuance of the 2019 BiOp as a new action under the regulations, Plaintiff was required to have brought its challenge within 30 days of the 2019 BiOp's issuance . . . ." Dkt. No. 51 at 17. This is error. In addition to regulations, § 1855(f) applies to actions "taken by [NMFS] under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing." 16 U.S.C. § 1855(f)(2). The limitations period expires "30 days after the date on which . . . the action is published in the Federal Register." *Id.* § 1855(f)(1). The 2019 SEAK BiOp was neither prepared in support of such an "action," nor was notice published in the Federal Register to commence the abbreviated limitations period.

The "actions" contemplated by § 1855(f) are those taken by NMFS pursuant to existing MSA regulations that implement a fishery management plan by establishing management measures, such as harvest limits or season dates. *See Or. Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1112–16 (9th Cir. 2006). For most MSA fisheries, NMFS retains management authority and implements the fishery management plan itself. When taking actions under MSA regulations to implement a fishery management plan, NMFS provides public notice and participation

---

[1] Acknowledging the paradox created by application of the limitations period, the R&R asserts that the Conservancy could have sought a consistency review. Dkt. No. 51 at 16 n.3. This is a reference to provisions of the Fishery Management Plan that allow the public to petition NMFS to review Alaska's management measures. Dkt. No. 14-1 at 485–87. However, NEPA and ESA section 7 apply exclusively to federal agencies and therefore do not even apply to Alaska's management measures. *See* 42 U.S.C. § 4331; 16 U.S.C. § 1536(a)(2). Thus, the Fishery Management Plan's consistency review provisions do not provide an opportunity to petition NMFS's to remedy its ESA and NEPA violations alleged herein. Moreover, as required by the ESA, the Conservancy notified NMFS of its violations and informed NMFS that the Conservancy would bring suit if the violations were not remedied within 60 days, and NMFS elected to not take any corrective action. *See* Dkt. No. 1 at 32–43; 16 U.S.C. § 1540(g)(2).

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 13
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

opportunities and is subject to NEPA. *See, e.g.*, *id.* at 1115–16; 16 U.S.C. § 1854(i)(1); 50 C.F.R. §§ 660.408, 660.411; 84 Fed. Reg. 19,729 (May 6, 2019).

Here, in contrast, NMFS previously delegated management authority to Alaska. Thus, NMFS did not take an action under MSA regulations that implemented the Fishery Management Plan, nor did it provide public notice or participation opportunities required for such MSA actions. The R&R and NMFS do not identify an action taken by NMFS under MSA regulations that implemented the Fishery Management Plan. That is unsurprising given that the 2019 SEAK BiOp was not prepared for such an action and not published in the Federal Register, but instead was prepared as a reinitiation of consultations to evaluate the ongoing effects of a fishery authorized by existing regulations in light of new information. *See* Dkt. No. 14-1 at 29–30.

To the extent the R&R finds that the 2019 SEAK BiOp is itself an "action taken by [NMFS] under regulations which implement a fishery management plan," the Court should reject this novel and wholly unsupported interpretation of the MSA and the ESA. A BiOp is prepared under section 7 of the ESA and supporting ESA regulations to evaluate "the nature and extent of jeopardy posed to [a] species by the agency action." *Conner v. Burford*, 848 F.2d 1441, 1452 (9th Cir. 1988); 16 U.S.C. § 1536(b)(3); 50 C.F.R. § 402.14(h). A BiOp is not an action taken by NMFS under MSA regulations that implement a fishery management plan. *See* 16 U.S.C. § 1855(f)(2); *Gutierrez*, 452 F.3d at 1112–16.

Finally, the abbreviated 30-day limitations period of § 1855(f) commences **only upon publication of the action or regulation in the Federal Register**. *See* 16 U.S.C. § 1855(f); *Gutierrez*, 452 F.3d at 1113–16 (publication of "action" triggers the 30-day period); *Nw. Envtl. Def. Ctr. v. Brennen*, 958 F.2d 930, 933–34 (9th Cir. 1992) (publication of regulation triggers 30-day period); *see also Turtle Island*, 438 F.3d 947–48 (the "limited window for judicial review" is consistent with notice requirements that put challengers in "prime position to seek judicial review"). It is undisputed that NMFS did not publish any notice in the Federal Register related to issuance of the 2019 SEAK BiOp; in fact, NMFS did not provide any public notice or

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 14
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

participation opportunities as would be required for MSA regulations or actions. The R&R wholly ignores the publication requirement for triggering the limitations period in finding that the Conservancy was required to file suit within thirty days of NMFS's completion of the 2019 SEAK BiOp. *See* Dkt. No. 51 at 17. The limitations period of 16 U.S.C. § 1855(f) did not commence with the issuance of the 2019 SEAK BiOp because NMFS did not publish notice.

In sum, the Conservancy was not required to file suit within thirty days of the 2019 SEAK BiOp because that BiOp was not prepared for "actions taken by [NMFS] under regulations which implement a fishery management plan," nor is the 2019 SEAK BiOp such an action itself, and NMFS did not publish notice required to commence the limitation period.

### 4. 16 U.S.C. § 1855(f) is not selectively applied.

The R&R and NMFS seek to selectively apply 16 U.S.C. § 1855(f) to bar some relief requested, but not others. This is inconsistent with § 1855(f) and *Turtle Island*.

While NMFS's response to the Motion suggested that the claims were reviewed under 16 U.S.C. § 1855(f) and would therefore be time-barred, NMFS clarified its position at argument:

> The plaintiff is suggesting that—what we're saying is that all aspects of this case cannot go forward and that you couldn't challenge a [BiOp] under the [APA] if you said that the [BiOp], for example, was arbitrary and capricious, or if there was a NEPA failure, or something along those lines.

> What we're focused on here is not the entire scope of the complaint. We're focused, particularly, on the relief that was requested in the preliminary injunction motion.

Attachment, 28:5–13. NMFS thus argues that § 1855(f) only applies to some relief requested under the claims. NMFS also argued that, although the limitations period of § 1855(f) applies, the requirement for expedited production of the administrative record under § 1855(f)(3)(B) does not apply. *Id.* at 48:13–25; Dkt. No. 48 at 2 n.1. The R&R accepted a piecemeal application of § 1855(f), finding the relief requested in the Motion precluded by the limitations period, but that the claims may nonetheless proceed as ESA and NEPA claims. Dkt. No. 51 at 17 n.4. However, the Magistrate Judge subsequently indicated that the claims are reviewed under § 1855(f), leaving the applicability of the limitations period to all of the claims unclear. Dkt. No. 52 at 2.

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 15
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Such piecemeal application of § 1855(f) is inconsistent with the statute and *Turtle Island*. Initially, § 1855(f) provides a comprehensive scheme for judicial review of actions subject to the provision; it establishes a truncated limitations period, precludes preliminary injunctions, requires expedited production of the administrative record, and requires expedited review upon request. *See* 16 U.S.C. § 1855(f)(1)–(4); *Turtle Island*, 438 F.3d at 943–44. These provisions are designed to work in harmony; selective application of § 1855(f) would undermine that intent. Moreover, the plaintiff in *Turtle Island* argued that the Court could review its ESA and NEPA claims as "stand alone challenge[s] to agency action[s]," just as NMFS is arguing here and as the R&R accepted. *See Turtle Island*, 438 F.3d at 945. The Ninth Circuit rejected that argument, holding that the ESA and NEPA claims that arose with the promulgation of MSA regulations must be dismissed in their entirety as time-barred under § 1855(f). *Id.* at 943–44, 949.

In contrast, the Ninth Circuit held that other ESA and NEPA claims that arise after the promulgation of regulations, such as those here, are among "**the many claims left untouched by § 1855(f).**" *Id.* at 949 (emphasis added). To avoid any doubt that plaintiffs would be able to seek relief against the actual fisheries in ESA and NEPA claims not subject to § 1855(f), the court emphasized that there would still be "effective enforcement of environmental laws in commercial fisheries." *Id.* at 948. There is no basis to preclude some relief otherwise available in ESA and NEPA claims by invoking § 1855(f) when that provision does not apply to judicial review of the claims whatsoever; i.e., when the claims are "untouched" by § 1855(f).

## B.   The Conservancy Has Standing to Pursue its Claims.

NMFS asserts that standing is lacking because the interests of the Conservancy's members—protection of Southern Residents—are not germane to the Conservancy's mission, which NMFS claims is limited to fish.[2] Dkt. No. 43 at 19–20. The R&R reserved this issue given

---

[2] NMFS also argued in a footnote that the injuries to one of Conservancy's members—Mr. McMillan—are not sufficiently concrete. Dkt. No. 43 at 20 n.5. This argument has no bearing on the Motion because NMFS did not challenge the injuries of another member—Mr. Soverel—which is sufficient for representational standing. *See, e.g.*, *Fleck & Assocs. v. City of Phoenix*, 471 F.3d 1100, 1105–06 (9th Cir. 2006). Regardless, Mr. McMillan's injuries are not speculative. *See* Dkt. No. 14-5 ¶¶ 6, 21; *see*

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

its application of the limitations period. Dkt. No. 51 at 13 n.2. This Court should reject NMFS's unsupported and wholly inaccurate factual assertion. The Conservancy's mission includes the protection of Southern Residents and other key components of wild salmonids' ecosystem.

For representational standing, the interests of the organization's members at issue must be germane to those of the organization. *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998). The "germaneness test" is "undemanding." *Id.* (citing *Humane Soc'y of the U.S. v. Hodel*, 840 F.2d 45, 58 (D.C. Cir. 1988)). In *Presidio*, the court rejected defendant's attempt to narrowly define a private golf club's interest as gathering to play golf, and accepted the club's description of its own interests as including the "corollary purpose" of maintaining a certain environment desired by the club and its members such that it could pursue NEPA claims. *Id.* at 1158–59; *see also Hodel*, 840 F.2d at 58–59 (the "modest" germaneness test requires only "pertinence," or relevance, between the interests in the litigation and those of the organization).

The Conservancy plainly meets this test, as its mission is to protect wild fish and their "**ecosystems**." Dkt. No. 14-4 ¶¶ 2–3 ("salmonids **and aquatic species** in the Northwest") (emphasis added); *Ecosystem*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/ecosystem ("the complex of a community of organisms . . ."). To the extent there is any uncertainty, the Conservancy requests an opportunity to provide further testimony on its mission and its long history in seeking to protect Southern Residents. *See* 28 U.S.C. § 636(b)(1)(C) (Court "may . . . receive further evidence" when revising the R&R).

## V.     CONCLUSION.

Wherefore, the Conservancy respectfully requests that the Court reject the R&R and enter an order establishing the preliminary injunction requested by the Motion.

Respectfully submitted this 15th day of June, 2020.

---

*Associated Gen. Contractors of Am. v. Metro. Water Dist.*, 159 F.3d, 1178, 1181 (9th Cir. 1998) ("regularly" taking action not speculative); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (injury satisfied where individual "shows . . . an aesthetic or recreational interest is a particular . . . animal . . . and that that interest is impaired by a defendant's conduct").

PLAINTIFF'S OBJECTIONS TO
MAGISTRATE JUDGE'S REPORT - 17
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
221 S.E. 11th Avenue, Suite 217
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1

2    KAMPMEIER & KNUTSEN, PLLC                    CORR CRONIN, LLP

3    By: _s/ Brian A. Knutsen_____           By: _s/ Benjamin C. Byers_____
     Brian Knutsen, WSBA No. 38806                Eric A. Lindberg, WSBA No. 43596
4    Emma Bruden, WSBA No. 56280                  Benjamin C. Byers, WSBA No. 52299
     221 S.E. 11th Avenue, Suite 217              1001 Fourth Avenue, Suite 3900
5    Portland, Oregon 97214                       Seattle, Washington  98154
     Tel: (503) 841-6515                          Tel: (206) 625-8600
6                                                 Email: elindberg@corrcronin.com
     Tel: (503) 841-6515 (Knutsen)                        bbyers@corrcronin.com
7          (503) 719-5641 (Bruden)
     Email: brian@kampmeierknutsen.com
8            emma@kampmeierknutsen.com

9
     Paul A. Kampmeier, WSBA No. 31560
10   811 First Avenue, Suite 468
     Seattle Washington 98104
11   Tel: (206) 858-6983
     Email: paul@kampmeierknutsen.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29   PLAINTIFF'S OBJECTIONS TO              KAMPMEIER & KNUTSEN PLLC          CORR CRONIN, LLP
     MAGISTRATE JUDGE'S REPORT - 18        221 S.E. 11th Avenue, Suite 217   1001 Fourth Avenue, Suite 3900
     Case No. 2:20-cv-00417-RAJ-MLP             Portland, Oregon 97214         Seattle, Washington 98154
                                                    (503) 841-6515                  (206) 625-8600

# **ATTACHMENT**

```
                    UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

WILD FISH CONSERVANCY,            ) CASE NO. C20-417-RAJ
                                  )
                    Plaintiff,    ) Seattle, Washington
                                  )
v.                                ) May 28, 2020
                                  ) 10:00 a.m.
BARRY THOM, in his official       )
capacity as Regional              ) TELEPHONIC MOTION FOR
Administrator for the National    ) EXTENSION OF TIME TO
Marine Fisheries Service, et al., ) FILE OPPOSITION TO
                                  ) MOTION FOR PRELIMINARY
                    Defendants.   ) INJUNCTION
_____

                   VERBATIM REPORT OF PROCEEDINGS
             BEFORE THE HONORABLE MICHELLE L. PETERSON
                  UNITED STATES MAGISTRATE JUDGE
_____


APPEARANCES:


  For the Plaintiff:      BRIAN ALAN KNUTSEN
                          Kampmeier & Knutsen
                          221 SE 11th Avenue, Suite 217
                          Portland, OR 97214


  For the Defendants:     FREDERICK TURNER
                          U.S.  Department of Justice
                          Environmental and Natural
                          Resources Division
                          PO Box 7611
                          Washington, D.C. 20044-7611


                          THANE WALKER TIENSON
  For the Intervenor,     Landye Bennett Blumstein
  Alaska Trollers         1300 SW Fifth, Suite 3600
  Association:            Portland, OR 97201

  Reported by:            NANCY L. BAUER, CCR, RPR
                          Federal Court Reporter
                          700 Stewart Street, Suite 17205
                          Seattle, WA 98101
                          nancy_bauer@wawd.uscourts.gov
```

Proceedings recorded by mechanical stenography; transcript produced with aid of computer

```
 1                           PROCEEDINGS
 2   _____

 3           THE CLERK:  Good morning, Your Honor.  The United
 4   States District Court for the Western District of Washington is
 5   now in session.  This morning, we have C20-417, assigned to
 6   Judge Jones and referred to Your Honor, Wild Fish Conservancy
 7   versus Barry Thom, et al.
 8      Counsel, please make your appearances for the record.
 9           MR. KNUTSEN:  Good morning, Judge Peterson.  Brian
10   Knutsen on behalf of plaintiff, Wild Fish Conservancy.
11           THE COURT:  Good morning, Mr. Knutsen.
12           MR. TURNER:  Good morning, Your Honor.  Frederick
13   Turner on behalf of the defendant.
14           THE COURT:  Good morning, Mr. Turner.
15           MR. TIENSON:  And good morning, Your Honor.  It's
16   Thane Tienson on behalf of the defendant intervenor, Alaska
17   Trollers Association.
18           THE COURT:  Good morning, Mr. Tienson.
19      So I know Mr. Farrell has already gone over the rules.
20   Just make sure that, unless you are presenting to the court,
21   you've muted your line.  Also, please remember that there's no
22   broadcasting or recording of court hearings in our jurisdiction.
23   So I know these apps allow you to do that; just make sure that
24   nobody is doing that.
25      Now, I'm going to pause here real quick and just make sure
```

1   that everybody is able to hear me okay.  Mr. Knutsen, are you

2   able to you hear me okay?

3           MR. KNUTSEN:  Yes, Your Honor.  Thank you.

4           THE COURT:  And Mr. Turner?

5           MR. TURNER:  Yes, Your Honor.

6           THE COURT:  And Mr. Tienson?

7           MR. TIENSON:  I am.

8           THE COURT:  Ms. Bauer, are you able to hear everything

9   okay?

10          THE COURT REPORTER:  Good morning, Judge.  Yes, I can

11  hear you.

12          THE COURT:  Ms. Bauer is our court reporter today, and

13  she will interject and stop the proceedings at any time that she

14  cannot understand what is being said.

15      So we're here on plaintiff's motion for a preliminary

16  injunction.  Before we begin, let me go over what I have

17  reviewed.

18      I did review the complaint at Docket No. 1.  I reviewed the

19  motion and the supporting declarations, which are at Docket

20  No. 14.  I've also reviewed the unopposed motion to intervene by

21  Alaska Trollers Association and those declarations that were

22  attached to that.  I've reviewed the answers that were filed by

23  both Alaska Trollers Association and the plaintiff in this case,

24  Docket No. 29 and Docket No. 45.  I've also reviewed Alaska

25  Trollers' response to the motion for preliminary injunction; the

1    declarations that were attached in support of that response.

2    I've reviewed the response by the government defendants at

3    Docket No. 43 and those declarations, and I've also reviewed the

4    reply that was filed by the plaintiff.

5         Is there anything in addition I should have reviewed?

6         MR. KNUTSEN:  Not that the plaintiffs are aware, Your

7    Honor.

8         MR. TURNER:  Same here.

9         MR. TIENSON:  Same here as well, Your Honor.

10        THE COURT:  Okay.  So the parties have received notice

11   of today's hearing by way of a minute order that sort of set out

12   what I think are the threshold questions before the court can or

13   should move on to the merits of this case, and those relate to

14   jurisdiction and standing.

15        Mr. Knutsen, I have a number of questions, but I will let

16   you get started on your presentation, and I will probably

17   interrupt.

18        MR. KNUTSEN:  Great.  Thank you, Your Honor.

19        So consistent with the court's minute order, today I intend

20   to address two issues:  One is the applicability of the

21   Magnuson-Stevens Act provision for judicial review of

22   regulations, and second is plaintiff's Article III

23   constitutional standing to pursue the claims and relief at issue

24   here.  I intend to focus primarily on the arguments raised by

25   defendants, unless the court has specific questions or concerns

1    on other issues.

2         So turning, first, to the applicability of the

3    Magnuson-Stevens Act provision at 16 U.S.C. 1855(f), that

4    provision governs judicial review of two specific types of

5    actions by NOAA Fisheries under the Magnuson-Stevens Act.

6    First, regulations promulgated by NOAA Fisheries under the

7    Magnuson-Stevens Act, and, second, to actions taken by NOAA

8    Fisheries under regulations which implement a fishery management

9    plan.

10        Now, the leading Ninth Circuit Court of Appeals case

11   determining the breadth of that provision is cited by the

12   parties in the briefing.  *Turtle Island Restoration Network* held

13   that, in addition to challenges to regulations, that that

14   provision also governs certain Endangered Species Act in NEPA

15   claims.  But at the same time, the Ninth Circuit was very

16   careful to limit the applicability of its holdings, explaining

17   that it doesn't apply to other Endangered Species Act in NEPA

18   claims.  So that opinion provides a bit of a framework for

19   evaluating whether or not the claims at issue here are governed

20   by 1855(f).

21        So at issue in the *Turtle Island Restoration* case was an

22   amendment to a fishery management plan that would reopen a

23   fishery that was eventually adopted as an amendment and

24   promulgated through regulations by NOAA Fisheries.  And as part

25   of --

1          THE COURT:  I'm going to ask you to slow down, just a

2     little bit, for the court reporter.

3          MR. KNUTSEN:  Sure.

4       And so as part of that Magnuson-Stevens Act process of

5     adopting an amendment to a fishery management plan and

6     promulgation of a regulation, NOAA Fisheries undertook both an

7     ESA Section 7 consultation process and a NEPA process that was

8     coupled with the adoption of that amendment to a fishery

9     management plan.  And so there was all the regular procedures

10    associated with a Magnuson-Stevens Act action.

11         There were public-comment periods, public-notice periods,

12    and even public hearings that allowed for input on the proposed

13    reopening of the fishery, and as part of that process, NOAA

14    prepared a biological opinion that, ultimately, opined that the

15    proposed amendment would not jeopardize endangered species, and

16    NOAA Fisheries also prepared an environmental impact statement

17    evaluating the proposed amendment to the fishery management plan

18    and alternative thereto, and then NOAA Fisheries issued a record

19    of decision, under NEPA, determining to adopt the amendment to

20    the fishery management plan and promulgate the regulation,

21    reopening the fishery.

22         And the court in that case held that those claim -- I'm

23    sorry -- so the lawsuit was then filed, not alleging any

24    Magnuson-Stevens Act claim, but, instead, challenging the ESA

25    and the NEPA process for the adoption of that amendment.

1     And the Ninth Circuit held that those claims were subject

2  to judicial review under 1855(f) of the Magnuson-Stevens Act,

3  pointing out that the record of decision being challenged, the

4  NEPA document, the record of decision being challenged by

5  plaintiffs, was the decision to reopen the fisheries through

6  promulgation of the regulation.

7     The Ninth Circuit held that that record of decision was the

8  foundation for the regulations, and, similarly, the Ninth

9  Circuit explained that the Endangered Species Act claim was

10 premised on the issuance of regulations reopening the fishery.

11    So the court held that those claims were to be reviewed

12 under 1855(f), explaining that the essence of the suit

13 challenges the reopening of the fisheries, which came about

14 through promulgation of the regulations.

15         THE COURT:  Was the case filed within 30 days of

16 promulgation of the regulation, or the amendment to the FMP?

17         MR. KNUTSEN:  I believe the lawsuit was filed five

18 months after promulgation of the regulation, Your Honor.

19         THE COURT:  So why didn't the 30-day period run?  Why

20 were they able to bring the lawsuit in the first place?

21         MR. KNUTSEN:  Well, so I believe they didn't, Your

22 Honor.  I believe the court said that those claims were subject

23 to the statute of limitations, and, therefore, could not be

24 reviewed by the Ninth Circuit.

25         THE COURT:  Okay.  Thank you.

1          MR. KNUTSEN:  But at the same time, the court was very

2    careful to limit the scope of that holding.

3          Apparently, the plaintiff had argued that the court's

4    holding would effectively eliminate enforcement of environmental

5    laws with respect to commercial fisheries, and the Ninth

6    Circuit's response was the sky is not falling.  The court

7    explained that Section 1855(f) applies to only a very specific

8    class of claims, those that clearly challenge regulations

9    promulgated under the Magnuson-Stevens Act.  The court went on

10   to explain that 1855(f) would not affect every claim that may

11   arise later.  So the court was very careful to distinguish

12   between ESA and NEPA claims that arise through the promulgation

13   of regulations and those that arise later, and the Ninth Circuit

14   went on to offer two examples.

15         First, the Ninth Circuit explained that a regulatory --

16   that the regulatory challenge limitation, meaning 1855(f), would

17   not encompass claims that NOAA Fisheries failed to reinitiate a

18   prior consultation if, for example, more taking occurred than

19   was previously authorized, or if new information revealed

20   impacts not addressed during prior consultation.

21         The court also provided a NEPA example.  The court

22   explained that NEPA imposes a continuing duty to supplement

23   prior environmental impact statements -- so prior NEPA

24   efforts -- if significant new circumstances indicate new

25   concerns.

1          And the court then went on to summarize that explanation to

2    state that, "We do not intend these examples to serve as an

3    exhaustive list but rather as illustrative of the many claims

4    left untouched by Section 1855(f)."

5          So what distinguishes these examples that the Ninth Circuit

6    was giving there from those that were found to be subject to

7    1855(f) is that the former do not challenge ESA or NEPA

8    processes that are coupled with the promulgation of a

9    regulation.  Instead, they allege that the ongoing

10   implementation of a fishery under preexisting regulation

11   violates the Endangered Species Act and NEPA, due to changed

12   circumstances, or new circumstances.

13         And so, for example, a failure-to-reinitiate claim would

14   allege that NOAA Fisheries' ongoing implementation of the

15   fishery, under regulations previously promulgated, violates the

16   Endangered Species Act because new circumstances warrant

17   reinitiation of consultation.  The Ninth Circuit held that that

18   would not be subject to review under 1855(f).

19         Similarly, the NEPA failure-to-supplement claim that the

20   Ninth Circuit provided as an example would allege that NOAA

21   Fisheries is violating NEPA by continuing to implement the

22   fishery under preexisting regulations without supplementing NEPA

23   to address changed circumstances.  Both of those examples would

24   seek relief against ongoing implementation of the fishery due to

25   the ESA and NEPA violations.

1          So under this framework of the *Turtle Restoration* case,

2     it's apparent that the claims at issue here are not subject to

3     review under 1855(f).  Wild Fish Conservancy is not challenging

4     Amendment 12 to the fishery management plan that was promulgated

5     in 2012, as defendants assert.  That regulation had its own ESA

6     consultation and had its own NEPA process in 2012, and Wild Fish

7     Conservancy is not challenging those efforts.

8          Instead, this case focuses on a 2019 biological opinion

9     that NOAA Fisheries prepared as a reinitiation, a consultation

10    to evaluate the ongoing impacts of its implementation of this

11    fishery under preexisting regulations.

12          THE COURT:  So, then, to distinguish *Turtle Island*

13    from this case, you would say that the 2019 BiOp is a changed

14    circumstance or a new circumstance that gives you the right to

15    bring these claims under NEPA and ESA?

16          MR. KNUTSEN:  Certainly the 2019 biological opinion is

17    a changed circumstance, but it's the adoption and implementation

18    of that 2019 biological opinion, it is a changed circumstance,

19    so that biological opinion was a reinitiation of prior

20    consultation, and this is explained on page 5 of the biological

21    opinion.

22          NOAA Fisheries reinitiated consultation on its delegation

23    of management afforded to Alaska to evaluate new information

24    regarding the effects of the action and the condition of the

25    species.  So NOAA Fisheries reinitiated, because it had to, to

1    address new circumstances, specifically the adoption of new

2    fishing regimes under the 2019 Pacific Salmon Treaty and their

3    new ten-year fishing regimes, and NOAA's proposals to offset or

4    mitigate the impacts of those harvests with hatchery and habitat

5    conservation programs, which is certainly new circumstances.

6              THE COURT:  Explain to me why would Congress require a

7    30-day filing period from a regulation or an action published in

8    the Federal Register but not make such a requirement for every

9    change in circumstance or every derivative of that regulation or

10   action?

11             MR. KNUTSEN:  But, Your Honor, I think there is a

12   difference between a challenge to a regulation and saying that

13   this regulation was promulgated inconsistent with the

14   Magnuson-Stevens Act or the Endangered Species Act.  That's very

15   different than alleging that the ongoing implementation of this

16   fishery violates the Endangered Species Act due to circumstances

17   that are untethered to the process that NOAA Fisheries undertook

18   to develop those regulations.

19             THE COURT:  Mr. Knutsen, slow down again.

20             MR. KNUTSEN:  Sorry.

21             THE COURT:  So talk to me about -- you mentioned that

22   there's good congressional intent for wanting a short period of

23   time when a regulation has been promulgated so it can be put

24   into effect, but what about an action taken by the secretary

25   that's published in the Federal Register?  I mean, why would

1    that also have only a 30-day period to be able to file a lawsuit

2    based on that action?

3              MR. KNUTSEN:  Sure, Your Honor.

4         So the Ninth Circuit discussed that, sort of, difference

5    between regulations and actions reviewed under 1855(f) in the

6    case of *Oregon Trollers Association*.  The citation is 452 F.3d

7    1104.  And the Ninth Circuit explained that -- initially, 1855

8    only applied to review of regulations and the legislative

9    history behind the amendment to that statute, to include

10   actions -- explained that many fishermen didn't have reason to

11   know that the adoption of regulations, you know, which they

12   described how annual quotas are going to be set, when the

13   harvest season is going to open or close.  Would it necessarily

14   know how those subsequent decisions are going to impact them

15   when the regulation is initially promulgated?

16        And so the addition of the actions by NOAA Fisheries, under

17   regulations which implement fishery management plans, was

18   intended to allow those impacted people to file suit upon an

19   action that actually impacted their fishery.

20             THE COURT:  But this is an action that you're alleging

21   actually impacts -- I mean, would impact the fisheries, if you

22   were successful, or the BiOp opinion is an action that would

23   affect the fisheries.

24             MR. KNUTSEN:  Correct.

25             THE COURT:  So why wouldn't that be subject to the

 1   30-day limitation for filing?

 2          MR. KNUTSEN:  Your Honor, because the claims at issue

 3   here don't relate to Magnuson-Stevens Act procedures that were

 4   undertaken, you know, under this very narrow type of actions

 5   that Congress delineated in 1855(f) and the Ninth Circuit was

 6   very careful to exclude from its holding in the *Turtle Island*

 7   *Restoration* case.

 8       Those claims that the Ninth Circuit identified would seek

 9   relief against the ongoing implementation of the fishery.  You

10   don't file a reinitiation claim attacking the failure to

11   reinitiate by itself.  You allege that the ongoing activity

12   violates the Endangered Species Act for failure to reinitiate

13   consultation.

14          THE COURT:  Okay.  Thank you.

15          MR. KNUTSEN:  So I was explaining that the biological

16   opinion at issue here was not a biological opinion prepared in

17   conjunction with some new Magnuson-Stevens Act regulations or

18   action, but was instead a reinitiation of consultation on prior

19   actions, to look at the ongoing impacts of implementation of

20   prior regulations.

21       So the claim specifically challenged that biological

22   opinion.  It alleged that NOAA Fisheries is violating NEPA by

23   adopting and implementing that biological opinion without

24   preparing new or supplemental NEPA documents.

25       These claims are the very sort of claims that the Ninth

1  Circuit held, in *Turtle Island*, were outside the purview of

2  1855(f) and that Wild Fish Conservancy is not challenging NEPA

3  and ESA efforts for the promulgation of a regulation.  So in

4  *Turtle Island*, the ESA claim that we just discussed is a failure

5  to initiate claims.  Wild Fish Conservancy isn't alleging a

6  failure-to-reinitiate claim because NOAA Fisheries did

7  reinitiate to consult on the ongoing impacts of the fishery.

8       Instead, Wild Fish Conservancy is challenging the product

9  of that biological opinion -- I'm sorry -- the product of that

10  consultation, but that distinction is not significant for the

11  purposes of the analysis in *Turtle Island*.  What's significant

12  is that the biological opinion was not prepared in conjunction

13  with and to evaluate a new Magnuson-Stevens Act action.

14       THE COURT:  So walk me through.  Why was the

15  biological opinion prepared?  I understand that there was a

16  change in circumstance because of the Pacific Salmon Treaty.

17  There was a lawsuit filed in front of Judge Pechman in 2019 that

18  then culminated in an agreement that NOAA would do the BiOp, the

19  biological opinion.

20       How did that all come about, as far as you know?  Because I

21  think that's important to understanding whether or not this is a

22  new circumstance or change in circumstance.  Tell me what you

23  know about that.

24       MR. KNUTSEN:  Sure.

25       So the case pending in front of Judge Pechman pertains to

1   an entirely different fishery.  It pertains to the West Coast --

2   they call it -- it's somewhat confusing.  It's the Pacific Coast

3   Management Council, which addresses fisheries along the

4   Washington, Oregon, and California coasts, while this is an

5   Alaska fishery.  So they're entirely different fishery

6   management plans.

7        So with respect to the case in front of Judge Pechman,

8   there was a claim that NOAA had an obligation to reinitiate, and

9   NOAA did, in fact, reinitiate.

10       Here, in contrast, NOAA had -- nobody sued NOAA for failing

11  to reinitiate.  NOAA did reinitiate because of the change in

12  circumstances.  And so there was no biological opinion

13  evaluating the implementation of the fishery regimes under the

14  2019 Pacific Salmon Treaty.  The prior biological opinions

15  address the ten-year fishing regimes under the 2008 or '9

16  Pacific Salmon Treaty.  And so NOAA was under an obligation to

17  reinitiate here due to the adoption of new ten-year fishing

18  regimes and the adoption of the mitigation package to offset the

19  harvest under that plan.

20            THE COURT:  Okay.  So you're saying that the case

21  before Judge Pechman is completely unrelated to the biological

22  opinion at issue in this case?

23            MR. KNUTSEN:  That's correct.  They're -- they are

24  entirely -- I hate to say they're entirely unrelated because

25  they're not -- obviously, reductions in one harvest may benefit

1   Southern Resident killer whales.  So there is some overlap,

2   certainly.  And, for example, the ESA consultation along the

3   West Coast, before Judge Pechman, is, in fact, relying on some

4   of this hypothetical mitigation that NOAA described in the BiOp

5   in front of this court.  So there is some overlap, but they're

6   different fisheries, different harvests.

7             THE COURT:  Okay.  Thank you.

8             MR. KNUTSEN:  Okay.

9        And then concluding with this 1855 analysis, the NEPA claim

10  alleged here is on all fours with the example provided by the

11  court in *Turtle Island*.

12       Here, Wild Fish is alleging that NOAA violated NEPA by

13  failing to prepare new or supplemental NEPA documents to address

14  new or changed circumstances since the promulgation of previous

15  regulations.  That claim is squarely within the example that the

16  Ninth Circuit provided in *Turtle Island*.

17       And so, Your Honor, I'll also just briefly note that

18  defendants here are certainly arguing that the statute of

19  limitations provision of 1855 apply, but they have not been

20  acting like the other provisions of 1855 apply; for example,

21  1855 contemplates an expedited judicial review, which requires a

22  response to the complaint within 45 days instead of 60.

23  Defendants did not comply with that.

24       It also, importantly, requires completion and submission of

25  the administrative record within 45 days of the complaint -- of

1  service, and defendants certainly haven't complied with that,

2  nor have they provided their administrative record yet.

3       So unless there are questions, Your Honor, on the scope of

4  the Magnuson-Stevens Act provision, I'll move on to standing.

5            THE COURT:  No.  I have some questions.

6            MR. KNUTSEN:  Sure.

7            THE COURT:  What case would you direct me to which

8  would be the best example of an action that affects the

9  fisheries within the federal waters or the exclusion zone, but

10  doesn't fall under the Magnuson-Stevens Act?  One that is not

11  subject to 1855(f).

12            MR. KNUTSEN:  Your Honor, I'm not sure if I have any

13  at my fingertips.  I can say that this court has certainly held

14  that there are other types of actions that can impact

15  regulations and fisheries that are not reviewed under 1855.

16       I think, for our case, the best example is the *Turtle*

17  *Island* case and the examples provided by the Ninth Circuit.

18  But, certainly, there is another provision of the

19  Magnuson-Stevens Act that governs judicial review of enforcement

20  actions.  So when, you know, NOAA Fisheries is seeking to

21  enforce a fishing regulation against fishermen, and the Ninth

22  Circuit -- and so, certainly, those claims are not reviewed

23  under 1855.  And, in fact, this particular court has held that

24  those defendants can collaterally attack regulations in those

25  enforcement actions, and that decision was upheld by the Ninth

1    Circuit.  Unfortunately, I don't have it at my fingertips, but I

2    can certainly provide those to the court, if the court would

3    like.

4              THE COURT:  Okay.  That's helpful.  Thank you.

5         Okay.  I think you answered my questions with respect to

6    jurisdiction, so let's move on to standing.

7              MR. KNUTSEN:  Okay.

8         Your Honor, I intend to focus on representational standing,

9    meaning the Wild Fish Conservancy has standing to represent the

10   interests and injuries of its members, because that was the

11   focus of Wild Fish Conservancy's declaration submissions and

12   because representational standing covers all of the claims and

13   injuries at issue, as opposed to the organizational standing

14   argument, which Wild Fish Conservancy put forward a declaration

15   just for purposes of the NEPA claim, but I'm certainly happy to

16   address organizational standing if the court has specific

17   questions.

18        But with respect to the representational standing, again, I

19   will focus on the specific arguments raised by the defendants,

20   unless the court has issues on other components.

21        So in the *Friends of the Earth v. Laidlaw*, the United

22   States Supreme Court case cited by the parties in the briefing,

23   the Supreme Court explained that an association, such as Wild

24   Fish Conservancy, has standing to bring suit on behalf of its

25   members when its members would otherwise have standing to sue in

1   their own right, the interests at stake are germane to the

2   organization's purpose, and neither the claim asserted nor the

3   relief requested requires the participation of individual

4   members.

5          And to satisfy standing for the individual members, a

6   plaintiff must show that the member has suffered injury-in-fact,

7   that the injury is fairly traceable to the challenged action of

8   the defendant, and that it is likely, as opposed to merely

9   speculative, that the injury will be redressed by a favorable

10  decision.

11         So turning to the injury-in-fact prong of standing,

12  plaintiff cited, in its briefing, the Ninth Circuit decision in

13  *Ecological Rights Foundation*, where the Ninth Circuit explained

14  that, for environmental cases, injury-in-fact is satisfied where

15  an individual shows that she has aesthetic or recreational

16  interests in a particular place, animal, or plant, and that that

17  interest is impaired by defendant's conduct.

18         The Ninth Circuit also explained, in that case, that actual

19  harm to the environment need not be proven; rather, individuals'

20  reasonable concerns as to the harm caused by defendant's conduct

21  are sufficient for standing purposes.

22         And so, here, Wild Fish --

23             THE COURT:  Why don't you address the

24  traceable-to-the-challenged-action issue?

25             MR. KNUTSEN:  Sure.

1          So that's an argument that I don't believe any parties have

2     raised, but the traceability prong -- or the causation prong

3     requires that there be some causal connection between the injury

4     complained of and the -- I'm sorry -- between the injury and the

5     conduct complained of.

6          One of the better cases on this prong of standing in the

7     Ninth Circuit is *Natural Resources Defense Council v. Southwest*

8     *Marine* at 236 F.3d 985, where the Ninth Circuit explained that

9     there doesn't have to be scientific certainty that the

10    defendant's conduct caused the precise harm alleged.  Instead,

11    the plaintiff must show that the defendant causes or contributes

12    to the kinds of injuries alleged in the specific geographic area

13    of concern.

14         So, here, the injury that Wild Fish Conservancy

15    demonstrated with its member separations were related to a

16    declining Southern Resident killer whale population due, in

17    large part, to a lack of prey, and there is no dispute that the

18    approval of harvests in Alaska contribute to that lack of prey,

19    and so that satisfies the causation or traceability element of

20    standing.

21         Did the court have any further questions on that component?

22              THE COURT:  No.

23              MR. KNUTSEN:  Did the court want me to address the

24    injury-in-fact component?

25              THE COURT:  Yes.

1          MR. KNUTSEN:  Okay.

2      So I had just described how the Ninth Circuit described the

3  injury-in-fact for environmental cases in the *Ecological Rights*

4  *Foundation* case, and Wild Fish Conservancy produced declarations

5  from two of its members, Peter Soverel and William McMillan, who

6  testified that they live on or near Puget Sound.  They testified

7  as to their deep recreational and aesthetic connection to Puget

8  Sound, especially to its salmonids and Southern Residents.  They

9  testified of their concern about harvest and hatchery impacts

10 that are at issue in this case, and they testified as to how

11 their reasonable concerns affects their recreational and

12 aesthetic uses and enjoyment of Puget Sound and its ecosystem.

13     Under the *Ecological Rights* case in the Ninth Circuit, that

14 is sufficient for injury-in-fact.  And, in fact, the defendants

15 do not contest the injury-in-fact demonstration put forth by

16 Peter Soverel, which, as plaintiff explained in our reply brief,

17 that is sufficient for standing purposes.

18     Wild Fish Conservancy needs to only establish that one of

19 its members would have standing, and defendants have not

20 challenged the injury-in-fact by Mr. Soverel.  Defendants do

21 challenge the injury-in-fact of a second member, Mr. McMillan,

22 in a footnote, Footnote 13, characterizing Mr. McMillan's

23 injuries as speculative because he testified that he will

24 continue to try to observe Southern Residents, but he didn't

25 specific precisely when.

1          The defendants cite the United States Supreme Court

2     decision, *Lujan v. Defenders of Wildlife*, for that argument.  In

3     that case, an individual had been to an area in Egypt that was

4     going to be impacted by a project and had testified that he

5     intended to do so again someday.  The court found that that

6     someday-intention was insufficient because there was no

7     continuing present, adverse effect.

8          Here, in sharp contrast to *Lujan*, Mr. McMillan testified

9     that he regularly creates opportunities to try and view Southern

10    Resident killer whales.  He regularly visits his adult children

11    in Port Angeles and in Victoria, by taking a ferry, and tries to

12    observe Southern Residents, and he testified that he intends to

13    continue trying to view Southern Residents and that he fears,

14    despite his best efforts, he will never be able to view Southern

15    Residents.  Those aren't someday-intentions to visit a foreign

16    country.  Those are regular, ongoing injuries.

17         Your Honor, I won't address redressability, unless the

18    court has any questions on the redressability component.

19         Okay.

20         So Wild Fish Conservancy established, through declarations

21    of Mr. McMillan and Mr. Soverel, that its members would have

22    standing in their own right.  So then to have representational

23    standing in this case, Wild Fish Conservancy's purpose must be

24    germane to the interests at stake.

25         First, I just want to note that the main interest at stake

1   in this litigation relates to salmon harvest and their impacts

2   on salmon, and salmon fisheries and their impacts on salmon, and

3   it is beyond dispute that those interests are germane to Wild

4   Fish Conservancy's purposes.  And so, certainly, Wild Fish

5   Conservancy has standing to pursue the claims generally.

6        Now, Wild Fish Conservancy certainly recognizes, as the

7   Supreme Court has explained it in *Laidlaw*, that they still must

8   show injury for each type of relief requested.  And so

9   defendant's argument argues narrowly that the interest at stake

10  in the PI motion, which focuses on irreparable injury to the

11  Southern Resident killer whale, is not germane to Wild Fish

12  Conservancy purpose.  That argument is simply factually

13  incorrect.

14       The leading Ninth Circuit case on the germaneness issue is

15  *Presidio Golf Club v. National Parks Service* at 155 F.3d 1153,

16  where, there, the Parks Service was proposing renovations to the

17  Presidio in a private golf club that operated at the Presidio,

18  sued for violations of NEPA and the National Historic

19  Preservation Act, alleging concerns that the renovations would

20  harm their property by harming the historical and environmental

21  integrity of their clubhouse.

22       So the defendant looks to the articles of incorporation of

23  the plaintiff.  They argued that the plaintiff's interests were

24  limited to economic interests, focused only on socializing and

25  gathering to play golf.  They made related arguments; one, they

1   argued that the interest -- that the organization's interests
2   were not within the zone of interests for NEPA, for prudential
3   standing purposes, and then they also argued that the members'
4   interests being asserted, which related to the historic
5   integrity of the facility, were not germane to the purposes of
6   the organization.

7        And the Ninth Circuit rejected the defendant's attempt to
8   characterize the plaintiff's purpose, and accepted the
9   plaintiff's explanation of its own purpose, which they explained
10  included, as a corollary to their interests in gathering for
11  golf, an interest in preserving the historic-built environment
12  surrounding their golf club.

13       But in doing so, importantly, the Ninth Circuit explained
14  that courts have generally found the germaneness test to be
15  undemanding, and the Ninth Circuit cited a D.C. Circuit Court of
16  Appeals opinion, collecting cases for that proposition, the case
17  of *Humane Society v. Hodel* at 840 F.2d 45, where the D.C.
18  Circuit Court of Appeals explained that the interests at issue
19  in the litigation don't have to be part of the organization's
20  central purpose; there only must -- there must be some relevance
21  or pertinence between the interests at issue in the litigation
22  and the organization's purpose.

23       So under any of these standards, Wild Fish Conservancy
24  plainly satisfies the germaneness test.  Wild Fish Conservancy's
25  executive director testified that Wild Fish Conservancy is

1    dedicated to protecting wild fish and their ecosystems.

2    Ecosystems are defined as a community of organisms.  It's beyond

3    dispute that Southern Resident killer whales are not a central

4    component of salmonids in the Pacific Northwest ecosystem.  The

5    Southern Resident killer whales have played a key role in

6    shaping the evolutionary significant units of salmon that exist

7    in the Pacific Northwest.

8         Further, Wild Fish Conservancy doesn't protect salmon for

9    the sake of salmon alone.  They have corollary purposes,

10   corollary purposes in protecting healthy salmon runs so that

11   healthy salmon runs are available for sustainable harvest and

12   fishing opportunities, and so that healthy salmon runs are

13   available to the predators that rely on those runs.

14        THE COURT:  Okay.  You've been speaking for about 38

15   minutes.  I'm getting a little bit of feedback.  Is anyone else

16   hearing that?

17        MR. TURNER:  Yes, Your Honor, I can hear that.

18        MR. KNUTSEN:  I apologize.  Can you hear me okay now?

19        THE COURT:  Now it's gone.  I don't know why I was

20   getting feedback.

21        So why don't we let Mr. Turner have an opportunity here,

22   and then, Mr. Knutsen, I will give you the last word.

23        And Mr. Tienson, when Mr. Turner is done, I'm happy to hear

24   from you.  I did review your response.  It doesn't seem that you

25   were raising the same issues with respect to jurisdiction and

1  standing that we're here today to discuss, but if you want to

2  add something to it, I can give you five minutes as well.

3      All right.  Mr. Turner, why don't you start -- I have a lot

4  of questions for you, so you probably won't get very far.

5      MR. TURNER:  Okay.  Thank you, Your Honor.

6      I wanted to start with Your Honor's comment during the

7  discussion about the Magnuson-Stevens Act, in particular.  At

8  one point, you asked plaintiff's counsel about impact to the

9  fishery, and I think that's where I'd like to begin here,

10  because the plaintiff's preliminary injunction motion seeks to

11  close the fishery.  That's the relief that it is seeking in this

12  motion.

13      And because the source of that fishery -- the source of the

14  authorization comes from the Magnuson-Stevens Act, that means

15  that the Magnuson-Stevens Act is necessarily implicated, and for

16  that reason, the Magnuson-Stevens Act 30-day review period

17  applies as it pertains to this particular requested relief.

18      I'd like to spin this out a little bit in the context of

19  the *Turtle Island* case.

20      I think the *Turtle Island* case is squarely on point, but

21  not for the reasons that plaintiffs said.  Plaintiff focuses on

22  the dicta for claims that would not be covered, which I can also

23  discuss, but I'd like to focus on the thrust of the holding.

24      The holding in that decision was a very similar relief

25  request, and I'd like to focus on some of the language from that

1    opinion.

2        The plaintiffs were asking the court to require the

3    defendants to withdraw their authorization of the swordfish

4    longlining in the Pacific Fishery.  And because the 2004

5    regulations are the source of the authorization for that

6    swordfish longlining, *Turtle Island*'s challenge cannot be viewed

7    as anything other than an attack on the regulations.

8        And we submit that the same is true here.  Because there is

9    this request -- notice -- notice in the very first paragraph of

10   the plaintiff's motion, that -- seeking an order that would stay

11   the National Fisheries Service's alteration of commercial

12   Chinook salmon fisheries in the federal waters.  Because they're

13   requesting nearly identical relief to what the plaintiffs in

14   *Turtle Island* were requesting, and because the source of that

15   fishery obligation flows from the Magnuson-Stevens Act, then the

16   holding in that case applies to this requested relief.

17           THE COURT:  But how do you view this situation -- I'm

18   still getting some feedback.  Is everyone muted?  Mr. Tienson,

19   are you muted?

20       How do you fit what happened in this case, the 2019

21   biological opinion, into 1855(f)'s requirement that it either be

22   a regulation or an action published in the Federal Register?

23   That's where I'm stuck.

24       I agree that it seems the purpose of the Magnuson-Stevens

25   Act would encompass this lawsuit, because it is aimed at, at

 1    least, limiting the functionality of a fishery.  I can't fit it

 2    into the regulation or regulation terms in 1855(f).

 3           MR. TURNER:  Well, Your Honor, I think this may come

 4    down to a fundamental framing issue.

 5           The plaintiff is suggesting that -- what we're saying is

 6    that all aspects of this case cannot go forward and that you

 7    couldn't challenge a biological opinion under the Administrative

 8    Procedure Act if you said that the biological opinion, for

 9    example, was arbitrary and capricious, or if there was a NEPA

10    failure, or something along those lines.

11           What we're focused on here is not the entire scope of the

12    complaint.  We're focused, particularly, on the relief that was

13    requested in the preliminary injunction motion.  And I think

14    that's an important distinction that really runs through our

15    opposition to the plaintiff's motion.

16           They're really focused on the requested relief.  The remedy

17    here would have to flow from the Magnuson-Stevens Act

18    authorization of the fishery, and that remedy is not available

19    because the plaintiff has missed the 30-day deadline.

20           And so I think there is another gloss on this that the

21    plaintiff provides in their reply brief.  They do make that a

22    point about how we're going to recast the lawsuit, which is not

23    the case.  We're really honed in on this preliminary injunction

24    motion.

25           But there is also this point of us being untethered to the

1    Magnuson-Stevens Act, and our position is that's simply not the

2    case.  If you look at the plaintiff's own motion, you see a

3    thorough background section on the development of the fishery

4    management plan, the role of the Magnuson-Stevens Act.

5         And if I could just -- it might be helpful here just to

6    step back and put those fishery management plans into context

7    for how they're developed.

8         These fishery management plans are really the source of the

9    authorization for fishing activity in the federal waters.

10   Federal waters runs from three miles offshore, 200 miles

11   offshore.

12        And the fishery management plan set out a number of

13   measures.  They authorized certain things, such as the types of

14   fish that can be harvested, the types of gear that can be used,

15   when and where the fish can be harvested.  And in developing

16   these plans that would authorize those activities, there's a

17   two-step process.  There's a lot of actual coordination between

18   fishery management council and the federal agency here at the

19   National Marine Fishery Service.

20        The council is really a body made up of federal and state

21   representatives, but also representatives from the fishing

22   industry, come together and put together a plan that they think

23   would be necessary and includes necessary measures.

24        Once the plan is finalized, the plan is submitted to the

25   National Marine Fishery Service.  The National Marine Fishery

1    Service then starts Step Two of the process.  It reviews the

2    plan, makes sure that it's in compliance with all the national

3    standards and all the aspects of the Magnuson-Stevens Act.

4         If it approves the plan, it issues implementing

5    regulations, and that's when the plan becomes effective.  It's

6    not a -- the plan from the council is not self-executing.  It

7    really needs to go through this process.

8         And I'm spinning this out just to help explain where the

9    authority for this particular plan is being challenged in this

10   particular motion.

11        The fisheries in the federal waters off the coast of

12   Southeast Alaska are governed by just this type of plan.  The

13   fishery management council came together and developed a plan

14   for the North Pacific.  That plan was submitted to the National

15   Marine Fishery Service, which approved the plan.

16             THE COURT:  Are we back in 2012 now?

17             MR. TURNER:  Yes.

18        So -- well, the original plan was designed in 1979, but it

19   did go through amendments.  Many of the plans are amended over

20   the years.  And if you fast-forward to 2012, you reached a point

21   when National Marine Fishery Service affirmed its delegation of

22   authority.  And that's really the final piece of the puzzle for

23   this fishery.

24        The federal agency, NMFS, has delegated the authority over

25   the federal waters here and the fishery management to the state,

1    and that was finalized in 2012.

2           THE COURT:  Is your position that they had 30 days

3    from the 2012 amendment to appeal the delegation to the State of

4    Alaska?

5           MR. TURNER:  That was one of the opportunities to

6    challenge the delegation and, therefore, the authorization for

7    the fishing.  As we've indicated in our opposition, there are,

8    actually, a couple other opportunities that postdated the

9    issuance of the biological opinion.

10        The biological opinion was issued in April of 2019.  April

11   5th to be exact.  And our position is that if the plaintiff had

12   filed a lawsuit within 30 days of the biological opinion being

13   finalized or within 30 days of being on notice of that

14   biological opinion, then the application for this remedy would

15   have been timely.

16        But we know, even from plaintiff's own pleading here, that

17   they knew about this particular biological opinion as early as,

18   at least, January of this year, and didn't bring the lawsuit

19   until March and didn't file the motion until April.  And so even

20   under the evidence we have in front of us from the pleadings, we

21   know the plaintiff was on notice for the biological opinion, and

22   did not meet this 30-day requirement.

23          THE COURT:  Well, but I think you are just reading

24   that 1855(f) far too broadly.  I mean, it seems like it's pretty

25   clear that it's 30 days from when the action is published in the

1   Federal Register, and there's not this discovery or notice-type

2   requirement.  I'm just having a hard time fitting even the

3   biological opinion into 1855(f).

4        Like I said before, I get the overall breadth of the

5   Magnuson-Stevens Act and why this might be a case that should

6   fall under the Magnuson-Stevens Act, but I can't fit this

7   biological opinion into 1855(f).

8        Do you have a case or something that can help us with that?

9             MR. TURNER:  Well, Your Honor, I'm not familiar with a

10  case that's exactly on point with these circumstances.  As

11  discussed earlier, we've got different circumstances in the

12  sense that we have reinitiation of the consultation.

13       And our position is that, to the extent that this

14  biological opinion would be an opportunity to once again

15  challenge that authorization, if that was the case, that it

16  would be a short window.

17       And, I think, for this part, I would really lean on the

18  purpose of the 30-day window, which Your Honor has alluded to

19  earlier, and the goal here being that if there is going to be a

20  challenge, that those engaged in the fishing industry need to

21  have certainty, and they need to know in advance what their crew

22  is going to look like and their plans for the fishing season.

23  And so to the extent that this biological opinion would reopen

24  that window for challenging the fishery, it would have to be a

25  short one.

1          THE COURT:  What should the plaintiffs have done?

2          MR. TURNER:  Well, under that scenario, the plaintiff,

3  upon being on notice of the biological opinion, would have --

4  could have filed a lawsuit under the Magnuson-Stevens Act and

5  the Administrative Procedure Act, challenging that

6  authorization, if that's the remedy that it was seeking, and

7  then add in other claims as it deemed appropriate.

8       I think it's worth noting here, there's a second option,

9  which is still available to the plaintiff or to other interested

10  parties, and that is the petition process that's contemplated in

11  the fishery management plan.  And that's another way for a group

12  or a person that thinks that there's some kind of inconsistency

13  between, say, the Endangered Species Act and the fishery

14  management, to challenge.  Now, it has to go through the State

15  process, appear before the Board of Fisheries for Alaska.  But

16  if it receives an adverse decision, it could then petition to

17  the National Marine Fishery Service.  At that point, the

18  National Marine Fishery Service would be obligated to act and

19  come to its -- reach its own decision.  And whatever was

20  decided, that would be subject to judicial review.

21       So that's another avenue.

22       And while we're talking about this administrative process,

23  I'd just point out that the *American Bird Conservancy* case,

24  which we referred to in our opposition brief, discussed a

25  similar administrative process toward the end of the opinion,

1    and I think it's just worth noting, because in that case the

2    Ninth Circuit was also addressing a jurisdictional provision

3    that it felt obligated to read very narrowly and very plainly,

4    and I think that applies here as well.

5              THE COURT:  So the consistency review process would

6    not be subject to 1855(f); it would just be an APA claim, even

7    though it arises under the Magnuson-Stevens Act?

8              MR. TURNER:  I'm sorry.  I should have also added:  At

9    the very end of that process, our view would be, again, when the

10   National Fishery Service took its final action, whether it was

11   adverse or not to the organization, the organization would then

12   have 30 days to challenge that.

13        So throughout this, you see our position being that when

14   there are opportunities, that the opportunity needs to remain

15   short to satisfy the purpose and try to adhere to the language

16   of the Magnuson-Stevens Act.

17             THE COURT:  So if the National Marine Fishery Service

18   issued a final opinion, would that be published in the Federal

19   Register?  If we did a consistency review process all the way

20   up, through?

21             MR. TURNER:  That -- I'm not sure if that would be

22   published in the Federal Register, but the party who had the

23   adverse decision would be notified, and so then could do its

24   challenge.

25             THE COURT:  Okay.

1          MR. TURNER:  Okay.

2          THE COURT:  So are you also saying, then, Mr. Turner,

3    that if the remedy that the plaintiffs were seeking were

4    different, that it may not be governed by the Magnuson-Stevens

5    Act and the 30-day time limit?

6          MR. TURNER:  That's correct, Your Honor.  Yes, we're

7    really focused on the relief requested in the preliminary

8    injunction, which is to close the fishery.  And that's pointed

9    out not just in that first paragraph but other parts of the --

10   other parts of the preliminary injunction motion, where they

11   seek to stay the -- perhaps the most telling layer in the motion

12   is they seek to stay the delegation of authority.  And, as I

13   described earlier, delegation flows from the fishery management

14   plan.  And if you're going to seek a stay of that delegation, it

15   would have to be governed by the Magnuson-Stevens Act, and

16   that's where the *Turtle Island* case really comes in.

17        There was insistence -- despite insistence from plaintiffs

18   about the nature of their claim, if they're seeking to close the

19   fishery, then it needs to be viewed in that light, as a

20   challenge under the Magnuson-Stevens Act.

21        THE COURT:  I understand what you're saying.

22        Do you want to discuss standing?

23        MR. TURNER:  Yes, Your Honor.  I'd like to turn to the

24   standing argument.

25        The plaintiff lacks standing as it pertains to the Southern

1   Resident killer whales.  And our position here, stated simply,

2   is that it cannot be that a party that files a complaint based

3   on concerns about wild fish, and then turn around and seek

4   emergency relief based on an alleged harm to the Southern

5   Resident killer whales.

6        And this is borne out both in the organizational standing

7   doctrine and in the representational standing document.  I'll

8   focus on the representational standing, because it seems where

9   plaintiff is focusing its efforts to try to obtain or

10   demonstrate that it has the standing necessary for this remedy.

11        The plaintiff has simply failed to meet that second prong,

12   the germaneness prong of the representational standing has not

13   shown that the Southern Resident killer whale is relevant to the

14   mission of the Wild Fish Conservancy.

15        Now, this morning, plaintiff has raised some points about a

16   case involving The National Environmental Policy Act, and then

17   talked about the germaneness being an undemanding standing.  But

18   even if it's undemanding, it still needs to be satisfied, and we

19   do not see, from the papers presented by the plaintiff at this

20   point, any kind of relevance or pertinence of the killer whales

21   to their mission.

22        And we submit that references to ecosystems, while they are

23   important, are not sufficient to show standing.  Standing is not

24   dispensed broadly once you make an allegation or attest to an

25   interest in ecosystems.  If it's read too broadly, you could

1   have a scenario where simply saying ecosystems are one of your

2   concerns, any species within that ecosystem could be -- you

3   would have standing to pursue a claim pertaining to that

4   species.

5          And so we submit that they are simply coming up short on

6   this question of showing that the Southern Resident killer

7   whales are germane to the organizational purpose.  And this is

8   also borne out in the declaration filed by the organization's

9   executive director.

10         And the same would go, too, for the references to aquatic

11  species.  It is simply too broad to satisfy a requirement that

12  there be an interest in this particular species.

13         So those were my arguments on the standing point.  If

14  there's no other questions from Your Honor, I'd be happy to rest

15  or turn to another topic.

16             THE COURT:  No.  Thank you, Mr. Turner.

17         Mr. Tienson, did you want to be heard on the issue of

18  jurisdiction or standing?

19             MR. TIENSON:  I did, Your Honor.  Just a few minutes,

20  if I could.

21         First of all, as the court can, presumably, appreciate, the

22  primary reason that the Alaska Trollers Association sought to

23  intervene is because of its concern about its own economic

24  well-being and the importance of the prosecution of the

25  fisheries that the plaintiff seeks to enjoin from being

1   prosecuted.

2       We, in our answer, identified both the lack of jurisdiction

3   and lack of standing as affirmative defenses.  And we tried to,

4   to some extent, coordinate our briefing with the government --

5   with the defendant.  And so for that reason, we didn't really

6   address that issue in my briefing.

7       However, I do want to say this:  If you look at all of the

8   cases that deal with the issue of under what circumstances the

9   Magnuson-Stevens Act should be identified as providing the

10  governing period within which to file, there is a common theme,

11  and as set forth in the *Turtle Island* case, it's, quote, the

12  essence of the complaint.  That's the phrase they use, what is

13  the essence of the complaint that is being sought here?

14      And as Mr. Turner just identified, it isn't just,

15  incidentally, in the motion for preliminary injunction.  It is

16  in the complaint.  It is to enjoin these fisheries from being

17  prosecuted.

18      And they identify the incidental-take statement as this

19  functional permit, again, artfully pleading, trying to take

20  advantage of the *Ramsey v. Kantor* decision back in 1997 that

21  used that phrase, the ITS, in that case, which had to do with

22  the operation of the Columbia River Power System and the dams on

23  the river, as being a functional permit for the fishery.

24      But as the court can see from looking at the history of

25  that case, subsequently, it has been largely confined to its

1  facts, and it has been distinguished as saying, let's look to

2  see if this interrelationship between the federal action that is

3  identified and the state action, and when there's state action

4  and there's cooperation between the state and the federal

5  government, *Ramsey* really has been determined not to apply.

6      If you look -- and, unfortunately, I don't have the cite --

7  but the salmon consolidation cases having to do with the

8  operation of the Central Valley Project and State Water Project

9  in the Eastern District of California, a 2013 decision, does a

10  really good job of --

11          THE COURT:  You're going to have to slow down as well.

12          MR. TIENSON:  I apologize, Your Honor.  It's the

13  pacemaker of the time.

14      If you look here, there is complete deferment, if you will,

15  deference to the State of Alaska, and has been, to manage these

16  fisheries.

17      And as Mr. Turner points out and as their briefs pointed

18  out, there's a remedy here.  And, in fact, if you look at the

19  State of Alaska litigation over fisheries, it is not

20  commonplace, but it is certainly a regular occurrence for

21  fisheries to be challenged for one reason or another.

22      And a cynic might say there's a reason they didn't do that.

23  They want to be in this court in Seattle.  They didn't want to

24  be in Alaska, challenging Alaska fisheries.  But I think that is

25  very much a sentiment that was in their operative here.

1     But the reality is, because these fisheries are managed by

2   the State of Alaska, and the State of Alaska makes the decisions

3   about what that threshold of catch is, that's where the

4   challenge should have been made, and, instead, looking at the

5   essence of the complaint, what the plaintiff clearly did is to,

6   through artful pleading, try to turn a Magnuson-Stevens Act

7   challenge into one under the ESA to avoid having to comply with

8   a short limitations period.

9     And as Mr. Turner points out as well, let's assume,

10   hypothetically, that it was the BiOp and the ITS that provided

11   that authority.  They blew that statute period as well, 30 days.

12   They had an opportunity to challenge this on a timely basis,

13   both in the state of Alaska, and when the BiOp was issued, they

14   failed to do it.

15     And if you read that, which, I submit, is really the

16   governing case here, the *Turtle Island* case, it's the gist of

17   the complaint, and the essence of it is clearly to enjoin the

18   fishery, and so viewed, they failed to comply with the operative

19   30-day period or to challenge this in the state of Alaska, which

20   they should have done, and for that reason, I believe, the court

21   has no jurisdiction, and the defendant's motion should be

22   granted.

23     THE COURT:  Thank you, Mr. Tienson.

24     Mr. Knutsen, while Mr. Turner pointed out that in the

25   proposed order submitted with the preliminary injunction, that

1    the plaintiff's request really relates to this delegation of

2    authority to the State of Alaska.  I mean, I pulled up the

3    proposed order, and it says that you want the court to stay, as

4    Mr. Turner says, delegation of the authority to the State of

5    Alaska to manage and allow commercial salmon fisheries within

6    the exclusion zone off the coast of Southeast Alaska, and that

7    you also are asking the court to stay or otherwise make

8    ineffective or force -- "NMFS shall take any additional steps

9    that are reasonable necessary to halt salmon fisheries within

10   the federal waters at issue."

11        So, I guess, what it seems to me that you're asking for is

12   for the court to say that the original delegation is the State

13   of Alaska.  Tell me why that's not covered by the

14   Magnuson-Stevens Act.

15             MR. KNUTSEN:  Sure, Your Honor.

16        There's no dispute that Wild Fish Conservancy is seeking

17   relief against the ongoing implementation of an action under the

18   Magnuson-Stevens Act.

19        I think what's important to remember is that 1855 applies

20   narrowly to review of regulations and actions taken by NOAA

21   Fisheries under regulations to implement a fishery management

22   plan.

23        And in the *Turtle Island* case, the Ninth Circuit was

24   reading that broadly.  So it was expanding that to not only

25   cover those two narrow actions, but to also cover ESA and NEPA

1  compliance that was coupled with one of those two actions.  But

2  the court was very careful to limit the applicability of its

3  expansion of that judicial provision, explaining that, in

4  response to the plaintiff saying that an expansive reading would

5  eliminate effective enforcement of environmental laws in

6  commercial fisheries.  So the Ninth Circuit was explaining that

7  it wasn't eliminating effective environmental enforcement.

8           THE COURT:  Okay.  So let me stop you there.

9       So enforcement is different, as Mr. Turner has pointed out.

10  It's not covered by 1855(f).  And I'm going to use that term,

11  "like angels dancing on a pinhead."  What is the difference

12  between the ongoing implementation of an action and a suit

13  that's coupled with one of the actions that would be subject to

14  1855(f)?

15           MR. KNUTSEN:  So, Your Honor, I think these are the

16  ways that Endangered Species Act and NEPA claims arise.  They

17  arise due to the ongoing implementation of an action for

18  violations of the statute, and they're outside of what the Ninth

19  Circuit characterized as a very narrow class of actions that

20  would be subject to review under 1855(f), which is ESA and NEPA

21  compliance for the promulgation of regulations.

22       And it's important to note the examples given.  You don't

23  sue NOAA Fisheries just because you want them to reinitiate

24  consultation.  You sue them for failing to initiate, because the

25  ongoing implementation of that fishery violates the Endangered

1    Species Act, and you would seek relief against that ongoing

2    implementation.

3         And the Ninth Circuit made clear that, when it was

4    describing the scope of its holding in *Turtle Island*, what it

5    was talking about was the applicability of 1855(f), which either

6    applies or it doesn't.  It either applies to the claims or it

7    doesn't, and so if it doesn't apply, then I don't understand

8    defendant's argument that somehow some of the relief that we're

9    seeking would be subject to 1855(f), and, therefore, it's

10   outside the limitations period --

11        THE COURT:  Well, let me help you, because the relief

12   that you are seeking is to have the court stay the original,

13   what, 1979 delegation to the State of Alaska, as, you know,

14   re-upped in 2012.  I mean, that is what it seems your problem is

15   with -- or it seems the resolution you're seeking in your

16   preliminary injunction is to ask the court to stop that

17   delegation or put the delegation on hold so that, you know, NMFS

18   or somebody else can come in and do what had been delegated to

19   the State of Alaska in the first place.

20        MR. KNUTSEN:  I think when the Ninth Circuit limited

21   its holding in *Turtle Island*, in order to avoid what the

22   plaintiff was worried about, the elimination of affected

23   environmental enforcement.  What it's talking about is the very

24   environmental enforcement at issue here; seeking environmental

25   enforcement for the ongoing implementation of fisheries that

 1    violate environmental statutes.

 2         So, again, the decision in *Turtle Island* was an expansion

 3    of 1855, beyond what you would assume, by its plain terms, but

 4    those carefully cabined to ESA's efforts that were undertaken in

 5    conjunction with the promulgation of a regulation.

 6         And I also want to note, one of the other -- certainly I

 7    understand the tension.  Right?  I understand that there's

 8    tension between the relief we're seeking here and some of the

 9    Ninth Circuit's reasoning in *Turtle Island*, being that, you

10    know, there's all this reliance on the fishery.  But it's

11    important to note that the other dicta, the other reasoning for

12    the Ninth Circuit's decision was that there is a lot of public

13    processes that lead up to the promulgation of a regulation.

14    There's public notices, there's public hearings, and, therefore,

15    plaintiff will be aware -- will be involved in a NEPA process,

16    will be aware of the final action when it's taken, and, as the

17    Ninth Circuit said, in a prime position to challenge the

18    regulation.  None of that occurred here.

19         There was no new Magnuson-Stevens Act regulation or action.

20    NOAA Fisheries reinitiated consultation to evaluate the ongoing

21    effects under previously promulgated regulations, which is

22    precisely what the Ninth Circuit carved out in *Turtle Island*.

23              THE COURT:  So why didn't you bring this as a

24    consistency review through the State of Alaska?  I mean, if

25    you're saying that the State of Alaska, through the fishery

1    management's plan and its council, is violating NEPA and ESA,

2    why can't you use that route?

3              MR. KNUTSEN:  Your Honor, first of all, only the

4    district courts of the United States have jurisdiction to review

5    the claims that are alleged here.

6         The administrative panel at issue or described in that

7    fishery management plan does not have jurisdiction to hear this

8    NEPA claim.

9              Further, that plan provides for a request, a petition to

10   have NOAA Fisheries review state management measures, and

11   plaintiffs aren't alleging that some state management measures

12   violate the Endangered Species Act or NEPA.  They're alleging

13   that NOAA Fisheries is in violation of the Endangered Species

14   Act and NEPA for its ongoing implementation of this program.

15             And further, there's no exhaustion requirement here.

16   Defendants have not made an exhaustion requirement, that somehow

17   we're required to go through this process.  If they did, we

18   certainly would have fully responded to it.  Instead, they just

19   insinuated that there is this other avenue that does not provide

20   jurisdiction to the action of the claims alleged.

21             THE COURT:  Okay.

22        All right, Mr. Turner, I'll give you the last word.

23             MR. TURNER:  Thank you, Your Honor.

24        I just want to address a few of those final points from

25   plaintiff's counsel.

1          One is that there is this, I think, a sense that the *Turtle*

2   *Island* case is really just about the fishery.  If you go back

3   and read the *Turtle Island* case, you see that there was an

4   attempt to characterize the case as an Endangered Species Act

5   case.

6          And the same is true in the *Bluewater Fishermen's* case that

7   we cited.  In that case, there was a biological opinion, and

8   there was a challenge to the biological opinion, but the court

9   read that as a challenge to the fishery regulation.

10         And so to suggest that *Turtle Island* was just about the

11  fishery I don't think is an accurate characterization of what

12  was before the court.

13         Now, as it pertains to the other aspects that were

14  addressed by the Ninth Circuit, those do not take away from the

15  ability of a party to challenge the National Marine Fishery

16  Service's failure to act.  If it does not act, that claim would

17  remain live.  And as I mentioned earlier, if there is a

18  challenge to the biological opinion and a suggestion that it's

19  somehow arbitrary, that challenge would still be an available

20  route.

21         What we're focused on here is the remedy, again, and when

22  the remedy is seeking to shut down the fishery, that means that

23  it's going to be connected to that authorization which flows

24  from the Magnuson-Stevens Act.

25         And on the final point about the public notice, that's, as

1   I was describing, one of the options available following the

2   issuance of the biological opinion.  I said 30 days after that

3   issuance or 30 days after the plaintiff became aware.  Now, we

4   understand that there may not be the same public Federal

5   Register noticing comment process for a biological opinion, but

6   30 days after the plaintiff became aware of the biological

7   opinion, the clock had started to run, and that was sort of the

8   thrust of why I was focused on when the plaintiff knew about

9   this biological opinion.  So it doesn't change the outcome of

10  our argument, that the biological opinion is not noticed in the

11  Federal Register.

12          THE COURT:  Okay.  Well, thank you.  This has been

13  very enlightening.  I appreciate the advocacy and how prepared

14  you were, and I appreciate you agreeing to appear by

15  video-conferencing, as this will be our new normal for quite

16  some time, so we might as well just get used to it.

17      Is there anything further that I can assist with?

18          MR. KNUTSEN:  Your Honor, with the court's permission,

19  I'd like to give the citations to the cases I didn't have at my

20  fingertips earlier.

21      So these are the cases from the Western District of

22  Washington and then the Ninth Circuit that held that a party of

23  enforcement action could collaterally attack regulations.  This

24  court's opinion is at 195 F.Supp 2D 1239, and that was affirmed

25  by the Ninth Circuit in 333 F.3d 1045.

1      And I have one other matter, with the court's indulgence,

2  Your Honor, before we recess.

3      I'd like to discuss the submission of the administrative

4  record.  As I mentioned earlier, if 1855 did apply, which we

5  think it doesn't, the record would have been due three weeks

6  ago.  Under this court's local rules, it's due with the answer,

7  and so I'd like to inquire as to when the administrative record

8  will be submitted, and certainly it's our intent to expedite

9  review of this matter in every way possible, and we'd like to

10  have the administrative record as soon as possible.

11          THE COURT:  Mr. Turner, I think that's for you.

12          MR. TURNER:  Thank you, Your Honor.

13      The fact that we're making this jurisdictional argument

14  under the Magnuson-Stevens Act doesn't mean that we are

15  recharacterizing or able to reframe the complaint on the part of

16  the plaintiff.  The plaintiff is the master of its complaint.

17  And in the complaint that's before us, and that we responded to

18  in our answer, there's no allegation that there's a

19  Magnuson-Stevens Act violation.

20      So we are preparing an administrative record, which I

21  anticipate will be prepared within the next month.  But it

22  doesn't mean that the Magnuson-Stevens Act rules about

23  administrative procedure and a motion to expedite automatically

24  apply simply because we raised the argument as a jurisdictional

25  defense.

1    THE COURT:  You raise it as an argument or as a

2    jurisdictional defense to, basically, the preliminary injunction

3    remedy, but you didn't bring a motion to dismiss the case, based

4    on jurisdictional grounds?

5    MR. TURNER:  That's correct.  That's correct, Your

6    Honor.

7    THE COURT:  Your position is that their complaint is

8    fine under the Administrative Procedures Act, but the remedy

9    they seek in the preliminary injunction violates the

10   Magnuson-Stevens Act, and, therefore, the court wouldn't have

11   jurisdiction to impose that remedy?

12   MR. TURNER:  With a couple of caveats, Your Honor,

13   that's generally true.  To the extent that the complaint also

14   seeks that relief, that form of relief, we would think that that

15   was not something the court could grant.  And there may still be

16   defenses that we would bring before the court, but at this time,

17   that's correct, yes.

18   THE COURT:  Okay.

19   MR. KNUTSEN:  Your Honor?

20   THE COURT:  Go ahead.

21   MR. KNUTSEN:  I'm sorry.  I didn't mean to create more

22   argument on that issue.

23   I was getting at the point that, even if the Magnuson -- if

24   we contend that the Magnuson-Stevens Act doesn't apply, and

25   certainly we don't think it does under *Turtle Island*, in which

1   case the defendant's administrative record, under this court's

2   local rules -- I think it's 791 or something, I don't have it in

3   front of me -- was due a week ago.  So we'd like to have the

4   administrative record provided as promptly as possible.

5            THE COURT:  Didn't the parties file a statement

6   stating that this case was exempt from the joint status report,

7   or am I confusing this case with another one?

8            MR. KNUTSEN:  No.  We did, Your Honor.  We stipulated

9   that the claims would be reviewed under the administrative

10  record.

11           THE COURT:  And, Mr. Turner, did you stipulate to

12  that?

13           MR. TURNER:  Yes, Your Honor.  We view this as an

14  administrative record case, and, therefore, are preparing the

15  administrative record.

16           THE COURT:  Okay.  Thank you.

17       I don't know what you're doing, Mr. Turner, but you --

18  yeah, I mean, if you are viewing this case as an administrative

19  appeal, then you need to prepare the administrative record, and

20  Mr. Knutsen is correct, that that was due with the answer, and

21  that's the way that you're viewing, you're viewing the complaint

22  in that manner?

23           MR. TURNER:  I apologize, Your Honor.  Our reading of

24  the local rules was not that the answer was -- was -- I'm

25  sorry -- that the record was due on the same day.  I did not

1    see, in the local rule, a reference to an administrative record.

2    If I missed it, my sincere apology.  We will launch the record

3    forthwith very quickly.

4              THE COURT:  I believe that the rule says the

5    administrative record -- I'd also have to look up the rule.  So

6    why don't you make sure that you're complying with the local

7    rule, confer with Mr. Knutsen, and make sure that you all agree

8    on the timeline that he's going to receive the administrative

9    record.

10             MR. TURNER:  Yes, Your Honor.

11             THE COURT:  All right.  With that, we'll be in recess.

12   Thank you, again.

13             MR. KNUTSEN:  Thank you, Your Honor.

14             MR. TURNER:  Thank you.

15             MR. TIENSON:  Thank you.

16             THE COURT:  Court is in recess.

17                  (Proceedings concluded at 11:20 a.m.)

18

19

20

21

22

23

24

25

C E R T I F I C A T E


        I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

        I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.



        Dated this 12th day of June 2020.


                        /S/  Nancy L. Bauer

                        Nancy L. Bauer, CCR, RPR
                        Official Court Reporter