1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY,                      )
                                            )       Case No. 2:20-cv-00417-RAJ-MLP
        Plaintiff,                          )
                                            )       PLAINTIFF'S MOTION FOR
v.                                          )       SUMMARY JUDGMENT
                                            )
BARRY THOM, in his official capacity as     )       NOTE ON MOTION CALENDAR:
Regional Administrator for the National     )       June 16, 2021
Marine Fisheries Service, *et al.*,         )
                                            )       ORAL ARGUMENT REQUESTED
        Defendants,                         )
                                            )
and                                         )
                                            )
ALASKA TROLLERS ASSOCIATION,                )
and STATE OF ALASKA,                        )
                                            )
        Defendant-Intervenors.              )
_____     )

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 1
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................4

GLOSSARY OF ACRONYMS ...........................................................11

I.      MOTION...........................................................................12

II.     INTRODUCTION. ...........................................................12

III.    LEGAL FRAMEWORK. ...................................................12

        A.      The Endangered Species Act ...................................12

        B.      The National Environmental Policy Act.................14

        C.      The Magnuson-Stevens Act. ...................................14

IV.     STATEMENT OF FACTS. ................................................15

        A.      Endangered Southern Resident Killer Whale. .........15

        B.      Threatened Salmonids.............................................15

        C.      The Pacific Salmon Treaty......................................16

        D.      Southeast Alaska Salmon Fisheries .......................17

        E.      NMFS's 2019 SEAK BiOp on the 2019 Pacific Salmon
                Treaty. ...................................................................18

V.      STANDARD OF REVIEW. ...............................................20

VI.     ARGUMENT.....................................................................21

        A.      The 2019 SEAK BiOp Is Arbitrary and Not in Accordance
                with Law. .................................................................21

                1.      NMFS's no jeopardy opinion relies on uncertain
                        mitigation. .................................................21

                        a.      The mitigation lacks specific and binding
                                plans. .............................................22

                        b.      The mitigation is not subject to NMFS's
                                control or otherwise reasonably certain to
                                be fully and timely implemented. .................25

                2.      The 2019 SEAK BiOp fails to draw a rational
                        connection between the facts and the no jeopardy
                        opinion reached for Southern Residents. .................27

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 2
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

3. The 2019 SEAK BiOp violates the ESA by failing to evaluate whether the prey increase program will jeopardize threatened salmonids. ..................................30

    a. The 2019 SEAK BiOp includes benefits of the prey increase program in its jeopardy analysis for Southern Residents. ....................................30

    b. The 2019 SEAK BiOp ignores harm from the prey increase program in its jeopardy analyses for threatened salmonid. ..................................30

    c. The 2019 SEAK BiOp's failure to evaluate whether the prey increase program may jeopardize salmonids violates the ESA. ..............................31–32

4. The ITS fails to adequately limit take of Southern Residents. .............................................................35

B. NMFS Failed to Ensure Its Actions Do not Jeopardize ESA-Listed Species. .........................................................35

C. NMFS Violated NEPA by Failing to Prepare an EIS or an EA and FONSI. ...............................................................35

1. NMFS's failure to complete NEPA for its authorization of take by the 2019 Pacific Salmon Treaty fisheries is not in accordance with law. ..........................35

2. NMFS's failure to complete NEPA for its adoption of a new federal grant program to fund hatcheries is not in accordance with law. .................................37

3. Conclusion on NMFS's Failure to Comply with NEPA. ...........................................................................39

D. The Appropriate Remedies for NMFS's Violations. .............................40

1. The 2019 SEAK BiOp, including the ITS, should be vacated. ...............................................................40

2. NMFS's prey increase program should be enjoined. ...............................43

E. The Conservancy Has Standing to Pursue this Matter. .........................46

VII. CONCLUSION. ................................................................................46

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 3
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

**TABLE OF AUTHORITIES**

**<u>Cases</u>**

*Alaska v. Andrus*,
  591 F.2d 537 (9th Cir. 1979) ..................................................................26, 27

*All. for the Wild Rockies v. Cottrell*,
  632 F.3d 1127 (9th Cir. 2011) ....................................................................45

*All. for the Wild Rockies v. U.S. Forest Serv. (Wild Rockies)*,
  907 F.3d 1105 (9th Cir. 2018) ..............................................................40, 43

*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ....................................................................41

*Aluminum Co. of Am. v. Bonneville Power Admin.*,
  175 F.3d 1156 (9th Cir. 1999) ....................................................................14

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
  271 F. Supp. 2d 230 (D.D.C. 2003) ............................................................34

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987).....................................................................................45

*Aquall. v. U.S. Bureau of Reclamation*,
  312 F. Supp. 3d 878 (E.D. Cal. 2018).........................................................41

*Bennett v. Spear*,
  520 U.S. 154 (1997).....................................................................................20

*California v. Block*,
  690 F.2d 753 (9th Cir. 1982) .................................................................27, 39

*Cal. Cmtys. Against Toxics v. U.S. Env't Prot. Agency*,
  688 F.3d 989 (9th Cir. 2012) ......................................................................41

*Ctr. for Biological Diversity v. Bernhardt*,
  982 F.3d 723 (9th Cir. 2020) ................................................................ *passim*

*Ctr. for Biological Diversity v. Rumsfeld*,
  198 F. Supp. 2d 1139 (D. Ariz. 2002) ...................................................23, 24

*Ctr. for Biological Diversity v. Salazar*,
  804 F. Supp. 2d 987 (D. Ariz. 2011) ......................................................23, 24

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*,
  698 F.3d 1101 (9th Cir. 2012) ..........................................................32, 34, 38

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 4
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

*Ctr. for Food Safety v. Vilsack*,
    734 F. Supp. 2d 948 (N.D. Cal. 2010) ........................................................42

*Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*,
    417 F. Supp. 3d 1354 (W.D. Wash. 2019) ...........................................40, 41

*Conner v. Burford*,
    848 F.2d 1441 (9th Cir. 1988) ..........................................................33, 34

*Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) ..........................................................13, 44

*Covington v. Jefferson Cty.*,
    358 F.3d 626 (9th Cir. 2004) ....................................................................46

*E. Bay Sanctuary Covenant v. Trump*,
    354 F. Supp. 3d 1094 (N.D. Cal. 2018) ....................................................40

*E. Bay Sanctuary Covenant v. Barr*,
    964 F.3d 832 (9th Cir. 2020) ....................................................................40

*Ecological Rights Found. v. Pac. Lumber Co.*,
    230 F.3d 1141 (9th Cir. 2000) ..................................................................46

*Env't Def. Fund, Inc. v. Andrus*,
    596 F.2d 848 (9th Cir. 1979) ....................................................................40

*Found. on Econ. Trends v. Heckler*,
    756 F.2d 143 (D.C. Cir. 1985) ..................................................................45

*Friends of Se.'s Future v. Morrison*,
    153 F.3d 1059 (9th Cir. 1998) ..................................................................39

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
    528 U.S. 167 (2000) ..................................................................................46

*Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*,
    378 F.3d 1059 (9th Cir. 2004) ..................................................................32

*Greenpeace v. Nat'l Marine Fisheries Serv.*,
    80 F. Supp. 2d 1137 (W.D. Wash. 2000) ................................................33

*Hall v. Norton*,
    266 F.3d 969 (9th Cir. 2001) ....................................................................46

*Hale v. Norton*,
    476 F.3d 694 (9th Cir. 2007) ....................................................................14

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 5
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

*Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*,
    No. 01-765 (CKK/JMF),
    2002 U.S. Dist. LEXIS 7263 (D.D.C. Apr. 25, 2002) ......................................................18

*High Sierra Hikers' Ass'n v. Blackwell*,
    390 F.3d 630 (9th Cir. 2004) ...........................................................................................45

*Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*,
    230 F. Supp. 3d 1106 (N.D. Cal. 2017) ...........................................................................45

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric
    Admin. Nat'l Marine Fisheries Serv.*,
    109 F. Supp. 3d 1238 (N.D. Cal. 2015) ....................................................................41, 42

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ...........................................................................................45

*League of Wilderness Defs./Blue Mountains Biodiversity
    Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ...........................................................................................45

*League of Wilderness Defs./Blue Mountains Biodiversity
    Project v. Peña*, No. 3:12-cv-02271-HZ,
    2015 U.S. Dist. LEXIS 46279 (D. Or. Apr. 6, 2015) ................................................41, 43

*League of Wilderness Defs./Blue Mountains Biodiversity
    Project v. U.S. Forest Serv.*, No. 3:10-CV-01397-SI,
    2012 U.S. Dist. LEXIS 190899 (D. Or. Dec. 10, 2012) ...................................................42

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000) ...........................................................................27, 39, 40

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)..........................................................................................................43

*Nat'l Family Farm Coal. v. U.S. Env't Prot. Agency*,
    966 F.3d 893 (9th Cir. 2020) ...........................................................................................41

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. (NWF I)*,
    254 F. Supp. 2d 1196 (D. Or. 2003) ..........................................................................25, 26

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. (NWF II)*,
    524 F.3d 917 (9th Cir. 2008) .............................................................................. *passim*

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. (NWF III)*,
    184 F. Supp. 3d 861 (D. Or. 2016) ...................................................................... *passim*

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 6
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* (*NWF IV*),
  886 F.3d 803 (9th Cir. 2018) ...................................................................43, 44, 45

*Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*,
  992 F. Supp. 2d 1095 (D. Or. 2014) .....................................................................27

*Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*,
  No. 3:12-cv-00431-HA,
  2014 U.S. Dist. LEXIS 33365 (D. Or. Mar. 14, 2014) ....................................41, 42

*Nat. Res. Def. Council v. U.S. Dep't of the Interior*,
  275 F. Supp. 2d 1136 (C.D. Cal. 2002) ..................................................................41

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs*,
  460 F. Supp. 3d 1030 (D. Mont. 2020) ............................................................41, 43

*Nw. Coal. for Alts. to Pesticides v. U.S. Env't Prot. Agency*,
  544 F.3d 1043 (9th Cir. 2008) ...............................................................................29

*Occidental Eng'g Co. v. Immigr. & Naturalization Serv.*,
  753 F.2d 766 (9th Cir. 1985) .................................................................................21

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
  402 F.3d 846 (9th Cir. 2005) ...................................................................................

*Or. Nat. Res. Council v. Allen*,
  476 F.3d 1031 (9th Cir. 2007) ...............................................................................35

*Pollinator Stewardship Council v. U.S. Env't Prot. Agency*,
  806 F.3d 520 (9th Cir. 2015) ............................................................................41, 43

*Presidio Golf Club v. Nat'l Park Serv.*,
  155 F.3d 1153 (9th Cir. 1998) ...............................................................................46

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*,
  898 F.2d 1410 (9th Cir. 1990) ...............................................................................13

*Ramsey v. Kantor*,
  96 F.3d 434 (9th Cir. 1996) ...............................................................27, 35, 36, 37

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)...........................................................................................14, 39

*San Francisco Baykeeper v. Whitman*,
  297 F.3d 877 (9th Cir. 2002) .................................................................................39

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ...............................................................13, 36, 37, 38

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 7
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

*Save the Yaak Comm. v. Block*,
    840 F.2d 714 (9th Cir. 1988) .................................................................39

*Se. Alaska Conservation Council v. U.S. Forest Serv.*,
    468 F. Supp. 3d 1148 (D. Alaska 2020) ...............................................42

*Sierra Club v. Bosworth*,
    510 F.3d 1016 (9th Cir. 2007) ...............................................................45

*Sierra Club v. Marsh*,
    816 F.2d 1376 (9th Cir. 1987) .........................................................25, 41

*Tenn. Valley Auth. v. Hill*,
    437 U.S. 153 (1978).....................................................................12, 42, 43

*Thomas v. Peterson*,
    753 F.2d 754 (9th Cir. 1985), *abrogated on other grounds*,
    *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*,
    789 F.3d 1075 (9th Cir. 2015) .......................................................13, 26, 32

*Wash. Toxics Coal. v. Env't Prot. Agency*,
    413 F.3d 1024 (9th Cir. 2005) ...............................................................43

*W. Watersheds Project v. Kraayenbrink*,
    620 F.3d 1187 (9th Cir. 2010) ...............................................................20

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.*,
    457 F. Supp. 3d 880 (D. Mont. 2020)....................................................42

*Wild Fish Conservancy v. Nat'l Park Serv.*,
    8 F. Supp. 3d 1289 (W.D. Wash. 2014)..................................................27

*Wild Fish Conservancy v. Nat'l Park Serv.*,
    No. C12-5109 BHS,
    2014 U.S. Dist. LEXIS 105689 (W.D. Wash. July 31, 2014) ...................42, 43

*Wild Fish Conservancy v. Salazar* (*WFC*),
    628 F.3d 513, 531–32 (9th Cir. 2010) ................................................... *passim*

## Statutes

5 U.S.C. § 706...............................................................................21, 39, 40

16 U.S.C. § 1532..........................................................................................13

16 U.S.C. § 1533..........................................................................................13

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 8
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

16 U.S.C. § 1536 ................................................................................................ *passim*

16 U.S.C. § 1538 ................................................................................................ 13

16 U.S.C. § 1802 ................................................................................................ 14

16 U.S.C. § 1811 ................................................................................................ 14

16 U.S.C. § 1852 ................................................................................................ 17

16 U.S.C. § 1854 ................................................................................................ 15

16 U.S.C. § 1855 ................................................................................................ 15

42 U.S.C. § 4332 ................................................................................................ 14

**Regulations**

40 C.F.R. § 1500.1 (2019) .................................................................................. 14

40 C.F.R. § 1501.4 (2019) .................................................................................. 14

40 C.F.R. § 1502.1 (2019) .................................................................................. 39

40 C.F.R. § 1502.5 (2019) .............................................................................. 39, 40

40 C.F.R. § 1506.1 (2019) .................................................................................. 39

40 C.F.R. § 1508.13 (2019) ................................................................................ 14

40 C.F.R. § 1508.18 (2019) ................................................................................ 26

50 C.F.R. § 17.11 ............................................................................................... 12

50 C.F.R. § 222.102 ........................................................................................... 13

50 C.F.R. § 223.102 ....................................................................................... 12, 15

50 C.F.R. § 223.203 ........................................................................................... 13

50 C.F.R. § 224.101 ....................................................................................... 12, 15

50 C.F.R. § 402.01 ............................................................................................. 12

50 C.F.R. § 402.02 ....................................................................................... 20, 34

50 C.F.R. § 402.03 ............................................................................................. 13

50 C.F.R. § 402.14 ........................................................................................ *passim*

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 9
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

**<u>Other Authorities</u>**

48 Fed. Reg. 10,605 (Mar. 14, 1983)............................................................................14

57 Fed. Reg. 14,653 (Apr. 22, 1992)............................................................................15

64 Fed. Reg. 14,308 (Mar. 24, 1999)...........................................................................15

70 Fed. Reg. 69,903 (Nov. 18, 2005)...........................................................................15

83 Fed. Reg. 31,340 (July 5, 2018)........................................................................17, 18

85 Fed. Reg. 43,304 (July 16, 2020)...........................................................................14

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

**GLOSSARY OF ACRONYMS**

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| BiOp | Biological Opinion |
| DPS | Distinct Population Segment |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| ESU | Evolutionarily Significant Unit |
| FONSI | Finding of No Significant Impact |
| FWS | United States Fish and Wildlife Service |
| HSRG | Hatchery Scientific Review Group |
| ITS | Incidental Take Statement |
| NEPA | National Environmental Policy Act |
| NMFS | National Marine Fisheries Service |
| pHOS | Proportion of Hatchery-Origin Spawners |
| SEAK | Southeast Alaska |

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 11
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

## I.    MOTION.

Plaintiff Wild Fish Conservancy (the "Conservancy") hereby moves for summary judgment and respectfully requests the Court: 1) determine that the National Marine Fisheries Service's ("NMFS") biological opinion for salmon fisheries in Southeast Alaska  ("2019 SEAK BiOp") is not in accordance with law; 2) determine NMFS is violating section 7(a)(2) of the Endangered Species Act ("ESA") by failing to ensure its actions identified in the 2019 SEAK BiOp do not jeopardize species; 3) determine NMFS violated the National Environmental Policy Act ("NEPA") by issuing and adopting the 2019 SEAK BiOp without NEPA processes; (4) vacate the 2019 SEAK BiOp; and 5) enjoin NMFS's implementation of increased hatchery production identified in the 2019 SEAK BiOp until NMFS complies with the ESA and NEPA.

## II.    INTRODUCTION.

In enacting the ESA, Congress instructed federal agencies to "insure," at "whatever the cost," that activities they authorize, fund, or implement will not jeopardize the continued existence of species, requiring agencies "give endangered species priority over [their] 'primary missions . . . .'" *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 184–85 (1978); 16 U.S.C. § 1536(a)(2). NMFS violated ESA mandates by approving salmon harvest levels that will continue to starve Southern Resident Killer Whales towards extinction, relying on undeveloped plans to increase hatchery production that, if implemented, would themselves inhibit recovery of threatened salmonids. Exacerbating these ESA violations, NMFS made these decisions without public input and without considering and disclosing alternatives in violation of NEPA.

## III.    LEGAL FRAMEWORK.

### A.    The Endangered Species Act.

The ESA assigns implementation responsibilities to the Secretaries for the Departments of Commerce and the Interior, who have delegated duties to NMFS and the United States Fish and Wildlife Service ("FWS"), respectively. *See* 50 C.F.R. § 402.01(b). NMFS generally has ESA authority for marine and anadromous species, while FWS has jurisdiction over terrestrial and freshwater species. *See id.* §§ 17.11, 223.102, 224.101.

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Section 4 of the ESA prescribes mechanisms by which NMFS and FWS list "species," defined to include a "distinct population segment of any species of vertebrate . . . . [that] interbreeds when mature," as endangered or threatened, and designate "critical habitat" for such species. 16 U.S.C. §§ 1532(16), 1533(a). Section 9 of the ESA makes it unlawful to "take" listed species. *See id.* § 1538(a)(1)(B); 50 C.F.R. § 223.203(a). "Take" includes to harm, kill, or capture a protected species. 16 U.S.C. § 1532(19). Harm includes "significant habitat modification" that "kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, . . . [or] feeding . . . ." 50 C.F.R. § 222.102.

Section 7 of the ESA imposes substantive and procedural requirements on federal agencies. *See id.* § 402.03. Substantively, it mandates that federal agencies "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered . . . or threatened species or result in the destruction or adverse modification" of such species' critical habitat. 16 U.S.C. § 1536(a)(2); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). Procedurally, it requires an agency planning an action that "may affect" listed species (the "action agency") to consult with NMFS and/or FWS (the "consulting agency"). 50 C.F.R. § 402.14(a). Such consultation is intended to facilitate compliance with the substantive mandate. *See Thomas v. Peterson*, 753 F.2d 754, 763–65 (9th Cir. 1985), *abrogated on other grounds*, *Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091–92 (9th Cir. 2015).

Consultation results in the consulting agency's issuance of a biological opinion ("BiOp") determining whether the action is likely to jeopardize listed species or adversely modify critical habitat. 50 C.F.R. § 402.14(h)(3). If the consulting agency determines that the action is likely to jeopardize species or adversely modify critical habitat, the BiOp will suggest "reasonable and prudent alternatives" to avoid jeopardy or adverse modification. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 634 (9th Cir. 2014); 16 U.S.C. § 1536(b)(3)(A). If jeopardy and adverse modification are not likely, or if reasonable and prudent alternatives are identified to avoid jeopardy and adverse modification, the BiOp will include an incidental take statement

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 13
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

("ITS") defining the amount of take anticipated. *Aluminum Co. of Am. v. Bonneville Power Admin.*, 175 F.3d 1156, 1158–59 (9th Cir. 1999); 16 U.S.C. § 1536(b)(4)(C)(i); 50 C.F.R. § 402.14(*i*)(1)(i). The ITS also includes terms to minimize impacts and monitor take. 16 U.S.C. § 1536(b)(4)(C)(ii), (iv); 50 C.F.R § 402.14(*i*)(1)(ii), (iv), (*i*)(3); *Wild Fish Conservancy v. Salazar* (*WFC*), 628 F.3d 513, 531–32 (9th Cir. 2010). Take in compliance with an ITS is exempt from liability under ESA section 9. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(*i*)(5).

      **B.**      **The National Environmental Policy Act.**

      NEPA directs federal agencies to prepare an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). An EIS ensures that the agency considers detailed information on environmental impacts when reaching decisions and that the information will be made available to the larger audience that may also play a role in the decision making process. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA requires the environmental information be available *before* decisions are made and *before* actions are taken. 40 C.F.R. § 1500.1(b), (c) (2019).[1] An environmental assessment ("EA") must be prepared to determine whether an action will have significant environmental impacts if the action is neither one that normally requires an EIS nor one that is excluded from NEPA review. *Hale v. Norton*, 476 F.3d 694, 700 (9th Cir. 2007); 40 C.F.R. § 1501.4. If it is determined that no significant impact will occur, the agency must issue a "finding of no significant impact" ("FONSI"). 40 C.F.R. §§ 1501.4(e), 1508.13.

      **C.**      **The Magnuson-Stevens Act.**

      The Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act") establishes exclusive federal management over fisheries within the Exclusive Economic Zones of the United States; i.e., the "federal waters" generally located between three and 200 nautical miles from the coastline. 16 U.S.C. §§ 1802(11), 1811(a); 48 Fed. Reg. 10,605 (Mar. 14, 1983). The Secretary of Commerce is charged with implementing the statute and has delegated

---

[1] The 1978 NEPA regulations, as amended, were in effect when NMFS made the relevant decisions here. *See* 85 Fed. Reg. 43,304, 43,305 (July 16, 2020). All citations to the NEPA regulations herein are to that version.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 14
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1    responsibilities to NMFS. *See* 16 U.S.C. §§ 1854, 1855(d).

2    **IV.    STATEMENT OF FACTS.**

3        **A.    Endangered Southern Resident Killer Whale.**

4        The Southern Resident Killer Whale distinct population segment ("DPS") was listed as

5    an endangered species in 2005. 70 Fed. Reg. 69,903 (Nov. 18, 2005); 50 C.F.R. § 224.101(h).

6    The species is at a high risk of extinction—considered by NMFS to be one of the eight most at

7    risk species. AR 15988–89. "[T]he Southern Resident population has declined to historically low

8    levels." AR 47276. As of December 2018, there were only 74 whales. *Id.* In early 2019, there

9    were 26 reproductive age females, and only 14 had successfully reproduced in the prior 10 years,

10   and there had been no viable calves since the beginning of 2016. AR 47434.

11       A primary limiting factor for Southern Residents is prey availability, with limited prey

12   contributing to premature mortality and reduced fecundity. AR 47276, 47282, 47286–87, 47434.

13   Females are producing a low number of surviving calves during their reproductive life span and

14   experiencing late onset of sexual maturity and a long average reproductive interval (6.1 years).

15   AR 47276. "[T]his reduced fecundity is largely due to nutritional limitation." AR 47276, 47434.

16   Indeed, a recent assessment by Dr. Robert Lacy found that "the effects of prey abundance on

17   fecundity and survival had the largest impact on the population growth rate." AR 47278.

18       Southern Residents consume a variety of fish species. AR 47282–83. However, salmon

19   and steelhead make up to 98 percent of their diet. AR 47283. Specifically, the whales consume

20   mostly larger (i.e., older) Chinook salmon, with 80 to 90 percent of the species' diet consisting of

21   Chinook salmon. *Id.* This preference for Chinook salmon persists despite low abundance. *Id.*

22       **B.    Threatened Salmonids.**

23       The Snake River fall-run Chinook salmon evolutionarily significant unit ("ESU") was

24   listed as a threatened species in 1992, followed by the Puget Sound, the Lower Columbia River,

25   and the Upper Willamette River Chinook salmon ESUs in 1999. 57 Fed. Reg. 14,653 (Apr. 22,

26   1992); 64 Fed. Reg. 14,308 (Mar. 24, 1999); 50 C.F.R. § 223.102(e). The primary causes of their

27   decline include harvests and hatcheries. AR 01729, 14492, 15761, 15891. Chinook salmon in

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 15
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

these ESUs are harvested in Southeast Alaska, Canada, and other fisheries. *See* AR 47373–419.

Hatchery programs harm wild salmonids in several ways, including through genetic and ecological interactions between hatchery and wild fish. AR 47422–24. Hatchery fish become less fit to survive and reproduce in the wild through "domestication selection," a process whereby natural selection processes occur in an unnatural environment. AR 47423, 39742–46, 13519–20. This domestication harms wild fish when hatchery fish, released *en masse*, mate with wild fish and transfer their maladapted genes, reducing productivity of wild populations. AR 47422–24, 30274. Harm through ecological interactions occurs, *inter alia*, when hatchery fish compete with wild fish for resources, including food and rearing and spawning habitat. *See* AR 47424–25.

Puget Sound Chinook salmon historically consisted of 31 independent populations; 22 remain in five major population groups. AR 01741–42. "To lower the extinction risk . . . , all existing independent populations . . . will need to improve . . ., and some will need to attain a low [extinction] risk status." AR 01741. All populations are below escapement levels set for recovery and most populations are declining. AR 01747. Most populations suffer low productivity, with "[h]atchery-origin spawners . . . present in high fractions in most populations . . . ." *Id.*

Lower Columbia River Chinook salmon consists of 32 populations in six major population groups. AR 15905. "The majority of the populations . . . remain at high [extinction] risk, with low natural-origin abundance levels." AR 15911. "Hatchery contribution to naturally spawning-spawning fish remains high." *Id.* NMFS funds most hatchery production affecting the species under the Mitchell Act and recently completed a BiOp for the programs ("Mitchell Act BiOp"). AR 13233–767; AR 47244. The Mitchell Act BiOp requires large reductions in numerous Chinook salmon hatchery programs in the Columbia River to reduce harm to the Lower Columbia River Chinook salmon ESU. *See* AR 13267–72, 13666, 13677.

C.     **The Pacific Salmon Treaty.**

The United States and Canada first ratified the Pacific Salmon Treaty in 1985. AR 00523. A primary objective was to ensure that each county receive equitable benefits from the salmon originating in its waters. *Id.* The Pacific Salmon Treaty establishes upper limits on

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 16
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

"intercepting fisheries," defined as fisheries in one country that harvest salmon originating in another country. AR 47194. These fishing regimes are contained in Annex IV to the Pacific Salmon Treaty. *Id.* The original agreed-upon regimes expired in 1992. *Id.* A new comprehensive agreement was reached in 1999 that established 10-year fishery regimes, with the next set agreed upon in 2009. AR 47194–95. The current set of agreements became effective in 2019. *See* AR 47195. Chapter 3 of Annex IV to the 2019 Pacific Salmon Treaty defines the management regime for the Chinook salmon fisheries and is effective from 2019 through 2028. *See id.*

### D.   <u>Southeast Alaska Salmon Fisheries</u>.

There is a commercial troll salmon fishery and a sport salmon fishery in Southeast Alaska. AR 00514–15. The commercial fishery harvests primarily Chinook and coho salmon. AR 00540. Harvests are limited annually to a specific number of "Treaty Chinook salmon" according to an abundance estimate established under the Pacific Salmon Treaty. *Id.*

The commercial fishery is divided into two seasons: winter and general summer, and the general summer season is divided into spring and summer fisheries. *Id.* The winter season is from October 11 through April 30 and is managed to not exceed harvesting 45,000 Chinook salmon. *Id.* Treaty Chinook salmon caught in the winter season count towards the annual limit for Southeast Alaska set under the Pacific Salmon Treaty. *Id.* The spring fishery begins when the winter season ends and harvests primarily Alaska hatchery-produced Chinook salmon not subject to the Pacific Salmon Treaty, although some Treaty Chinook salmon are also caught. AR 00540–41. The summer troll season opens on July 1 and targets all Treaty Chinook salmon that remain available under the annual quota set pursuant to the Pacific Salmon Treaty. AR 00541.

All winter and spring harvests and some summer harvest occur in state waters and are therefore not subject to the Magnuson Stevens Act. *See* AR 00540–41. Some of the summer fishery occurs in the Exclusive Economic Zone that is subject to the Magnuson Stevens Act. AR 00541. The North Pacific Fishery Management Council, which manages fisheries in the federal waters of Alaska, developed a salmon fishery management plan in 1979 and has since issued numerous amendments. *See* 16 U.S.C. § 1852(a)(1)(G); AR 00502–03; 83 Fed. Reg. 31,340

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 17
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

(July 5, 2018). That plan delegates management authority over the fishery in federal waters of Southeast Alaska to the State of Alaska. *See* AR 00515. However, NMFS retains oversight authority of Alaska's management of these federal fisheries. AR 00561–65.

Under this regime, Alaska manages salmon fisheries "as a single unit throughout federal and state waters" using the allocations set under the Pacific Salmon Treaty. *See* AR 00515, 00541. NMFS provides federal funding to Alaska to "monitor and manage salmon fisheries in State and Federal waters to meet the obligations of [the Pacific Salmon Treaty] . . . ." AR 47198.

### E.   NMFS's 2019 SEAK BiOp on the 2019 Pacific Salmon Treaty.

NMFS first consulted under the ESA on the Southeast Alaska salmon fisheries in 1993. AR 47195. NMFS consulted in 1999 and again in 2009 on the 10-year harvest regimes set under the Pacific Salmon Treaty. AR 47195–96. NMFS reinitiated consultation after completion of the 2019 Pacific Salmon Treaty and issued the 2019 SEAK BiOp on April 5, 2019. AR 47173–76.

The 2019 SEAK BiOp is the product of an intra-agency ESA consultation; i.e., NMFS is both the action agency and the consulting agency. *See Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, No. 01-765 (CKK/JMF), 2002 U.S. Dist. LEXIS 7263, at *5 n.4 (D.D.C. Apr. 25, 2002). The 2019 SEAK BiOp consults on three actions: (1) NMFS's ongoing delegation of authority to Alaska to manage the portion of the summer fishery that occurs in federal waters; (2) NMFS's disbursement of funds to Alaska to manage all Southeast Alaska salmon fisheries to ensure compliance with the Pacific Salmon Treaty; and (3) a new grant program whereby NMFS will disburse funds for hatchery and habitat programs intended to partially mitigate harvests. AR 47198–204. The 2019 SEAK BiOp analyzes Southeast Alaska salmon fisheries, in both State and federal waters, under the regimes of the 2019 Pacific Salmon Treaty. *See, e.g.*, AR 47366.

The 2019 SEAK BiOp acknowledges that Southern Residents are at a high risk of extinction due to low fecundity rates, primarily attributable to reduced prey abundance. AR 47276–78, 47434. Under NMFS's management of fisheries "over the last decade, salmon availability has not been sufficient to support Southern Resident population growth." AR 47503. In 2017, Dr. Lacy found that prey abundance has the largest impact on population growth and

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 18
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

that **Chinook abundance would need to increase by 15%** to achieve the recovery growth rate target for Southern Residents. AR 47278, 47503. While the 2019 Pacific Salmon Treaty reduced some harvests, it was insufficient for Southern Residents and Puget Sound Chinook salmon:

> [T]here was a practical limit to what could be achieved through the bilateral negotiation process. As a consequence . . . , the U.S. Section generally recognized that **more would be required to mitigate the effects of harvest** and other limiting factors that contributed to the reduced status of Puget Sound Chinook salmon and [Southern Resident Killer Whales] . . . .

AR 47201–02 (emphasis added). Southeast Alaska harvests under the 2019 Pacific Salmon Treaty will reduce Southern Resident prey in coastal waters from 0.2% to **12.9%**, and in inland waters from 0.1% to 2.5%. AR 47439–40. The fisheries will reduce larger Chinook salmon preferred by Southern Residents from the whale's critical habitat up to 2.5%. AR 47283, 47507.

The Pacific Salmon Treaty sets an **upper limit** on fisheries; **NMFS can further restrict harvests to protect species under the ESA**. *E.g.*, AR 47436. Instead of limiting harvests to ensure they do not jeopardize species, NMFS manufactured a hypothetical federal "funding initiative" in an effort to partially mitigate harm to Puget Sound Chinook salmon and Southern Residents. AR 47201–03. This initiative includes three elements. AR 47202. First, $3.06 million per year is to be allocated for Puget Sound Chinook salmon "conservation"[2] hatcheries; to increase funding for existing programs on the Nooksack, Dungeness, and Stillaguamish Rivers and to fund a new program in Hood Canal. AR 47202, 47420. Second, $31.2 million is to fund (unidentified) habitat projects to benefit Chinook salmon populations in those same four Puget Sound watersheds. AR 47202, 47419–20. The third component seeks to dramatically increase Chinook salmon hatchery production to provide a 4% to 5% increase in prey for the Southern Residents. AR 47202–03. NMFS proposes spending "no less than $5.6 million per year" on this "prey increase program" in order to release 20 million smolts annually; five to six million smolts in Puget Sound and the rest in the Columbia River and the Washington Coast. AR 47203.

---

[2] A conservation hatchery is designed to preserve the genetic resources of a salmon population, as opposed to a program designed to provide other benefits, such as harvests. *See* AR 47420.

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

The 2019 SEAK BiOp found that the Southeast Alaska salmon fishery "**is likely to adversely affect designated critical habitat**" for Southern Residents "[d]uring the time it takes for . . . hatchery fish [produced under the prey increase program] to return as adults to critical habitat areas . . . ." AR 47507 (emphasis added). It is unclear how long NMFS believes that will be, as the mitigation "is not anticipated to be implemented immediately." AR 47435. Further, any hatchery fish would not be available to Southern Residents until "several years" after release because the whales "prefer to consume larger (i.e., older) Chinook salmon." AR 47507.

NMFS nonetheless assumed that this aspirational "mitigation package" will eventually produce beneficial effects when evaluating whether the Southeast Alaska salmon fisheries are likely to jeopardize species or adversely modify critical habitat under section 7(a)(2) of the ESA. *See, e.g.*, AR 47500–01, 47506–07. NMFS ultimately concluded that the fisheries, given the mitigation, are not likely to jeopardize Southern Residents or adversely modify their critical habitat. *See* AR 47508; 50 C.F.R. § 402.02 (defining "jeopardize the continued existence of").

NMFS also found that fisheries under the 2019 Pacific Salmon Treaty are not likely to jeopardize four Chinook salmon ESUs, including Puget Sound Chinook salmon and Lower Columbia River Chinook salmon. AR 47485–47501. Despite assuming the supposed benefits to Southern Residents from the hypothetical new hatchery production, the 2019 SEAK BiOp did not evaluate whether that increased production will jeopardize ESA-listed salmonids. *See id.*

The 2019 SEAK BiOp includes an ITS authorizing take of Southern Residents and four threatened Chinook salmon ESUs resulting from the Southeast Alaska salmon fisheries up to the harvest limits in 2019 Pacific Salmon Treaty. AR 47518–19. The ITS does not authorize take associated with the hypothetical mitigation—the proposed hatchery and habitat programs—explaining instead that future ESA consultations will be required. *E.g.*, AR 47420, 47428, 47433.

## V.  STANDARD OF REVIEW.

Challenges to a BiOp and to an agency's compliance with NEPA are reviewed under the Administrative Procedure Act ("APA"). *See Bennett v. Spear*, 520 U.S. 154, 174–79 (1997); *W. Watersheds Project v. Kraayenbrink*, 620 F.3d 1187, 1195 (9th Cir. 2010). Summary judgment is

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 20
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

generally the appropriate mechanism for resolving the merits of such claims. *See Occidental Eng'g Co. v. Immigr. & Naturalization Serv.*, 753 F.2d 766, 769–70 (9th Cir. 1985). The APA directs courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## VI.   ARGUMENT.

### A.   <u>The 2019 SEAK BiOp Is Arbitrary and Not in Accordance with Law</u>.

#### 1.   <u>NMFS's no jeopardy opinion relies on uncertain mitigation</u>.

NMFS's management of fisheries has pushed Southern Residents to the brink of extinction. *See, e.g.*, AR 47503. The 10-year harvests contemplated by the 2019 Pacific Salmon Treaty will continue to reduce prey to far below what is necessary for the species. *See* AR 47201–02, 47278, 47439–41, 47503, 47507. NMFS found that, absent other measures, these fisheries will "**adversely affect designated critical habitat**" of Southern Residents. AR 47507 (emphasis added). That finding should require the imposition of reasonable alternatives under the ESA. 16 U.S.C. § 1536(b)(3)(A). Instead of imposing such alternatives, NMFS approved the maximum harvests contemplated in the 2019 Pacific Salmon Treaty based on an assumption that it will be able to develop mitigation plans before Southern Residents go extinct. *See* AR 47201–02, 47498–47501 (mitigation also needed to preserve Puget Sound Chinook salmon). NMFS's reliance on this undeveloped and poorly-defined mitigation violates the ESA.

To satisfy ESA section 7's duty to "insure" no jeopardy, NMFS cannot rely on future mitigation to offset negative impacts absent "solid guarantees that they will actually occur." *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* (*NWF II*), 524 F.3d 917, 935 (9th Cir. 2008); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* (*NWF III*), 184 F. Supp. 3d 861, 914 (D. Or. 2016). The Ninth Circuit has adopted strict standards:

> Mitigation measures . . . must constitute a clear, definite commitment of resources, and be under agency control or otherwise reasonably certain to occur. A sincere general commitment to future improvements—without more specificity—is insufficient. The measures must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards. Binding

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 21
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1

2

> mitigation measures cannot refer only to generalized contingencies or gesture at
> hopeful plans; they must describe, in detail, the action agency's plan to offset the
> environmental damage caused by the project.

3

*Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (internal citations

4

and quotations omitted); *see also NWF II*, 524 F.3d at 935–36 (there must be "specific and

5

binding plans" for the mitigation). The proposed funding initiative relied upon by NMFS in

6

formulating the 2019 SEAK BiOp is dramatically deficient under these standards.

7

**a.**   <u>**The mitigation lacks specific and binding plans**</u>.

8

9

The mitigation measures relied upon by NMFS lack specific and binding plans. *E.g.*, AR

10

47203 ("[t]he **specific details** of how the three activities for which funding would be used **have**

11

**not been developed**" (emphasis added)). This vagueness undermines an analysis of whether the

12

mitigation will be sufficient to satisfy the "no jeopardy" standard of section 7 of the ESA. *See*

13

*Bernhardt*, 982 F.3d at 743 (mitigation must satisfy the jeopardy and adverse modification

14

standards). Further, the lack of specific "deadlines or otherwise-enforceable obligations"

15

frustrates a determination as to whether the mitigation contemplated in the 2019 SEAK BiOp is

16

being implemented. Agencies are required to reinitiate consultation when mitigation is not

17

implemented and they can become liable under the ESA for take. *Id.* at 743–44. Mitigation that

18

is too vague undermines that structure and cannot be relied upon to satisfy they ESA. *Id.*

19

The "prey increase" proposal to fund production of 20 million hatchery smolts annually

20

is devoid of specifics. *See* AR 47202–03, 47315, 47432–33. The only detail available is that the

21

mitigation must "increase prey availability by 4-5 percent in areas that are most important to

22

[Southern Residents]." AR 47202–03, 47315. NMFS knows the outcome needed to support its

23

"no jeopardy" opinion, **but there is no plan whatsoever** for achieving that outcome; e.g., what

24

hatcheries will be used; what hatchery stocks will be used; who will operate the programs; where

25

the fish will be released; the age of fish released; the smolt to adult return ratio; the number of

26

fish needed for broodstock; or when, where, or how many salmon will be available to the

27

Southern Residents. *See, e.g.*, AR 47315 (mitigation "is less well defined and does not lend itself

28

to further specification"); AR 47433 ("the details needed to conduct site-specific assessments

29

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

have not been worked out"). The mitigation is exceedingly less-defined than that rejected in *Bernhardt*, where a specific entity was to conduct annual surveys for polar bears dens within a specified radius, but that mitigation still lacked sufficient detail. 982 F.3d at 744–46.

Instead of describing the details of how this mitigation will be implemented as required, the 2019 SEAK BiOp directs NMFS to come up with a plan: "NMFS shall design the prey increase program using the best available information . . . ." AR 47525. NMFS hopes "to work collaboratively with the state and tribal co-managers [that operate hatcheries] . . . to develop a program that meets the goal related to increasing prey abundance." AR 47433. This is glaringly contrary to the Ninth Circuit's explicit holding that a BiOp cannot rely on undeveloped "hopeful plans" in lieu of "describe[ing], in detail, [NMFS's] plan to offset" impacts. *Bernhardt*, 982 F.3d at 743; *see also NWF III*, 184 F. Supp. 3d at 913 (rejecting BiOp's reliance on "unidentified projects" to be implemented by others); *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1004 (D. Ariz. 2011) (A BiOp cannot rely on a "promise—no matter how well-intended— to develop a plan in the future to mitigate the impacts of its proposed action."); *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1154 (D. Ariz. 2002) (rejecting reliance on undeveloped plans that would "identify the necessary mitigation").[3]

Reliance on the "prey increase" proposal is also impermissible because the mitigation is not subject to "deadlines or otherwise-enforceable obligations." *See Bernhardt*, 982 F.3d at 743. Notably, the 2019 SEAK BiOp does not include any deadlines whatsoever for this mitigation, nor does it include specific requirements by which to confirm that the mitigation is being implemented in the manner and on the schedule needed to avoid the extinction of Southern Residents. *See* AR 47525–26. Instead, NMFS vaguely admits that the mitigation "is not anticipated to be implemented immediately." AR 47435; *see also* AR 47203 (2019 SEAK BiOp noting that if "funding is not provided in time for actions to take effect during the [10-year] agreement" set in the 2019 Pacific Salmon Treaty, that "**may** constitute a modification" requiring

---

[3] "District courts in this circuit follow the standard [for reliance on mitigation] articulated by *Rumsfeld*. *Bernhardt*, 982 F.3d at 743 n.6.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 23
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

new ESA consultation (emphasis added)). Reliance on such "vague" and "indefinite" mitigation measures is inconsistent with the ESA. *See Bernhardt*, 982 F.3d at 743–44.

The mitigation proposal to provide funding to four Puget Sound conservation hatcheries is also too ill-defined for reliance under ESA section 7. Remarkably, NMFS cannot even confirm that additional fish will be produced. AR 47420 (funding will "most likely include increased production"). NMFS does not specify how the funds will be spent; how many additional fish could be produced; where fish would be released; the age of fish released; the number of adult fish needed for broodstock; or when, where, or how many adult salmon could be made available to Southern Residents or to aid recovery of Puget Sound Chinook salmon. *See* AR 47420–27. NMFS has thus failed to describe, in detail, how funding these four conservation hatcheries would mitigate harvest impacts. *Bernhardt*, 982 F.3d at 743. This mitigation also does not meet the Ninth Circuit's standards because the 2019 SEAK BiOp **lacks any** "deadlines or otherwise-enforceable obligations" to guide this supposed mitigation as required under the ESA. *See id*.

With respect to the habitat restoration component of mitigation, NMFS admits that "while a list of potential habitat restoration projects . . . exists, it has not been decided which projects would be funded . . . ." AR 47203; *see also* AR 47420 ("site specific details" for habitat restoration "are not yet available"). Moreover, even the "original project [sic] listed may change." AR 47427. NMFS does not provide any details about which projects will be implemented, who will implement them, when they would be implemented, or, most importantly, the extent to which they would mitigate harvest impacts. *See* AR 47427–32. The Ninth Circuit has rejected such reliance on lists of "'possible' strategies, without selecting a mitigation measure from the incorporated list or committing [the agency] to carrying out any specific number of measures." *Bernhardt*, 982 F.3d at 746; *see also Salazar*, 804 F. Supp. 2d at 1002 (cannot rely on a "laundry list of possible mitigation measures" (quoting *Rumsfeld*, 198 F. Supp. 2d at 1153)). Separately, reliance on the habitat projects is impermissible because there are absolutely no "deadlines or otherwise-enforceable obligations." *See Bernhardt*, 982 F.3d at 743.

In sum, the mitigation does not meet applicable standards because there are no details for

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 24
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

implementation, nor is the mitigation subject to deadlines or otherwise-enforceable obligations.

**b.** **The mitigation is not subject to NMFS's control or otherwise reasonably certain to be fully and timely implemented.**

NMFS's reliance on the mitigation is also, and independently, impermissible under the ESA because the mitigation is not subject to NMFS's "control or otherwise reasonably certain to occur." *See Bernhardt*, 982 F.3d at 743; *NWF II*, 524 F.3d at 935–36 n.17.

NMFS does not intend to implement any mitigation itself; instead, it intends to develop a "grant program" to provide funding to others for the hatchery and habitat projects. *E.g.*, AR 47447; AR 47201–02, 47433 (NMFS intends to work with "state and tribal co-managers," which operate hatcheries, to develop mitigation). However, NMFS's administrative record **does not contain a single commitment, legal or otherwise, to implement mitigation** from any entity that would be responsible for implementation; i.e., Tribes, States (Washington, Oregon, and Idaho), and FWS. NMFS's record does not even contain communications from those entities indicating that they have the capacity or ability to implement the projects. There is nothing in the record to support a finding that the mitigation is subject to NMFS's "control or otherwise reasonably certain to occur," and NMFS's reliance on the mitigation is therefore inconsistent with Ninth Circuit precedent. *See Bernhardt*, 982 F.3d at 743; *NWF II*, 524 F.3d at 935–36 n.17; *Sierra Club v. Marsh*, 816 F.2d 1376, 1385 (9th Cir. 1987) ("This reliance on the proposed actions of others does not satisfy [the agency's] burden of insuring that its actions will not jeopardize . . . species" (quotation, citations, and original alterations omitted)); *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* (*NWF I*), 254 F. Supp. 2d 1196, 1213–14 (D. Or. 2003) (reliance on mitigation to be implemented by third-parties, States and Tribes, where there was no authority or binding agreements to compel implementation, was impermissible). Further, "there is a degree of uncertainty regarding whether Congress will [timely] provide the [mitigation] funding, in whole or in part . . . ." AR 47203.

Additionally, the hatchery components of mitigation lack the requisite "solid guarantees that they will actually occur" in the time and manner contemplated by NMFS because they

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

require review and approval under the ESA and NEPA. *See NWF II*, 524 F.3d at 935; *NWF I*, 254 F. Supp. 2d at 1208, 1213–16 (NMFS improperly relied on mitigation that had not undergone ESA consultation, including habitat and hatchery measures). NMFS cannot rely on these proposals because, as the Tribes explained in *NWF I*, the mitigation "may never occur, may be substantially modified, or may be found to jeopardize the species upon closer scrutiny during future [ESA] consultation." 254 F. Supp. 2d at 1208.

NMFS has long-recognized that hatcheries harm wild salmonids. *See, e.g.*, *NWF II*, 524 F.3d at 935 ("NMFS explicitly found that continued reliance on the hatchery operation itself threatens [the salmon's] chances of recovery . . . ."). Hatchery production is already suppressing recovery of salmonids, including Puget Sound and Lower Columbia River Chinook salmon. *See supra* sec. IV.B. NMFS's proposal to fund even more hatchery production would exacerbate that harm and requires further ESA consultation. AR 47420 (funding Puget Sound Chinook salmon conservation hatcheries requires "further consultation once the site specific details are fully described"), 47433 ("Once the details are known" for the prey increase program, "NMFS would complete site-specific [ESA] consultations.").

ESA consultation on these hatchery programs may determine that they are likely to jeopardize species. *See* 16 U.S.C. § 1536(a)(2). That would preclude implementation unless NMFS is able to prescribe "reasonable and prudent alternatives," such as smaller programs. *Thomas*, 753 F.2d at 763; 16 U.S.C. § 1536(b)(3)(A). Further, any BiOp will include terms to minimize impacts to threatened salmonids, which could alter the hatchery programs as contemplated. *See Thomas*, 753 F.2d at 763; 16 U.S.C. § 1536(b)(4)(ii). Notably, the Mitchell Act BiOp requires that numerous hatcheries **reduce** annual releases into the Columbia River by 2022 by nearly two million Chinook salmon to protect ESA-listed salmonids. *See* AR 13267–72. NMFS cannot rely on hatcheries as mitigation because the programs may be modified or rejected when reviewed under the ESA. *See NWF I*, 254 F. Supp. 2d at 1208, 1213–16.

NMFS's massive new federal grant program to fund mitigation for the Southeast Alaska salmon harvests is also subject to NEPA. *See* 40 C.F.R. § 1508.18(a); *Alaska v. Andrus*, 591 F.2d

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 26
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

537, 540 (9th Cir. 1979) (federally funded projects subject to NEPA); *see also Ramsey v. Kantor*, 96 F.3d 434, 443–44 (9th Cir. 1996) (ESA take authorizations also trigger NEPA requirements).[4] NMFS already violated NEPA by adopting the hatchery mitigation identified in the 2019 SEAK BiOp without first providing any NEPA procedures. *See infra* sec. VI.C.2; *Metcalf v. Daley*, 214 F.3d 1135, 1138, 1143–44 (9th Cir. 2000) (NMFS, et al., unlawfully predetermined NEPA by committing to support a specific harvest quota before preparing EIS or EA).

When NMFS does comply with NEPA for the hatchery mitigation, it will be required to consider reasonable alternatives, including smaller hatchery releases that pose less harm to wild salmonids. *See Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 992 F. Supp. 2d 1095, 1110 (D. Or. 2014) (NMFS violated NEPA by failing to consider smaller hatchery releases); *Wild Fish Conservancy v. Nat'l Park Serv.*, 8 F. Supp. 3d 1289, 1299–1301 (W.D. Wash. 2014) (same); *California v. Block*, 690 F.2d 753, 767 (9th Cir. 1982) ("touchstone" of NEPA is proper "selection and discussion of alternatives [to] foster[] informed decision-making"). NMFS cannot provide "solid guarantees" that the hatchery programs will occur as contemplated in the 2019 SEAK BiOp because NMFS has yet to disclose and evaluate alternatives as required by NEPA; reliance on this mitigation is therefore impermissible. *See NWF II*, 524 F.3d at 935.

NMFS's reliance on the mitigation proposals is impermissible because they are not subject to its "control or otherwise reasonably certain to occur." *Bernhardt*, 982 F.3d at 743.

### 2.    The 2019 SEAK BiOp fails to draw a rational connection between the facts and the no jeopardy opinion reached for Southern Residents.

NMFS is required to articulate a rational connection between the facts found and its "no jeopardy" conclusions reached. *E.g.*, *WFC*, 628 F.3d at 525–27; *NWF III*, 184 F. Supp. 3d at 909–10 (BiOp "must provide sufficient information so that a reviewing court can educate itself in order to perform its reviewing function—'determining whether the agency's conclusions are rationally supported'" (quotation omitted)). NMFS has failed to meet this standard because it has

---

[4] *See also Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 992 F. Supp. 2d 1095, 1107–09 (D. Or. 2014) (NMFS's approval of hatcheries under ESA regulations is subject to NEPA).

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 27
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

not explained how the Southeast Alaska salmon harvests, combined with other west coast fisheries, will not continue to starve Southern Residents into extinction, regardless of whether the hypothetical mitigation is implemented. This deficiency is exacerbated by NMFS's apparent failure to account for increases in harvests that would result from the prey increase program, reducing any benefits to Southern Residents.

In *WFC*, a BiOp that found a local bull trout population was small and vulnerable to extirpation, was declining in size, and was likely to continue declining primarily due to the hatchery operations under review. 628 F.3d at 525–26. FWS nonetheless concluded that the hatchery would not jeopardize bull trout. *Id.* at 526–27. The Ninth Circuit rejected the BiOp because FWS failed to explain the apparent contradiction between the factual findings and the "no jeopardy" opinion. *Id.* at 527–29. While FWS may have believed that the population could be lost without jeopardizing the entire bull trout species, a BiOp can be affirmed only on the bases articulated by the agency and FWS's record did not include such a finding. *Id.* at 529.

The 2019 SEAK BiOp suffers from this same deficiency. NMFS considers Southern Residents one of the species most at risk of extinction. AR 15988–89. "[T]he Southern Resident population has declined to historically low levels," primarily because insufficient prey abundance is reducing fecundity. AR 47276, 47282, 47286–87, 47434. NMFS's management of salmon fisheries over the last 10 years has been insufficient to support Southern Resident population growth. AR 47503. NMFS predicts that the "downward trend in population growth" for Southern Residents will continue. AR 47502.

A recent population viability assessment found prey abundance has the largest impact on the Southern Residents' population growth rate and Chinook salmon abundance would need to increase by 15% to achieve growth rate targeted for recovery of Southern Residents. AR 47278, 47503. NMFS does not identify the increase needed to merely sustain the severely depressed population size. The 2019 Pacific Salmon Treaty somewhat reduced salmon harvests relative to the prior agreement. *E.g.*, AR 47445, 47504. Those reductions provide very minor improvements in prey availability; e.g., prior Southeast Alaska harvests reduced prey in coastal waters up to

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 28
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

15.1%, while those harvests under the 2019 Pacific Salmon Treaty will reduce prey in coastal waters up to 12.9%. AR 47505. While NMFS assumes that the prey increase program will eventually increase prey by 4% to 5%, that is far below the 15% increase needed for recovery. *See* AR 47202–03. Yet, NMFS concludes that the Southeast Alaska salmon harvests, along with other west coast fisheries, are not likely to jeopardize Southern Residents. AR 47508. NMFS fails to draw a rational connection between that conclusion and the facts found, including the fact that Southern Resident population size is expected to continue declining primarily due to inadequate prey. *See* AR 47502; *WFC*, 628 F.3d at 525–29.

This failure is aggravated by NMFS's complete failure to explain the assumption that releasing 20 million hatchery smolts annually will increase Southern Residents' prey by 4% to 5%. *See* AR 47202–03, 47432–33. It is unclear whether that assumption accounts for increased harvests that will also result. Harvests are set annually under the 2019 Pacific Salmon Treaty for Southeast Alaska, North-Central British Columbia, and West Coast Vancouver Island using an abundance index. *See* AR 47205–09. The abundance index reflects the predicted abundance of Chinook salmon available to the fisheries where an index of 1.0 equals the average abundance from 1979 to 1982, and an index of 1.2 is 20% greater. AR 47205. Harvest limits increase with abundance index increases. *See* AR 47208. Hatchery releases will increase the abundance index; as a crude example, using a smolt to adult ratio of 0.7%, an annual release of 20 million smolts could produce 140,000 adult fish that could be included in the abundance index. *See*, *e.g.*, AR 30609 (smolt to adult ratios in the range of 0.5% to 1.0%). That would raise an abundance index of 1.0 (around 1,235,020 salmon) to 1.1 (around 1,375,020 salmon), increasing harvests from 390,500 salmon (1.0 abundance index) to 462,500 salmon (1.1 abundance index); an increase in harvest of 72,000 salmon. *See* AR 47208. Under this scenario, over half of the 140,000 adult salmon produced by the prey increase program could be harvested and not benefit Southern Residents. NMFS's record does not provide "sufficient evidence" to show that it considered this critical issue. *See NWF III*, 184 F. Supp. 3d at 909–10; *Nw. Coal. for Alts. to Pesticides v. U.S. Env't Prot. Agency*, 544 F.3d 1043, 1052 (9th Cir. 2008) (agency failed to provide enough

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 29
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

information to demonstrate a rational connection between the facts and its conclusion).

In sum, NMFS has failed to draw a rational connection between the facts, including its predicted continued decline of Southern Residents, and the "no jeopardy" conclusion.

### 3. The 2019 SEAK BiOp violates the ESA by failing to evaluate whether the prey increase program will jeopardize threatened salmonids.

NMFS identified the prey increase program as an "action" consulted on in the 2019 SEAK BiOp because it needed to assume the benefits to approve the Southeast Alaska harvests. Yet, the 2019 SEAK BiOp altogether ignores the prey increase program in evaluating whether the "actions" are likely to jeopardize threatened salmonids. That is inconsistent with the ESA.

### a. The 2019 SEAK BiOp includes benefits of the prey increase program in its jeopardy analysis for Southern Residents.

NMFS explains that the prey increase program was developed because the 2019 Pacific Salmon Treaty did not reduce harvests enough to protect Southern Residents. *See* AR 47201–02. The 2019 SEAK BiOp contends that enough information is available to assume the supposed benefits of that program to Southern Residents: "Some effects of the [mitigation] funding initiative can be described specifically and analyzed quantitatively now (e.g., increasing in prey abundance for [Southern Residents] by 4-5 percent)." AR 47420; *see also* AR 47432, 47447. NMFS's biological opinion that the actions addressed in the 2019 SEAK BiOp are not likely to jeopardize Southern Residents relies upon the supposed benefits of the prey increase program. *See* AR 47506–08 ("The hatchery production will increase abundance of Chinook salmon . . . , which will reduce impacts from the [harvest] action during times of low prey for the whales).[5]

### b. The 2019 SEAK BiOp ignores harm from the prey increase program in its jeopardy analyses for threatened salmonid.

In contrast to the supposed beneficial impacts, NMFS altogether ignores the prey increase program and its harmful impacts in its jeopardy analyses for threatened salmonids.

NMFS explains that it is unable to analyze harm to threatened Chinook salmon from the

---

[5] NMFS's jeopardy analyses and opinions are in the "Integration and Synthesis" section of the 2019 SEAK BiOp. AR 47484–85.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 30
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

prey increase program in any detail because the program is too undeveloped. AR 47420. The

discussion of such effects is barely half a page; NMFS expects of "a range of effects" similar to

the Puget Sound conservation hatcheries proposed as a separate mitigation component. AR

47432–33. NMFS also lacks sufficient information to conduct a detailed analysis of the

conservation hatcheries and instead provides a generic summary of concerns associated with

artificial propagation programs in general. AR 47420–27.

NMFS's analyses of whether the actions addressed in the 2019 SEAK BiOp are likely to

jeopardize four threatened Chinook salmon ESUs **omits the prey increase program altogether**.

AR 47485–47501. Thus, the 2019 SEAK BiOp **does not include NMFS's biological opinion** as

to whether the prey increase program is likely to jeopardize the threatened Puget Sound, Lower

Columbia River, Upper Willamette, and Snake River Fall-Run Chinook salmon ESUs.[6]

Similarly, NMFS omits the prey increase program when addressing impacts to other

threatened salmonids—i.e., those not caught in the Southeast Alaska fishery—such as threatened

Lower Columbia River steelhead and Puget Sound steelhead. *See* AR 47528–31.[7] The 2019

SEAK BiOp concludes that the "actions" "are not likely to adversely affect" any salmonid

species that is not caught in the Southeast Alaska salmon fishery. AR 47528. When such a

determination is made, there is no formal consultation under section 7 of the ESA and NMFS

does not issue a BiOp determining whether the action is likely to jeopardize the species. *See* 50

C.F.R. § 402.14(b). In concluding that the actions addressed in the 2019 SEAK BiOp are "not

likely to adversely affect" numerous threatened salmon species, NMFS considers the salmon

harvests only, completely omitting the prey increase program as an "action." *See* AR 47528–31.

c.      **The 2019 SEAK BiOp's failure to evaluate whether the prey**

---

[6] In contrast, NMFS provides a cursory analysis of impacts to threated Puget Sound Chinook salmon from the conservation hatchery mitigation component. AR 47498–99. In doing so, NMFS explains that it has "consider[ed] in this opinion the effects of the [Southeast Alaska] fishery . . . and the effects of the conservation funding initiative," thereby admitting that its "no jeopardy" opinion for Puget Sound Chinook salmon does not account for the harmful impacts from the prey increase program. AR 47500.

[7] The prey increase program will, unquestionably, adversely affect salmonids species in addition to the four Chinook salmon ESUs caught in the Southeast Alaska fishery. *See, e.g.*, AR 30641–46 (NMFS's BiOp describing take of threated Puget Sound steelhead from Chinook and coho salmon programs).

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 31
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

**increase program may jeopardize salmonids violates the ESA.**

The 2019 SEAK BiOp is inconsistent with the ESA and implementing regulations because it does not include analyses or opinions on whether the prey increase program is likely to jeopardize threatened salmonids. Instead, NMFS's impermissibly segmented consultation by assuming benefits of the prey increase program in its jeopardy analysis for Southern Residents, while omitting the program altogether in its jeopardy analyses for threatened salmonids.

The central function of consultation under section 7 of the ESA is formulation of NMFS's biological opinion as to whether proposed actions will jeopardize species or adversely modify their critical habitat. *See Thomas*, 753 F.2d at 763; 16 U.S.C. § 1536(b)(3)(A) ("Promptly after conclusion of consultation . . . , [NMFS] shall provide . . . a written statement setting forth [NMFS's] opinion . . . . If jeopardy or adverse modification is found, [NMFS] shall suggest . . . reasonable and prudent alternatives . . . ."). The ESA implementing regulations provide:

> The biological opinion **shall include** . . . [NMFS's] opinion on whether the action is (A) Likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy" biological opinion); or (B) Not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion).

50 C.F.R. § 402.14(h)(1)(iv) (emphasis added); *see also* 50 C.F.R. § 402.14(g)(4) (NMFS must "formulate [its] opinion as to whether the action is likely to jeopardize . . . listed species or result in . . . adverse modification of critical habitat."). The Ninth Circuit has reiterated this fundamental requirement of a BiOp: "[d]uring the formal consultation process, the [consulting agency] **must** 'formulate its biological opinion as to whether the action . . . is likely to jeopardize the continued existence of listed species . . . .'" *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1107 (9th Cir. 2012) (emphasis added) (quoting 50 C.F.R. § 402.14(g)(4)); *see also Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004) ("The first requirement of an ESA BiOp is to determine whether the proposed action is likely to jeopardize . . . species."). The 2019 SEAK BiOp is not in accordance with the ESA because it lacks any analyses or opinions on whether the prey increase program is

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 32
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

likely to jeopardize ESA-listed salmonids, including the Chinook salmon affected by the

Southeast Alaska salmon fisheries and other salmonid species affected by the hatcheries.

Further, by including benefits of the prey increase program in the jeopardy analysis for

Southern Residents, but entirely omitting the program from the jeopardy analysis for threatened

salmonids, NMFS impermissibly segmented its consultation on this program. *See Conner v.*

*Burford*, 848 F.2d 1441, 1453–58 (9th Cir. 1988). "A biological opinion which is not

coextensive in scope with the identified agency action necessarily fails to consider important

aspects of the problem and is, therefore, arbitrary and capricious." *Greenpeace v. Nat'l Marine*

*Fisheries Serv.*, 80 F. Supp. 2d 1137, 1150 (W.D. Wash. 2000). Regardless of uncertainties,

NMFS cannot "'ignore available biological information [and] fail to develop projections' which

may indicate potential conflicts between the proposed action and the preservation of endangered

species." *See id.* at 1150 (quoting *Conner*, 848 F.2d at 1454) (rejecting NMFS's argument that a

lack of information prevented further analysis); *NWF II*, 524 F.3d at 936 (NMFS improperly

relied on hatcheries as mitigation without also considering the "impact of prolonging the

[salmon's] hatchery dependence on its eventual prospects for recovery.").

The BiOp in *Conner* purported to address issuance of leases for oil and gas exploration

and "all resulting subsequent activities." 848 F.2d at 1453. However, the BiOp "concluded that

there was insufficient information pertaining to specific location and extent of post-leasing . . .

activities to render a comprehensive [BiOp] beyond the initial lease stage." *Id.* The BiOp

therefore contemplated an "incremental-step" process where future ESA consultations would

occur. *Id.* at 1452. The Ninth Circuit held that FWS "violated the ESA by failing to use the best

information available to prepare comprehensive [BiOps] considering all stages of the agency

action, and thus failing to adequately assess whether the agency action was likely to jeopardize

[ESA-listed species] as required by section 7(a)(2)." *Id.* at 1454. Regardless of "incomplete

information," the BiOp must use "available biological information" and "develop projections" to

"assess whether [all phases of] the agency action [are] likely to jeopardize . . . species . . . ." *Id.*

The "incremental-step" process would allow the "piecemeal chipping away" of species. *Id.*; *see*

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 33
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

*also WFC*, 628 F.3d at 521–25 (rejecting temporal segmentation of effects analysis).

As in *Conner*, the 2019 SEAK BiOp violates the ESA because it "pay[s] lip service" to the requirement to prepare a comprehensive BiOp by including the prey increase program as an "action," without analyzing whether the program will jeopardize ESA-listed salmonids. 848 F.2d at 1453; *see also Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 255 (D.D.C. 2003) ("ESA requires that all impacts of agency action—both present *and* future effects of species—be addressed in the consultation's jeopardy analysis"). NMFS thereby violated the ESA by failing to prepare a comprehensive BiOp using available information and making projections, as necessary, to evaluate whether the prey increase program may jeopardize salmonid species. NMFS instead relied entirely on future "site-specific consultations" akin to the "incremental-step" consultations rejected in *Conner*. *See* AR 47433.

NMFS's inclusion of the prey increase program as an "action" in the 2019 SEAK BiOp, without evaluating whether it jeopardizes threatened salmonids, has significant consequences. First, NMFS believes that hatcheries may be appropriate to "alleviate short-term extinction risks," but must otherwise be limited to protect wild salmonids. AR 47422. Yet, NMFS's "no jeopardy" opinion for Southern Residents relies on the prey increase program to provide "long-term" benefits. AR 47506. Second, actions that have undergone consultation are assumed in the "environmental baseline" for future consultations. 50 C.F.R. § 402.02 (defining "environmental baseline"). The 2019 SEAK BiOp explains that the benefits of the prey increase program will be assumed in the baseline in future consultations on other fisheries that affect Southern Residents. AR 47203–04. Thus, NMFS seeks to authorize harvests all along the west coast that will deprive Southern Residents of prey in reliance on the prey increase program before even evaluating whether that increased hatchery production will jeopardize ESA-listed salmonids.

NMFS's failure to make a jeopardy determination on the prey increase program—an "action" included in the 2019 SEAK BiOp—for ESA listed salmonids violates the ESA. *See, e.g.*, 50 C.F.R. § 402.14(g)(4), (h)(1)(iv); *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d at 1107.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 34
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

4. **The ITS fails to adequately limit take of Southern Residents**.

The ITS in 2019 SEAK BiOp authorizes whatever amount of take of Southern Residents happens to result due to harvests set under the 2019 Pacific Salmon Treaty. AR 47519. This is an impermissible limit on take, as the limit is coextensive with the action subject to the consultation. *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1038–41 (9th Cir. 2007); *see* Dkt. 14, at 26–28.

B. **NMFS Failed to Ensure Its Actions Do not Jeopardize ESA-Listed Species**.

Section 7 of the ESA imposes a substantive duty on NMFS to ensure that any action it authorizes or funds is not likely to jeopardize species or destroy critical habitat. *See* 16 U.S.C. § 1536(a)(2). NMFS is in violation of that obligation because NMFS is relying on the 2019 SEAK BiOp, which contains the legal flaws discussed above, to support its continued authorization of and funding for management of salmon fisheries in Southeast Alaska and to support its funding of new hatchery production as supposed mitigation. *See WFC*, 628 F.3d at 532.

C. **NMFS Violated NEPA by Failing to Prepare an EIS or an EA and FONSI**.

NMFS violated NEPA by failing to conduct any NEPA analysis for its authorization of take resulting from the 10-year fishery regimes set in the 2019 Pacific Salmon Treaty. NMFS further violated NEPA by adopting the prey increase program without NEPA processes.

1. **NMFS's failure to complete NEPA for its authorization of take by the 2019 Pacific Salmon Treaty fisheries is not in accordance with law.**

The Ninth Circuit held in 1996 that NMFS violated NEPA by failing to prepare an EA or an EIS "*before* issuing" an ITS authorizing take associated with salmon fisheries. *Ramsey*, 96 F.3d at 443–44 (emphasis in original). Inexplicably, NMFS disregarded *Ramsey* and issued the ITS in the 2019 SEAK BiOp, authorizing take associated with Southeast Alaska salmon fisheries under the 2019 Pacific Salmon Treaty, without any NEPA process. Under the unequivocal holding in *Ramsey*, that violated NEPA. *See id.*

NMFS's ITS in *Ramsey* authorized take associated with salmon fisheries under the Columbia River Fish Management Plan, a "federal-state-tribal compact that controls . . . harvests for fish that enter the Columbia River system." *Id.* at 438. Like the Pacific Salmon Treaty, the

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 35
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

plan did not directly regulate fisheries; state fishery rules were enacted consistent with the plan. *Id.* at 438, 444. Like the 2019 SEAK BiOp, the BiOp in *Ramsey* was the result of an intra-agency consultation; NMFS was both the federal action agency involved in preparing the plan and the ESA consulting agency issuing the BiOp. *Id.* at 438–39. NMFS was required to prepare an EA or EIS because the ITS "is the functional equivalent to a permit because the activity in question would, for all practical purposes, be prohibited but for the [ITS]." *Id.* at 444. NEPA compliance rested with NMFS in its capacity as the ESA consulting agency issuing the ITS because "there was no downstream federal agency [implementing the project] to complete an EIS." *Jewell*, 747 F.3d at 643–44 (explaining *Ramsey*). Rather, Washington and Oregon, which are not subject to NEPA, implement the fishery through rules; "[i]f the consulting agency, the NMFS, did not comply with the EIS requirement in *Ramsey*, then the action would have evaded NEPA review altogether . . . ." *Id.* at 644.

NMFS responded to *Ramsey* with a 2003 programmatic EIS covering several fisheries, including the Southeast Alaska salmon fisheries, explaining:

> The Ninth Circuit Court of Appeals, in its 1996 decision in *Ramsey v. Kantor* . . . , clarifies that the actions ensuing from NMFS' review are the decision of whether to continue deferral of management to the State of Alaska and the associated issuance of an Incidental Take Statement (ITS), and that those actions need to comply with NEPA.

AR 47948, 47952–53. The federal actions subject to the EIS included NMFS's ITS authorizing take associated with Southeast Alaska fisheries under the 1999 Pacific Salmon Treaty (through 2008) and the "continued deferral of management [over the fisheries] to the State" of Alaska. AR 47953. NMFS recognized that it would be required to comply with NEPA even if it authorized take associated with the fisheries under section 10 of the ESA, applicable to non-federal actions, instead of section 7 of the ESA, which applies only to federal actions. *Id.*

The ITS issued with the 2019 SEAK BiOp is identical, in all relevant aspects, to that in *Ramsey*. This new ITS applies to fisheries that "incidentally take[] salmon that are listed" under the ESA; specifically, Southeast Alaska fisheries from 2019 through 2028 under the 2019 Pacific

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 36
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Salmon Treaty. *Ramsey*, 96 F.3d at 444; AR 47518. The ITS was the result of an intra-agency consultation; i.e., NMFS consulted on its own actions, including its disbursement of funds to Alaska to manage the fisheries under the 2019 Pacific Salmon Treaty. AR 47197–47204; *see also* 16 U.S.C. § 1536(a)(2) (requiring consultation under ESA section 7 for actions "authorized, funded, or carried out" by a federal agency). Alaska implements the fisheries through state rules, so there is no "downstream federal agency to complete an EIS." *Jewell*, 747 F.3d at 644. NMFS was therefore required to comply with NEPA as the consulting agency authorizing take associated with fisheries under the 2019 Pacific Salmon Treaty; otherwise, "the action would . . . evade[] NEPA review altogether . . . ." *Id.* NMFS violated NEPA by failing to prepare an EA or and EIS for the fisheries "*before* issuing the [ITS]." *Ramsey*, 96 F.3d at 444.

2.  **NMFS's failure to complete NEPA for its adoption of a new federal grant program to fund hatcheries is not in accordance with law.**

NMFS further violated NEPA by adopting the federal grant program for new hatchery production described in the 2019 SEAK BiOp without first preparing an EIS or even an EA.

As discussed, the Ninth Circuit explained in *Jewell* circumstances under which NMFS is required to comply with NEPA in its role as an ESA consulting agency issuing an ITS. 747 F.3d at 643–45. The court went on to explain that, when the action subject to ESA consultation is undertaken by a federal agency, that action agency's adoption and implementation of the BiOp is subject to NEPA. *Id.* at 645–46; *see also NWF III*, 184 F. Supp. 3d at 935 ("In *Jewell*, the Ninth Circuit held clearly and explicitly, for the first time, that action agencies adopting a [decision] implementing a biological opinion generally *must* prepare an EIS.").

In *Jewell*, FWS issued a BiOp concluding that the Bureau of Reclamation's continued operations of a water project jeopardizes a species and the BiOp therefore identified reasonable and prudent alternatives to avoid jeopardy; i.e., alternative operations that reduce water exported from northern to southern California. 747 F.3d at 592. Reclamation would be subject to liability under section 9 of the ESA for take of listed species if it chose to deviate from the BiOp's reasonable and prudent alternatives. *Id.* at 642–43. "Reclamation . . . notified the FWS that it

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 37
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

intends to operate the Projects in compliance with the biological opinion." *Id.* at 592. The Ninth

Circuit held that Reclamation's "provisional adoption and implementation of the BiOp triggered

its obligation to comply with NEPA." *Id.* at 642; *see also NWF III*, 184 F. Supp. 3d at 933

(Reclamation and Army Corps of Engineers' decisions "adopting and implementing [NMFS's]

2014 BiOp [for operations of the Federal Columbia River Power System] triggered those

agencies' obligations to comply with NEPA."). An exception to this requirement may apply

where the action addressed in the BiOp does not change the status quo, but the BiOp in *Jewell*

resulted in material changes to operations and thus triggered NEPA. 747 F.3d at 646.

NEPA applies to NMFS's adoption of the prey increase program in the same manner as it

did to Reclamation's adoption of the reasonable and prudent alternatives in *Jewell*. The

consulting agency—FWS—proposed the reasonable and prudent alternatives in *Jewell* as

alternatives to Reclamation's proposal to ensure that the action does not jeopardize species. 747

F.3d at 592, 642–43. Similarly, NMFS included the prey increased program in the 2019 SEAK

BiOp as an additional action it would implement to ensure that the fisheries would not result in

jeopardy or adverse modification. *E.g.*, AR 47506–07. Reclamation needed to comply with the

reasonable and prudent alternatives outlined in the BiOp in *Jewell* to be immune from liability

under section 9 of the ESA. 747 F.3d at 642–43. NMFS is likewise required to implement the

prey increase program included as mitigation/conservation measures in the 2019 SEAK BiOp to

be immune from liability for under section 9 of the ESA. *See Ctr. for Biological Diversity v. U.S.*

*Bureau of Land Mgmt.*, 698 F.3d 1113–15.

Under the Ninth Circuit's precedent in *Jewell*, NMFS violated NEPA by failing to

prepare an EIS or an EA before the agency's "provisional adoption and implementation of the

[2019 SEAK] BiOp . . . ." 747 F.3d at 601, 642 ("We affirm the district court's judgment that

Reclamation failed to comply with NEPA before implementing FWS's BiOp."); *NWF III*, 184 F.

Supp. 3d at 948 (granting summary judgment where "Action Agencies failed to comply with

NEPA" prior to adoption of BiOp). NMFS has unquestionably adopted the 2019 SEAK BiOp's

actions, as it is both the action agency that developed the actions for consultation, including the

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 38
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

prey increase program, and the consulting agency that issued the 2019 SEAK BiOp on the

actions. NMFS has also moved forward seeking to implement the prey increase program. Dkt.

43-4 ¶¶ 10, 14–17; Dkt. 43-5 ¶¶ 5–11; *see also* Second Decl. of Brian A. Knutsen, Exhibit 1.[8]

### 3.  Conclusion on NMFS's Failure to Comply with NEPA.

"NEPA does not set out substantive environmental standards, but instead establishes

'action-forcing' procedures that require agencies take a 'hard look' at environmental

consequences." *Metcalf*, 214 F.3d at 1141 (quoting *Robertson*, 490 U.S. at 348). "Proper timing

is [therefore] one of NEPA's central themes. An assessment must be 'prepared early enough so

that it can serve practically as an important contribution to the decisionmaking process and will

not be used to rationalize or justify decisions already made.'" *Save the Yaak Comm. v. Block*, 840

F.2d 714, 718 (9th Cir. 1988) (quoting 40 C.F.R. § 1502.5). Further, the "touchstone" of NEPA

is proper "selection and discussion of alternatives [to] foster[] informed decision-making."

*California v. Block*, 690 F.2d at 767; *see also Friends of Se.'s Future v. Morrison*, 153 F.3d

1059, 1065 (9th Cir. 1998); 40 C.F.R. § 1502.1. NEPA therefore prohibits agencies from making

any "irreversible and irretrievable commitment of resources," or taking any action that would

"[l]imit the choice of reasonable alternatives" or "[h]ave an adverse environmental impact,"

before NEPA procedures are complete. *Metcalf*, 214 F.3d at 1144; 40 C.F.R. § 1506.1(a).

NMFS violated these requirements and undermined NEPA's intent by issuing the 2019

SEAK BiOp without first preparing an EIS or an EA. In issuing the ITS, NMFS decided to

authorize take of Chinook salmon from fisheries at levels it predicts will continue to suppress

Southern Residents and Puget Sound Chinook salmon. In an effort to mitigate that harm, NMFS

developed the prey increase program; a program with doubtful benefits for Southern Residents

and certain harmful impacts to threatened salmonids. These decisions constituted irreversible

commitments of resources and have caused environmental harm; e.g., the fisheries irretrievably

---

[8] The Court should consider extra-record material generated after the 2019 SEAK BiOp that shows NMFS is seeking to implement the actions. Such consideration is appropriate because this claim alleges that NMFS failed to act—i.e., failed to complete NEPA procedures—under 5 U.S.C. § 706(1), and the record for such a claim is not limited to the record as it existed at any single point. *San Francisco Baykeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002).

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 39
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

took salmon that would otherwise have been available to Southern Residents or to aid wild salmon recovery. These decisions also limited NMFS's reasonable alternatives; namely, the alternative of reduced harvests to protect Southern Residents in lieu of new hatchery production.

NMFS made these decisions without the public disclosure procedures or alternative analyses required by NEPA. Any subsequent NEPA process would simply be to "rationalize or justify decisions [it] already made," which violates NEPA. *See* 40 C.F.R. § 1502.5. Accordingly, NMFS's actions violate NEPA. *See, e.g.*, *Metcalf*, 214 F.3d 1143–45 (NMFS violated NEPA by agreeing to a whaling quota and working to effectuate the agreement before preparing an EA or EIS); *Env't Def. Fund, Inc. v. Andrus*, 596 F.2d 848, 851–52 (9th Cir. 1979) (The failure to prepare an EIS before deciding to allocate 832,000 acre feet of water annually to industrial uses violated NEPA, even though "the details of subsequent use" were not yet known.).

### D.   The Appropriate Remedies for NMFS's Violations.[9]

#### 1.   The 2019 SEAK BiOp, including the ITS, should be vacated.

The 2019 SEAK BiOp, including the ITS, should be vacated, along with NMFS's adoption of the 2019 SEAK BiOp, for NMFS's ESA and NEPA violations.

The APA instructs that a "reviewing court **shall** . . . set aside agency action" that is "arbitrary . . . or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (emphasis added). This provision demands a "presumption of vacatur." *E.g.*, *All. for the Wild Rockies v. U.S. Forest Serv.* (*Wild Rockies*), 907 F.3d 1105, 1121–22 (9th Cir. 2018); *see also E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 856–57 (9th Cir. 2020) ("[O]ur obligation . . . is to vacate the unlawful agency action."). The party seeking to avoid vacatur bears the burden of demonstrating that the Court should invoke its equitable authority to withhold the presumptive statutory remedy of vacatur. *See Wild Rockies*, 907 F.3d at 1121–22 (defendant failed to overcome vacatur presumption); *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of*

---

[9] The APA provides that a court should determine whether an agency action is "arbitrary and capricious" based on "the whole record," but that limit on the scope of review does not apply to relief issues. *E.g.*, *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1107–08 (N.D. Cal. 2018).

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 40
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

*Eng'rs*, 417 F. Supp. 3d 1354, 1369 (W.D. Wash. 2019) ("Because there is a presumption in favor of vacatur, defendants . . . will be the moving parties . . . regarding the appropriate relief for the APA violations discussed above."); *see also Aquall. v. U.S. Bureau of Reclamation*, 312 F. Supp. 3d 878, 882 (E.D. Cal. 2018). NMFS cannot meet this burden.

An invalid action will be left in place during a remand "only in limited circumstances" and "only when equity demands." *Pollinator Stewardship Council v. U.S. Env't Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (quotations omitted). Two factors are considered: "how serious the agency's errors are 'and the disruptive consequences of an interim change'" that may result from vacatur. *Cal. Cmtys. Against Toxics v. U.S. Env't Prot. Agency*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). Vacatur is withheld only if it would cause "serious and irremediable harms that significantly outweigh the magnitude of the agency's error." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin. Nat'l Marine Fisheries Serv.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015). "In balancing these factors in ESA cases, courts will tip the scales in favor of the endangered species under the [statute's] 'institutionalized caution' mandate." *Id.* (quoting *Marsh*, 816 F.2d at 1383); *see also N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 460 F. Supp. 3d 1030, 1037–38 (D. Mont. 2020).

Violations are generally serious if the remand may result in changes to the agency decision. *E.g.*, *Pollinator Stewardship Council*, 806 F.3d at 532–33 (obtaining adequate studies may lead to different conclusion); *Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1243–45; *Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, No. 3:12-cv-00431-HA, 2014 U.S. Dist. LEXIS 33365, at *9–10 (D. Or. Mar. 14, 2014); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Peña*, No. 3:12-cv-02271-HZ, 2015 U.S. Dist. LEXIS 46279, at *8–12 (D. Or. Apr. 6, 2015); *see also Nat. Res. Def. Council v. U.S. Dep't of the Interior*, 275 F. Supp. 2d 1136, at 1145 (C.D. Cal. 2002). In contrast, "technical" violations where the same result could be reached on remand are generally less serious. *Nat'l Family Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 929 (9th Cir. 2020).

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 41
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

NMFS's ESA violations are exceedingly serious. The Southern Residents are at a severe risk of extinction due primarily to inadequate Chinook salmon for prey. Decl. of Dr. Deborah Giles, Ph.D ("Giles Decl.") ¶¶ 5, 7 9; Dkt. 14-3 ¶¶ 6, 33; Second Decl. of Dr. Robert Lacy, Ph.D. ("Second Lacy Decl.") ¶¶ 6, 8. Despite the ESA requiring agencies afford endangered species the highest of priorities, NMFS authorized salmon harvest levels that will lead to the Southern Residents' continued slide towards extinction, while gambling on undeveloped mitigation. *See Hill*, 437 U.S. at 185, 194. Even if the mitigation is fully implemented, it would not provide enough prey to support growth of the Southern Residents and, if the mitigation does not produce the maximum benefit hypothesized by NMFS, harvests will continue to reduce prey to levels that cause Southern Residents to decline. Second Lacy Decl. ¶¶ 6, 9, 12–13.

Exacerbating the seriousness of those violations is that the supposed mitigation will suppress recovery of salmonids, but NMFS has not even analyzed the adverse impacts of the mitigation or determined whether it may jeopardize listed salmonids. These are not "technical or procedural formalities," but are instead serious substantive errors that undermine the ESA and cast doubt on NMFS's reaching the result on remand, making the presumptive remedy of vacatur appropriate. *See, e.g.*, *Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1243–45; *Native Fish Soc'y v. Nat'l Marine Fisheries Serv.*, 2014 U.S. Dist. LEXIS 33365, at *9–10. Similarly, NMFS's complete failure to study and disclose alternatives and their impacts as required by NEPA is a serious violation that warrants vacatur of the 2019 SEAK BiOp and its ITS. *See, e.g.*, *Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1245; *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 457 F. Supp. 3d 880, 896–97 (D. Mont. 2020); *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 468 F. Supp. 3d 1148, 1151–52 (D. Alaska 2020); *Wild Fish Conservancy v. Nat'l Park Serv.*, No. C12-5109 BHS, 2014 U.S. Dist. LEXIS 105689, at *7–8 (W.D. Wash. July 31, 2014); *League of Wilderness Defs./Blue Mountains Biodiversity Project v. U.S. Forest Serv.*, No. 3:10-CV-01397-SI, 2012 U.S. Dist. LEXIS 190899, at *10 (D. Or. Dec. 10, 2012); *Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 953 (N.D. Cal. 2010).

Courts generally prioritize harm to species and the environment over administrative or

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 42
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

economic burdens when considering any "disruptive consequences." *E.g.*, *Wild Rockies*, 907

F.3d at 1121–22; *Pollinator Stewardship Council*, 806 F. 3d at 532; *Coal. to Protect Puget*

*Sound Habitat*, 466 F. Supp. 3d at 1126; *N. Plains Res. Council*, 460 F. Supp. 3d at 1038–41;

*Peña*, 2015 U.S. Dist. LEXIS 46279, at *12–15; *Wild Fish Conservancy*, 2014 U.S. Dist. LEXIS

105689, at *9–10. Any disruptive consequences from vacatur here are significantly outweighed

by NMFS's serious NEPA and ESA errors and by the severe consequences to Southern

Residents and Chinook salmon that would occur absent vacatur.

Accordingly, the presumptive remedy of vacatur is appropriate for the 2019 SEAK BiOp.

### 2.   NMFS's prey increase program should be enjoined.

The Court should enjoin NMFS's implementation of the prey increase program until

NMFS prepares a BiOp that complies with the ESA and completes required NEPA procedures.[10]

Generally, a plaintiff seeking a permanent injunction must show: (1) it has suffered an

irreparable injury; (2) remedies available at law are inadequate to compensate for that injury; (3)

considering the balance of hardships between the plaintiff and defendant, a remedy in equity is

warranted; and (4) the public interest would not be disserved by a permanent injunction. *Nat'l*

*Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* (*NWF IV*), 886 F.3d 803, 817 (9th Cir. 2018).

However, "Congress intended endangered species to be afforded the highest of priorities" and

once Congress has so "decided the order of priorities in a given area, it is . . . for the courts to

enforce them . . . ." *Hill*, 437 U.S. at 174, 194. Thus, "[w]hen considering an injunction under the

ESA, we presume . . . that the balance of interests weighs in favor of protecting endangered

species, and that the public interest would not be disserved by an injunction." *NWF IV*, 886 F.3d

at 817; *see also Wash. Toxics Coal. v. Env't Prot. Agency*, 413 F.3d 1024, 1035 (9th Cir. 2005)

("the balance of hardships always tips sharply in favor of the . . . threatened species").

Irreparable injury is evaluated with reference to the statute being enforced. *NWF IV*, 886

F.3d at 818. "The 'plain intent' of Congress in enacting the ESA was 'to halt and reverse the

---

[10] If NMFS would halt the prey increase program in response to vacatur of the 2019 SEAK BiOp, an injunction is not necessary. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010).

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 43
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

trend toward species extinction, whatever the cost.'" *Id.* (citation omitted). This is achieved

through "incremental steps" that include protecting individual members of species; "[h]arm to

those members is irreparable because 'once a member of an endangered species has been injured,

the task of preserving that species becomes all the more difficult.'" *Id.* (citation omitted). Thus,

an extinction-level threat is not required for an injunction. *Id.* at 819; *Cottonwood*, 789 F.3d at

1091 ("establishing irreparable injury [under the ESA] should not be an onerous task"). Also, the

activity enjoined need not be the exclusive cause of harm and a showing that the injunction

would forestall the injury is sufficient. *NWF IV*, 886 F.3d at 819.

The injury to threatened salmonids from NMFS's prey increase program easily meets

these standards. Threatened Puget Sound and Lower Columbia River Chinook salmon are not

meeting recovery objectives due, in part, to excessive hatchery influences. *See, e.g.*, AR 01741–

42, 01747, 15911; *see also* Decl. of Dr. Gordon Luikart, Ph.D ("Luikart Decl.") ¶¶ 24–53.

Congress established the Hatchery Scientific Review Group ("HSRG") to, *inter alia*, develop

guidelines to conserve wild salmonids. *See, e.g.*, AR 30242; AR 10419. To limit harm through

genetic introgression, the HSRG developed criteria using the metric pHOS—the "proportion of

hatchery-origin spawners"—which represents the percentage of adult fish on spawning grounds

that are hatchery origin. *See, e.g.*, AR 30260. Generally, the productivity of wild populations

decreases as pHOS increases. *E.g.*, AR 13546. pHOS levels that exceed HSRG recommendations

are acceptable only where the wild population is at a high risk of extinction and the hatchery is

used to reduce short term extinction risk. AR 10419.

The pHOS levels for most Puget Sound and Lower Columbia River Chinook salmon

populations are well in excess of HSRG guidelines. Luikart Decl. ¶¶ 51–53. The recent Mitchell

Act BiOp requires reductions in annual releases by nearly two million hatchery Chinook salmon

to protect wild Chinook salmon and meet pHOS levels. *See* AR 13267–72. The prey increase

program will cause biologically significant increases in pHOS levels "and thereby further inhibit

the prospects for the continued survival, much less recovery," of threatened Chinook salmon.

Luikart Decl. ¶¶ 54–64. This constitutes irreparable injury under the ESA for which there is no

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 44
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

adequate remedy at law. *See NWF IV*, 886 F.3d at 818–19, 822–23; *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, 1140 (N.D. Cal. 2017); *see also infra* sec. VI.E (and cited declarations). An injunction is therefore warranted for the ESA violations, as the Court does not balance hardships or public interests in assessing an injunction for such violations.

For NEPA, "irreparable injury flows from the failure to evaluate the environmental impact of a major federal action." *High Sierra Hikers' Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004). "The NEPA duty is more than a technicality; it is an extremely important statutory requirement to serve the public and the agency *before* major federal actions occur." *Found. on Econ. Trends v. Heckler*, 756 F.2d 143, 157 (D.C. Cir. 1985). Here, NMFS decided to implement the prey increase program, which will impede recovery of threatened salmonids, to offset and thereby subsidize salmon harvests without any consideration of alternatives or other analyses or disclosures required under NEPA. This constitutes irreparable injury for which there is no adequate remedy at law. *See, e.g., League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 764 (9th Cir. 2014) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable.") (quoting *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) and *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)).

The balance of harms and the public interests support an injunction based on NMFS's NEPA violation because of "the public interest in careful consideration of environmental impacts before major federal projects go forward . . . ." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1138 (9th Cir. 2011). "[S]uspending such projects until that consideration occurs 'comports with the public interest'" where NEPA is violated. *Id.* (citation omitted); *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007) ("[T]he public interest favor[s] issuance of an injunction because allowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of NEPA.").

Accordingly, the Court should enjoin the prey increase program until NMFS prepares a BiOp that complies with the ESA for this program and completes required NEPA procedures.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 45
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

E.       **The Conservancy Has Standing to Pursue this Matter**.

The Conservancy has standing because: 1) it has suffered an "injury in fact;" 2) the injury is fairly traceable to the challenged conduct; and 3) it is likely, as opposed to speculative, that the injury will be redressed by a favorable decision. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). Further, the interests at stake are germane to the Conservancy's purposes. *Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1159 (9th Cir. 1998); Second Decl. of Kurt Beardslee ("Second Beardslee Decl.") ¶¶ 2–13; *see also* Second Decl. of William John McMillan ("Second McMillan Decl.") ¶ 2.

The "injury in fact" requirement in environmental cases is satisfied if an individual adequately shows an aesthetic or recreational interest in a particular place or animal and shows reasonable concerns that those interests are impaired by the defendant's conduct. *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147, 1151 (9th Cir. 2000); *Laidlaw*, 528 U.S. at 183–84. Members of the Conservancy derive recreational and aesthetic enjoyment from Puget Sound and its wildlife, and their use and enjoyment are diminished by NMFS's violations and by the members' reasonable concerns about NMFS's violations. Second Beardslee Decl. ¶¶ 18–19; Second McMillan Decl. ¶¶ 2–34; Second Decl. of Peter W. Soverel ¶¶ 2–23. The injuries stem from NMFS's conduct addressed herein and are therefore "fairly traceable" to the violations. *See* Second McMillan Decl. ¶¶ 2–34; Second Decl. of Peter W. Soverel ¶¶ 2–23; *Ecological Rights Found.*, 230 F.3d at 1152; *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001). The injuries are redressable by an order from the Court because proper ESA and NEPA analysis could influence agency actions. *See Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 860–61 (9th Cir. 2005) (procedural); *Covington v. Jefferson Cty.*, 358 F.3d 626, 639 (9th Cir. 2004). Finally, the Conservancy has prudential standing because its interests fall within the "zone of interests" protected by NEPA and the ESA. *See Ocean Advocates*, 402 F.3d at 859, 861.

**VII.     CONCLUSION.**

For the foregoing reasons, the Conservancy respectfully requests that the Court enter an order granting summary judgment and relief as requested herein.

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 46
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

1

2

Respectfully submitted this 5th day of May, 2021.

3

KAMPMEIER & KNUTSEN, PLLC

CORR CRONIN, LLP

4

By: s/ Brian Knutsen

By: s/ Eric Lindberg

5

Brian Knutsen, WSBA No. 38806

Eric A. Lindberg, WSBA No. 43596

By: s/ Emma Bruden

Benjamin C. Byers, WSBA No. 52299

6

Emma Bruden, WSBA No. 56280

1001 Fourth Avenue, Suite 3900

1300 S.E. Stark Street, Suite 202

Seattle, Washington 98154

7

Portland, Oregon 97214

Tel: (206) 625-8600

Tel: (503) 841-6515 (Knutsen)

Email: elindberg@corrcronin.com

8

         (503) 719-5641 (Bruden)

        bbyers@corrcronin.com

9

Email: brian@kampmeierknutsen.com

        emma@kampmeierknutsen.com

10

11

Paul A. Kampmeier, WSBA No. 31560

12

811 First Avenue, Suite 468

Seattle Washington 98104

13

Tel: (206) 858-6983

Email: paul@kampmeierknutsen.com

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

PLAINTIFF'S MOTION FOR
SUMMARY JUDGMENT - 47
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600