Honorable Michelle L. Peterson

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

WILD FISH CONSERVANCY,

        Plaintiff,

vs.

BARRY THOM, *et al.*,

        Defendants,

ALASKA TROLLERS ASSOCIATION, and
STATE OF ALASKA,

        Defendant-Intervenors.

CASE NO: 2:20-cv-417-RAJ-MLP

**STATE OF ALASKA'S OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND CROSS MOTION FOR
SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:
June 16, 2021**

**ORAL ARGUMENT REQUESTED**

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

**TABLE OF CONTENTS**

I.      INTRODUCTION ..................................................................................1

II.     FACTUAL BACKGROUND ..............................................................2

        A.      Southeast Alaska Salmon Fisheries.........................................2

        B.      Southern Resident Killer Whales.............................................5

        C.      Threatened Salmonoids. ..........................................................6

        D.      The Pacific Salmon Treaty. .....................................................6

                1.      Treaty harvest reductions. ...........................................7

                2.      Treaty funding mechanisms. ........................................8

        E.      2019 Southeast Alaska Biological Opinion. ...........................9

III.    STAUTORY BACKGROUND............................................................10

        A.      Endangered Species Act..........................................................10

        B.      National Environmental Policy Act. ........................................12

        C.      Magnuson-Stevens Act.............................................................12

IV.     STANDARD OF REVIEW .................................................................13

V.      ARGUMENT .......................................................................................14

        A.      Plaintiff's Focus on the Southeast Alaska Salmon Fishery is
                Misplaced. ................................................................................15

                1.      Environmental contaminants.........................................15

                2.      Vessel traffic. ...............................................................16

                3.      Prey availability............................................................17

        B.      NMFS was Not Required to Conduct a New NEPA Analysis After
                the 2019 Treaty.........................................................................18

        C.      Vacatur Would Not Be Appropriate in This Case. ..................20

                1.      Legal standards. ............................................................21

                2.      Vacatur should not be considered here..........................21

                3.      Vacatur would be overbroad because the BiOp covers much that
                        is not challenged in this litigation. ..............................26

1  D. The Court Should Not Enjoin NMFS's Prey Increase Program. .......26

2  VI. CONCLUSION ......................................................................................30

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT          ii
Case No.  2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104
Telephone:  206-395-7630

**Page(s)**

**Federal Cases**

*Alaska Ctr. for the Env't v. Browner,*
    20 F.3d 981 (9th Cir. 1994) ........................................................................21

*Alaska v. Lubchenco,*
    723 F.3d 1043 (9th Cir. 2013) ...................................................................14

*Alliance for the Wild Rockies v. U.S. Forest Serv. (Wild Rockies),*
    907 F.3d 1105 (9th Cir. 2018) ...................................................................25

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) .............................................21, 22, 23, 24

*Apache Corp. v. FERC,*
    627 F.3d 1220 (D.C. Cir. 2010) ................................................................23

*Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife,*
    273 F.3d 1229 (9th Cir. 2001) ...................................................................14

*California Communities Against Toxics v. U.S. Envtl. Prot. Agency (Cal
    Communities),*
    688 F.3d 989 (9th Cir. 2012) .............................................21, 23, 25, 26

*California v. Azar,*
    911 F.3d 558 (9th Cir. 2018) .....................................................................22

*Catholic League for Religious and Civil Rights v. City and Cnty. of San
    Francisco,*
    567 F.3d 595 (9th Cir. 2009) .......................................................................9

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.,*
    789 F.3d 1075 (9th Cir. 2015) ...................................................................27

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
    623 F.3d 633 (9th Cir. 2010) .....................................................................13

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
    807 F.3d 1031 (9th Cir. 2015) ...................................................................13

*Dep't of Transp. v. Pub. Citizen,*
    541 U.S. 752 (2004)....................................................................................12

*Ecology Ctr. v. Castaneda,*
    574 F.3d 652 (9th Cir. 2009) .....................................................................13

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT     iii
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

*Frigard v. U.S.*,
862 F.2d 201 (9th Cir. 1988) ........................................................................................15

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ........................................................................................21

*Karuk Tribe of California v. U.S. Forest Serv.*,
681 F.3d 1006 (9th Cir. 2012) ......................................................................................14

*Kitty Hawk Aircargo, Inc. v. Chao*,
418 F.3d 453 (5th Cir. 2005) ..........................................................................................5

*Klamath-Siskiyou Wildlands Ctr. v. Nat'l Marine Fisheries Serv*,
109 F. Supp. 3d 1238 (N.D. Cal. 2015) ...........................................................20, 25, 26

*Lands Council v. McNair*,
629 F.3d 1070 (9th Cir. 2010) ......................................................................................14

*Mazurek v. Armstrong*,
520 U.S. 968 (1997) (per curiam) .................................................................................28

*Melendres v. Arpaio*,
784 F.3d 1254 (9th Cir. 2015) .................................................................................27, 28

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
184 F. Supp. 3d 861 (D. Or. 2016) ...............................................................................21

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
886 F.3d 803 (9th Cir. 2018) ........................................................................................27

*NLRB v. Food Store Emps. Union*,
417 U.S. 1 (1974)..........................................................................................................27

*Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
426 F.3d 1082 (9th Cir. 2005) ......................................................................................11

*Robertson v. Methow Valley Citizens Council*,
490 U S. 332 (1989)......................................................................................................12

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
747 F.3d 581 (9th Cir. 2014) ...................................................................................12, 23

*Tri-Valley CAREs v. U.S. Dep't of Energy*,
671 F.3d 1113 (9th Cir. 2012) ......................................................................................12

*Turtle Island Restoration Network v. U.S. Dept. of Commerce*,
438 F.3d 937 (9th Cir. 2006) ...................................................................................15, 20

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT          iv
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

*Westlands Water Dist. v. U.S. Dep't of Interior*,
     376 F.3d 853 (9th Cir. 2004) ...................................................................13

*Wild Fish Conservancy v. Salazar*,
     628 F.3d 513 (9th Cir. 2010) .........................................................11, 13

**Constitutional Provisions**

Alaska Const. Article VIII, §§ 1, 4 .................................................................1,3

**Alaska Statues**

Alaska Stat.
     § 16.05.020..............................................................................................1

**Alaska Regulations**

5 AAC 39.222 .................................................................................................3

**Federal Statutes**

16 U.S.C.
     § 1531.....................................................................................................10
     § 1536(a)(2)...........................................................................................11
     § 1536(b)(4)...........................................................................................11
     § 1536(o)(2)...........................................................................................11
     §§ 1801(b)(4), 1852(h)(l), 1853(c)...................................................12
     § 1811(a)................................................................................................13
     § 1852(a)(l)(G).......................................................................................12
     § 1852(b).................................................................................................12
     § 1855.....................................................................................................13
     § 1856(a)(3)...........................................................................................13

42 U.S.C.
     § 4332(C)................................................................................................12

**Federal Regulations**

50 C.F.R.
     § 402.14..................................................................................................11
     § 402.14(g)(8)........................................................................................11
     § 402.14(h)............................................................................................11
     § 402.14(i)..............................................................................................11

**Other Authorities**

Fed. R. Evid. 201 .............................................................................................9

84 FR 49218.......................................................................................................5

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT          v
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

# I.    INTRODUCTION

Wild Fish Conservancy ("Plaintiff") asks the Court to rule, as a matter of law, that the National Marine Fisheries Service ("NMFS") biological opinion ("BiOp") for salmon fisheries in Southeast Alaska ("SEAK") was unlawfully adopted in violation of the Endangered Species Act ("ESA") 16 U.S.C. § 1531, *et seq.*, and the National Environmental Policy Act ("NEPA") 42 U.S.C. § 4321, *et seq.*. As a remedy, Plaintiff asks this Court to vacate the BiOp and its Incidental Take Statement ("ITS"), resulting, by default, in the closure of SEAK troll fisheries that occur in federal waters. This is relief that the Court has previously denied because of Plaintiff's untimely challenge to Alaska's management of the salmon fisheries under the Magnuson-Stevens Act ("MSA"), and the Court continues to have no jurisdiction to grant such relief. *See* Report and Recommendation, Dkt. 51 at 12-16. Plaintiff also asks the Court to enjoin NMFS from implementing the prey increase program that is designed to provide an immediate and meaningful increase in prey availability for Southern Resident Killer Whales ("SRKW"). Dkt. 91, p. 12.

Because NMFS complied with the requirements of the ESA, NEPA,  and associated regulations and interpreting case law, the State of Alaska ("State" or "Alaska") opposes Plaintiff's motion and asks the Court to deny it. On the basis of the arguments set forth in this brief and pursuant to LCR 7(k), the State respectfully cross-moves for summary judgment that the BiOp is lawful,[1] and for a final judgment dismissing with prejudice any claims by Plaintiff based upon the delegation of management of the SEAK salmon fishery to the State of Alaska under the MSA.

On March 30, 2021, the Court granted the State's motion to intervene. Dkt. 88. Alaska, as a sovereign state and pursuant to its public trust responsibilities, has an interest in managing and conserving all wildlife and other natural resources within its jurisdiction, including SEAK salmon fisheries. Alaska Const. art. VIII, §§ 1, 4; Alaska Stat. § 16.05.020; *see also* Dkt. 76 at 4, ¶¶9, 10.

---

[1] Alaska joins in the arguments of Federal Defendants regarding the ESA and NEPA claims and Defendant-Intervenor Alaska Troller's Assoc. with respect to standing.

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT                    1
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104
Telephone:  206-395-7630

Section 7 of the ESA provides that taking incidental to an otherwise lawful agency action is not considered to be a prohibited "taking" under the ESA if that action is performed in compliance with the terms and conditions of an ITS. AR 47517. In this case, that action is continued salmon fishing in SEAK. Vacatur of the BiOp and ITS would be an extraordinary overreaction to the untimely claims advanced by Plaintiff and would be inappropriate in this case. Such an order would decimate SEAK's coastal communities, while providing no colorable benefit to SRKW. Vacatur of the SEAK BiOp would also impact the  biological opinion on the Authorization of the West Coast Ocean Salmon Fisheries Through Approval of the Pacific Salmon Fishery Management Plan, because consultation on the Pacific Salmon Treaty ("PST" or "Treaty") mitigation funding initiative, which is included in the SEAK BiOp, is an important element of the environmental baseline in the West Coast salmon fisheries BiOp.

As the record demonstrates, NMFS engaged in reasoned decision making and its determinations are entitled to deference. Plaintiff's ESA and NEPA claims are entirely without merit and should be summarily denied.

## II.     FACTUAL BACKGROUND

### A.      Southeast Alaska Salmon Fisheries.

The SEAK troll fishery operates in both federal and State waters, and is managed as a single unit. AR 00540; AR 00515. The Alaska Department of Fish & Game ("ADF&G") has managed salmon fisheries in federal waters since statehood in 1959 and has made "substantial investments over the years in facilities, communications, information systems, vessels, equipment, experienced personnel capable of carrying out extensive management, research, and enforcement programs." AR 00522. In 1979, the North Pacific Fishery Management Council developed, and the Secretary of Commerce ("Secretary") approved, the *Fishery Management Plan for the Salmon Fisheries in the EEZ off Alaska* ("FMP") under the MSA. With the implementation of the FMP, the State has played the major role in managing the salmon fisheries in the federal exclusive economic zone ("EEZ"). AR 00522.

The SEAK subsistence, commercial, and sport salmon fisheries are a vitally important and

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No.  2:20-cv-417-RAJ-MLP

2

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104
Telephone:  206-395-7630

longstanding part of the social and economic fabric of coastal communities in SEAK. Dkt. 76, p 6, ¶ 14. From a purely economic perspective, the SEAK salmon fishery produced $806 million in output, $484 million in gross domestic product, $299 million in labor income or wages, and provided 6,600 full time equivalent jobs on average from 2012 to 2015. *Id*. The economic activity generated by the SEAK fisheries is critically important to the coastal communities in the region. Dkt. 76 at ¶ 16. The EEZ constitutes approximately 87% of SEAK waters (81,203 out of 93,167 total nautical miles squared), a nearly 7:1 ratio of EEZ waters to State of Alaska waters in the region. Dkt. 76 at ¶ 12.

The SEAK Chinook salmon fishery is managed to stay within the negotiated annual all-gear PST total allowable catch limit determined by the Pacific Salmon Commission and to meet escapement goals for wild stocks originating from SEAK and transboundary rivers. *See* AR 47318. Chinook catch is allocated through regulations established by the Alaska Board of Fisheries among subsistence, troll, net, sport, and personal use fisheries. AR 00544. Under Article VII, Section 4 of the Alaska Constitution, all fisheries must be managed on the sustained yield principle. *See also* 5 AAC 39.222 (the Board's Policy for the Management of Sustainable Salmon Fisheries).

Subsistence fishing is managed as the priority and all other fisheries are restricted to ensure reasonable opportunity as defined by the Alaska Board of Fisheries. AS 16.05.258. Outside of subsistence, the current allocation plan reserves 1,000 fish for set gillnet fisheries and 4.3% and 2.9% of the remaining all-gear catch is allocated to the purse seine and drift gillnet fisheries. AR 00544. After the net quotas are subtracted, 80% of the remainder is allocated to the commercial troll fishery and the other 20% to sport fisheries. *Id*. All fisheries are sampled in-season for coded-wire tags and/or genetics, which are processed and used to determine the proportion of catch comprised of Alaska hatchery fish. AR 00541.

Annual accounting of troll fisheries occurs on a cycle that begins October 1 and ends September 30 each year. AR 00540. The troll fishery consists of two seasons: (1) a winter fishery that occurs from October 11 to April 30 of the following year and (2) a summer fishery that occurs from May through September. AR 00540. The summer season is further divided into spring fishery

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

3

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

which occurs May 1 through June 30 and a summer fishery which occurs July 1 through September 30. *Id*. The winter and spring troll fisheries are limited to State waters; the summer troll fishery occurs in both federal and State waters. *Id*. The winter fishery is managed to a guideline harvest level of 45,000 Treaty fish and the open fishing area is restricted to within the troll boundary of the outer coast surf line. *Id*. The spring troll fishery (May 1 or earlier, through June 30) is managed to target Chinook produced from SEAK hatcheries. AR 00540-41.

The summer troll fishery accounts for the majority of the annual Chinook salmon commercial harvest and is closely monitored and managed to prevent exceeding the troll portion of the annual harvest limit by allowing retention of Chinook salmon during two or more periods in most years. AR 00541. The first summer troll fishery opening, beginning July 1 by regulation, allows harvest in the waters of frequent high Chinook abundance and is managed to not exceed 70% of the remaining troll portion of the annual harvest limit. *Id*. Once the July fishery is closed, the troll fleet targets coho salmon, and Chinook retention by the troll fleet is not allowed unless it is determined that additional openings will not result in exceeding the annual harvest limit. AR 00541. Coho salmon management is subject to Chapter 7 Attachment B of the 2019 PST Agreement and regulatory provisions established by the Board of Fisheries for allocation and conservation of SEAK coho stocks. AR 00521.

The majority of coho salmon harvested in the troll fishery are of SEAK local origin, as coho are less migratory than Chinook salmon and coded-wire tag studies suggest that "none of the ESA-listed coho salmon ESUs on the west coast are likely to range into SEAK fisheries." AR 47530, AR 25190. Accordingly, Washington and Oregon origin coho salmon stocks are not encountered in substantial numbers in the troll fisheries occurring in SEAK fisheries. The SEAK BiOp accurately concluded that SEAK fisheries were unlikely to adversely affect ESA-listed coho stocks. AR 47174.

The State relies on information reported on fish tickets to estimate the proportion of fish harvested in the State waters and in the EEZ. AR 00542, 00548. Over the most recent 10-year period (2010–2019), the State estimates that, on average, 14% (28,907 fish) of the total troll fishery

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

4

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

Chinook harvest and 7% or 90,268 of the troll coho harvest occurred in the EEZ.[2] Dkt. 36, p. 6.

B. **Southern Resident Killer Whales.**

The SRKW distinct population segment ("DPS") was listed as an endangered species under the ESA in 2005. AR 47196. The reproductive rates of SRKW have been found to be significantly lower than those of Northern Residents or Alaska Residents. AR 47347. "Compared to Northern Resident killer whales (a resident killer whale population with a sympatric geographic distribution ranging from coastal waters of Washington State and British Columbia north to SEAK) Southern Resident females appear to have reduced fecundity." AR 47276. Two of the toxic chemicals that have been found to be present in relatively high levels in SRKW, polychlorinated biphenyls (PCBs) and dichlorodiphenyltrichloroethane (DDT), can cause reproductive impairment. AR 37742

The primary factors inhibiting SRKW population growth include high levels of contaminants from pollution, disturbances from vessel traffic and vessel noise, and reduced prey availability. AR 47276, 47282, 47286-87, 47433, 47434. Oil spills and disease as well as the small population size are also risk factors. *Id.* It is likely that multiple threats are acting together to impact the whales. *Id.* There have been studies that have suggested the low fecundity of SRKW is in large part attributable to nutritional limitations, however, much uncertainty remains. AR 47276, 47433. The cumulative effects of the primary factors, along with high uncertainty in Chinook abundance estimates, the low number and long life of the SRKW, and reduced immune function from chronic stress make the findings of those studies more uncertain. AR 47433, 47288.

SRKW range throughout the coastal waters off Washington, Oregon, and Vancouver Island and are known to travel as far south as central California. AR 47280. There has been only one sighting in SEAK, in Chatham Strait in 2007. 84 FR 49218. As such, the inclusion of SRKW in the SEAK BiOp is solely within the context of prey resources harvested in the SEAK fishery that

---

[2] These data from the ADF&G Mark, Tag, and Age Laboratory are publicly available at https://mtalab.adfg.gov/CWT/reports/default.aspx, last visited May 13, 2021. The Court may take judicial notice of these public agency records. *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005) (noticing agency document readily accessible on agency website).

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

5

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

could potentially otherwise be available to SRKW. AR 47504.

C. **Threatened Salmonids.**

NMFS considered the effects of the SEAK fishery on four ESA-listed stocks or Evolutionary Significant Units ("ESU") of Chinook salmon in the SEAK BiOp: Puget Sound, Lower Columbia River, Upper Willamette River, and Snake River fall-run. AR 47193. The primary causes of declines in the ESUs are loss of freshwater and estuarine habitat, hydropower development, poor ocean conditions, overfishing, and hatchery practices. AR 14492, 15761, 15891. Per the ESA hatchery listing policy, several hatchery stocks are now included within each ESU and therefore are within the ESA-listing. AR 01730. However, Chinook fisheries have been reduced under the Treaty in response to these conservation concerns. *See* AR 47504.

The record shows that SEAK fisheries have an insignificant impact on endangered West Coast salmon stocks. *See* AR 47589-607. For Puget Sound stocks, the majority of the fisheries impacts occur in West Coast Vancouver Island, Southern British Columbia, and Puget Sound fisheries with small exploitation occurring in SEAK fisheries. AR 08030, 08031, 08039, 08040, 08042, 08043, 08046, 08047, 08052. Lower Columbia Fall Chinook stocks are primarily harvested in the West Coast Vancouver Island, Southern British Columbia, and South Cape Falcon fisheries. AR 08023, 08045. Snake River Fall Chinook are primarily harvested in fisheries occurring along the Washington and Oregon coasts. AR 08026, 47593.

D. **The Pacific Salmon Treaty.**

Prior to the signing of the Treaty in 1985, management of salmon fisheries of the two countries was not coordinated and was often competitive, leading to overfishing and the loss of production to both Canada and the United States. *See, e.g.*, AR 00523. The fundamental goals of the Treaty are to prevent overfishing and to provide for the optimum production and fair sharing of the harvest of salmon. AR 47194. To achieve these goals, the Treaty establishes a process through which the parties interact to establish, implement, and monitor science-based fishery management regimes applicable to their respective jurisdictions. *See, e.g.*, AR 00523. These fishery management regimes are tailored to each of the major geographical regions covered by the

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT                    6
Case No.  2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104
Telephone:  206-395-7630

Treaty, reflecting coast-wide differences in migration and concentration of the various salmon species and stocks. *Id.*

Alaska's obligations under the Chinook Chapter of the 2019 Treaty include managing SEAK fisheries to (1) not exceed the annual preseason catch limit, with the severe penalty for exceeding annual harvest limits of paying back any overages the following year; (2) achieve escapement goals for SEAK and transboundary river wild stocks; and (3) not exceed limits on incidental mortality.[3] AR 00541. The Treaty also contains obligations to collect the data necessary to evaluate compliance. AR 47201. Since the 2019 version of the Treaty was signed, Alaska has met all of its obligations set forth in the Treaty.

### 1.    Treaty harvest reductions.

Chinook fisheries have been reduced substantially since the Treaty was first ratified in 1985. AR 47202. Significant harvest reductions occurred in association with the 1999 and 2009 revisions to the Treaty. *Id.* Further reductions occurred in conjunction with the 2019 revision. *Id.* In response to conservation concerns particularly for ESA-listed Puget Sound Chinook stocks, the 2009 Treaty revisions called for negotiated reductions of 15% and 30%, respectively, in catches in the SEAK and West Coast Vancouver Island outside fisheries. AR 47212. These reductions were intended to provide more Chinook to the spawning grounds for ESA-listed Puget Sound stocks as substantial harvest of Puget Sound Chinook stocks occurs off the West Coast of Vancouver Island. *See id.* The 2019 Treaty reduces the allowable annual catch in the SEAK and West Coast of Vancouver Island fisheries by up to 7.5% and 12.5%, respectively, beyond the reductions imposed in the 2009 Treaty. *Id.*

All of these measures were specifically designed to reduce fishery impacts in all fisheries to respond to conservation concerns, including the need to provide additional prey for SRKW. This is despite the fact that following issuance of a 2011 biological opinion on the management

---

[3] To this end, the SEAK FMP calls for a decrease in "the incidental mortalities of salmon hooked and released, consistent with allocation decisions and the objective of providing the greatest overall benefit to the people of the United States." AR 00519.

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

7

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

plan for Puget Sound fisheries, NMFS convened an independent science panel to critically evaluate the effects of salmon fisheries on the abundance of Chinook salmon available to SRKW. AR 47286. The panel concluded that while salmon abundance will likely influence the recovery of SRKW, the "impact of reduced Chinook salmon harvest on future availability of Chinook salmon to Southern Residents is not clear, and cautioned against overreliance on correlative studies or implicating any particular fishery." *Id.*

### 2. Treaty funding mechanisms.

Federal funding is provided annually through NOAA, which provides grants to the state and federal agencies conducting the work of implementing the Treaty and for mitigation actions. Public Law 99–5, (Mar. 15, 1985), 99 Stat. 7 (Amended through Public Law 111–8, March 11, 2009). Congressional appropriations have increased substantially in recent years to implement the Treaty. Pub. L. No. 116-260 (Dec. 27, 2020).

The fiscal year 2020 congressional appropriations bill provided $35.5 million for Treaty implementation. Pub. L. No. 116-93, 113 Stat. 2317 (Dec. 20, 2019). The spend plan agreed to by the U.S. Commissioners on February 21, 2020, directed $19.1 million to ESA-related conservation activities, with $3.1 million for the conservation hatchery programs, $10.4 million for habitat restoration actions, and $5.6 million for hatchery production aimed at increasing prey for SRKW. Dkt. 43-4, p. 6 ¶ 14. The fiscal year 2021 Congressional appropriation for Treaty implementation included $39.5 million in Commerce, an increase of $4.0 million over the fiscal year 2020 enacted level. Pub. L. No. 116-260 (Dec. 27, 2020). With this funding, the United States invested no less than $20.0 million to implement the mitigations activities within the SEAK BiOp including habitat restoration projects in Puget Sound, hatchery programs to conserve at-risk Chinook salmon stocks in Puget Sound, and new hatchery production to increase the food available for SRKW. *Id.*

The relationship between fisheries in Alaska, Canada, and the Southern U.S. are complex and it was necessary to ensure that all fisheries were reduced to provide benefits for SRKW. AR 47202. The U.S. Commissioners to the PST recognized that further mitigation could be addressed through a targeted funding initiative. *Id.* The funding initiative was relevant to NMFS'

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

8

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

consideration of the SEAK fishery in the BiOp, and became an essential element of the environmental baseline in other BiOps regarding Puget Sound and other Southern U.S. fisheries in Washington, Oregon, and California. *Id.*[4] The funding of additional mitigation measures, contemplated by the U.S. Commissioners to the PST and incorporated into the SEAK BiOp, is inextricably tied to the fundamental underpinnings of the BiOps for numerous West Coast salmon fisheries. *Id.*

E. **2019 Southeast Alaska Biological Opinion.**

The 2019 biological opinion challenged by Plaintiff in this action is only one in series of continued consultations under the ESA. NMFS conducted its first ESA review of salmon fisheries in SEAK in 1993, and continued their consideration of the SEAK fisheries by means of annual consultations through 1998. AR 47195. After that NMFS, consulted on the three 10-year Treaty agreements in 1999, 2009, and 2019. AR 47196-97. The consultation on the 1999 version of the Treaty was the first time that NMFS consulted directly on a fishery management regime that involved specific harvest provisions for both U.S. and Canadian fisheries. AR 47196. The opinion on the 1999 Treaty focused primarily on the effects of fisheries in SEAK and Canada ("northern fisheries") on the same 4 ESA-listed Chinook stocks. *Id.* The scope of the consultation for the 2009 Treaty Agreement differed from that of the opinion on the 1999 Treaty Agreement, as NMFS extended its specified action area to also include all marine and freshwater areas in the southern U.S. subject to provisions of the PST. *Id.* The biological opinion again focused in particular on the effects on the same four Chinook salmon ESUs and Hood Canal summer-run chum, and for the first time, SRKW. *Id.*

The consultation in 2019 had a vastly different scope than the previous BiOps as it was focused on the SEAK fishery. NMFS consulted on the delegation of management authority over

---

[4] *See also* ESA BiOp on Implementation of the PFMC Salmon FMP in 2020, https://repository.library.noaa.gov/view/noaa/27908, p 10-11, last accessed May 13, 2021. The Court may take judicial notice of this public record and as an agency action posted on the agency's website. *See* Fed. R. Evid. 201; *Catholic League for Religious and Civil Rights v. City and Cnty. of San Francisco*, 567 F.3d 595, 606 n.13 (9th Cir. 2009) (noticing local resolution as matter of public record).

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

9

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

salmon fisheries in the EEZ in SEAK to the State of Alaska, federal grants to the State of Alaska for the implementation of the 2019 PST, and also included three U.S. domestic mitigation funding actions for a conservation program for critical Puget Sound stocks and SRKW associated with the 2019 PST Agreement. AR 47197.

Chronologically, the SEAK fishery begins first and with the separation of the SEAK fishery from the remainder of the fisheries subject to the Treaty, the consultation of the SEAK fishery was completed before all others. Presumably, this is the basis for NMFS' inclusion in the consultation of impacts to ESA-listed species from U.S. domestic mitigation actions associated with the 2019 Treaty Agreement which are applicable to NMFS' consideration of all U.S. fisheries subject to the Treaty. The mitigation action for federal funding of a conservation program for critical Puget Sound salmon stocks through conservation hatcheries and habitat restoration is tangential to impacts from the SEAK fishery, as harvests of Puget Sound stocks in Alaska are small. *See* AR 47589-607. The inclusion of federal funding to increase prey availability for SRKW at no less than $5.6 million per year is likewise intended to mitigate for harvest along the West Coast and Canada. *See, e.g.*, AR 47203; *see also* ESA BiOp on Implementation of the PFMC Salmon FMP in 2020, https://repository.library.noaa.gov/view/noaa/27908, p 10-11, last accessed May 13, 2021.

The mitigation funding initiative is also relevant to NMFS' consideration in its BiOp for the Pacific Fishery Management Council authorization of ocean salmon fisheries off the coasts of Washington, Oregon, and California, and will likewise be an essential element of the environmental baseline in upcoming opinions regarding Puget Sound and other southern U.S. fisheries. AR 47203-04. "Fundamentally, all U.S. fisheries may be affected by decisions made in the event that funding is not provided." *Id*.

## III.    STAUTORY BACKGROUND

### A.    **Endangered Species Act.**

Congress enacted the ESA in 1973 "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved…." 16 U.S.C. § 1531.

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

10

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

Section 7 of the ESA ("Section 7") requires each federal agency to "insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the species' designated critical habitat. 16 U.S.C. § 1536(a)(2). Section 7(a)(2)'s consultation requirement applies to "any endangered species or threatened species." *Id.*

Section 7 consultation requires NMFS to prepare a biological opinion to determine whether the proposed action will result in jeopardy to the species or result in the destruction or adverse modification of the species' critical habitat. *Id.*; *see also* 50 C.F.R. § 402.14. If NMFS determines the action will not cause jeopardy or adverse modification, or offers reasonable and prudent alternatives that avoid jeopardy or adverse modification, it may issue an ITS. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

A finding of jeopardy requires population level impacts that threaten the continued survival and recovery of the species. *Pacific Coast Fed'n of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1093-94 (9th Cir. 2005) (jeopardy determination requires consideration of the impacts to the species *population*); *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 518-19 (9th Cir. 2010) (jeopardy analysis conducted at the *population* level).

NMFS' only task in a formal consultation is to prepare a BiOp that discusses whether the proposed action is likely to cause jeopardy and the effects of the proposed action on listed species or on the species' critical habitat. 50 C.F.R. § 402.14(h). In preparing its opinion, NMFS must use "the best scientific and commercial data available." *Id.* § 402.14(g)(8). If NMFS concludes that a proposed action will result in the incidental taking of an endangered or threatened species but will not cause jeopardy, it must include in its BiOp an ITS specifying, among other things, "the impact of such incidental taking on the species" affected. *See* 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). Under the ESA, a taking that complies with an ITS "shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2).

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

11

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

1          B.      **National Environmental Policy Act.**

2          NEPA declares a broad national commitment to protecting and promoting environmental

3   quality and establishes important "action-forcing procedures" to meet this goal. *Robertson v.*

4   *Methow Valley Citizens Council*, 490 U S. 332, 348 (1989).

5          However, NEPA "does not mandate particular results, but simply provides the necessary

6   process to ensure that federal agencies take a 'hard look' at the environmental consequences of

7   their actions." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1124 (9th Cir. 2012)

8   (internal quotations and citations omitted); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756-57

9   (2004).

10          NEPA often requires the preparation of an Environmental Impact Statement ("EIS") for

11  "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C.

12  § 4332(C). However, a consulting agency that prepares a biological opinion or issues an ITS has

13  not commenced a "major Federal action" for the purposes of triggering NEPA. *San Luis & Delta-*

14  *Mendota Water Auth. v. Jewell*, 747 F.3d 581, 643 (9th Cir. 2014) ("We would not ordinarily

15  consider an 'opinion' or 'suggest[ion]' a 'major Federal action[ ].'")

16          C.      **Magnuson-Stevens Act.**

17          In the MSA, Congress established eight regional fishery management councils, comprised

18  of state and federal officials and fisheries experts nominated by state governors and appointed by

19  the Secretary. 16 U.S.C. § 1852(b). The principal task of each council is to prepare and submit to

20  the Secretary for approval fishery management plans "for each fishery under its authority that

21  requires conservation and management," amendments to plans, and regulations to implement the

22  plans. AR 00507; 16 U.S.C. §§ 1801(b)(4), 1852(h)(l), 1853(c). Relevant to this case, the MSA

23  establishes the North Pacific Fishery Management Council with authority over fisheries in the EEZ

24  of the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of Alaska. 16 U.S.C. § 1852(a)(l)(G).

25  The EEZ begins three geographical miles from the coast and extends out 200 nautical miles. AR

26  00512.

27

28

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT                12
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104
Telephone:  206-395-7630

Under the MSA, the United States claims exclusive management authority over all fish in the EEZ, 16 U.S.C. § 1811(a), yet in a section entitled "State jurisdiction," the MSA allows States to manage fisheries in the EEZ if the fishery management plan for the fishery in which a fishing vessel is operating delegates management of the fishery to a State and the State's laws and regulations are consistent with such fishery management plan. *Id.* § 1856(a)(3). Such is the case here with respect to the State's management of the SEAK salmon fisheries under the FMP and state regulations. *See also* AR 00520.

Regulations promulgated by the Secretary under the MSA "shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of Title 5, if a petition for such review is filed within *30 days* after the date on which the regulations are promulgated or the action is published in the Federal Register…." 16 U.S.C. § 1855 (emphasis added). This Court has previously found the 30-day requirement to be jurisdictional. Dkt. 51 at 17 ("Given that Plaintiff's requested relief is circumscribed by the Magnuson-Steven's Act and § 1855(f)'s 30 day limitations period to bring a challenge, Plaintiff's challenge is time-barred, and the Court therefore lacks jurisdiction to issue relief.")

IV.     STANDARD OF REVIEW

Courts review agency compliance with NEPA and the ESA under § 706 of the Administrative Procedure Act. *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 641 (9th Cir. 2010); *Wild Fish Conservancy*, 628 F.3d at 521. Under the APA, the court may set aside an agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (quoting 5 U.S.C. § 706(2)(A)); *see also Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004). Under both of these statutes, the traditional deference is "at its highest where a court is reviewing an agency action that required a high level of technical expertise." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.,* 807 F.3d 1031, 1043 (9th Cir. 2015) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989)).

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT                    13
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104
Telephone:  206-395-7630

The Court's "review of agency actions, including the promulgation of a BiOp, is narrow." *Alaska v. Lubchenco*, 723 F.3d 1043, 1052 (9th Cir. 2013). As the Ninth Circuit explained, courts should be at their most deferential "when reviewing scientific judgments and technical analyses within the agency's expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010). It is not the court's function to instruct the agency, choose among scientific studies, and order the agency to explain every possible scientific uncertainty. *Id.* "Deference is particularly important when the agency is making predictions, within its area of special expertise, at the frontiers of science." *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) (internal quotations omitted).

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (*citing Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007)). Because this is a record review case, the Court may direct that summary judgment be granted to either party based upon review of the administrative record. *Id.* (*citing Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005).

## V.     ARGUMENT

Plaintiff's main argument is that the 2019 SEAK BiOp is arbitrary primarily because it, according to Plaintiff, relies on uncertain mitigation and "fails to draw a rational connection between the facts and the no jeopardy opinion reached for Southern Residents." Dkt. 91, pp. 21, 27. Plaintiff also alleges that NMFS failed to comply with NEPA. Dkt. 91, p. 35. Plaintiff's arguments are without merit and should be rejected. The Federal Defendants have briefed these and other issues in their cross motion for summary judgment. The State agrees with and joins with Federal Defendants' arguments.

Plaintiff also lacks standing to pursue this matter. Intervenor-Defendant Alaska Trollers Assoc. has briefed the Plaintiff's lack of standing, and the State agrees with and joins in their arguments. In order to avoid replicating arguments, the State will touch on some of these issues, but will focus primarily on the appropriate remedy in the event that one should become necessary.

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

14

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104
Telephone:  206-395-7630

In addition, Plaintiff may not challenge actions related to the delegation of management authority to the State under the MSA, nor can it seek any relief that results in the suspension of that management authority. Dkt, 51, 69. The Court previously found that it lacked jurisdiction under the MSA to grant injunctive relief because the Plaintiff's challenge to authorization of commercial Chinook salmon fisheries in SEAK was an MSA action and untimely. *Id*. The State respectfully requests the Court issue an order dismissing with prejudice Plaintiff's challenge to the authorization and funding of the SEAK Chinook fishery through the delegation of authority to the State under the FMP for lack of subject matter jurisdiction under Federal Rule 12(b)(1). *See Turtle Island Restoration Network v. U.S. Dept. of Commerce,* 438 F.3d 937 (9th Cir. 2006); *Frigard v. U.S.,* 862 F.2d 201 (9th Cir. 1988).

Even if Plaintiff had brought a timely challenge under the MSA, its motion is legally and factually flawed, and the requested relief should be denied for the reasons set forth below.

A.   **Plaintiff's Focus on the Southeast Alaska Salmon Fishery is Misplaced.**

Plaintiff begins the argument section of its brief with the allegation that "NMFS's management of fisheries has pushed Southern Residents to the brink of extinction." Dkt. 91, p 21. In support of this protestation, Plaintiff cites "e.g., AR 47503." Plaintiff is presumably referring to the statement that "[u]nder the existing management and recovery regimes over the last decade, salmon availability has not been sufficient to support Southern Resident population growth." AR 47503. But this ignores several important factors that are impacting SRKW, none of which have anything to do with Alaska or its fisheries.

Plaintiff's focus on Alaska's fisheries ignores that other omnipresent factors, such as "toxic chemicals that accumulate in top predators," disturbance from vessels, and oil spills are all factors that are limiting SRKW recovery. AR 47502.

1.   **Environmental contaminants.**

Puget Sound is a "deep-water ford with several sills that restrict mixing and inhibit both ocean inflow and the outflow of toxic chemicals. AR 37444. As a result, "POPs that enter the Puget Sound basin have long residence times, resulting in an increase in contaminant exposure and

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

15

bioaccumulation in local food webs." *Id*. SRKWs frequent the marine areas "where relatively high levels of PCBs [polychlorinated biphenyls], PBDEs [polybrominated diphenyl ethers], and DDTs [dichlorodiphenyltrichloroethane] are found." AR 37507. And exposure to these pollutants "may hinder recovery of the SRKW population." *Id*. Indeed, "[h]igh concentrations of PCBs, DDTs, and PBDEs have been detected in the blubber and scat of the whales. AR 37965.

The SRKW recovery plan identified "a number of environmental contaminants that may pose a health risk to killer whales." AR 37741. Among those environmental contaminants that may pose a risk to SRKW, the following were found at relatively high levels in SRKW and their environment: PCBs, which can cause reproductive impairment, skeletal abnormalities, neuro- and immunotoxicity, terato- and carcinogenicity, and endocrine disruption; PBDEs, which can cause endocrine disruption, liver and thyroid function impairment, autoimmunity induction, immunosuppression, and impacts on lung and neural development; and DDT, which can cause reproductive impairment, immunosuppression, and adrenal and thyroid effects. AR 37742. Other environmental pollutants include dioxins, furans, polycyclic aromatic hydrocarbons, perfluorooctane sulfonate, tributyltin, dibutyltin, polychlorinated paraffins, polychlorinated naphthalenes, alkylphenol ethoxylates, and polychlorinated terphenyls, which are associated with liver damage, birth defects, reproductive impairment, cancer, cardiac dysfunction, developmental neurotoxicity, and endocrine disruption. AR 37742-43.

### 2. Vessel traffic.

Plaintiff's focus on the SEAK fishery also ignores the acoustic and physical disturbances to SRKW that result from vessel traffic in their home waters. The "Georgia Basin and Puget Sound are among the busiest waterways in the world, with several thousand trips made per month by various types of commercial vessels." AR 20914. And Haro Strait, which is frequented by SRKW, "is one of the region's primary shipping lanes." *Id*. "Killer whales are the principal target species for the commercial whale watch industry" and "encounter a variety of other vessels in their urban environment (e.g., recreational, fishing, ferries, military, shipping)." AR 37965, AR 20906. SRKWs experience "much heavier viewing pressure" than do their Northern Resident

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

16

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

counterparts. AR 20914. In fact, SRKW are so frequently in the presence of whale watching vessels that researchers have not been able to study their behavior absent vessels for comparison purposes. *Id*.

The Recovery Plan specifically listed "direct vessel strikes, the masking of echolocation and communication signals by anthropogenic sound, and behavioral changes" as possibly negatively impacting the whales. AR 37965. "Research has shown that the whales spend more time traveling and performing surface active behaviors and less time foraging in the presence of all vessel types, including kayaks, and that noise from motoring vessels up to 400m away has the potential to affect the echolocation abilities of foraging whales." *Id*. And beyond direct vessel strikes, commercial shipping is a major source of low frequency sound in the oceans that may disturb SRKW. AR 20915.

### 3. Prey availability.

When it comes to prey salmon, the SEAK fisheries are not the primary factor impacting their availably to SRKW. The would-be prey Chinook are adversely impacted by land use activities that result in habitat loss and degradation; hydropower systems; climate effects from Pacific decadal oscillation and other events that cause changes in ocean productivity; predation in the ocean by pelagic fishes, birds, and marine mammals such as abundant Northern Resident killer whales other than SRKW; and habitat-altering activities such as agriculture, forestry, marine construction, levy maintenance, shoreline armoring, dredging, and new development that can all reduce prey available to SRKW. AR 47347.

Restoring Puget Sound, reducing vessels impacts on the whales, and rebuilding the stocks of prey salmon are long-term projects. But producing 20 million additional Chinook smolt as near-future prey for SRKW provides an immediate improvement to the whales near- and long-term outlook. *See* AR 47447. Regardless, Plaintiff seeks to enjoin the hatchery program that will produce more SRKW prey. Dkt. 91, p. 43. There are many factors impacting SRKW and, unlike toxic pollutants and vessel traffic in Puget Sound, the apparent lack of prey is one where an

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT                17
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

1    immediate remedy exists. The meaningful increase is Chinook abundance will increase prey for

2    SRKW, AR 47202, alleviating one of the many environmental stressors.

3         SRKW's primary marine environment is both heavily polluted and one of the busiest

4    waterways in the world, while many salmon stocks on which the whales forage have been

5    decimated by habitat loss and degradation. These issues provide a clear linear connection between

6    cause and effect when it comes to the population decline of SRKW. The same cannot be said of

7    Plaintiff's proposed relief of closing down the SEAK salmon fishery. While fishing undoubtedly

8    removes some potential SRKW prey from the water, Alaskan fisheries, which are separated from

9    SRKW by a great distance and another country, are not the primary factor in reducing prey. This

10   is likely why independent scientists cautioned against overreliance on correlative studies or

11   implicating any particular fishery as the cause of reduced prey, by stating that the "impact of

12   reduced Chinook salmon harvest on future availability of Chinook salmon to Southern Residents

13   is not clear." AR 47285.

14        NMFS' analysis suggests that over the next ten years SEAK fisheries would reduce

15   available prey in coastal waters by only 5% and in inland waters by just 1%. AR 47439. But again,

16   as explained previously, shutting down the SEAK salmon fisheries would have negligible, if any,

17   impact on SRKW, as any Chinook not caught in SEAK must travel some seven hundred miles past

18   Canadian commercial and recreational fisheries, tribal fisheries, Northern Resident killer whales

19   and Steller sea lions, which are also predators of large Chinook, and Southern U.S. fisheries to

20   reach the SRKWs. *See, e.g.*, AR 16128, 16126, 47363, 36320.

21        If ensuring an increase in prey Chinook for SRKWs is the goal, then the BiOp and the

22   associated mitigation measures must be upheld by this Court.

23   B.   **NMFS was Not Required to Conduct a New NEPA Analysis After the 2019**

24        **Treaty.**

25        Plaintiff argues that NMFS "violated NEPA by failing to conduct any NEPA analysis for

26   its authorization of take resulting from the 10-year fishery regimes set in the 2019 Pacific Salmon

27

28

1  Treaty." Plaintiff is simply wrong. NMFS conducted an Environmental Assessment ("EA") for the

2  FMP in 2012. AR 47632, AR 00500.

3       Consistent with the requirements of the MSA, the North Pacific Fishery Management

4  Council promulgated an FMP covering federal waters off SEAK in 1979. AR 47634. That FMP

5  was comprehensively revised in 2012. AR 00507. NMFS completed an EA concerning the FMP

6  salmon fisheries impact on the environment. AR 47638. Specifically, the EA stated that the

7  "proposed action concerns the application of federal management in addition to the existing State

8  management for the salmon fisheries that occur in the EEZ." AR 47638. The EA also concluded

9  that the considered alternatives "would have an insignificant impact on Alaska salmon stocks,

10  Pacific salmon stocks listed under the Endangered Species Act, marine mammals, seabirds, and

11  essential fish habitat." *Id*.

12       SRKW were specifically analyzed in the EA. "The FMP salmon fisheries occur outside of

13  the range of the SRKW, therefore, there are no direct interactions between the whales and these

14  fisheries." AR 47824. Given that, the EA focused on SRKW prey. *Id*. And in doing so, found that

15  "the extent of adverse impact is limited by management measures that define catch or total

16  mortality limits on Chinook in the Pacific Salmon Treaty Agreement." *Id*. As such, "the Southeast

17  Alaska troll fishery is not likely to adversely affect the Southern Resident killer whales or critical

18  habitat beyond those effects previously analyzed in the 2008 BiOp." *Id*. Of course, since that was

19  written in the 2012 EA, both Alaska and Canada took substantial reductions in their annual catch

20  quotas, thus it cannot rationally be argued that the fisheries pose a greater issue to SRKW today

21  than they may have in 2012. Finally, the EA closed the analysis by stating that "all potential

22  adverse effects to the Southern Resident killer whale critical habitat would be insignificant, NMFS

23  makes a determination that the proposed project may effect, but is not likely to adversely affect

24  Southern Resident killer whale critical habitat." AR 47825.

25       Plaintiff ignores the 2012 EA that considered the SEAK fisheries' potential impact on

26  SRKW, as though it does not exist. But it does exist, and it is part of the record. And the record is

27

28

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

19

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

clear that NMFS complied with NEPA. As such, the Defendants should be granted summary judgment on this claim.

### C. Vacatur Would Not Be Appropriate in This Case.

Plaintiff asks the Court to vacate the "BiOp, including the ITS, along with NMFS's adoption of the 2019 SEAK BiOp." Dkt. 91 at p. 40. Their request lacks merit for a number of legal and practical reasons and should be denied.

First, Plaintiff's request for vacatur is simply a convoluted attempt to make an end-run around Plaintiff's jurisdictional issues. The practical effect of Plaintiff's vacatur request would be to imperil the SEAK EEZ salmon fishery and force its closure. The Ninth Circuit foreclosed just such a maneuver in *Turtle Island Restoration Network.* There, the plaintiff attempted to prevent the reopening of a federally authorized fishery on ESA grounds. But as the Ninth Circuit observed, "Standing alone, the Incidental Take Statement [for the fishery] did nothing. It became operational, and allegedly unlawful, only upon the promulgation of regulations reopening the fishery." 438 F.3d 937, 945-46. An untimely challenge to the conduct of a fishery authorized through an MSA action cannot be "circumvented by artful pleading." *Id.* at 945. Through its request for vacatur, Plaintiff attempts again to obtain improperly the relief that the Court has previously denied, and its request should be denied again.

But even if Plaintiff's challenge was timely, "courts may decline to vacate agency decisions when vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of the agency's error." *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Marine Fisheries Serv*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015). And in this case the relief that Plaintiff seeks would cause serious and irremediable harms, without producing any tangible benefit. Vacating the entire BiOp would effectively halt a broad range of activities that are not challenged in this lawsuit, and would be disproportionate given the issues that are before this Court. The State requests that if the Court finds Plaintiff's latest request to be timely, and identifies any flaw with the agency actions, that the BiOp and the ITS remain in effect while the matter is remanded for NMFS to cure any defect.

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

20

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

## 1. Legal standards.

"When a biological opinion is unlawful, the ordinary remedy is to vacate and remand for immediate reinitiation of consultation." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 184 F. Supp. 3d 861, 949 (D. Or. 2016) (citing *Fla. Power & Light v. Lorion*, 470 U.S. 729, 744 (1985)). However, vacatur is not the only or automatic remedy in the ESA or NEPA context: "when equity demands, the regulation can be left in place while the agency follows the necessary procedures." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995); *see also California Communities Against Toxics v. U.S. Envtl. Prot. Agency*, (*Cal Communities*), 688 F.3d 989, 993-94 (9th Cir. 2012). "Whether agency action should be vacated depends on [1] how serious the agency's errors are and [2] the disruptive consequences of an interim change that may itself be changed." *Cal. Communities*, 688 F.3d at 992.[5]

## 2. Vacatur should not be considered here.

In considering an appropriate remedy for a timely challenge, a district court "has broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Alaska Ctr. for the Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994). Here, like in *Idaho Farm Bureau*, the balance of the equities clearly favors leaving the BiOp, and the ITS, in place if the matter must be remanded. Plaintiff claims that "NMFS authorized salmon harvest levels that will lead to the Southern Residents' continued slide towards extinction," but this is simply not the case. Dkt. 91 p. 42. Rather, if the BiOp is vacated the incentive behind the prey increase program, which will provide an "immediate and meaningful increase in prey availability for" SRKW, vanishes. AR 47202. This would, without question, lead to less prey for SRKW while destroying SEAK's economy—and it would do so without producing any colorable benefit. If the financing of mitigation measures is found to be unduly speculative, then remanding the matter to NMFS without vacatur is the only outcome that would protect SRKW to ensure the prey increase program

---

[5] This is often referred to as the two-part *Allied-Signal* test, and is explained in more detail infra at 2.a.

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

1   continues, while not destroying the economy of SEAK. NMFS can, and, if necessary, should be

2   given the opportunity to conduct any review on remand with the current BiOp and ITS left in place.

3          Balancing the equities is not an exact science; rather it is "lawyers' jargon for choosing

4   between conflicting public interests." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018)

5   (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 609 (1952) (Frankfurter, J.,

6   concurring)). The State's primary interest in this matter is clear cut: the economic vitality of an

7   entire region of Alaska. Importantly, that interest can be balanced with the health of SRKW in a

8   manner that does not require discarding the protection afforded by the ITS and vacating the BiOp

9   if any shortcomings are identified by the Court.

10                            *a. Conservation Interest*

11          The SRKW prey increase program is the most immediate and dependable way to ensure

12  conservation of the DPS. The conservation hatchery and habitat programs would contribute to prey

13  abundance for SRKW over the intermediate and long-term, but the prey increase program is

14  "specifically designed to increase the production of hatchery Chinook salmon to provide an

15  immediate and meaningful increase in prey availability for SRKWs." AR 47432. SRKW are

16  negatively impacted by pollution and vessel traffic and other issues could be, but are not likely to

17  be remediated, in the near term. *See Supra* V. A. One issue that is immediately remediable is the

18  amount of prey available to the whales, and that is precisely what this BiOp reviews. Producing

19  20 million additional Chinook smolt as future prey for SRKW provides an immediate improvement

20  to the whales near-term outlook. AR 47447.

21          Assuring that the mitigation measures continue is one of the best ways to ensure the SRKW

22  population does not decline. Given that, if remand is ultimately required for any reason, vacatur

23  would not be beneficial to SRKW in this particular situation. Indeed, vacatur of the BiOp may

24  interfere with the one well-defined action that will benefit the whales: production of more prey. If

25  the goal is to protect SRKW, vacatur is not the means to that end and should not be considered.

26          When deciding to remand to an agency, with or without vacatur, the legal standard involves

27  the two-part test articulated in *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d

28

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

22

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

1  146 (D.C. Cir. 1993). The conservation interest can be viewed alongside the first prong, which

2  requires the court to weigh the "the seriousness of the order's deficiencies." *Id.* at 150. Under this

3  prong, courts have found that vacatur may not be an appropriate remedy where there is a likelihood

4  that the agency can cure any defects and justify the defective ruling on remand. *See Apache Corp.*

5  *v. FERC*, 627 F.3d 1220, 1223 (D.C. Cir. 2010).

6      When making this determination, courts defer to the expert agency, which Congress has

7  chosen to implement its legislative design, to reconsider and repair its own errors. *San Luis &*

8  *Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 602 (9th Cir. 2014) ("When examining this

9  kind of scientific determination [under the ESA], as opposed to simple findings of fact, a reviewing

10 court must generally be at its most deferential.") (citation omitted).

11      Here, Federal Defendants could repair any error alleged by Plaintiff on remand without

12 vacating the BiOp. Plaintiff complains chiefly that the no jeopardy opinion relies on uncertain

13 mitigation. Dkt. 91, p. 21. The State believes that the record demonstrates the contemplated

14 mitigation is occurring and the matter should not be remanded. But even if the Court finds that the

15 mitigation measures need review, doing so while the BiOp and ITS remain in place allows for the

16 mitigation measures—which will categorically benefit SRKW—to continue occurring while any

17 issues are addressed on remand.

18              *b. Economic Interest*

19      According to the Ninth Circuit, economic impacts are a worthy consideration with respect

20 to the disruptive consequences of vacatur, and thus, this Court should fully consider them. *See,*

21 *e.g.*, *Cal. Communities*, 688 F.3d at 993-94. This is analogous to *Allied-Signal's* second prong,

22 which requires the court to weigh the "disruptive consequences of an interim change that may

23 itself be changed." *Allied-Signal*, 988 F.2d at 150-51.

24      The disruptive consequences of vacating the BiOp would be disproportionate and

25 unnecessary and would severely hamper SEAK's economy while providing comparatively little

26 improvement to the SRKW prey availability.

27

28

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT          23
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

1    Fishing is critically important to SEAK. From 2012 to 2015 the SEAK salmon fishery

2    produced $806 million in output, $484 million in gross domestic product, $299 million in labor

3    income or wages, and provided 6,600 full time equivalent jobs on average. Dkt 76 p. 6, ¶ 14. The

4    State levies a fishery resource landing tax which is collected primarily from floating processors

5    that process fishery resources outside of the State three-mile limit and bring their products into

6    Alaska for transshipment. Dkt 76 p. 6, ¶ 16. All revenues from the fishery resource landing tax are

7    deposited into Alaska's General Fund, and 50% of taxes are shared with the respective

8    municipalities or unorganized boroughs in which landings occur. *Id.* The shared revenue provides

9    for municipal school districts, school bond debt, utilities, and other municipal or borough services.

10   *Id.* In addition to the fishery landing tax, municipalities may impose their own taxes, and

11   commercial fishing operations contribute a share of the motor fuel and corporate income tax

12   revenues collected by the State. *Id.*

13   The importance of these fisheries to SEAK cannot be overstated—and vacating the BiOp,

14   thereby effectively closing several of Alaska's fisheries, would decimate the region. Such a court

15   order would result in the loss of substantial tax revenues to the State and to the communities in

16   which fish are landed, while jeopardizing many of the full-time fisheries jobs.

17   Ninth Circuit case law is clear that economic devastation of the nature contemplated here

18   is a worthy consideration with respect to the disruptive consequences of vacatur. It should be

19   axiomatic that substantially impacting a stable, functioning, and relatively predictable sector of

20   Alaska's economy is a significant consideration, and the determination of whether to shut down a

21   critically important industry should not be reflexive, as suggested by Plaintiff.

22   Plaintiff addresses the catastrophic economic consequences of the sought relief by simply

23   noting that courts sometimes prioritize harm to species over "disruptive consequences." According

24   to plaintiff, "[c]ourts generally prioritize harm to species and the environment over administrative

25   or economic burdens when considering any 'disruptive consequences.'" Dkt. 91, at 42-43. But

26   Ninth Circuit case law does not support that formulaic conclusion.

27

28

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT                    24
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

1    Perhaps the best example of this is the first case plaintiffs cite for support: *Alliance for the*
2    *Wild Rockies v. U.S. Forest Serv. (Wild Rockies)*, 907 F.3d 1105, 1121-22 (9th Cir. 2018). Dkt.
3    91, p. 40. Plaintiff claims that *Wild Rockies* supports the proposition that any APA violation
4    "demands a 'presumption of vacatur.'" *Id.* The actual quote from *Wild Rockies* reveals a
5    considerably more nuanced approach:

6            Although not without exception, vacatur of an unlawful agency action
7            normally accompanies a remand. This is because '[o]rdinarily when a
8            regulation is not promulgated in compliance with the APA, the regulation
9            is invalid.' When equity demands, however, the regulation can be left in
10           place while the agency reconsiders or replaces the action, or to give the
11           agency time to follow the necessary procedures. A federal court 'is not
12           required to set aside every unlawful agency action,' and the 'decision to
13           grant or deny injunctive or declaratory relief under APA is controlled by
14           principles of equity.'

15   907 F.3d at 1121. (citations omitted).

16       In *Klamath-Siskiyou Wildlands Ctr. v. Nat'l Marine Fisheries Serv*, another case cited by
17   Plaintiff, Dkt. 91, p. 41, the Court ordered vacatur after finding that "the Services failed to perform
18   a cumulative impacts analysis—an integral part of fulfilling NEPA's purpose—of its proposed
19   actions in three different areas." 109 F. Supp. 3d at 1245. Importantly, the court specifically stated
20   that the possible economic harm in that case did not "rise to the concrete, foreseeable economic
21   harm like that found in *California Communities Against Toxics*, where vacatur meant halting
22   construction of a power plant that would lead to 350 layoffs, blackouts to the community, and
23   additional action from the California legislature." *Id.* at 1246.

24       Here, however, any possible ESA or NEPA violation is much more circumscribed than in
25   *Klamath-Siskiyou*, and the agency is much better positioned to address any potential infirmity
26   absent vacatur. Similarly, the economic consequences of vacatur on the SEAK region would be

27
28

considerably more extreme than shutting down a single power plant in Northern California. There are other powerplants in California. There are no other seafaring economic opportunities in SEAK.

It is important to remember that while vacatur would result in catastrophic economic harm to SEAK, far worse than the economic disruption described in *Cal Communities*, it would likely not benefit SRKW in any material way.

This Court can and should weigh the economic consequences to Alaska's economy if determining an appropriate remedy becomes necessary. Vacatur poses the prospect of both current and future irremediable economic harm to SEAK that far outweighs any potential harm to SRKW from remand without vacatur.

### 3. Vacatur would be overbroad because the BiOp covers much that is not challenged in this litigation.

It is important to note that the BiOp covers a significant swath of activity not at issue in this litigation. As previously explained, the BiOp covers three actions: "the delegation of management authority over salmon troll fishery and the sport salmon fishery (the only authorized fisheries currently occurring in the SEAK EEZ) in the SEAK EEZ to the State of Alaska," the disbursal of "grants to the State of Alaska to monitor and manage salmon fisheries in State and Federal waters to meet the obligations of the PST through 2028," and the "funding of a conservation program for critical Puget Sound stocks and SRKW." AR 47198, AR 47534. Any challenge to the first two actions are untimely. Dkt. 51. Even if the Court were to find fault with the funding for mitigation measures, those are the type of issues that could and should be addressed on remand while the BiOp and ITS are left in place so that a majority of the actions contemplated in the BiOp, actions which are not at issue here, may continue to occur.

### D. The Court Should Not Enjoin NMFS's Prey Increase Program.

A court's decision to issue an injunction constitutes an unwarranted "extraordinary remedy" if a less drastic remedy could sufficiently redress plaintiff's injury. *Klamath-Siskiyou Wildlands Center*, 109 F. Supp. 3d at 1247. (*citing Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165-66 (2010)). If the Court finds a flaw in NMFS hatchery program, or any other

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT        26
Case No. 2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

challenged portion of the BiOp, remand is the remedy—but injunctive relief is disfavored. If a "court concludes that an agency invested with broad discretion to fashion remedies has apparently … omit[ed] a remedy justified in the court's view …, remand to the agency for reconsideration, and not enlargement of the agency order, is ordinarily the reviewing court's proper course." *NLRB v. Food Store Emps. Union*, 417 U.S. 1, 10 (1974).

Vacatur is not appropriate in this matter, for the reasons explained in the previous section. It then naturally follows that the more drastic "extraordinary remedy" of a permanent injunction sought by Plaintiff should also be roundly rejected by this Court.

"[A] plaintiff seeking permanent injunctive relief must satisfy a four-factor test by showing: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015) (*citing eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

"[T]he ESA strips courts of at least some of their equitable discretion in determining whether injunctive relief is warranted." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018) (*citing Cottonwood*, 789 F.3d at 1090). The ESA removes the latter three factors in the four-factor injunctive relief test from courts' equitable discretion. *Id.*

The ESA does not, however, restrict courts' discretion to decide whether a plaintiff has suffered an irreparable injury. *Id.* at 818. "There is no presumption of irreparable injury where there has been a procedural violation in ESA cases." *Id.* (*citing Cottonwood*, 789 F.3d at 1091). Plaintiffs must demonstrate that irreparable injury "is *likely* in the absence of an injunction." *Id.* (*citing Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)) (emphasis in original). "A 'possibility' of irreparable harm cannot support an injunction." *Id.* And if a court determines that injunctive relief is warranted, such relief must be tailored to remedy the specific harm. *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015) ("We have long held that injunctive relief must be

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

27

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

tailored to remedy the specific harm alleged.") (internal quotations omitted). "Nevertheless, the district court has broad discretion in fashioning a remedy." *Id.*

An injunction should issue only where a plaintiff makes a "clear showing" and presents "substantial proof" that equitable relief is warranted. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam). But in this matter, Plaintiff does not cite substantial proof required to support the extraordinary remedy sought.

For example, Plaintiff states that "[t]hreatened Puget Sound and Lower Columbia River Chinook salmon are not meeting recovery objectives due, in part, to excessive hatchery influences. *See, e.g.*, AR 01741-42, 01747, 15911." Dkt. 91, p 44. But the administrative record does not support the proposition for which it is cited. The cited document is the 5-year Review Summary and Evaluation of Puget Sound Chinook Salmon. While AR 01741-42 does discuss hatcheries, nowhere in the cited pages does it conclude or indicate that Puget Sound Chinook are not meeting recovery objectives due to excessive hatchery influences. Contrary to Plaintiff's claim, the Puget Sound Technical Recovery Team recommended "that viable populations of Chinook salmon be spread throughout the region to minimize the risk of a catastrophic loss." AR 01742. The same is true for the subsequent citations. The team noted that natural-origin fish levels were low and hatchery-produced fish are prevalent in certain areas, but there is no conclusion of a cause of effect relationship as presented by Plaintiff. AR 01747, 15911.

The closest the team came to suggesting that hatcheries were problematic was the observation that "the long-term use of artificial propagation *may* pose risks to natural productivity and diversity. The magnitude and type of the risk is dependent on the status of affected populations and on specific practices at the hatchery program." AR 01788 (emphasis added). But any potential risk is obviated by the finding that "[h]atchery programs can provide short-term demographic benefits such as increases in abundance in periods of low natural abundance and they can help preserve genetic resources until limiting factors are addressed." *Id.*

Plaintiff states that the "recent Mitchell Act BiOp requires reductions in annual releases by nearly two million hatchery Chinook salmon to protect wild Chinook salmon and meet pHOS

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

28

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

levels." Dkt. 91, p. 44. But NMFS has explained that it will "work with hatchery operators and funders to ensure that all increased hatchery production to support SRKW has been reviewed under the ESA (and NEPA as applicable) to ensure that it does not jeopardize the survival and recovery of any ESA-listed species." ESA BiOp on Implementation of the PFMC Salmon FMP in 2020, p. 47. Moreover, NMFS specifically addresses this issue in the SEAK BiOp, stating that they expect the risk of "adverse competitive interactions between hatchery- and natural-origin fish will be minimized by the proposed action awarding funding to programs that use the following strategies:

- Releasing hatchery smolts that are physiologically ready to migrate. Hatchery fish released as smolts emigrate seaward soon after liberation, minimizing the potential for competition with juvenile naturally produced fish in freshwater

- Operating hatcheries such that hatchery fish are reared to a size sufficient to ensure that smoltification occurs in nearly the entire population

- Releasing hatchery smolts in lower river areas, below areas used for stream-rearing by naturally produced juveniles

- Monitoring the incidence of non-migratory smolts (residuals) after release and adjusting rearing strategies, release location, and release timing if substantial competition with naturally rearing juveniles is determined likely."

  AR 47425.

NMFS plans to address predation concerns by "awarding funding to hatchery programs that can implement the following strategies:

- Releasing all hatchery fish as actively migrating smolts so that the fish migrate quickly seaward, limiting the duration of interaction with any co-occurring natural-origin fish downstream of the release site.

- Ensuring that a high proportion of the population have physiologically achieved full smolt status. Juvenile salmon tend to migrate seaward rapidly

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No. 2:20-cv-417-RAJ-MLP

29

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA 98104
Telephone: 206-395-7630

1       when fully smolted, limiting the duration of interaction between hatchery

2       fish and naturally produced fish present within, and downstream of, release

3       areas.

4  •    Operating hatchery programs and releases to minimize the potential for

5       residualism."

6       AR 47425-26.

7       The entirety of the prey increase plan shows that the hatchery releases are done in

8  accordance with the ESA and are necessary to benefit SRKW.

9       Plaintiff does not come close to the "clear showing" of "substantial proof" that an increase

10  hatchery-origin Chinook—produced for the purpose of enhancing prey available to SRKW—is

11  causing irreparable injury to endangered stocks. As such, the request for a permanent injunction

12  should be denied.

13  **VI.**    **CONCLUSION**

14       For the foregoing reasons, the State respectfully asks the Court to deny Plaintiff's motion

15  and grant the State's cross-motion for summary judgment.

16       DATED: May 26, 2021.

17                    NOSSAMAN LLP

18

19            By: */s/ Linda R. Larson*

20                    Linda R. Larson, WSBA #9171

                  Brian Ferrasci-O'Malley, WSBA #46721

21                    719 Second Avenue, Suite 1200

                  Seattle, WA 98104

22                    Phone: (206) 395-7630

                  llarson@nossaman.com

23                    bferrasciomalley@nossaman.com

24

25

26

27

28

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No.  2:20-cv-417-RAJ-MLP

30

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104
Telephone:  206-395-7630

TREG R. TAYLOR
ATTORNEY GENERAL

By: */s/ Aaron C. Peterson*

       Aaron C. Peterson, admitted *pro hac vice*
       Senior Assistant Attorney General
       Alaska Bar No. 1011087
       Department of Law
       1031 West Fourth Avenue, Ste. 200
       Anchorage, AK  99501
       Phone: (907) 269-5232
       Facsimile: (907) 276-3697
       Email: aaron.peterson@alaska.gov

       *Attorneys for State of Alaska*

STATE OF ALASKA'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND
CROSS MOTION FOR SUMMARY JUDGMENT
Case No.  2:20-cv-417-RAJ-MLP

31

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104
Telephone:  206-395-7630

# CERTIFICATE OF SERVICE

I hereby certify that on May 26, 2021, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all ECF registrants.

*/s/ Linda R. Larson*
Linda R. Larson

CERTIFICATE OF SERVICE
Case No.  2:20-cv-417-RAJ-MLP

Nossaman LLP
719 Second Avenue, Suite 1200
Seattle, WA  98104
Telephone:  206-395-7630