UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY,

               Plaintiff,

    v.

BARRY THOM, *et al.*,

               Defendants,

  and

ALASKA TROLLERS ASSOCIATION and
STATE OF ALASKA,

               Defendant-Intervenors.

Case No. C20-417-RAJ-MLP

REPORT AND RECOMMENDATION

## I.   INTRODUCTION

This matter is before the Court on Plaintiff Wild Fish Conservancy's ("WFC") motion for summary judgment ("Plaintiff's Motion"). (Pl.'s Mot. (Dkt. # 91).) WFC seeks summary judgment on its claims that: (1) the National Marine Fisheries Services' ("NMFS") 2019 Southeast Alaska Biological Opinion ("2019 SEAK BiOp") is not in accordance with law under the Administrative Procedure Act ("APA"); (2) NMFS is in violation of section 7(a)(2) of the Endangered Species Act ("ESA") because the 2019 SEAK BiOp fails to ensure "no jeopardy" to

the Southern Resident Killer Whale ("SRKW") and certain Chinook salmon evolutionary

significant units ("ESUs"); and (3) NMFS violated the National Environmental Policy Act

("NEPA") by issuing and adopting the 2019 SEAK BiOp without conducting proper NEPA

procedures. (Pl.'s Mot. at 12.) WFC requests that the Court vacate the 2019 SEAK BiOp and

enjoin NMFS's implementation of increased salmon hatchery production until NMFS complies

with the ESA and NEPA. (*Id.*)

NMFS, NMFS Regional Administrator Barry Thom, NMFS Assistant Administrator

Chris Oliver, Secretary of the United States Department of Commerce Wilbur Ross, Jr., and the

United States Department of Commerce ("Government Defendants") filed a response and

cross-motion for summary judgment ("Government Defendants' Cross-Motion"). (Defs.' Mot.

(Dkt. # 93).) In addition, Defendant-Intervenor Alaska Trollers Association ("ATA") filed a

response and cross-motion for summary judgment ("ATA's Cross-Motion") (ATA's Mot. (dkt.

# 92)) and Defendant-Intervenor State of Alaska filed a separate response and cross-motion for

summary judgment ("Alaska's Cross-Motion") (AK's Mot. (dkt. # 94)).

Having considered the parties' submissions, oral argument, the balance of the record, and

the applicable law, the Court recommends that Plaintiff's Motion (dkt. # 91) be GRANTED, and

that Government Defendants' Cross-Motion (dkt. # 93), Defendant-Intervenor ATA's

Cross-Motion (dkt. # 92), and Defendant-Intervenor State of Alaska's Cross-Motion (dkt. # 94)

all be DENIED, as further explained below.

## II.      BACKGROUND

### A.      Procedural History

On March 18, 2020, WFC filed its complaint in this action. (Compl. (Dkt. # 1).) WFC's

complaint alleges that Government Defendants failed to ensure that its management and

authorization of commercial salmon fisheries within the federal waters off the coast of Southeast Alaska was not likely to jeopardize the SRKW and certain Chinook salmon ESUs, or result in adverse modification and destruction of SRKW habitat under Section 7(a)(2) of the ESA. (*Id.* at ¶¶ 13, 114-115.) WFC's complaint additionally raises claims alleging that Government Defendants violated the APA by failing to comply with the ESA and NEPA because NMFS's issuance of the 2019 SEAK BiOp was arbitrary, capricious, and not in accordance with law. (Compl. at ¶¶ 13, 116-120.)

On April 16, 2020, WFC filed a motion for preliminary injunction to stay NMFS's authorization of the subject commercial Chinook salmon fisheries. (Pl.'s Inj. Mot. (Dkt. # 14).) On April 23, 2020, ATA filed an unopposed motion to intervene and was joined to the case as Defendant-Intervenor. (Dkt. ## 19, 25.) On April 28, 2020, ATA filed its answer, and on May 22, 2020, Government Defendants filed their answer. (Dkt. ## 29, 45.)

On June 9, 2020, this Court issued a report and recommendation finding that the judicial review provision of the Magnuson-Stevens Act, 16 U.S.C. § 1855(f), barred WFC's request for a preliminary injunction. (Dkt. # 51.) This Court's report and recommendation was adopted by the Honorable Richard A. Jones on March 1, 2021. (Dkt. # 69.) On March 9, 2021, the State of Alaska filed a motion to intervene and was joined as a Defendant-Intervenor on March 30, 2021. (Dkt. ## 75, 88.) On March 31, 2021, the State of Alaska filed its answer. (Dkt. # 90.)

On May 5, 2021, WFC filed its Motion. (Pl.'s Mot.) On May 26, 2021, Government Defendants, in addition to Defendant-Intervenors ATA and the State of Alaska, each filed a Cross-Motion. (Dkt. ## 92-94.) Government Defendants' Cross-Motion generally contends that NMFS's issuance of the 2019 SEAK BiOp fully complied with the ESA and NEPA and that WFC's challenge to increased salmon hatchery production hatchery fails because it is a

"programmatic action that approves a framework for site-specific actions." (Gov. Defs.' Mot. at 1.) Defendant-Intervenor ATA's Cross-Motion, which was joined by the State of Alaska, primarily alleges that WFC does not have standing to bring its substantive claim that NMFS's no jeopardy determination in the 2019 SEAK BiOp violated the ESA. (ATA's Mot. at 1, 8-13.) Defendant-Intervenor State of Alaska's Cross-Motion joins Government Defendants' arguments regarding the ESA and NEPA claims, and ATA's arguments regarding standing, but separately contends that vacatur of the 2019 SEAK BiOp would be an inappropriate remedy in this case. (AK's Mot. at 1-2, 14.) Defendant-Intervenor State of Alaska's Cross-Motion also seeks a final judgment dismissing any claims by Plaintiff that are premised upon the delegation of management of the Southeast Alaska salmon fishery to the State of Alaska under the Magnuson-Stevens Act. (*Id*.)

On June 9, 2021, WFC filed a combined response and reply to Government Defendants' and Defendant-Intervenors' Cross-Motions ("Plaintiff's Reply").[1] (Pl.'s Reply (Dkt. # 96).) On June 16, 2021, Government Defendants filed a reply ("Government Defendants' Reply") (Gov. Defs.' Reply (dkt. # 99)), Defendant-Intervenors ATA filed a reply (ATA's Reply (dkt. # 98)), and the State of Alaska filed a reply (AK's Reply (dkt. # 97)). On July 27, 2021, this Court held oral argument on Plaintiff's Motion and Government Defendants' and Defendant-Intervenors Cross-Motions. (Dkt. # 103.) This matter is now ripe for the Court's review.

---

[1] In its combined response and reply, WFC requests that the Court strike portions of Government Defendants' Cross-Motion that relied on extra-record material to defend the 2019 SEAK BiOp from WFC's ESA claims. (Pl.'s Reply at 10.) A BiOp is a final agency action that shall be reviewed on "the whole record" before the federal agency at the time of its decision. 5 U.S.C. § 706; *see Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1245 (9th Cir. 2001). But as noted by WFC at oral argument and in its responsive briefing, the Court may properly consider extra-record evidence in considering WFC's NEPA claim, which does not challenge a final agency decision, and in fashioning relief. (Dkt. # 110 at 35-39; Pl.'s Reply at 10 n.1.) As such, the Court declines to strike Government Defendants' references to extra-record evidence in its cross-motion.

REPORT AND RECOMMENDATION - 4

**B.** **Statutory Background**

*i.* *Endangered Species Act*

The ESA was enacted by Congress to conserve endangered species and to protect the ecosystems they depend on. 16 U.S.C. §§ 1531(b). The ESA assigns implementation responsibilities to the Secretary of Commerce and the Secretary of the Interior, who have delegated such duties to NMFS and the United States Fish and Wildlife Services ("FWS"). *See* 50 C.F.R. § 402.01(b). NMFS retains ESA authority for marine and anadromous species, while FWS has jurisdiction over terrestrial and freshwater species. *See* 50 C.F.R §§ 17.11, 223.102, 224.101.

Section 7 of the ESA imposes substantive and procedural requirements on federal agencies. *See* 50 C.F.R. § 402.03. At issue in this case, Section 7(a)(2) of the ESA substantively requires federal agencies to "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat. 16 U.S.C. § 1536(a)(2). In addition, Section 7 of the ESA procedurally requires that any federal agency that proposes an action must first determine whether the action "may affect" a listed species or critical habitat. 50 C.F.R. § 402.14(a). If the federal agency determines the action "may affect" a listed species, it must consult with NMFS, FWS, or both agencies. 50 C.F.R. §§ 402.03, 402.13, 402.14.

Formal consultation results in the consulting agency's issuance of a biological opinion ("BiOp"). 50 C.F.R. § 402.14(h)(1). A BiOp includes the consulting agency's opinion on whether a proposed action is likely to jeopardize listed species or adversely modify critical habitat. 50 C.F.R. § 402.14(h)(3). If the consulting agency determines an action is likely to

jeopardize species or adversely modify critical habitat, the BiOp will suggest "reasonable and prudent alternatives" to avoid jeopardy or adverse modification. 16 U.S.C. § 1536(b)(3)(A); *see also San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 634 (9th Cir. 2014). The implementing regulations for the ESA define "action" as "all activities or programs of any kind authorized, funded, or carried out . . . by Federal agencies." 50 C.F.R. § 402.02.

Section 9 of the ESA prohibits "take" of a listed species. 16 U.S.C. § 1538(a)(1)(B); 50 C.F.R. § 223.203(a). "Take" is defined to include harming, harassing, or killing listed species. 16 U.S.C. § 1532(19). Harm is defined to include "significant habitat modification" which "kills or injures fish or wildlife by significantly impairing essential behavioral patterns, including, breeding, spawning, . . . [or] feeding . . . ." 50 C.F.R. § 222.102.

If the consulting agency determines a proposed action is not likely to jeopardize the species, or if reasonable and prudent alternatives are identified to avoid jeopardy and adverse modification but will likely result in the incidental "take" of some individual members of a listed species, the agency provides an "incidental take statement" ("ITS") along with the BiOp for the proposed action. *See* 16 U.S.C. § 1536(b)(4)(c)(i)-(iv); 50 C.F.R. § 402.14(i)(1)(i). Any "take" in compliance with an ITS does not violate Section 9 of the ESA. 16 U.S.C. § 1536(o)(2); 50 C.F.R. § 402.14(i)(5).

ii.      *National Environmental Policy Act*

NEPA requires federal agencies to prepare an Environmental Impact Statement ("EIS") for any "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C)(i). An EIS ensures that a federal agency will consider information on environmental impacts when reaching decisions and that the information will be made available to the larger audience who may play a role in the decision-making process. *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA requires that "relevant environmental information be identified and considered early in the process in order to ensure informed decision making by Federal agencies." 40 C.F.R. § 1500.1(b).

NEPA regulations direct federal agencies to prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary if the proposed action is neither one that normally requires an EIS nor one that is excluded from NEPA review. *Hale v. Norton*, 476 F.3d 694, 700 (9th Cir. 2007); *see* 40 C.F.R. § 1501.4(a)-(b). If it is determined no significant impact will occur after completing an EA, the federal agency must issue a "finding of no significant impact ('FONSI') and then execute the action." *Sierra Club v. Babbitt*, 65 F.3d 1502, 1505 (9th Cir. 1995); *see* 40 C.F.R. §§ 1501.4(e), 1508.13. However, if the EA shows that the proposed action will have a significant impact, the federal agency must prepare an EIS before proceeding with the proposed action. 42 U.S.C. § 4332(2)(C); *Ramsey v. Kantor*, 96 F.3d 434, 443 (9th Cir. 1996).

> *iii.*     *Magnuson-Stevens Act*

The Magnuson-Stevens Act establishes exclusive federal management over fisheries within the federal waters of the United States, which extends from the seaward boundary of each coastal state to 200 nautical miles from the coastline. 16 U.S.C. §§ 1802(11), 1811(a). The Secretary of Commerce is charged with implementing the Magnuson-Stevens Act but has delegated this responsibility to NMFS. 16 U.S.C. §§ 1854, 1855(d).

## C.     Factual Background

WFC is a membership-based 501(c)(3) nonprofit organization in the State of Washington, with its principal place of business in Duvall, Washington. (Compl. at ¶ 14.) WFC brings this

action on behalf of its members who it asserts regularly spend time in areas in and around the

waters occupied by the SRKW and subject Chinook salmon ESUs. (*Id.* at ¶ 15.)

             i.       *The SRKW and Chinook Salmon*

In 2005, NMFS listed the SRKW as endangered under the ESA. 50 C.F.R. § 224.101(h);

*see also* Endangered Status for Southern Resident Killer Whales, 70 Fed. Reg. 69,903 (Nov. 18,

2005). As of December 2018, the SRKW population was 74. AR at 47276. In early 2019, there

were 26 reproductive age females, with only 14 having successfully reproduced in the prior 10

years, and there had been no viable calves since the beginning of 2016. *Id.* at 47434.

A primary limiting factor for the SRKW population is prey availability, which has

contributed to premature mortality and reduced fertility. AR at 47276, 47282, 47286-87, 47434.

While the SRKW consume a wide variety of fish species, 80 to 90 percent of the SRKW's diet

consists of older and larger Chinook salmon. *Id.* at 47282-83. Overall, the major threats that have

led to SRKW population decline are: (1) the worsening availability of salmon prey; (2) noise and

vessel impacts; and (3) habitat destruction and pollution, including the presence of toxins in the

environment and in their food. *Id.* at 29604, 47276, 47282, 47286-90, 47433-34.

NMFS listed the Snake River fall-run Chinook salmon ESU as a threatened species under

the ESA in 1992. 50 C.F.R. § 223.012(e); *see also* Threatened Status for Snake River

Spring/Summer Chinook Salmon, Threatened Status for Snake River Fall Chinook Salmon, 57

Fed. Reg. 14,653 (Apr. 22, 1992). The Puget Sound, the Lower Columbia River, and the Upper

Willamette River Chinook salmon ESUs were all listed as threatened species in 1999. 50 C.F.R.

§ 223.102(e); *see also* Threatened Status for Three Chinook Salmon ESUs in Washington and

Oregon, and Endangered Status for One Chinook Salmon ESU in Washington, 64 Fed. Reg.

14,308 (Mar. 24, 1999). The primary limiting factors for the Chinook salmon ESUs' decline

1  include harvests, loss of habitat, and hatcheries. *See* AR at 1729, 14492, 15761, 15891,

2  47422-24.

3       As the 2019 SEAK BiOp notes, NMFS has performed numerous consultations on the

4  effects of Southeast Alaska fisheries on both the SRKW and the Chinook Salmon populations

5  under the ESA since 1992. AR at 47195-97. In the 2019 SEAK BiOp, NMFS determined that its

6  proposed actions were likely to adversely affect the SRKW and the Snake River-fall run, Puget

7  Sound, Lower Columbia River, and Upper Willamette River Chinook salmon ESUs. *Id.* at

8  47173, 47175, 47221-90.

9            ii.      *The Pacific Salmon Treaty*

10      Due to migratory patterns, Chinook salmon regularly travel across the boundary between

11  the United States and Canadian waters. AR at 523. As a result, fish originating in one country are

12  often "intercepted" by individuals fishing in the other country. *Id.*; *see id.* at 47194-95. To resolve

13  this issue, the United States and Canada ratified the Pacific Salmon Treaty ("PST"). *Id.*

14  Beginning in 1985, the PST established a framework for the management of Pacific salmon

15  fisheries in the federal waters off the coast of the United States and Canada that fall within the

16  treaty's geographical boundaries. *Id.*

17      In both 1999 and 2009, the United States and Canada entered into 10-year agreements

18  that comprehensively updated the PST. AR at 47194-95. Both countries entered into the most

19  recent agreement in 2019, which set the current upper harvest limits of Chinook salmon. *Id.*

20  Chapter 3 of Annex IV to the 2019 PST defines the current management regime for the Chinook

21  salmon fisheries within the PST geographical region, including Southeast Alaska, and is in effect

22  from 2019 through 2028. *Id.* at 515, 517, 47194-95.

23

1          *iii.*          *The Salmon Fishery Management Plan*

2          NMFS delegated its authority over the Southeast Alaska salmon fisheries in federal

3    waters to Alaska. 50 C.F.R. § 679.3(f). Pursuant to the Magnuson-Stevens Act, the North Pacific

4    Fishery Management Council ("NPFMC") has "authority over the fisheries in the Arctic Ocean,

5    Bering Sea, and Pacific Ocean seaward of Alaska." 16 U.S.C. § 1852(a)(1)(G); *see* AR at 502.

6    The NPFMC has issued several amendments to its original 1979 fishery management plan for

7    salmon fisheries in Alaska (the "Salmon FMP"), with the most recent amendment completed in

8    2018. Fisheries of the Exclusive Economic Zone Off Alaska; Essential Fish Habitat

9    Amendments, 83 Fed. Reg. 31,340 (July 5, 2018). On December 12, 2012, NMFS reaffirmed its

10   delegation of authority over the salmon fisheries in Southeast Alaska to the State of Alaska in

11   FMP Amendment 12. 50 C.F.R. § 679.3(f); *see also* Fisheries of the Exclusive Economic Zone

12   Off Alaska; Pacific Salmon, 77 Fed. Reg. 75,570 (Dec. 21, 2012). The Salmon FMP delegates

13   management authority over the fishery in federal waters of Southeast Alaska to the State of

14   Alaska; however, NMFS retains oversight authority. AR at 515, 561-65.

15         The 2018 Salmon FMP provides for two salmon fisheries in Southeast Alaska: (1) a

16   commercial troll salmon fishery; and (2) a sport fishery. AR at 514-15. Harvests are limited to a

17   specific number of "Treaty Chinook salmon" according to the abundance estimate established

18   under the PST. *Id.* at 540-41. All winter and spring harvests, and some summer harvest, occur in

19   state waters and are not subject to the Magnuson-Stevens Act. *See id.* However, some of the

20   summer harvest occurs in the Exclusive Economic Zone subject to the Magnuson-Stevens Act.

21   *Id.*

22

23

iv.        *2019 SEAK BiOp*

Following the completion of the 2019 PST, NMFS reinitiated consultation under the ESA on the Alaska salmon fisheries, and on April 5, 2019, issued the 2019 SEAK BiOp. AR at 47173-76, 47193-204. The 2019 SEAK BiOp considered the combined effects of three actions. *Id.* at 47193-204. First, NMFS analyzed its ongoing delegation of management authority over the Southeast Alaska salmon fisheries in federal waters to the State of Alaska. *Id.* at 47197-98. Second, NMFS analyzed federal funding to the State of Alaska to meet the obligations of the PST. *Id.* at 47198-201. Third, NMFS analyzed funding for a conservation program to benefit Puget Sound Chinook salmon stocks and the SRKW. *Id.* at 47201-04. The 2019 SEAK BiOp analyzes Southeast Alaska salmon fisheries under the 2019 PST. *See, e.g., id.* at 47366.

In the 2019 SEAK BiOp, NMFS ultimately concluded the continued operation of the salmon fisheries, consistent with the PST established harvest limits, was not likely to jeopardize the SRKW or adversely modify its critical habitat. AR at 47508 ("it is NMFS' [BiOp] that the proposed actions are not likely to appreciably reduce the likelihood of both survival and recovery of [the SRKW] or destroy or adversely modify their designated critical habitat."). Similarly, NMFS concluded the proposed actions would not jeopardize the Lower Columbia River, Upper Willamette River Chinook, Snake River-fall run, and Puget Sound Chinook salmon ESUs. *Id.* at 47485-47501.

v.        *Conservation Program*

Relevant to the instant matter, under the third action in the 2019 SEAK BiOp, NMFS planned to secure national and state funding for a conservation program to benefit Puget Sound Chinook salmon stocks and the SRKW. AR at 47201-04. NMFS's federal "funding initiative" under the proposed conservation program contains three elements. *Id.* at 47202. The first and

second parts of the conservation program were projected to benefit populations of Puget Sound

Chinook salmon that are considered essential for recovery as well as the SRKW. *Id*. First, NMFS

noted $3.06 million per year would be allocated for Puget Sound Chinook salmon conservation

hatcheries to increase funding for existing programs on the Nooksack, Dungeness, and

Stillaguamish Rivers and to fund a new program in Hood Canal. *Id*. at 47202, 47420. Second,

NMFS noted that $31.2 million would be provided to fund habitat projects to benefit Chinook

salmon populations in the same four watersheds. *Id.* at 47202, 47419-20. The 2019 SEAK BiOp

specified that the habitat related recovery projects are "one[-]time capital projects that would . . .

be funded and completed during the first three years." *Id*.

The third component of the conservation program contemplated by the 2019 SEAK BiOp

is a prey increase program that was specifically designed to "increase hatchery Chinook salmon

abundance to provide a meaningful increase in prey availability for SRKWs."[2] AR at 47202,

47419-20. The prey increase program sought to provide a four to five percent increase in prey for

the SRKW in approximately 4-5 years. *Id.* at 47202-03. Per the 2019 SEAK BiOp, NMFS

proposed spending at least $5.6 million annually on the conservation program to release 20

million smolts annually. *Id.* at 47203.

For purposes of the 2019 SEAK BiOp, NMFS considered the conservation program

action to be a "framework programmatic action." AR at 47203; *see* 50 C.F.R. § 402.02. As a

result, the 2019 SEAK BiOp acknowledged aspects of the conservation program would be

decided in the future, such as the selection of funding recipients for the habitat restoration

programs. AR at 47203. NMFS noted that it would perform site-specific analysis as needed if the

activities were determined to not be covered by existing programmatic BiOps. *Id.*

---

[2] This program is alternatively referred to by Government Defendants the "Hatchery Production Initiative for Southern Resident Killer Whales." (Gov. Defs.' Mot. at 13 n.7.)

1

*vi.*      *Incidental Take Statement*

2      The 2019 SEAK BiOp includes an ITS authorizing take of the SRKW in addition to the

3 four threatened Chinook salmon ESUs, allowing for the salmon fisheries to harvest up to the

4 limits put in place under the 2019 PST. AR at 47518-19. The ITS does not authorize take

5 associated with the proposed hatchery and habitat programs for the Chinook salmon ESUs. *Id.;*

6 *see also id.* at 47420, 47428, 47433. Instead, the ITS acknowledges "limited adverse effects to

7 the listed Chinook salmon as a result of increased hatchery production and habitat restoration

8 work associated with the mitigation funding initiative" and that the 2019 SEAK BiOp constitutes

9 a programmatic review of the funding action. *Id.* at 47519 ("[W]e do not provide an exemption

10 from the take prohibition for those actions in this take statement. This will be addressed in future

11 project-specific consultations, 4(d) rule approvals, or determinations of coverage by existing

12 biological opinions.").

13      The ITS included in the 2019 SEAK BiOp additionally notes that the salmon harvest that

14 may occur under the proposed actions was likely to result "in some level of harm constituting

15 take of SRKW by reducing prey availability" by causing the SRKW to forage for longer periods,

16 travel to alternate locations, or abandon foraging efforts. AR at 47519. Therefore, NMFS utilized

17 the level of Chinook salmon catch in Southeast Alaska as a surrogate for incidental take of

18 SRKW. *Id.* ("The extent of take for SRKW is therefore the same as the extent of take for

19 Chinook salmon and is described by the provisions of Chapter 3, Annex IV of the PST

20 Agreement that define annual catch or total mortality limits on Chinook salmon (including

21 ESA-listed and non ESA-listed Chinook salmon.").

22

23

1          *vii.*          *Environmental Assessment and Environmental Impact Statement History*

2          In 1998, NMFS prepared an EA to comply with NEPA for its continued deferral of

3   management to Alaska that addressed the Southeast Alaska salmon fisheries though 2003. AR at

4   47953. Subsequent to the 1998 EA, the 1999 PST was completed, which set the harvest limits

5   from 1999 through 2008. *Id*. Under the guidance of the 1998 EA, NMFS issued a BiOp with an

6   ITS "that covers the 1999 [PST], and the deferral of management to the State of Alaska for the

7   duration of this management program subject to conditions that require reinitiation of

8   consultation." *Id*.

9          In November 2003, NMFS issued a programmatic EIS addressing its review of several

10  salmon fisheries—including those located in Southeast Alaska. AR at 47914. The EIS addressed

11  the ITS for the 1999 PST and the "annual decision regarding continued deferral of management

12  to the State [of Alaska] and the issuance of an ITS through the Section 7 consultation process."

13  *Id.* at 47953. The 2003 EIS additionally explained that the Ninth Circuit's "decision in *Ramsey v.*

14  *Kantor* clarifies that the actions ensuing from NMFS's review are the decision of whether to

15  continue deferral of management to the State of Alaska and the associated issuance of an [ITS],

16  and that those actions need to comply with NEPA." *Id.* at 47953.

17         In 2012, NMFS completed an EA in connection with Amendment 12 to the Salmon FMP

18  considering the impacts of the ongoing delegation of authority to the State of Alaska, which

19  included an analysis of the 2008 BiOp and an ITS. AR at 47797-825. The 2008 BiOp surveyed

20  the impact of the ongoing delegation on both the SRKW and Chinook salmon ESUs. *Id.* at

21  343-61, 399-402.

22

23

1

### III.    DISCUSSION

2

#### A.    Legal Standards

3      Summary judgment is generally the appropriate mechanism for resolving the merits of

4  ESA and NEPA claims. *See e.g., Occidental Eng'g Co. v. Immigr. & Naturalization Serv.*, 753

5  F.2d 766, 769-70 (9th Cir. 1985). Summary judgment in such case is appropriate where there is

6  no genuine issue of material fact and the moving party is entitled to a judgment as a matter of

7  law. *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (citing

8  *Sierra Club v. Bosworth*, 510 F.3d 1016, 1022 (9th Cir. 2007)). Because this matter is a record

9  review case, the Court may direct summary judgment be granted to either party based upon

10  review of the administrative record. *Id.* (citing *Lands Council v. Powell*, 395 F.3d 1019, 1026

11  (9th Cir. 2005)).

12      Federal agencies' compliance with the ESA and NEPA is reviewed under the APA. *Ctr.*

13  *for Biological Diversity v. Ilano*, 928 F.3d 774, 779-80 (9th Cir. 2019); *Jewell*, 747 F.3d at 601.

14  Under the APA, "an agency action must be upheld on review unless it is 'arbitrary, capricious,

15  an abuse of discretion, or otherwise not in accordance with law.'" *Jewell*, 747 F.3d at 601

16  (quoting 5 U.S.C. § 706(2)(A)). A reviewing court "must consider whether the decision was

17  based on a consideration of the relevant factors and whether there has been a clear error of

18  judgment." *Id.* (citation and quotation marks omitted). Courts will "reverse a decision as

19  arbitrary and capricious only if the agency relied on factors Congress did not intend it to

20  consider, entirely failed to consider an important aspect of the problem, or offered an explanation

21  that runs counter to the evidence before the agency or is so implausible that it could not be

22  ascribed to a difference in view or the product of agency expertise." *N. Plains Res. Council, Inc.*

23  *v. Surface Transp. Bd.*, 668 F.3d 1067, 1074-75 (9th Cir. 2011).

The Court's "review of agency actions, including the promulgation of a BiOp, is narrow." *Alaska v. Lubchenco*, 723 F.3d 1043, 1052 (9th Cir. 2013). The Court should give "deference to a reasonable interpretation of a statute by an administrative agency charged with its implementation." *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 344 (1984). Courts should be at their most deferential "when reviewing scientific judgments and technical analyses within the agency's expertise." *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010). "Deference is particularly important when the agency is making predictions, within its area of special expertise, at the frontiers of science." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1236 (9th Cir. 2001) (quotations omitted).

## B. Standing

Before considering the merits of WFC's claims, the Court must first address WFC's standing. Government Defendants and ATA both argue WFC lacks standing for its substantive ESA claim concerning the "no jeopardy" determination for both the SRKW and Chinook salmon ESUs in the 2019 SEAK BiOp. (Gov. Defs.' Mot. at 10-11; ATA's Mot. at 9-14.) Specifically, both Government Defendants and ATA contend WFC's alleged injury is neither causally related to the Southeast Alaska troll fishery nor redressable by the relief sought by WFC. (*Id.*) In addition, Government Defendants and ATA argue WFC lacks organizational standing to bring its substantive and procedural ESA claims because WFC's claims are premised on injuries to its members, fail to satisfy the causation and redressability requirements, and, therefore, WFC members would not have standing to bring a suit on their own.[3] (Gov. Defs.' Mot. at 10; ATA's Mot. at 9 n.3.)

---

[3] Neither Government Defendants nor ATA challenge WFC's standing as to its NEPA claim. (*See* ATA's Mot. at 8-14; Gov. Defs.' Mot. at 10 n.6.)

Generally, a plaintiff must establish that it meets both constitutional and prudential standing requirements. *Ocean Advocates v. U.S. Army Corps of Engineers.*, 402 F.3d 846, 859 (9th Cir. 2005). To that end, Article III standing requires that WFC demonstrate:

> (1) [I]t has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by favorable decision.

*Id.* (citing *Friends of the Earth, Inc. v. Laidlaw Env'tl Servs., Inc.*, 528 U.S. 167, 180-81 (2000)); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). WFC must also demonstrate standing for each claim it seeks to press and for each form of relief sought. *Washington Env'tl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (citation omitted). At the summary judgment stage, a plaintiff cannot rest on "mere allegations [of standing] but must set forth by affidavit or other evidence specific facts" to support it. *Gerlinger v. Amazon.com Inc., Borders Group, Inc.*, 526 F.3d 1253, 1255-56 (9th Cir. 2008). "A plaintiff's basis for standing must affirmatively appear in the record." *Salmon Spawning & Recovery Alliance v. Gutierrez,* 545 F.3d 1220, 1228 n.5 (9th Cir. 2008) (citation and internal quotation omitted).

To satisfy the prudential standing requirement, WFC must demonstrate its interests fall within the "zone of interests" protected by the ESA and NEPA. *Ocean Advocates*, 402 F.3d at 859 (citing *Bennet v. Spear*, 520 U.S. 154, 162 (1997)). Per Plaintiff's complaint, WFC is "dedicated to the preservation and recovery of Washington's native fish species and the ecosystems upon which those species depend" and functions as a self-described environmental watchdog. (*See* Pl.'s Compl. at ¶ 14.) Given WFC's interests involve protecting ESA-protected species such as the SRKW and Chinook salmon, and that Defendants do not contest WFC's

espoused interests, the Court finds WFC interests fall within the "zone of interests" protected by the ESA and NEPA for prudential standing.

Because Government Defendants and ATA have challenged WFC's standing on both its substantive and procedural ESA claims, the Court examines each claim under the applicable standards below.

         *i.*      *Substantive Injury ("No Jeopardy") Claim*

         1.    <u>Injury in Fact</u>

The Supreme Court has held environmental plaintiffs adequately allege injury when they allege that they use an affected area and are individuals "for whom the aesthetic and recreational values of the area will be lessened" by the challenged activity. *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972); *see Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147, 1151 (9th Cir. 2000) ("The 'injury in fact' requirement in environmental cases is satisfied if an individual adequately shows that she has an aesthetic or recreational interest in a particular place, or animal . . . and that that interest is impaired by a defendant's conduct.").

WFC asserts that their injury is WFC members' decreased viewing opportunities of the SRKW and Chinook salmon in the wild. (*See* Pl.'s Reply at 39, 43-44.) Per WFC's members' declarations, WFC members derive recreational and aesthetic enjoyment from Puget Sound and its wildlife. (*See* Second McMillan Decl. (Dkt. # 91-7) at ¶¶ 7-9, 17, 21, 27-34; Second Soverel Decl. (Dkt. # 91-8) at ¶¶ 3-5, 14, 16, 18.) WFC members note that depleting Chinook salmon populations negatively affect their ability to perform spawning surveys, or otherwise observe Chinook salmon, and impact their ability to view SRKW due to the SRKW's reliance on Chinook salmon as prey. (*See* Second McMillan Decl. at ¶¶ 5, 8-9, 22-25, 32; Second Soverel Decl. at ¶¶ 5, 24, 22.) In addition, WFC members testify that the prey increase program that

would release hatchery Chinook salmon will directly adversely impact wild salmonids, and in turn, WFC members' recreational and aesthetic enjoyment of the Puget Sound and its wildlife. (*See* Second McMillan Decl. at ¶¶ 9, 29-33; Second Soverel Decl. at ¶¶ 4, 20-22.) As a result, WFC members testify their use and enjoyment of Puget Sound, and its wildlife, are diminished by NMFS's alleged violations of the ESA and NEPA. (*See* Second McMillan Decl. at ¶ 9; Second Soverel Decl. at ¶ 4.)

Based on the record before the Court, WFC members have adequately demonstrated injury in fact. Furthermore, Government Defendants and the ATA both do not challenge the validity of WFC members' claim of injury. (*See* Gov. Defs.' Mot. at 20-21; ATA's Mot. at 9-16; ATA's Reply at 2-3.) Therefore, the Court finds WFC has demonstrated injury in fact for its substantive ESA claims.

## 2. Causation

To establish causation, a plaintiff need only establish the theory of causation is at least plausible. *See Nat'l Audubon Soc'y v. Davis*, 307 F.3d 835, 849 (9th Cir. 2002). The causal connection need not be airtight but cannot be too speculative or rely on conjecture. *See Ecological Rights Found.*, 230 F.3d at 1152; *Bellon*, 732 F.3d at 1141-42 ("A causal chain does not fail simply because it has several links, provided those links are not hypothetical or tenuous and remain plausible."). In addition, "a litigant challenging an agency action need not eliminate any other contributing causes to establish its standing." *WildEarth Guardians v. U.S. Dep't. of Agric.*, 795 F.3d 1148, 1157 (9th Cir. 2015).

ATA argues that, in light of the other threats affecting the SRKW population and Chinook salmon abundance, the effect the Southeast Alaska troll fishery has on prey availability is "scientifically indiscernible" for purposes of standing. (ATA Mot. at 9-13.) On this point,

1   ATA centrally argues that the Ninth Circuit's decision in *Bellon* is illustrative that WFC's theory

2   of causation remains tenuous. (*Id.*)

3         In *Bellon*, plaintiffs challenged several environmental agencies' lack of regulation of five

4   oil refineries in the State of Washington and alleged that greenhouse gas pollution from those

5   refineries caused recreational, aesthetic, economic, and health injuries that were causally linked

6   to the agencies' failure to regulate. *Bellon*, 732 F.3d at 1135, 1139-41. The Ninth Circuit noted

7   that the refineries were responsible for only six percent of Washington's emissions, an amount

8   the court found was "scientifically indiscernible" in the context of global climate change. *Id.* at

9   1143-44. Therefore, the Ninth Circuit determined that plaintiffs failed to demonstrate causation

10   because "a multitude of independent third parties [were] responsible for the changes contributing

11   to Plaintiffs' injuries" and, therefore, the "the causal chain [was] too tenuous to support

12   standing" *Id.* at 1144.

13         Here, the Court finds that WFC's theory of causation remains plausible. While the Court

14   notes that there are several environmental and third-party factors that have contributed to the

15   population decrease for both SRKW and Chinook salmon (*see* AR 29607, 47345-47), absent the

16   2019 SEAK BiOp, Chinook salmon that the fisheries are authorized to take would otherwise be

17   available for the SRKW and for wildlife viewing. Based on the 2019 SEAK BiOp, NMFS

18   estimates prey reductions as a result of the Southeast Alaska fisheries amounting to, at

19   maximum, 12.9 percent in coastal waters and 2.5 percent in inland waters. *See id.* at 47507.

20   NMFS notes that prey availability is a primary factor limiting recovery and that the fisheries

21   covered by the 2019 SEAK BiOp will "adversely affect" SRKW critical habitat unless other

22   measures are taken. *See id.* at 47282-83, 47507. To compensate for the decrease in prey, NMFS

23

sought to provide a 4 percent to 5 percent increase in prey through hatchery production, which the BiOp characterizes as a "meaningful increase." *See id.* at 47202-03.

Consequently, the Court finds that reduction of Chinook salmon availability through the Southeast Alaska fisheries meaningfully contributes to the decreased viewing opportunities of the SRKW and Chinook salmon for WFC's members. *See e.g., WildEarth Guardians*, 795 F.3d at 1158. Furthermore, WFC's claims are distinguishable from the plaintiff's claims in *Bellon* because the Southeast Alaska fisheries' impact on prey availability is not "scientifically indiscernible" given the 2019 SEAK BiOp's noted impacts of prey availability to the SRKW. *See* AR 47282-83, 47507. Therefore, the Court finds that WFC has met the causation requirement for standing on its substantive claim.

### 3.   Redressability

In order to meet the redressability prong to find standing for WFC's substantive injury claims, there must be evidence in the record that demonstrates a "substantial likelihood" that the injury will be redressed to some degree if the plaintiffs receive a favorable decision. *Bellon*, 732 F.3d at 1146; *Barnum Timber Co. v. U.S. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011). "Redressability does not require certainty, but only a substantial likelihood that the injury will be redressed by a favorable decision." *Northwest Requirements Utilities v. F.E.R.C.*, 798 F.3d 796, 806 (9th Cir. 2015).

WFC argues its members' alleged injuries are likely redressable by a Court order that NMFS failed to ensure its actions would not jeopardize the SRKW and ESA-listed Chinook salmon because NMFS would have to stop relying on the 2019 SEAK BiOp. (Pl.'s Reply at 43-44.) ATA argues that the record fails to evince that there is a substantial likelihood the WFC

1    members may be more likely to see SRKW if the Southeast Alaska troll fishery is closed.

2    (ATA's Mot. at 13-14.)

3         As previously considered above, NMFS has noted prey availability is a primary factor

4    limiting recovery for the SRKW and the Southeast Alaska fisheries covered by the 2019 SEAK

5    BiOp will "adversely affect" the SRKW. *See* AR at 47282-83, 47507. With more Chinook

6    salmon in the population, there would be an increase in prey availability that would help to

7    increase SRKW population recovery, and therefore, WFC members' chances of seeing SRKW

8    would likely rise. (*See* Second McMillan Decl. at ¶¶ 7, 34; Second Soverel Decl. at ¶¶ 22-23).)

9    Thus, the Court finds that an order requiring NMFS to reinitiate consultation to ensure against

10   jeopardy is substantially likely to redress WFC members' injuries to some degree. *See Barnum*

11   *Timber Co.*, 633 F.3d at 901; *see also Cal. Sea Urchin Comm'n v. Bean*, 883 F.3d 1173, 1181-82

12   (9th Cir. 2018) ("We have held that in order to have standing a plaintiff need not show that the

13   requested relief will inevitably alleviate the harm complained of."). Consequently, the Court

14   finds that WFC has met its redressability burden as a favorable decision would likely redress

15   WFC members' concerns.

16         ii.      *Procedural Injury Claim*

17               1.   <u>Injury in Fact</u>

18         Under the procedural injury test, a plaintiff must show "the procedures in question are

19   designed to protect some threatened concrete interest of his that is the ultimate basis of his

20   standing." *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1043 (9th

21   Cir. 2015) (quoting *Salmon Spawning*, 545 F.3d at 1225). The Ninth Circuit has previously held

22   that the consultation procedures under Section 7 of the ESA are designed to protect "concrete

23   interests"—such as the recreational and aesthetic interests asserted by WFC members in this

1   case. *See Salmon Spawning*, 545 F.3d at 1225-26 ("These procedures are designed to advance

2   the ESA's overall goal of species preservation, and thus the [conservation group's] specific goals

3   as to salmon preservation, by ensuring agency compliance with the ESA's substantive

4   provisions."). Therefore, WFC has adequately alleged injury in fact for its procedural ESA

5   claim.

6                              2.      Causation and Redressability

7          "A showing of procedural injury lessens a plaintiff's burden on the last two prongs of the

8   Article III standing inquiry, causation and redressability." *Salmon Spawning*, 545 F.3d at 1226

9   (citing *Lujan*, 504 U.S. at 572). Because WFC is asserting a procedural injury under its

10  procedural ESA claim, it therefore "'must show only that [it has] a procedural right that, if

11  exercised, *could* protect [its] concrete interests'" in order to demonstrate causation. *Id.*

12  (quoting *Defs. of Wildlife*, 420 F.3d at 957 (emphasis in original)). As for redressability, WFC

13  "need[s] to show only that the relief requested—that the agency follow the correct procedures—

14  may influence the agency's ultimate decision of whether to take or refrain from taking a certain

15  action. This is not a high bar to meet." *Id.* at 1226-27 (citations omitted).

16         Here, requiring adequate ESA consultation clearly "could protect" the WFC members'

17  recreational and aesthetic interests in the SRKW and the Chinook salmon. Furthermore, as

18  previously discussed in the redressability analysis for WFC's substantive ESA claim, the

19  Southeast Alaska fisheries and the prey increase program authorized by the 2019 SEAK BiOp

20  have considerable impacts on SRKW population recovery and the Chinook salmon ESUs. *See*

21  AR at 47282-83, 47507. Thus, any deficiencies in the 2019 SEAK BiOp could be remedied by

22  WFC's requested relief that NMFS follow the correct procedures in determining "no jeopardy"

23  to the SRKW and Chinook salmon ESUs.

1     *iii.*   *Organizational and Statutory Standing*

2    To bring a suit under the APA, WFC must also establish organizational and statutory

3 standing. 16 U.S.C. § 1540(g)(1)(A); *see Friends of the Earth*, 528 U.S. at 180-81. To establish

4 organizational standing, WFC must demonstrate that: (1) its members would otherwise have

5 Article III standing to sue in their own right; (2) the interests at stake are germane to the

6 organization's purpose; and (3) neither the claim asserted nor the relief requested requires the

7 participation of individual members in the lawsuit. *Friends of the Earth, Inc.* 528 U.S. at 181; *see*

8 *also Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1154 (9th Cir. 2019). For

9 statutory standing, the plaintiff must establish "(1) that there has been a final agency action

10 adversely affecting the plaintiff, and (2) that, as a result, it suffers legal wrong or that its injury

11 falls within the 'zone of interests' of" the statue in question. *Ocean Advocates*, 402 F.3d at 861

12 (quoting *Churchill County v. Babbitt*, 150 F.3d 1072, 1078 (9th Cir. 1998)).

13    The Court finds that WFC has organizational and statutory standing for all of its claims.

14 As considered above, WFC has adequately alleged standing as to its members for both its

15 substantive and procedural ESA claims. The interests at stake—the impacts of the 2019 SEAK

16 BiOp to the SRKW population and Chinook salmon—are germane to WFC's interests as an

17 environmental advocacy organization. There is also no indication that resolving WFC's claims

18 and injuries would require the participation of individual WFC members. As for statutory

19 standing, as also previously considered above, WFC's claims fall within the "zone of interests"

20 of both the ESA and NEPA under the prudential standing requirement. The entirety of WFC's

21 claims are derived from NMFS's decision process regarding the 2019 SEAK BiOp and

22 accompanying ITS, and, therefore, the Court finds that the 2019 SEAK BiOp was a final agency

23 action that adversely affected WFC.

1    Accordingly, finding that WFC meets standing requirements to bring its substantive and

2    procedural ESA claims, the Court turns to an analysis of WFC's claims.

3    **C.    Procedural ESA Claim**

4         *i.    Conservation Program*

5    WFC argues the 2019 SEAK BiOp is arbitrary and capricious for improperly relying on

6    uncertain mitigation to find no jeopardy to the SRKW.[4] (Pl.'s Mot. at 21-27.) Specifically, WFC

7    alleges that the conservation program measures relied upon by NMFS in the 2019 SEAK BiOp

8    to find no jeopardy to the SRKW lack specific and binding plans, lack specific deadlines or

9    otherwise-enforceable obligations, and are not subject to agency control or otherwise reasonably

10   certain to occur. (*Id.*)

11   Government Defendants characterize the conservation program as a framework

12   programmatic action as well as allege it is the mitigating factor for their first two authorized

13   actions. (Gov. Defs.' Mot. at 19.) Government Defendants argue that because the conservation

14   program is a framework programmatic action,"the initial analysis is broad but is followed by

15   site-specific analyses as additional details become available. (*Id.*) Consequently, Government

16   Defendants argue NMFS met its ESA obligations as the action and consulting agency by

17   "establishing a flexible, legally compliant conservation program that will substantially aid

18   SRKW and salmon." (*Id.*)

19

20   [4] In addition, WFC contends that the 2019 SEAK BiOp was arbitrary and capricious because it: (1) fails
to draw a rational connection between the facts found and the no jeopardy opinion for the SRKW; and (2)
the ITS regarding the SRKW failed to adequately limit take of SRKW. (Pl.'s Mot. at 27-30, 35.) Because
21   the Court finds the 2019 SEAK BiOp relies on uncertain mitigation to find no jeopardy to the SRKW and
fails to evaluate whether the prey increase program would jeopardize the Chinook salmon ESUs, and thus
22   was not in accordance with law, the Court declines to consider WFC's additional arguments. *See
Fairweather Fish, Inc. v. Pritzker*, 155 F.Supp.3d 1136, 1142 (W.D. Wash. 2016) (citing *PDK Labs. Inc.
23   v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("[I]f it is not necessary to decide more, it is necessary not to
decide more.") (Roberts, J., concurring in part and concurring in the judgment)).

While mitigation is allowed to satisfy ESA section 7's duty to ensure against jeopardy, an agency cannot rely on future mitigation to offset negative impacts absent "solid guarantees that they will actually occur." *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. (NWF II)*, 524 F.3d 917, 935 (9th Cir. 2008). The Ninth Circuit has adopted strict standards when it comes to such mitigation:

> Mitigation measure[s] . . . must constitute a clear, definite commitment of resources, and be under agency control or otherwise reasonably certain to occur. A sincere general commitment to future improvements—without more specificity—is insufficient. The measures must be subject to deadlines or otherwise-enforceable obligations; and most important, they must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards. Binding mitigation measures cannot refer only to generalized contingencies or gesture to hopeful plans; they must describe, in detail, the action agency's plan to offset the environmental damage caused by the project.

*Ctr. For Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020) (citations and internal quotations omitted); *see also NWF II*, 524 F.3d at 935-36 (there must be "specific and binding plans" for mitigation).

### 1.    Framework Programmatic Action

A framework programmatic action for an ITS "approves a framework for the development of future action(s) that are authorized, funded, or carried out at a later time, and any take of a listed species would not occur unless and until those future action(s) are authorized, funded, or carried out and subject to further section 7 consultation." 50 C.F.R. § 402.02. For a framework programmatic action, an ITS "is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate." 50 C.F.R. § 402.14(i)(6). For a mixed programmatic action, an ITS is "required at the programmatic level only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation." *Id.*

Though mitigation measures can be used for a framework programmatic action, there is no indication that the mitigation itself to find "no jeopardy" can be a site-specific or framework programmatic action under 50 C.F.R. §§ 402.02, 402.14(i)(6). A framework programmatic action can defer consultation to a later site-specific analysis for the purposes of take, however, this would only occur once an action is found to pose no jeopardy to listed species under ESA section 7. *See id.* Government Defendants' arguments referencing ESA regulations that contemplate site-specific analysis following a programmatic action are therefore inaccurately applied to the mitigation measures challenged in this action. (*See* Gov. Defs.' Mot. at 11-12, 14-15, 19.) Furthermore, Government Defendants cite to *Bernhardt* to argue that NMFS's approach "is entirely consistent with a framework programmatic action." (*Id.* at 14-15.) However, there is no indication in *Bernhardt* that a framework programmatic action can be utilized to alleviate concerns with uncertain mitigation or where take is certain to occur. *See Bernhardt*, 982 F.3d at 743.

While the ESA contemplates programmatic consultations, the ESA's allowance for programmatic consultations does not nullify the Ninth Circuit's stated requirements for mitigation measures. As such, the Court finds that NMFS's actions identified in the 2019 SEAK BiOp require certain mitigation.

## 2.   Specific and Binding Plans

In the 2019 SEAK BiOp, NMFS found that absent other measures, the Southeast Alaska fisheries would "adversely affect" the SRKW. AR at 47507. Despite this finding, NMFS approved the maximum harvest limits allowed by the 2019 PST, citing that it would be able to develop and implement mitigation plans to counter the Southeast Alaska fisheries prior to the SRKW's extinction. *See id.* at 47201-02, 47498-47501 (finding mitigation also needed to

1    preserve Puget Sound Chinook salmon). As a result, WFC argues that NMFS's reliance on

2    "undeveloped and poorly defined" mitigation violates the ESA and, therefore, the 2019 SEAK

3    BiOp is arbitrary and capricious. (Pl.'s Mot. at 21.)

4        Here, the central point at issue is the third component of NMFS's conservation plan—the

5    prey increase program—as it relates to the adverse impact on SRKW. As NMFS noted in the

6    2019 SEAK BiOp, a 4-5 percent increase in Chinook salmon would be needed to "address the

7    threats to the [listed] species" that their 2019 SEAK BiOp action would cause. AR at 47420. In

8    effect, the prey increase program is NMFS's essential long-term mitigation solution to NMFS's

9    proposed actions. Therefore, absent the mitigation from the prey increase program, NMFS would

10   be unable to conclude that the proposed actions would not destroy or adversely modify critical

11   habitat for the SRKW.

12       Per the 2019 SEAK BiOp, NMFS noted that the plans for the prey increase program

13   could not be described in further detail and merely set out a plan to later iron out the specifics.

14   *See e.g.,* AR at 47203 ("The specific details of how the three activities for which funding would

15   be used have not been developed."), 47525 ("NMFS shall design the prey increase program

16   using the best available information . . ."), 47433 (NMFS hopes "to work collaboratively with

17   the state and tribal co-managers [that operate hatcheries] . . . to develop a program that meets the

18   goal related to increasing prey abundance."). When describing the funding plan for the prey

19   increase program in the 2019 SEAK BiOp, NMFS listed specific goals but admitted the plan was

20   "less well defined" and "will likely be subject to additional review once they are fully

21   described." *Id.* at 47315. Therefore, the Court finds that NMFS failed to create a binding

22   mitigation measure that described "in detail the action agency's plan to offset the environmental

23   damage caused by the project" for the prey increase program. *Bernhardt*, 982 F.3d at 743; *see*

*also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. (NWF III)*, 184 F.Supp.3d 861, 935 (D. Or. 2016*)*; *Ctr. for Biological Diversity v. Salazar*, 804 F.Supp.2d 987, 1004 (D. Ariz. 2011) (finding that a BiOp cannot rely on a "promise—no matter how well-intended— to develop a plan in the future to mitigate the impacts of its proposed action.").

In addition, and as previously noted, proper mitigation plans must be "subject to deadlines or otherwise-enforceable obligations." *Bernhardt*, 982 F.3d at 743. Government Defendants argue that the 2019 SEAK BiOP provided such deadlines for the three parts of the conservation program because the BiOp states the programs will "operate each year" and "during the first three years." (Gov. Defs.' Mot. at 17-18.) Nevertheless, it does not appear from the record that these are deadlines for implementation but merely prospective timelines. *See* AR at 47202-03. Notably, the 2019 SEAK BiOp does not include any specific deadlines for implementing the proposed mitigation, nor does it include specific requirements by which to confirm that the mitigation is being implemented in the manner and on a schedule needed to avoid the extinction of the SRKW.[5] *See id.* at 47435 (noting that the mitigation "is not anticipated to be implemented immediately."), 47525-26; *see also id.* at 47203 (noting that if "funding is not provided in time for actions to take effect during the [10-year] agreement" set in the 2019 PST, that "may constitute a modification" requiring new consultation). The purpose of

---

[5] Government Defendants reliance on *Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515 (9th Cir. 1998) is also misplaced. Government Defendants argue that mitigation has previously been upheld where FWS "did not identify specific areas available and suitable for acquisition and restoration." *Id*. at 518. However, the reasonable and prudent alternatives ("RPA") in that case required FWS to acquire a defined number of acres of replacement habitat for the endangered species by a specific date to mitigate acres lost by the action. *Id.* at 524. The Ninth Circuit specifically noted the record demonstrated the amount of acreage required was available and there was "no indication that [the Bureau of Reclamation] cannot acquire and restore the needed replacement habitat as specified in the final RPA by the required deadlines." *Id.* Here, the 2019 SEAK BiOp offers no timetables or specific deadlines to implement the mitigation.

the deadlines and enforceable obligations precedent for mitigation is to ensure that the prey increase program would be implemented in the manner NMFS deemed necessary to avoid jeopardizing the SRKW. Merely stating a length of the action and that NMFS "may" be required to reinitiate consultation if a modification is needed due to a lack of funding is insufficient to ensure the prey increase program will effectively mitigate the jeopardy to the SRKW. *See Bernhardt*, 982 F.3d at 743-44 ("An indefinite mitigation measure is less likely to trigger re-consultation because it will be difficult to know at which point or whether the action agency has failed to comply.").

In considering NMFS's proposed mitigation to provide funding to four Puget Sound conservation hatcheries, per the 2019 SEAK BiOp, NMFS notes it cannot confirm additional fish will be produced by the funding. *See* AR at 47420 (funding will "most likely include increased production"). Tellingly, NMFS fails to specify how the funds will be spent, how many additional fish could be produced, where fish would be released, or when, where, or how many salmon could be made available to SRKW or to aid recovery of Chinook salmon. *See id.* at 47420-27. NMFS failed to describe, in detail, how funding these four conservation hatcheries would mitigate harvest impacts or provide "deadlines or otherwise enforceable obligations" to guide the proposed mitigation as required under the ESA. *See Bernhardt*, 982 F.3d at 743.

With respect to the habitat restoration component, NMFS admits that "while a list of potential habitat restoration projects . . . exists, it has not been decided which projects would be funded . . . ." AR at 47203; *see also id.* at 47420 ("site specific details" for habitat restoration "are not yet available"). Moreover, even the "original project listed may change." *Id.* at 47427. NMFS does not provide any details about which projects will be implemented, who will implement them, when they would be implemented, or the extent to which they would mitigate

1    harvest impacts. *See id.* at 47427-32. As such, these mitigation measures also fail for lack of

2    specificity and deadlines or otherwise enforceable obligations. *See Bernhardt*, 982 F.3d at 743.

3            3.      <u>Subject to Agency Control or Reasonably Certain to Occur</u>

4           NMFS's conservation program is premised as a "grant program" to provide funding to

5    other parties and entities for the habitat and hatchery projects. *See* AR at 47201-02, 47433,

6    47447. But based on the record before the Court, the 2019 SEAK BiOp does not enumerate a

7    party or entity that would be responsible for implementation of such projects. *See id.*

8    Furthermore, NMFS also notes that "there is a degree of uncertainty regarding whether Congress

9    will [timely] provide the funding in whole or in part . . . ." *See id.* at 47203. Consequently, based

10   on the 2019 SEAK BiOp, NMFS's reliance on the mitigation proposals was not subject to

11   NMFS's "control or otherwise reasonably certain to occur". *See Bernhardt*, 982 F.3d at 743; *see*

12   *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv. (NWF I)*, 254 F.Supp.2d 1196, 1213-14 (D.

13   Or. 2003) (finding "absence in the record of any binding commitments by the States, Treaty

14   Tribes, and private parties" to implement mitigation was impermissible).

15            *ii.*    *Prey Increase Program*

16          WFC further argues that the 2019 SEAK BiOp violates the ESA by failing to evaluate

17   whether the prey increase program will jeopardize the Chinook salmon ESUs. (Pl.'s Mot. at

18   30-34.) WFC argues that NMFS impermissibly segmented consultation by assuming benefits of

19   the prey increase program in its jeopardy analysis for the SRKW, while omitting the program in

20   its jeopardy analyses for the threatened salmonids. (*Id.* at 32-34.) Government Defendants argue

21   that NMFS considered the effects on wild fish in other parts of the 2019 SEAK BiOp and that

22   NMFS otherwise appropriately consulted at the programmatic level. (Gov. Defs.' Mot. at 20-23.)

23          Pursuant to the ESA implementing regulations concerning the requirements of a BiOp:

> The biological opinion shall include . . . [NMFS's] opinion on whether the action is (A) Likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy" biological opinion); or (B) Not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion).

50 C.F.R. § 402.14(h)(1)(iv); *see also* 50 C.F.R. § 402.14(g)(4). "During the formal consultation process, the [consulting agency] must 'formulate its biological opinion as to whether the action . . . is likely to jeopardize the continued existence of listed species . . . .'" *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1107 (9th Cir. 2012) (quoting 50 C.F.R. § 402.14(g)(4)).

Here, NMFS's biological opinion that the actions addressed in the 2019 SEAK BiOp are not likely to jeopardize the SRKW relies upon the benefits of the prey increase program. *See* AR at 47506-08 ("The hatchery production will increase abundance of Chinook salmon . . . , which will reduce impacts from the [harvest] action during times of low prey for the whales"). Yet, NMFS's analyses of whether the actions addressed in the 2019 SEAK BiOp are likely to jeopardize the Chinook salmon ESUs omits mention of the prey increase program altogether. *See id.* at 47485-47501. For the Lower Columbia River, Upper Willamette River, and Snake River Chinook salmon ESUs, the jeopardy analysis only addressed impacts associated with the Southeast Alaska fisheries. *See id.* at 47485-97. For Puget Sound Chinook salmon, the jeopardy analysis discusses the Puget Sound conservation hatchery and habitat mitigation but does not mention the prey increase program. *See id.* at 47497-47501.

By including benefits of the prey increase program in the jeopardy analysis for the SRKW but omitting the program from the jeopardy analysis for the threatened Chinook salmon ESUs, NMFS improperly segmented its consultation. *See Conner v. Burford*, 848 F.2d 1441,

1453-58 (9th Cir. 1988); *Greenpeace v. Nat'l Marine Fisheries Serv.*, 80 F.Supp.2d 1137, 1150

(W.D. Wash. 2000) ("A biological opinion which is not coextensive in scope with the identified

agency action necessarily fails to consider important aspects of the problem and is, therefore,

arbitrary and capricious."). Therefore, the Court finds that NMFS's failure to make a jeopardy

determination on the prey increase program for the Chinook salmon ESUs violated its

obligations under the ESA.

In conclusion, there is no support in the administrative record that the NMFS's mitigation

contains "specific or binding plans" nor that it is under NMFS's "control or reasonably certain to

occur." *See Bernhardt*, 982 F.3d at 743. The mitigation identified in the 2019 SEAK BiOp does

not meet the Ninth Circuit's standards and was relied upon by NMFS in the 2019 SEAK BiOp to

reach its no jeopardy findings for the SRKW. Additionally, NMFS's failure to make a jeopardy

determination on the prey increase program for the Chinook salmon ESUs violated its procedural

obligations under the ESA. The Court therefore recommends that summary judgment on WFC's

procedural ESA claim be granted as the 2019 SEAK BiOp was arbitrary, capricious, and not in

accordance with law under 5 U.S.C. § 706(2)(A).

### D.   "No Jeopardy" Finding under the ESA

An agency violates its substantive duty under Section 7 of the ESA to ensure against

jeopardy when it relies on a BiOp that suffers legal flaws. *See e.g.*, *Wild Fish Conservancy v.

Salazar*, 628 F.3d 513, 532 (9th Cir. 2010); *Defenders of Wildlife v. EPA,* 420 F.3d 946, 976 (9th

Cir. 2005). As a result of the Court's finding that NMFS's reliance on the 2019 SEAK BiOp was

arbitrary and capricious in regard to mitigation measures utilized to find no jeopardy to the

SRKW, the Court concludes that NMFS violated its substantive duty to ensure no jeopardy to the

SRKW. Particularly, and as noted above, the unspecified and deadline-lacking conservation

1   program contemplated by the 2019 SEAK BiOp does not meet the standards for certain

2   mitigation to find no jeopardy to the SRKW. In addition, NMFS was similarly incapable of

3   finding no jeopardy for the threatened Chinook salmon ESUs because NMFS failed to address

4   the prey increase program in its jeopardy analysis for the Chinook salmon ESUs.

5         Consequently, the Court recommends that summary judgment on WFC's substantive

6   ESA claims regarding the SRKW and Chinook salmon ESUs be granted.

7         **E.**     **NEPA Claims**

8         Next, WFC argues that NMFS violated NEPA by failing to conduct any NEPA analysis

9   for the issuance of the ITS in the 2019 SEAK BiOp and by adopting the prey increase program.

10   (Pl.'s Mot. at 35-39.) In addition, WFC argues that NMFS failed to provide an explanation for its

11   change in legal position concerning the effect of *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996)

12   and its requirement for NEPA procedures for the issuance of an ITS.[6] (Pl.'s Supp. Br. (Dkt.

13   # 108) at 3-5.) Government Defendants counter that NMFS complied with NEPA when it

14   completed the federal actions subject to consultation and analyzed in the 2019 SEAK BiOp and

15   the associated ITS. (Gov. Defs.' Mot. at 27-32.). Government Defendants additionally argue

16   NEPA review was not needed because it previously provided NEPA procedures on its delegation

17   of authority to Alaska to manage fisheries in federal waters.[7] (*Id.* at 29-30.)

18

19

20   _____

[6] At oral argument, Government Defendants acknowledged that NMFS's interpretation of *Ramsey* had

21   changed since it issued the 2003 EIS covering the Southeast Alaska fisheries (AR at 47914). (Dkt. # 110
at 74-75.) As a result, the Court authorized supplemental briefing from the parties on this issue. (Dkt.

22   ## 105-109.)

23   [7] Government Defendants' contention is incorrect that prior NEPA efforts were sufficient. The actions
here include NMFS's decision to provide "funding to the State of Alaska for the implementation of the
2019 [PST] in SEAK." AR at 47366. Prior NEPA efforts undertaken with the 2012 EA regarding the
Southeast Alaska salmon fisheries clearly did not address implementation of the 2019 PST.

For the reasons explained below, the Court finds that NMFS violated NEPA requirements in issuing the ITS in the 2019 SEAK BiOp.

> i.     Change in Position

Under APA review, "[w]hen an agency changes its position, it must (1) 'displace awareness that it is changing its position,' (2) show 'the new policy is permissible under the statute,' (3) 'believe' the new policy is better, and (4) provide 'good reasons' for the new policy." *Ctr. for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021). The standards apply where an agency has changed its position for legal reasons. *See Fed. Commc'ns Comm'n v. Fox TV Stations, Inc.*, 56 U.S. 502, 515-16 (2009); *see also Organized Village of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015). The agency must also provide its rationales "in a form that can adequately be examined on judicial review, not simply present arguments in its briefing how the decision may have been reached." *Haaland*, 998 F.3d at 1068; *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049-50 (9th Cir. 2010).

In *Ramsey v. Kantor*, the Ninth Circuit determined that NMFS must comply with NEPA when it issues an ITS under the ESA for a fishery implemented by non-federal entities. 96 F.3d at 444. In that case, NMFS issued a BiOp for several fisheries that included an ITS which "allowed takings to occur in those fisheries notwithstanding the prohibitions of § 9 [of the ESA]." *Id.* at 439. The Ninth Circuit explained that in such instances NEPA is generally required "if a federal permit is a prerequisite for a project." *Id.* at 444. The Ninth Circuit further explained that the subject ITS in *Ramsey* was "functionally equivalent to a permit because the activity in question would, for all practical purposes, be prohibited but for the [ITS]." *Id.* As a result, the Ninth Circuit held that NMFS "was required . . . to comply with the requirements of NEPA before issuing the [ITS]." *Id.*

In 2003, NMFS responded to *Ramsey* with a programmatic EIS covering several

fisheries, including those in Southeast Alaska. AR at 47914. Pursuant to that EIS, NMFS noted:

> The Ninth Circuit Court of Appeals, in its 1996 decision in *Ramsey v. Kantor . . .*,
> clarifies that the actions ensuing from NMFS' review are the decision of whether
> to continue deferral of management to the State of Alaska and the associated
> issuance of an Incidental Take Statement (ITS), and that those actions need to
> comply with NEPA.

*Id.* at 47948, 47952-53. The actions subject to the EIS included NMFS's ITS authorizing take

associated with the Southeast Alaska fisheries under the 1999 and the "continued deferral of

management [over the fisheries] to the State [of Alaska]." *Id.* at 47953.

Here, NMFS's change in legal position is the sort of change that requires NMFS to

provide an explanation for its change in course. As noted, NMFS previously explained in its

2003 EIS that it was required under *Ramsey* to complete NEPA procedures when issuing an ITS

for PST fisheries (*see* AR at 47948, 47952-53) and NMFS did so for the ITS issued with the

1999 PST. *See id.* at 47953. However, the 2019 SEAK BiOp and ITS lack any clarification why

NMFS concluded NEPA procedures were required for ITS issued for the 1999 PST but not for

the ITS issued for the 2019 PST. As such, NMFS's change in legal position required NMFS to

provide the explanations identified under the APA requirements. *See, e.g., Haaland*, 998 F.3d at

1067. The record before the Court is also devoid of any showings that NMFS's changed position

is permissible, that NMFS believes the new position is better, and that NMFS had good reasons

for its new policy. *See id.* Therefore, NMFS did not sufficiently explain why it changed its prior

position to escape the import of *Ramsey* requiring NEPA procedures for the issuance of an ITS.

### ii.  *Effect of* Ramsey *and* Jewell

In any event, NMFS violated NEPA by issuing the 2019 SEAK BiOp's ITS, and in

adopting the prey increase program, without preparing an EIS or EA. In *Ramsey*, the Ninth

Circuit held that NMFS was required to prepare an EA or EIS "*before* issuing" an ITS. *Ramsey*, 96 F.3d at 443-44 (emphasis in original). Here, NMFS issued an ITS for the Southeast Alaska fisheries under the 2019 PST (*see* AR at 47366, 47518) that was the functional equivalent of a federal permit because it authorized take of the Chinook salmon in Southeast Alaska set by the 2019 PST that could not occur but for the ITS. Accordingly, the ITS constituted a major federal action for purposes of NEPA, and thus, the preparation of an EA or EIS under NEPA was required prior to the issuance of the ITS. *See Ramsey*, 96 F.3d at 443-44; *see also* 42 U.S.C. § 4332(2)(C)(i).

Moreover, NMFS is both the consulting and action agency in this case. (*See* Gov. Defs.' Mot. at 2 n.1.) The Ninth Circuit has clarified that a BiOp and ITS do not necessarily function as automatic triggers for NEPA review, but where there was no "downstream federal agency" poised to complete NEPA review prior to the major federal action occurring, the consulting agency must complete NEPA review. *Jewell*, 747 F.3d at 644. *In Jewell*, FWS's BiOp at issue was found not subject to NEPA because "its implementation [was] contingent on [Bureau of Reclamation's (the downstream federal agency)] adoption of the BiOp, which is an action that will trigger Reclamation's obligation to complete an EIS." 747 F.3d at 645. Here, there is no separate downstream federal agency implementing the fisheries that will comply with NEPA. NMFS was therefore required to comply with NEPA as the consulting agency authorizing take because otherwise, "the action would . . . evade[] NEPA review altogether . . . ." *See Jewell*, 747 F.3d at 644.

### iii. *Prey Increase Program*

Finally, NMFS violated NEPA in adopting the prey increase program without preparing an EIS or an EA. The prey increase program was included in the 2019 SEAK BiOp as a new

1   "action" subject to consultation and as a "reasonable and prudent measure" imposed in the ITS

2   under section 7(b)(4) of the ESA. *See* AR at 47201-03, 47524-25. Based on the record, the prey

3   increase program is entirely funded by federal grants administered by NMFS. *See e.g.*, *id.* at

4   47202-03. Consequently, the Court finds that NMFS's prey increase program is a major federal

5   action subject to NEPA. *See, e.g.*, *Sierra Club v. U.S. Fish & Wildlife Serv.*, 235 F.Supp.2d 1109,

6   1120-21 (D. Or. 2002) ("Significant federal funding can turn what would otherwise be a state or

7   local project into a major federal action.") (citation and internal quotations omitted).

8           In sum, the Court concludes NMFS failed to conduct necessary NEPA analyses for the

9   issuance of the ITS contained in the 2019 SEAK BiOp and adoption of the prey increase

10  program. Accordingly, the Court recommends that summary judgment on WFC's NEPA claim

11  be granted.

12          **F.      Magnuson-Stevens Act**

13          The State of Alaska requests that the Court dismiss WFC's "challenge to the

14  authorization and funding of the SEAK Chinook fishery through the delegation of authority to

15  the State under the [FMP] . . . ." (AK's Mot. at 21.) The State of Alaska argues that WFC "may

16  not challenge actions related to the delegation of management authority to the State under the

17  MSA, nor can it seek any relief that results in the suspension of that management . . . ." *Id.* In

18  effect, the State of Alaska argues that the Magnuson-Stevens Act functions to prevent the Court

19  from granting WFC's claims.

20          As the Court previously noted in adjudicating the previous motion for preliminary

21  injunction, "Section 1855(f) [of the Magnuson-Stevens Act] applies only to a very specific class

22  of claims—those that clearly challenge regulations promulgated under the Magnuson-Stevens

23  Act." (Dkt. # 51 at 17 n.4 (quoting *Turtle Island Restoration Network v. U.S. Dept. of*

*Commerce*, 438 F.3d 937, 948-49 (9th Cir. 2006)).) While the Magnuson-Stevens Act allows for the delegation of authority of the management of fisheries in international waters to the State of Alaska, the Magnuson-Stevens Act does not apply in the manner sought by the State of Alaska because the management itself is not being challenged. *See Lubchenco*, 723 F.3d at 1048. The 2019 SEAK BiOp incorporated a renewal of the delegation of authority to Alaska; however, the procedural and substantive injuries being alleged by WFC in this matter do not relate to the redelegation of authority to Alaska. *See id.* at 1049; *Turtle Island*, 438 F.3d at 949. Therefore, the Court declines to recommend dismissal of WFC's claims on the State of Alaska's requested basis.

## IV.    CONCLUSION

For the foregoing reasons, the Court recommends that Plaintiff's Motion (dkt. # 91) be GRANTED, and that Government Defendants' Cross-Motion (dkt. # 93), Defendant-Intervenors ATA's Cross-Motion (dkt. # 92), and State of Alaska's Cross-Motion (dkt. # 94) be DENIED. The Court will consider an appropriate remedy for NMFS's violations of section 7(a)(2) of the ESA and NEPA in the 2019 SEAK BiOp upon Judge Jones' determination of this Report and Recommendation. A proposed Order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **October 15, 2021**.

The Clerk is directed to send copies of this Order to the parties and to the Honorable Richard A. Jones.

Dated this 27th day of September, 2021.

MICHELLE L. PETERSON
United States Magistrate Judge