HONORABLE RICHARD A. JONES

1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

11 _____
                                          )
12 WILD FISH CONSERVANCY,                 )      Case No. 2:20-cv-417-RAJ-MLP
                                          )
13          Plaintiff,                    )
                                          )      DEFENDANTS' OBJECTIONS
14      v.                                )      TO REPORT AND
                                          )      RECOMMENDATION
15 BARRY THOM, *et al.*,                  )
                                          )      NOTE ON MOTION CALENDAR:
16                                        )      OCTOBER 29, 2021
17          Defendants,                   )
                                          )
18      and                              )
                                          )
19 ALASKA TROLLERS ASSOCIATION,          )
                                          )
20          Defendant-Intervenor,         )
                                          )
21      and                              )
                                          )
22 STATE OF ALASKA,                       )
                                          )
23          Defendant-Intervenor.         )
24 _____)
25
26
27
28

*Defendants' Objections to Report and Recommendation*                U.S. Department of Justice
                                                                      P.O. Box 7611
                                                                      Washington, D.C. 20044
Case No. 2:20-CV-417-RAJ-MLP                                          (202) 305-0641

**TABLE OF CONTENTS**

TABLE OF AUTOHRITIES ....................................................................................................ii

TABLE OF ACRONYMS ......................................................................................................iv

INTRODUCTION ................................................................................................................. 1

STANDARD OF REVIEW .................................................................................................... 2

OBJECTIONS........................................................................................................................ 2

    I.     The Court Should Reject the Analysis of Framework Programmatic Actions. ........... 2

    II.    The Court Should Reject the Findings on Specificity and Certainty.......................... 5

    III.   The Court Should Reject the Analysis of the No-Jeopardy Decision for Salmon....... 8

    IV.   The Court Should Reject the Conclusion About NMFS's Substantive ESA Duty...... 8

    V.    The Court Should Reject the Report and Recommendation's NEPA Analysis........... 9

CONCLUSION...................................................................................................................... 12

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

## TABLE OF AUTOHRITIES

**Cases**                                                                                                    **Page**

*Center for Biological Diversity v. Bernhardt,*
      982 F.3d 723 (9th Cir. 2020) ................................................................................ 4, 5

*Center for Biological Diversity v. Haaland,*
      998 F.3d 1061 (9th Cir. 2021) ........................................................................... 1, 9, 10

*Center for Biological Diversity v. Salazar,*
      804 F. Supp. 2d 987 (D. Ariz. 2011) ....................................................................... 6

*Center for Biological Diversity v. U.S. Fish & Wildlife Serv.,*
      807 F.3d 1031 (9th Cir. 2015) .................................................................................. 8

*City of Santa Clarita v. U.S. Dep't of Interior,*
      No. CV02-00697 DT (FMOx), 2006 WL 4743970 (C.D. Cal. Jan. 30, 2006) ............... 10

*National Wildlife Federation v. NMFS,*
      184 F. Supp. 3d 861 (D. Or. 2016) ....................................................................... 5, 6

*Organized Village of Kake v. U.S. Department of Agriculture,*
      795 F.3d 956 (9th Cir. 2015) .................................................................................. 10

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy,*
      898 F.2d 1410 (9th Cir. 1990) .................................................................................. 9

*Ramsey v. Kantor,*
      96 F.3d 434 (9th Cir. 1996) ....................................................................... 1, 9, 10, 11

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
      747 F.3d 581 (9th Cir. 2014) ............................................................................ 10, 11

*San Luis & Delta-Mendota Water Auth. v. Locke,*
      776 F.3d 971 (9th Cir. 2014) ..................................................................................... 8

*Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation,*
      143 F.3d 515 (9th Cir. 1998) ............................................................................ 1, 6, 7

*Southwest Center for Biological Diversity v. U.S. Forest Serv.,*
      100 F.3d 1443 (9th Cir. 1996) ................................................................................... 8

**Statutes**

5 U.S.C. § 551(13) ......................................................................................................... 9

*Defendants' Objections to Report and Recommendation*

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

Case No. 2:20-CV-417-RAJ-MLP                    ii

5 U.S.C. § 702 .................................................................................................10

5 U.S.C. § 704 .................................................................................................10

5 U.S.C. § 706 .................................................................................................10

16 U.S.C. § 1536(a)(2) .......................................................................................2

16 U.S.C. § 1536(b)(3)(A) ................................................................................11

16 U.S.C. § 1536(o)(2) .....................................................................................11

28 U.S.C. § 636(b)(1) .........................................................................................2

**Regulations**

40 C.F.R. § 1501.4 ...........................................................................................12

50 C.F.R. § 402.02 .............................................................................................3

50 C.F.R. § 402.14(a) .........................................................................................5

50 C.F.R. § 402.14(b) .........................................................................................5

50 C.F.R. § 402.14(g)(4) .....................................................................................5

**Federal Register**

80 Fed. Reg. 26,832 (May 11, 2015) ........................................... 1, 3, 4, 5, 7

**Rules**

Fed. R. Civ. P. 72(b)(3) .......................................................................................2

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP                 iii

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1

**TABLE OF ACRONYMS**

2  APA          Administrative Procedure Act

3  BiOp         Biological Opinion

4  EA           Environmental Assessment

5  EIS          Environmental Impact Statement

6  ESA          Endangered Species Act

7  FMP          Fishery Management Plan

8  FWS          U.S. Fish & Wildlife Service

9  ITS          Incidental Take Statement

10  MSA         Magnuson-Stevens Fishery Conservation Management Act

11  NEPA        National Environmental Policy Act

12  NMFS        National Marine Fisheries Service

13  PST         Pacific Salmon Treaty

14  SEAK        Southeast Alaska

15  SRKW        Southern Resident Killer Whale

16

17

18

19

20

21

22

23

24

25

26

27

28

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          iv

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

**INTRODUCTION**

Plaintiff Wild Fish Conservancy endeavors to close down a conservation program aimed at providing more prey for endangered Southern Resident killer whales (SRKW) and to invalidate a 2019 Biological Opinion (BiOp) issued by the National Marine Fisheries Service (NMFS) that analyzed the funding for the conservation program and the impact of Southeast Alaska (SEAK) fisheries on SRKW and threatened Chinook salmon. The Report and Recommendation recommends granting the motion for summary judgment that Plaintiff filed in support of its endeavor. Dkt. # 111. Defendants hereby submit their objections to the merits analysis in the Report and Recommendation. *See id*. at 25-38.

The conservation funding program is a proposed action that fits comfortably within the concept of a framework programmatic action contemplated by the Endangered Species Act (ESA) implementing regulations. The Report and Recommendation views this framework programmatic action through the lens of incidental take, but the regulations are not so narrow. A framework programmatic action is an acceptable form of agency "action," and the regulations anticipate that the consulting agency will analyze the "effects" of such a program even if the level of "take" can be identified only in the future. *See* 80 Fed. Reg. 26,832, 26,833-35 (May 11, 2015). The effects of this program include tangible benefits to SRKW and Chinook salmon. Contrary to the conclusion reached by the Report and Recommendation, the program satisfies the requirements established by case law for mitigation measures. In particular, the case is similar to *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515 (9th Cir. 1998). Further, the Report and Recommendation's conclusion on NMFS's analysis of the impact of the prey increase program on Chinook salmon is not supported by the record.

The Report and Recommendation's determination that the Court should grant Plaintiff's National Environmental Policy Act (NEPA) claim is also flawed. The Court should reject Plaintiff's invitation to cast NMFS's position on NEPA as being governed by *Center for Biological Diversity v. Haaland*, 998 F.3d 1061 (9th Cir. 2021). Stated simply, NMFS's view of *Ramsey v. Kantor*, 96 F.3d 434 (9th Cir. 1996), is not a final agency action subject to review under the Administrative Procedure Act (APA). In any event, NMFS met its NEPA obligations

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          1

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

for the two proposed actions for which take was authorized in the BiOp, specifically with the 2012 Environmental Assessment (EA) on the management of salmon fishing in federal waters off Southeast Alaska, including continued delegation of management of fishing in federal waters to the State of Alaska, and with the Categorical Exclusion determination for the funding of grants to Alaska. Also, NMFS has performed site-specific NEPA analysis for specific hatchery programs that have received funding through the prey increase program.

## STANDARD OF REVIEW

Following a Report and Recommendation by a magistrate judge, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings and recommendations." 28 U.S.C. § 636(b)(1); *see* Fed. R. Civ. P. 72(b)(3).

## OBJECTIONS

### I.    The Court Should Reject the Analysis of Framework Programmatic Actions.

The Report and Recommendation reaches two conclusions regarding framework programmatic actions, both of which should be rejected. First, the Report and Recommendation states that NMFS "inaccurately applied" framework actions to the conservation program. Dkt. # 111 at 27. In reaching this conclusion, the Report and Recommendation focused on the relationship between framework programmatic actions and incidental take statements (ITSs), *see id.*, but this view presents only part of the regulatory backdrop. Second, the Report and Recommendation states that "programmatic consultations do[] not nullify the Ninth Circuit's stated requirements for mitigation measures." *Id.* But Defendants have not argued that a framework programmatic action allows the agency to avoid the requirements for mitigation.

Considering the ESA regulations as a whole shows that NMFS's conservation program falls squarely within the concept of a framework programmatic action and that NMFS properly conducted an effects analysis pursuant to ESA Section 7, which requires agencies to ensure that "any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species or result in the destruction or adverse modification of habitat." 16 U.S.C. § 1536(a)(2). The ESA regulations, in turn, define

*Defendants' Objections to Report and Recommendation*

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1    "[a]ction" as "all activities and *programs* of any kind authorized, funded, or carried out, in

2    whole or in part, by Federal agencies." 50 C.F.R. § 402.02 (emphasis added). A "[f]ramework

3    programmatic action" means, "for purposes of an [ITS], a Federal action that approves a

4    framework for the development of future action(s) that are authorized, funded, or carried out at

5    a later time, and any take of a listed species would not occur unless and until those future

6    action(s) are authorized, funded, or carried out and subject to further section 7 consultation." *Id.*

7          The Report and Recommendation found "no indication that the mitigation itself to find

8    'no jeopardy' can be a site-specific or framework programmatic action," reasoning that deferred

9    consultation for purposes of take can "only occur once an action is found to pose no jeopardy to

10   listed species under ESA section 7." Dkt. # 111 at 27. Yet this approach rests on a flawed

11   interpretation of the ESA regulations and NMFS's application of those regulations to the

12   conservation program. Although the conservation program partially mitigates, through increased

13   hatchery production, impacts from U.S. salmon fisheries—including the fisheries subject to the

14   delegation of authority to the State in the federal waters off Southeast Alaska—the conservation

15   program is broader than that: it is a stand-alone proposed action intended to benefit SRKW and

16   Puget Sound Chinook salmon through habitat restoration and hatchery programs. It could have

17   its own impacts on ESA-listed species, and NMFS therefore conducted an analysis of the effects

18   of the conservation program as a framework action and that analysis supported NMFS's no-

19   jeopardy determination for the three proposed actions.

20         This approach to the program as an action is fully supported by the NMFS and U.S. Fish

21   and Wildlife Service (FWS) (together, the Services) rulemaking that added the "framework

22   programmatic action" definition to the regulations. 80 Fed. Reg. 26,832. The preamble to the

23   rulemaking explains that a program "may include a collection of activities of a similar nature, a

24   group of different actions proposed within a specified geographic area, or an *action adopting a*

25   *framework* for the development of future actions." *Id.* at 26,835 (emphasis added). The

26   preamble continues: "[t]hose future actions may be developed at the local, statewide, or national

27   scale," and then provides examples of Federal programs that provide such a framework. *Id.* The

28   primary purpose of NMFS's conservation program is to establish a framework for funding

---

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          3

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

future habitat restoration, conservation hatchery programs for four Puget Sound Chinook salmon populations, and hatchery production of Chinook salmon for consumption by SRKW. This falls under the preamble's description of an action adopting a framework for the development of future actions, and the regulations provide no indication that the program must be excluded because it will also mitigate the effects of other actions considered in the BiOp.

Not only did NMFS accurately characterize the conservation program as a framework programmatic action for purposes of the ESA, the agency also conducted an analysis on the effects of the conservation program and, in the language of the Report and Recommendation, could therefore determine that it would "pose no jeopardy to listed species under ESA section 7." Dkt. # 111 at 27. This approach to the framework programmatic action is supported by the language in the rulemaking indicating that an effects analysis of a framework is appropriate when the program is established even though incidental take resulting from specific actions under the framework will be properly identified and analyzed later in time. The preamble states: "Conducting an *effects analysis on a framework programmatic action* that examines the potential effects of implementing the program is fully consistent with the purposes of a biological opinion." 80 Fed. Reg. at 26,836 (emphasis added). Allowing NMFS to quantify any incidental take when the program is carried out, yet requiring jeopardy analysis when the program is developed, affords NMFS with "substantial flexibility to efficiently and effectively conduct consultation, while ensuring compliances with responsibilities under the ESA." *Id.*

NMFS's application of the framework programmatic description to the conservation funding program was an effort to clarify that it was a framework for future, site-specific actions; it was *not* an effort to avoid the requirements for mitigation measures established in case law, as the Report and Recommendation suggests. *See* Dkt. # 111 at 27.[1] The rulemaking on framework programmatic actions indicates that the analysis of a framework's effects can be "a broad-scale examination of a program's potential impacts on a listed species and its designated critical

---

[1] The Report and Recommendation improperly dismisses Defendants' reference to *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723 (9th Cir. 2020). *See* Dkt. # 111 at 27. *Bernhardt* stated that mitigation measures "must address the threats to the species in a way that satisfies the jeopardy and adverse modification standards." 982 F.3d at 743. That principle can be applied with equal force to framework programmatic actions, and the record shows that the conservation program addresses the threats to SRKW.

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          4

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

habitat." 80 Fed. Reg. 26,836. This language reflects an additional advantage to a framework

programmatic action—it can analyze the benefits and effects of the program holistically.

**II.      The Court Should Reject the Findings on Specificity and Certainty.**

The Court should also reject the Report and Recommendation's analysis on the contours

of the conservation program and the certainty surrounding it. *See* Dkt. # 111 at 27-31.[2] The

record shows that NMFS proposed to fund a prey increase program to produce approximately

20 million smolts annually for 10 years: 5-6 million would come from facilities in Puget Sound,

and 14-15 million would come from facilities on the Washington Coast and Columbia River.

AR 47203. NMFS arrived at these numbers through a calculation that included inputs from a

study conducted by NMFS and the Washington Department of Fish and Wildlife regarding

priority Chinook salmon stocks for SRKW and from its assessment of facilities with capacity to

increase production or to be brought online quickly. AR 37928-30; 16334-41. The prey increase

program included funding of at least $5.6 million per year as grants to hatchery facilities to

increase production of Chinook salmon and would lead to a 4-5% increase in Chinook salmon

available as prey for SRKW, which represents a meaningful increase. AR 47202-03. The other

aspects of the conservation program—conservation hatcheries and habitat restoration—were

marked by similar levels of detail. AR 47202; 47420-32.

The Report and Recommendation focuses less on these specific details and more on

NMFS's recognition that, while the agency had clearly defined the boundaries of the

framework, site-specific aspects would need to be developed in the future. *See* Dkt. # 111 at 28-

29. But this improper balancing leads to an erroneous conclusion when applying the rubric for

mitigation that has been developed in case law. In *Center for Biological Diversity v. Bernhardt*,

the court rejected "unapproved and undefined" mitigation measures and measures that staked

out "possible strategies." 982 F.3d at 743-44. Similarly, in *National Wildlife Federation v.*

---

[2] The Report and Recommendation states: "Despite this finding [that the fisheries would adversely affect SRKW], NMFS approved the maximum harvest limits allowed by the 2019 [Pacific Salmon Treaty (PST)], citing that it would be able to develop and implement mitigation plans." Dkt. # 111 at 27. This is incorrect not only because a BiOp does not "approve" an action, but also because finding that an action adversely affects a species or critical habitat triggers formal consultation, 50 C.F.R. § 402.14(a), (b), and the outcome of that consultation determines whether the action causes jeopardy. *See id.* § 402.14(g)(4).

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP                    5

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1    *NMFS*, the court rejected "unidentified projects," 184 F. Supp. 3d 861, 913 (D. Or. 2016), and

2    in *Center for Biological Diversity v. Salazar*, the court rejected the mitigation measures because

3    they were "entirely unwritten" and not included in the BiOp. 804 F. Supp. 2d 987, 1004 (D.

4    Ariz. 2011). Yet simply because NMFS's conservation program is "less well defined," AR

5    47315, does not mean that it is "undefined." The BiOp included specific funding amounts and a

6    timeline for implementing each element of the program. Further, NMFS identified four

7    populations of Puget Sound Chinook that would be targeted by the conservation hatchery and

8    habitat components. NMFS also identified specific geographic areas that should be prioritized

9    for the increased hatchery production. While certain details of the funding would be determined

10    after the BiOp was issued, NMFS's conservation program clears the bar set by these cases.

11      But Defendants have done more than distinguish three cases that found mitigation to be

12    insufficiently detailed. Defendants have identified analogous cases, including one in the Ninth

13    Circuit, in which the court found similar mitigation measures to be sufficiently specific. In

14    *Southwest Center for Biological Diversity*, FWS proposed short-term and long-term mitigation

15    that would initiate various *programs.* 143 F.3d at 518-19. The short-term mitigation involved "a

16    program to procure and protect alternative compensation habitat" for the Southwestern Willow

17    Flycatcher. *Id.* at 518. Under the program, the action agency had flexibility because it was

18    allowed to "procure and protect approximately 1,400 acres of currently unprotected riparian

19    habitat that is currently used by the Flycatcher, preferably on the Lower Colorado River," but

20    "if insufficient occupied habitat could be identified," the agency could "instead procure and

21    protect high potential, unoccupied habitat." *Id.* Importantly, FWS's mitigation "*did not identify*

22    *specific areas* available and suitable for acquisition and restoration. . . ." *Id.* (emphasis added).

23    The long-term mitigation included "an additional program" of habitat compensation, and the

24    "continued development of the Multi-Species Conservation Program." *Id.* at 518-19.

25      Echoes of these programs can be heard in NMFS's conservation program. Those echoes

26    are especially relevant because the *Southwest Center for Biological Diversity* court upheld the

27    mitigation despite the flexibility, the broad brushstrokes with which the programs were

28    designed, and the delayed benefits. The Report and Recommendation fails to distinguish this

*Defendants' Objections to Report and Recommendation*

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1   case. *See* Dkt. # 111 at 29 n.5. According to the Report and Recommendation, the record in

2   *Southwest Center for Biological Diversity* "demonstrated the amount of acreage required was

3   available" and that there was "'no indication that [the Bureau of Reclamation] cannot acquire

4   and restore the needed replacement habitat as specified in the final [reasonable and prudent

5   alternative] by the required deadlines.'" *Id.* (quoting *Sw. Ctr.*, 143 F.3d at 524). But it is not

6   clear how the case is distinct based on those characteristics. Indeed, the record in this case

7   shows that the "amount of" smolts needed to boost prey by a meaningful amount is available,

8   and there is "no indication" that NMFS cannot acquire those hatchery fish.[3] Consistent with the

9   level of specificity in *Southwest Center for Biological Diversity* (number of acres for habitat),

10  the record here shows that NMFS specified an amount of smolts (approximately 20 million)

11  over 10 years that would lead to a meaningful 4-5% increase in Chinook salmon available as

12  prey for SRKW. AR 47202-03.

13      The Report and Recommendation also errs in its assessment of deadlines and

14  enforceable obligations. *See* Dkt. # 111 at 29. The yearly funding of the program satisfies the

15  requirement for deadlines. AR 47202-03. By comparison, in *Southwest Center for Biological

16  Diversity*, FWS "did *not* mandate that the replacement habitat be established at *a date certain*,"

17  yet that mitigation was nevertheless upheld. 143 F.3d at 518-19 (emphasis added). Moreover,

18  that court upheld as reasonable FWS's determination that the Flycatcher could survive the loss

19  of habitat for 18 months until 500 acres could be protected, survive an additional 2 years until

20  500 more acres could be protected, and survive through the Conservation Program process

21  "until compensation could be made for the historical habitat lost on the Lower Colorado River

22  and until an extensive ecological restoration could be undertaken." *Id.* at 523. If a program

23  lacking a "date certain" and relying on a conservation program's process to be completed is

24  sufficient, then so too is NMFS's program in this case.

[3] The Report and Recommendation incorporates from Plaintiff's motion types of details that are not included in the first and second parts of the conservation program, such as "where fish would be released." Dkt. # 111 at 30-31. But this injects a level of detail that does not find support in the case law or the regulations. Such details are more appropriately analyzed as part of consultations on future, site-specific actions. *See* 80 Fed. Reg. at 26,835 (explaining that the Services "focus the provision of [ITSs] at the action level where such take will result" because "the level of detail available at the program (framework) level is often insufficient to identify with particularity where, when, and how the program will affect listed species").

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          7

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1    Additional certainty comes from the fact that the mitigation measures "are not only

2    'included as part of the project' consulted upon; they actually *are* the project consulted upon."

3    *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 807 F.3d 1031, 1046 (9th Cir. 2015)

4    (emphasis in original) (citation omitted). These factors outweigh any "degree of uncertainty"

5    regarding Congressional funding, and NMFS recognized that a lapse in funding, like a change

6    to any part of the proposed project subject to consultation, could trigger reinitiation. AR 47203.

7    **III.    The Court Should Reject the Analysis of the No-Jeopardy Decision for Salmon.**

8        The Report and Recommendation accepted Plaintiff's contention that NMFS's BiOp

9    was faulty because it did not explicitly mention the prey increase program in the jeopardy

10   section of the BiOp relating to the Chinook salmon. *See* Dkt. # 111 at 31-33. Yet Plaintiff's

11   approach overlooks relevant analysis in the BiOp and thus elevates form over substance. The

12   record shows that NMFS considered the effects of the prey increase program on wild fish in the

13   BiOp. AR 47420-27; 47447. For example, NMFS stated that "hatcheries also pose risks to

14   natural-origin salmon populations" and referenced a number of studies on that particular issue.

15   AR 47447 (citing AR 45960-66; 44008-18; 41057-63; 40917-1051). These effects were then

16   added to the environmental baseline and cumulative effects as part of NMFS's assessment of

17   whether the proposed actions were likely to jeopardize Chinook salmon. Notably, the Report

18   and Recommendation does not address any of these portions of the BiOp, which reveal that

19   NMFS actually made a jeopardy determination on all aspects of the proposed actions, even if

20   not every aspect garnered mention on certain pages of the BiOp. Moreover, courts defer to

21   agencies' ultimate expert judgment despite "gaps and imperfections" in the record. *Sw. Ctr. for*

22   *Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1448 (9th Cir. 1996). Even if there is a

23   "gap" because NMFS did not carry over each piece of the effects analysis into the jeopardy

24   analysis, "the agency's path may be reasonably discerned" and therefore should be upheld. *San*

25   *Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 994 (9th Cir. 2014).

26   **IV.    The Court Should Reject the Conclusion About NMFS's Substantive ESA Duty.**

27       The Report and Recommendation determined that because NMFS's mitigation measures

28   and analysis of Chinook salmon was flawed, NMFS also violated its substantive duty to not

---

*Defendants' Objections to Report and Recommendation*

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1   jeopardize SRKW and Chinook salmon. *See* Dkt. # 111 at 33-34. Defendants object to this

2   conclusion because the BiOp reflects a rational exercise of NMFS's expert judgment, *see supra*,

3   and agencies do not violate their substantive duty when they rely on a valid BiOp. *Pyramid*

4   *Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990).

5   **V.   The Court Should Reject the Report and Recommendation's NEPA Analysis.**

6       A review of the record in this case shows that NMFS has fully satisfied its NEPA

7   obligations for each of the underlying actions: as part of a review of federal fisheries

8   management of salmon in Alaska, the continued delegation of management authority in the

9   federal waters off Southeast Alaska to the State was evaluated in the 2012 EA; the funding of

10  grants to Alaska was covered by a Categorical Exclusion; and the funding awarded pursuant to

11  the conservation program, including the prey increase program, has been (and will continue to

12  be) evaluated in site-specific NEPA reviews prior to implementation. AR 47632-901; Dkt. # 93-

13  2 at 594-97 (Ex. D); Dkt. # 93-4 (Purcell Decl.) ¶¶ 10, 11.[4] Rather than assessing the adequacy

14  of these NEPA determinations, the Report and Recommendation erroneously focuses on

15  whether NMFS's NEPA analysis can be traced to the structural elements of the BiOp, which is a

16  product of an ESA analysis. *See* Dkt. # 111 at 36-38.

17      This flaw is compounded by additional errors in the Report and Recommendation. First,

18  it incorrectly applies *Haaland* to NMFS's view on *Ramsey*. *See id.* at 34-36. The Report and

19  Recommendation errs by interpreting NMFS's reading of *Ramsey* as a final agency action and

20  by resting on an incomplete analysis of the issue since 2003. As a threshold matter, NMFS's

21  view of a judicial opinion set forth in the introduction to an Environmental Impact Statement

22  (EIS) written almost 20 years ago is not an "agency action" under the APA, which defines that

23  term as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent

24  or denial thereof, or failure to act." 5 U.S.C. § 551(13). By contrast, *Haaland* involved two final

25  agency actions taken by FWS under ESA Section 4. 998 F.3d at 1064-67. One action was a

26  decision in 2011 that listing the Pacific walrus under the ESA was warranted, and the other

27

28  _____
    [4] References to material that post-dates the administrative record is appropriate here because Plaintiff has challenged
    an agency inaction. Dkt. # 111 at 4 n.1.

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          9

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1   action was a decision in 2017 that the same species did not warrant listing. *Id.* FWS changed

2   positions between those *decisions* without a rational explanation, and the court found that the

3   agency acted arbitrarily under the APA. *Id.* A similar sequence occurred in *Organized Village of*

4   *Kake v. U.S. Department of Agriculture*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc), which

5   involved a switch between a 2001 Record of Decision and a 2003 Record of Decision. *See* Dkt.

6   # 111 at 35 (citing *Organized Village* at 966). Neither NMFS's perspective on *Ramsey* in the

7   2003 EIS nor its view of whether *Ramsey* applies to the 2019 BiOp is a final agency action

8   subject to review under the APA or its standards. 5 U.S.C. §§ 702, 704, 706. As such, *Haaland*

9   is inapplicable. The Report and Recommendation did not address this threshold issue, and thus

10  its analysis here should be rejected.

11      Moreover, the difference between the 2003 EIS and NMFS's view on whether *Ramsey*

12  applied to the 2019 BiOp and the ITS cannot be fully understood without reviewing events since

13  2003. The section of the 2003 EIS that discussed *Ramsey*'s application to SEAK fisheries was

14  prepared in response to the Ninth Circuit's discussion of the regimes governing Pacific salmon

15  fisheries; NMFS was *not* taking the position that any future issuance of an ITS, including one

16  relating to SEAK fisheries, would require NEPA analysis. AR 47948; 47952-55. Indeed, when

17  NMFS issued an ITS for the BiOp on the 2009 PST Agreement and deferral of management to

18  Alaska, NMFS did not conduct a NEPA review on the issuance of the ITS.[5]

19      NMFS's view that NEPA was not required for issuance of the ITS for the 2019 BiOp—

20  which consulted on the delegation of management authority to Alaska and the funding of grants

21  to Alaska, but not on the 2019 PST—was also influenced by the Ninth Circuit's decision in *San*

22  *Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581 (9th Cir. 2014). The Report and

23  Recommendation acknowledges that *Jewell* "clarified that a BiOp and ITS do not necessarily

24  function as automatic triggers for NEPA review," and invokes the Ninth Circuit's reference to a

25  "downstream federal agency." Dkt. # 111 at 37. Nevertheless, the Report and Recommendation

26  found that there is not a "separate downstream federal agency" here. *Id.* But for SEAK fisheries,

27

28

---

[5] After *Ramsey*, district courts in the Ninth Circuit rejected arguments that the issuance of any ITS by a consulting agency necessarily triggers NEPA analysis. *E.g.*, *City of Santa Clarita v. U.S. Dep't of Interior*, No. CV02-00697 DT (FMOx), 2006 WL 4743970, at *19 (C.D. Cal. Jan. 30, 2006), *aff'd*, 249 F. App'x 502 (9th Cir. 2007).

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          10

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1    NMFS has continued to perform NEPA analysis on the underlying action with environmental

2    impacts—i.e., the delegation of management authority to Alaska. *See supra*. The fact that this

3    analysis was performed "upstream," i.e., before the 2019 BiOp, rather than "downstream" as

4    suggested in *Jewell*, is not distinguishing: the import of *Ramsey* is that NEPA applies to the

5    issuance of an ITS where an underlying action with environmental impacts could "evade[]

6    NEPA review altogether." *Jewell*, 747 F.3d at 644. The Report and Recommendation also

7    indicated that the downstream federal agency needs to be "separate," Dkt. # 111 at 37, but that

8    is not correct because NMFS can wear two hats—it can be the action agency and the consulting

9    agency for the same action. When NMFS wears both hats (and is the sole action agency), as is

10   the case here, there is no "separate" agency undertaking an action that would trigger the

11   requirements of the ESA and NEPA. If the Court agrees that NEPA review is required for

12   issuance of the ITS associated with the 2019 BiOp, that analysis will not be performed by

13   another agency; it will be performed by an office within NMFS.

14          Second, the Report and Recommendation's analogy between issuance of the ITS in the

15   2019 BiOp and issuance of the ITS in *Ramsey* is an error. *See* Dkt. # 111 at 36-37. To clarify,

16   the ITS in the 2019 BiOp covers fishing in both federal and state waters in Southeast Alaska

17   because it covers *two* federal actions: (1) the ongoing delegation to the State of Alaska to

18   regulate fishing in the federal waters off Southeast Alaska under the Magnuson-Stevens Fishery

19   Conservation and Management Act (MSA); and (2) the funding of grants to Alaska. Contrary to

20   Plaintiff's argument and the position in the Report and Recommendation, the first action

21   considered in the 2019 BiOp is *not* "fisheries under the 2019 PST." *Id.* at 37. This distinction

22   between delegation and fishing under the PST matters because it means that the ITS does not

23   serve as "the authorizing document" as it did in *Ramsey*. 96 F.3d at 439. Instead, the authorizing

24   document for the ongoing delegation is the Fishery Management Plan (FMP) for the Salmon

25   Fisheries in the federal waters off Alaska. The Report and Recommendation further states that

26   fishing in Southeast Alaska "could not occur but for the ITS," Dkt. # 111 at 37, but this

27

28

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          11

misreads the ESA because a BiOp and ITS do not independently authorize a federal action.[6] Moreover, the Report and Recommendation fails to take into account the fact that NMFS complied with NEPA for the underlying federal actions related to salmon fishing in Southeast Alaska. The first underlying federal action—delegation—was authorized through amendments to the FMP, including Amendment 12. NMFS complied with NEPA through the 2012 EA on Amendment 12, which was a comprehensive review. AR 47632-901. For the second underlying action—funding of grants to Alaska—NMFS complied with NEPA through a Categorical Exclusion, which is a well-established NEPA process.[7] 40 C.F.R. § 1501.4.

Third, the Report and Recommendation reached an erroneous conclusion on the prey increase program and NEPA. Dkt. # 111 at 37-38. As described above, one of the proposed actions considered in the BiOp was the conservation program, which includes three elements: funding for habitat restoration, conservation hatchery programs, and increased hatchery prey production (the prey increase program). As it pertains to the prey increase program, NMFS has completed the NEPA analysis for all of the funds that have been spent to date on the site-specific hatchery production. Dkt. # 93-4 (Purcell Decl.) ¶¶ 10, 11. As pointed out in the Purcell Declaration, "[s]ome of the hatchery proposals identified as likely candidates for Fiscal Year 2020 funding had already been analyzed under the ESA and NEPA as indicated in Attachment C," and "[f]or the remaining proposals, [the National Oceanic and Atmospheric Administration (NOAA)] required all applicable site-specific ESA and NEPA reviews to be completed before the candidate hatchery programs could receive any of the Fiscal Year 2020 funds." *Id.* ¶ 10. By May 2021, all applicable site-specific NEPA reviews were complete for Fiscal Year 2020 proposals that were identified as likely candidates for funding. *Id.* ¶ 11; *see* Dkt. 93-4 at 189-90.

## CONCLUSION

For these reasons, Defendants respectfully submit that the merits portion of the Report and Recommendation be rejected in its entirety.

---

[6] The BiOp is "a written statement" of NMFS's opinion "detailing how the agency action affects the species or its critical habitat," and the ITS grants an exemption from the ESA's prohibition on take for any taking incidental to that agency action. 16 U.S.C. § 1536(b)(3)(A), (o)(2).

[7] Defendants have not argued, as the Report and Recommendation suggests, that this funding of grants was covered by the 2012 EA. Dkt. # 111 at 34 n.7.

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          12

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

Dated: October 12, 2021                    Respectfully submitted,

                                           TODD KIM
                                           Assistant Attorney General
                                           SETH M. BARSKY
                                           Section Chief
                                           S. JAY GOVINDAN
                                           Assistant Section Chief
OF COUNSEL:
                                           */s/ Frederick H. Turner*
SHEILA LYNCH                               FREDERICK H. TURNER
ROSE STANLEY                               Trial Attorney
Office of General Counsel                  U.S. Department of Justice
National Oceanic and Atmospheric           Environment and Natural Resources Division
      Administration                       Wildlife and Marine Resources Section
Seattle, WA                                Ben Franklin Station, P.O. Box 7611
                                           Washington, D.C. 20044-7611
MOLLY E. WATSON                            Phone: (202) 305-0641
Office of General Counsel                  Fax: (202) 305-0275
National Oceanic and Atmospheric           Email: frederick.turner@usdoj.gov
      Administration
Juneau, AK                                 COBY HOWELL
                                           Senior Trial Attorney
                                           U.S. Department of Justice
                                           c/o U.S. Attorney's Office
                                           1000 SW Third Avenue
                                           Portland, Oregon 97204-2902
                                           Tel: (503) 727-1023 | Fax: (503) 727-1117
                                           Email: Coby.Howell@usdoj.gov

                                           *Attorneys for Defendants*

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP                    13

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Washington by using the CM/ECF system, which will serve a copy of the same on the counsel of record.

> */s/ Frederick H. Turner*
> FREDERICK H. TURNER
> Trial Attorney
> U.S. Department of Justice
> Environment and Natural Resources Division
> Wildlife and Marine Resources Section
> Ben Franklin Station, P.O. Box 7611
> Washington, D.C. 20044-7611
> Phone: (202) 305-0641
> Fax: (202) 305-0275
> Email: frederick.turner@usdoj.gov
>
> *Attorney for Defendants*

*Defendants' Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          14

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641