1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

WILD FISH CONSERVANCY,

9                             Plaintiff,

10        v.

11   SCOTT RUMSEY, *et al.*,[1]

12                             Defendants,

13        and

14   ALASKA TROLLERS ASSOCIATION and
     STATE OF ALASKA,

15

16                             Defendant-Intervenors.

17

Case No. C20-417-RAJ-MLP

REPORT AND RECOMMENDATION

18              **I.    INTRODUCTION**

19        This matter is before the Court on Plaintiff Wild Fish Conservancy's ("WFC") Motion

20   for "Final Order on Relief and for a Temporary Restraining Order and/or a Preliminary

21   Injunction Pending Entry of a Final Order on Relief" ("Plaintiff's Motion"). (Pl.'s Mot. (dkt.

22

23   _____

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Scott Rumsey, the current Acting Regional
Administrator for NMFS, was substituted for Barry Thom as a Defendant in this action. (*See* dkt. # 126 at
1 n.1.)

REPORT AND RECOMMENDATION - 1

# 127).) WFC moves the Court for a final order remanding the National Marine Fisheries

Service's ("NMFS") 2019 Southeast Alaska Biological Opinion ("2019 SEAK BiOp") to remedy

Endangered Species Act ("ESA") and National Environmental Policy Act ("NEPA") violations

previously found by this Court. (*Id.* at 10.) WFC additionally requests: (1) vacatur of the 2019

SEAK BiOp's "take" authorization of Southern Resident killer whale ("SRKW") and Chinook

salmon from commercial harvests during the winter and summer seasons of the Southeast Alaska

troll fisheries; (2) vacatur of the 2019 SEAK BiOp's portions that adopt and consult under

Section 7 of the ESA regarding NMFS's prey increase program; and (3) enjoinment of the prey

increase program.[2] (*Id.*)

NMFS, NMFS West Coast Acting Regional Administrator Scott Rumsey, NMFS

Assistant Administrator Chris Oliver, Secretary of the United States Department of Commerce

Wilbur Ross, Jr., and the United States Department of Commerce ("Government Defendants")

filed a response ("Government Defendants' Response"). (NMFS's Resp. (Dkt. # 133).) In

addition, both Defendant-Intervenor Alaska Trollers Association ("ATA") ("ATA's Response")

and Defendant-Intervenor State of Alaska filed responses ("Alaska's Response"). (ATA's Resp.

(dkt. # 128); State of AK's Resp. (dkt. # 134).) WFC filed a reply. (Pl.'s Reply (dkt. # 138).)

This Court heard oral argument from the parties on November 1, 2022. (Dkt. # 141.)

---

[2] WFC additionally requests a temporary restraining order and/or preliminary injunction vacating the 2019 SEAK BiOp in its requested manner and enjoining the prey increase program until the Court enters its final order on relief. (Pl.'s Mot at 10, 33.) However, WFC's sought immediate and preliminary relief pending a final order cannot be entered by this Court pursuant to this Court's Local Magistrate Judge Rule 4(a) and 28 U.S.C. § 636(b)(1)(B). WFC must instead seek any immediate request for relief from the District Court.

1    Having considered the parties' submissions, oral argument, the balance of the record, and

2    the applicable law, the Court recommends that Plaintiff's Motion (dkt. # 127) be GRANTED in

3    part and DENIED in part, as further explained below.

## II.    BACKGROUND[3]

### A.    Relevant Procedural History

6    On September 27, 2021, this Court issued its Report and Recommendation granting

7    summary judgment in favor of WFC. (R. & R. (dkt. # 111).) In relevant part, this Court found

8    that WFC had sufficient standing to pursue its substantive and procedural ESA claims. (*Id.* at

9    16-25.) This Court further determined that the 2019 SEAK BiOp relied on uncertain mitigation

10   to find no jeopardy to the SRKW and failed to evaluate whether the prey increase program would

11   jeopardize the Chinook salmon, and thus, was arbitrary, capricious, and not in accordance with

12   law under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). (*Id.* at 28-31.) This

13   Court also concluded NMFS failed to conduct necessary NEPA analyses for the issuance of the

14   Incidental Take Statement ("ITS") authorizing "take" associated with the Southeast Alaska

15   salmon fisheries in the 2019 SEAK BiOp, and by adopting the prey increase program without

16   preparing an Environmental Impact Statement ("EIS") or Environmental Assessment ("EA").

17   (*Id.* at 36-38.) This Court's Report and Recommendation was fully adopted by the Honorable

18   Richard A. Jones on August 8, 2022. (Order (dkt. # 122).)

19   On September 7, 2022, WFC filed its Motion. (*See* Pl.'s Mot.) In support of its Motion,

20   WFC attached declarations from: (1) University of Washington Resident Marine Scientist Dr.

21   Deborah Giles (Third Giles Decl. (dkt. # 127-1)); (2) Chicago Zoological Society Senior

22

23   ---
[3] The Court previously laid out a more extensive background of this case in its first Report and
Recommendation. (*See* R. & R. (dkt. # 111) at 2-14.) Accordingly, the Court incorporates its prior
procedural, statutory, and factual background and recites only necessary, additional, and/or contextual
background for this Court's determination of Plaintiff's Motion.

1    Conservation Scientist Emeritus Dr. Robert Lacy (Third Lacy Decl. (dkt. # 127-2)); (3)

2    University of Montana Wildlife Geneticist Dr. Gordon Luikart (Third Luikart Decl. (dkt.

3    # 127-3)); (4) Fisheries Economist Dr. Hans Radtke (First Radtke Decl. (dkt. # 127-4)), and (5)

4    WFC Co-Founder Kurt Beardslee (Third Beardslee Decl. (dkt. # 127-5)).

5           On October 3, 2022, Government Defendants, Defendant-Intervenor ATA, and

6    Defendant-Intervenor State of Alaska all filed responses to Plaintiff's Motion. (*See* NMFS's

7    Resp.; ATA's Resp.; State of AK's Resp.) With its response, Government Defendants submitted

8    declarations from NMFS Alaska Region Acting Assistant Regional Administrator of the

9    Sustainable Fisheries Division Josh Keaton (Keaton Decl. (dkt. # 133-1)), NMFS West Coast

10   Region Protected Resources Division Branch Chief Lynn Barre (Third Barre Decl. (dkt.

11   # 133-2)), NMFS West Coast Region Anadromous Production and Inland Fisheries Branch Chief

12   Allyson Purcell (Third Purcell Decl. (dkt. # 133-3)), and NMFS Regional Administrator Rumsey

13   (Second Rumsey Decl. (dkt. # 133-4)).

14          Defendant-Intervenor ATA submitted declarations from ATA Members Tad Fujioka

15   (Fujioka Decl. (dkt. # 129)) and Paul Olson (Third Olson Decl. (dkt. # 131)), in addition to

16   declarations from Eric Jordan, a Southeast Alaska salmon troller (Jordan Decl. (dkt. # 130)) and

17   the Mayor of the City of Pelican, Alaska, Patricia Phillips (Phillips Decl. (dkt. # 132)).

18   Defendant-Intervenor State of Alaska submitted declarations from Alaska Department of Fish

19   and Game ("ADFG") Fisheries Scientist Danielle Evenson (Evenson Decl. (dkt. # 135)) and

20   ADFG Commissioner Douglas Vincent-Lang (Second Vincent-Lang Decl. (dkt. # 136)) with its

21   response. On October 14, 2022, WFC filed its reply and a second declaration from Dr. Radtke.

22   (Pl.'s Reply; Second Radtke Decl. (dkt. # 139).)

23

1

## B.     Factual Background

2

### i.     The SRKW

3

In 2005, NMFS listed the SRKW population segment as endangered under the ESA.

4   (R. & R. at 8 (citing 50 C.F.R. § 224.101(h); Endangered Status for Southern Resident Killer

5   Whales, 70 Fed. Reg. 69,903 (Nov. 18, 2005)).) Per NMFS and the 2019 SEAK BiOp, the

6   SRKW are at a high risk of extinction and are considered by NMFS to be one of the eight most

7   at-risk species. *See* AR at 15988-89; *see also* AR at 47276 ("[T]he [SRKW] population has

8   declined to historically low levels."). Major threats that led to the SRKW's population decline

9   and subsequent listing under the ESA remain: (1) the decline of salmon; (2) noise and vessel

10  impacts; and (3) habitat destruction and pollution. (R. & R. at 8 (citing AR at 29604, 47276,

11  47282, 47286-90, 47433-34).) A primary limiting factor for SRKW is prey abundance and

12  availability, which has contributed to premature mortality and reduced fertility. (*Id.* (citing AR at

13  47276, 47278, 47282, 47286-87, 47434).) Though the SRKW consume a wide variety of fish

14  species, 80 to 90 percent of the SRKW's diet consists of older and larger Chinook salmon. (*Id.*

15  (citing AR at 47282-83).)

16

As of the filing of Plaintiff's Motion, there are only 73 SRKW, which is down from a

17  high of 98 SRKW in 1995, and 83 SRKW in 2016. (*See* AR at 15988-89; Third Giles Decl. at

18  ¶ 4.) More than 20 percent of the SRKW population is estimated to be in a susceptible state due

19  to weakened body conditions, with two male SRKW presumed to have recently died. (*See* Third

20  Giles Decl. at ¶¶ 8-9, 11, 14.) March 2022 SRKW population modeling predicts that "[t]he

21  long-term population trend [for the SRKW] continues to be a slide toward extinction" and that

22  Chinook salmon prey availability would need to increase by around 5 percent to stop the SRKW

23

1    decline with greater increases in prey availability, or additional protective measures

2    implemented, to achieve population growth toward recovery. (*See* Third Lacy Decl. at ¶¶ 5-6.)

3         Due to the condition of the SRKW population, both the State of Washington and Canada

4    recently undertook emergency actions to protect the remaining SRKW population. (*See* Third

5    Giles Decl. at ¶¶ 10-17, Exs. A-C.) This includes the State of Washington issuing an emergency

6    order to prevent vessels from coming within 0.5 nautical miles of the SRKW after finding at

7    least a dozen SRKW were "vulnerable" and/or in "poor condition." (*Id.* at ¶¶ 10-14, Ex. A.)

8    Canada implemented management measures to protect the SRKW by closing selected Gulf

9    Islands fisheries after the confirmed presence of the SRKW in those waters. (*See id.* at ¶¶ 15-17,

10   Exs. B-C.)

11                 ii.    *Chinook Salmon*

12        The Puget Sound, the Lower Columbia River, the Upper Willamette River, and the Snake

13   River fall-run evolutionary significant units ("ESUs") of Chinook salmon are each listed as

14   threatened under the ESA. (R. & R. at 8 (citing 50 C.F.R. § 223.102(e); Threatened Status for

15   Three Chinook Salmon ESUs in Washington and Oregon, and Endangered Status for One

16   Chinook Salmon ESU in Washington, 64 Fed. Reg. 14,308 (Mar. 24, 1999); Threatened Status

17   for Snake River Spring/Summer Chinook Salmon, Threatened Status for Snake River Fall

18   Chinook Salmon, 57 Fed. Reg. 14,653 (Apr. 22, 1992)).) The primary limiting factors for these

19   Chinook salmon ESUs include harvests, loss of habitat, and hatcheries. (*Id.* (citing AR at 1729,

20   14492, 15761, 15891, 47422-24).) Chinook salmon from these ESUs are all harvested in

21   Southeast Alaska. *See* AR at 47319, 47373-419.

22        Relevant to the subject Chinook salmon ESUs, long-term domestication of hatchery fish

23   harms wild salmon because when hatchery fish are released and interbreed with wild salmon

1   populations, they transfer their genes, ultimately reducing the productivity of the wild fish

2   populations. *See* AR at 30274, 47420, 47422-24. To limit the harm caused by the genetic

3   introgression of hatchery fish, Congress established the Hatchery Scientific Review Group

4   ("HSRG") to develop guidelines to conserve wild salmonid populations through hatchery

5   programs. *See id.* at 10419, 30242. In doing so, the HSRG developed criteria using the "pHOS"

6   metric to denote the "percentage of hatchery origin fish on the spawning grounds." *See e.g.*, *id.* at

7   30259-61. Generally, as pHOS increases, the productivity of the subject wild fish population

8   decreases. *See e.g.*, *id.* at 13546. The HSRG recommends that pHOS levels not exceed 5 percent

9   for some salmon populations and 10 percent for others.[4] (*See id.* at 13545; First Luikart Decl.

10  (dkt. # 91-5) at ¶ 35.) For integrated programs of high conservation importance, the pHOS

11  guidelines per the 2019 SEAK BiOp are a pHOS no greater than 30 percent. *See* AR at

12  47423-24.

13      Per NMFS, pHOS levels that exceed the HSRG criteria are tolerable where the wild fish

14  population is at a high extinction risk and the hatchery is used to reduce short-term extinction

15  risk. *See* AR at 10419; *see also id.* at 47422 ("NMFS believes that hatchery intervention is a

16  legitimate and useful tool to alleviate short-term extinction risk, but otherwise managers should

17  seek to limit interactions between hatchery and natural-origin fish . . . ."), 47424 ("Higher levels

18  of hatchery influence are acceptable in the short term, however, when a population is at high risk

19  or very high risk of extinction due to low abundance."). According to WFC, the average pHOS

20

---

21  [4] Per NMFS Branch Chief Purcell, though NMFS has not formally adopted HSRG recommendations for
    reducing genetics risks by managing pHOS, NMFS finds them "important" and "use[s] them along with
22  other best available science in [its] review of hatchery programs." (Second Purcell Decl. (dkt. # 93-5) at
    ¶¶ 16-17; Third Purcell Decl. at ¶ 7 ("Optimal pHOS will depend upon multiple factors, such as the
23  importance of the population to ESA recovery and the fitness differences between hatchery-origin and
    natural-origin fish . . . In addition, [NMFS] consider[s] the cumulative impacts of all other hatchery
    programs that may be contributing to pHOS for a particular population.").

1    estimates for Chinook salmon populations in areas of the Puget Sound, the Lower Columbia

2    River, and the Washington Coast are "well in excess of levels recommended by the HSRG."[5]

3    (First Luikart Decl. at ¶¶ 51-53; *see also* Third Luikart Decl. at ¶¶ 6-7.)

4              iii.     *Pacific Salmon Treaty and Salmon Fishery Management Plan*

5              Chinook salmon regularly migrate between the United States and Canadian waters, and

6    therefore, fish originating in one country are often caught or "intercepted" by those fishing in the

7    other country. (R. & R. at 9 (citing AR at 523, 47194-95).) To resolve this issue, the United

8    States and Canada ratified the Pacific Salmon Treaty ("PST") in 1985, establishing a framework

9    for the management of Pacific salmon fisheries in those waters that fall within the PST's

10   geographical scope. (*Id.*) The countries entered into the most recent agreement in 2019, which

11   set the current upper harvest limits of Chinook salmon. AR at 47194-95. A "key objective" of the

12   United States in negotiating the 2019 PST was to achieve harvest reductions "to help address

13   ongoing conservation concerns for Puget Sound Chinook salmon and coincidentally provide

14   benefits for SRKWs." AR at 47201-02.

15            NMFS has delegated its authority over Southeast Alaska salmon fisheries in federal

16   waters to the State of Alaska. (R. & R. at 10 (citing 50 C.F.R. § 679.3(f); AR at 502).) Under the

17   Magnuson-Stevens Act, the North Pacific Fishery Management Council ("NPFMC") maintains

18   "authority over the fisheries in the Arctic Ocean, Bering Sea, and Pacific Ocean seaward of

19   Alaska." (*Id.* (citing 16 U.S.C. § 1852(a)(1)(G); AR at 502).) NPFMC first developed a fishery

20   management plan ("FMP") for salmon fisheries in Alaska in 1979 ("Salmon FMP") and has

21   since issued several amended plans. (*Id.* (citing Fisheries of the Exclusive Economic Zone Off

22

23   [5] Per Dr. Luikart, mean pHOS estimates for Chinook salmon populations in rivers in Puget Sound, the
     Lower Columbia River, and the Washington Coast range from a 12 percent mean pHOS for at least one
     river studied between 2010 and 2020 in the Washington Coast up to a 97 percent mean pHOS in another
     river studied in the Lower Columbia from 2010 to 2016. (Third Luikart Decl. at ¶¶ 6-7 (citing Table 1).)

Alaska; Essential Fish Habitat Amendments, 83 Fed. Reg. 31,340 (July 5, 2018)).) Though the Salmon FMP delegates management authority over the fishery in federal waters of Southeast Alaska to the State of Alaska, NMFS retains oversight authority. (*Id.* (citing AR at 515, 561-65).)

The Salmon FMP provides for two salmon fisheries in Southeast Alaska: (1) a commercial troll salmon fishery; and (2) a sport fishery. (R. & R. at 10 (citing AR 514-15).) Harvests are limited to a specific number of "Treaty Chinook salmon" according to the abundance estimate established under the PST. (*Id.* (citing AR at 540-41).) The commercial troll salmon fishery opens on July 1 and targets all remaining Chinook salmon available under the annual quota set pursuant to the PST. AR at 541. The winter and summer seasons together last nearly 10 months each year and are responsible for the vast majority of Treaty Chinook salmon harvested.[6] *See* AR at 540-41, 47318.

Under the PST, the limits on Chinook salmon harvest for Southeast Alaska are set based on abundance for the given year. (AR at 47195, 47205, 47318; *see also* Keaton Decl. at ¶ 17 ("The all-gear catch limit for Southeast Alaska is based on a forecast of the aggregate abundance of Pacific Coast Chinook salmon stocks subject to management under the [PST].").) The ADFG sets annual Chinook salmon harvest consistent with such catch limits for Southeast Alaska. AR at 527-29, 531-32. This catch limit is allocated among the commercial and sport fisheries in Southeast Alaska. (AR at 540-41; *see* Keaton Decl. at ¶ 18.)

---

[6] The winter season runs from October 11 to March 15, and the summer season runs from July 1 to September 30. (AR at 540-41; *see also* Keaton Decl. at ¶¶ 21-22.) WFC represents that the spring season of the troll fishery, which runs from May 1 to June 30 and mostly catches Chinook salmon released from Alaska hatcheries, would not be impacted by its sought relief. (Pl.'s Mot. at 22 (citing AR at 47318).) The spring season of the troll fisheries are conducted along salmon migration routes in close proximity to hatcheries and hatchery release sites to specifically target Alaska hatchery-produced Chinook salmon. (AR at 540-41; *see also* Evenson Decl. at ¶ 10.)

From 2018-2022, the net gear fisheries were allocated an average of 7.78 percent, the sport fishery was allocated an average of 18.44 percent, and the troll fishery was allocated 73.79 percent of the annual all-gear catch limit of Chinook salmon. (*See* Keaton Decl. at ¶ 19.) Any Treaty Chinook salmon not harvested during the winter season are available for harvest in the spring and summer commercial troll seasons. (*See id.* at ¶ 21.) The summer harvest targets the number of Treaty Chinook salmon remaining on the annual commercial troll allocation after the winter and spring season Treaty Chinook salmon harvests are subtracted. (*See id.* at ¶ 22.)

iv.   *2019 SEAK BiOP*

Following the completion of the 2019 PST, NMFS reinitiated consultation under the ESA on the State of Alaska salmon fisheries, and on April 5, 2019, NMFS issued the 2019 SEAK BiOp. (R.& R. at 11 (citing AR at 47173-76, 47193-204).) The 2019 SEAK BiOp considered the combined effects of three actions: (1) NMFS's ongoing delegation of authority over SEAK salmon fisheries in federal waters to Alaska; (2) federal funding to the State of Alaska to meet the obligations of the PST; and (3) funding for a conservation program to benefit Puget Sound Chinook salmon stocks and the SRKW. (*Id.* (citing AR at 47193-204).)

1.   Incidental Take Statement

Relevant to Plaintiff's Motion, the 2019 SEAK BiOp includes an ITS authorizing "take" of the SRKW, in addition to the four threatened Chinook salmon ESUs, allowing for the Southeast Alaska fisheries to harvest salmon up to the limits put in place under the 2019 PST. (R. & R. at 13 (citing AR at 47518-19).) The ITS does not authorize "take" associated with the proposed hatchery and habitat programs for the Chinook salmon ESUs. (*Id.* (citing AR at 47420, 47428, 47433).) Instead, the ITS acknowledges "limited adverse effects to the listed Chinook salmon as a result of increased hatchery production and habitat restoration work associated with

1   the mitigation funding initiative" and that the 2019 SEAK BiOp constitutes a programmatic

2   review of the funding action. (*Id.* (citing AR at 47519 ("[W]e do not provide an exemption from

3   the take prohibition for those actions in this take statement. This will be addressed in future

4   project-specific consultations, 4(d) rule approvals, or determinations of coverage by existing

5   biological opinions.")).)

6       The ITS included in the 2019 SEAK BiOp additionally notes that the Treaty Chinook

7   salmon harvest that may occur under the proposed actions was likely to result "in some level of

8   harm constituting take of SRKW by reducing prey availability" by causing the SRKW to forage

9   for longer periods, travel to alternate locations, or abandon foraging efforts. (R. & R. at 13

10  (citing AR at 47519).) Therefore, NMFS utilized the level of Chinook salmon catch in Southeast

11  Alaska as a surrogate for incidental take of SRKW. (*Id.* ("The extent of take for SRKW is

12  therefore the same as the extent of take for Chinook salmon . . . .).)

13                      2.   Prey Increase Program

14      In addition, and related to Plaintiff's Motion, the third component of the conservation

15  program considered by the 2019 SEAK BiOp is a "prey increase program," which was

16  specifically designed to "increase hatchery Chinook salmon abundance to provide a meaningful

17  increase in prey availability for SRKWs." (R. & R. at 12 (citing AR at 47202-03, 47419-20).)

18  The prey increase program contemplated sought to provide a four to five percent increase in prey

19  availability for the SRKW in approximately 4-5 years. (*Id.* (citing AR at 47202-03).) NMFS

20  proposed spending at least $5.6 million annually on the conservation program in the 2019 SEAK

21  BiOp to release 20 million smolts annually. (*Id.* (citing AR at 47203).)

22      Since the issuance of the 2019 SEAK BiOp, the prey increase program has been fully

23  funded for the past three years. (*See* Second Rumsey Decl. at ¶¶ 7-11; Third Purcell Decl. at ¶ 3,

1    Ex. 1.) Government Defendants represent that the prey increase program is "increasing the prey

2    available to SRKW now," that the "increase in abundance anticipated from the prey increase

3    program will contribute to the overall Chinook abundance, and reduce the potential for [SRKWs]

4    to experience low abundance conditions in general," and that the prey increase program remains

5    "on track to provide the benefits to SRKWs that were anticipated in the [2019 SEAK BiOp]."

6    (*See* Third Barre Decl. at ¶¶ 15, 22; Third Purcell Decl. at ¶¶ 3, 9-10.)

7                                **III.    DISCUSSION**

8          WFC argues that its request for partial vacatur is the most reasonable interim solution

9    because it focuses on the most harmful aspects of NMFS's unlawful actions and will only affect

10   fisheries that have the most impact on the SRKW and threatened Chinook salmon. (Pl.'s Mot. at

11   10-11, 21-22.) Specifically, WFC argues its sought partial vacatur is warranted because vacatur

12   is the presumptive remedy, NMFS's ESA and NEPA violations are serious, and risks to the

13   SRKW and Chinook salmon greatly outweigh any disruptive consequences arising from vacatur.

14   (*Id.* at 22-30.) WFC additionally argues the Court should enjoin NMFS's implementation of the

15   prey increase program until NMFS remediates its BiOp because the prey increase program will

16   irreparably harm wild salmonids and suppress salmon recovery efforts, which poses long-term

17   threats to SRKW. (*Id.* at 30-33.)

18         Government Defendants counter that the Court should remand the 2019 SEAK BiOp to

19   NMFS without vacatur to allow NMFS to undertake additional analysis under the ESA and

20   NEPA and that no form of injunctive relief is appropriate. (NMFS's Resp. at 1, 10-24.) The ATA

21   concurs and argues that WFC's sought vacatur is not warranted as it would provide "a small

22   hypothetical benefit to the SRKW population, but a guaranteed economic disaster" for the

23   Southeast Alaska troll fishery communities and that WFC's sought injunction of the prey

1   increase program opposes an effort otherwise intended to address the prey threat to the SRKW's

2   existence.[7] (ATA's Resp. at 1-2, 7-12.) The State of Alaska similarly contends that remand to

3   NMFS without vacatur is the most appropriate remedy as any resulting closure of the fisheries

4   would cause severe economic impact to the Southeast Alaska troll fishery communities, would

5   achieve no measurable gain in prey availability for the SRKW, and that the prey increase

6   program should not be enjoined because WFC fails to demonstrate that hatchery-origin Chinook

7   salmon are causing irreparable injury to wild stocks and due to the impacts it would have on

8   other Puget Sound and Pacific salmon fishery BiOps and Pacific Northwest FMPs. (State of

9   AK's Resp. at 1-2, 11-13.)

10          Here, as further considered and detailed below, remand of the 2019 SEAK BiOp to

11  NMFS with partial vacatur of the 2019 SEAK BiOp's ITS is warranted. However, the Court

12  declines to vacate or enjoin NMFS's prey increase program, and instead, recommends remand of

13  that challenged portion without vacatur.

14          **A.     Legal Standard**

15          Federal agencies' compliance with the ESA and NEPA is reviewed under the APA. *Ctr.*

16  *for Biological Diversity v. Ilano*, 928 F.3d 774, 779-80 (9th Cir. 2019); *San Luis &*

17  *Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). Under the APA, "an

18

19  ─────────────────────

20  [7] ATA additionally contends that WFC does not have standing to close the Southeast Alaska troll fishery
    because it is unable to satisfy the redressability prong for standing. (ATA's Resp. at 5-7.) But this Court
    already found sufficient redressability exists for WFC's statutory and procedural standing for the ESA

21  and NEPA claims, previously noting that: (1) the "Southeast Alaska fisheries and the prey increase
    program authorized by the 2019 SEAK BiOp have considerable impacts on SRKW population recovery
    and the Chinook salmon ESUs"; and (2) that "[w]ith more Chinook salmon in the population, there would

22  be an increase in prey availability that would help to increase SRKW population recovery, and therefore,
    WFC members' chances of seeing SRKW would likely rise." (R. & R. at 22-23.) Therefore, as previously

23  concluded, an Order favorable to WFC will likely redress its members' injuries "to some degree" despite
    there clearly being other impacts and factors related to the SRKW and Chinook salmon populations. (*Id.*
    at 22.)

1   agency action must be upheld on review unless it is 'arbitrary, capricious, an abuse of discretion,

2   or otherwise not in accordance with law.'" *Jewell*, 747 F.3d at 601 (quoting 5 U.S.C.

3   § 706(2)(A)). A reviewing court "must consider whether the decision was based on a

4   consideration of the relevant factors and whether there has been a clear error of judgment." *Id*.

5   (citation and quotation marks omitted).

6        The APA requires a "presumption of vacatur" if an agency acts unlawfully and this

7   presumption must be overcome by the party seeking remand without vacatur. *350 Mont. v.*

8   *Haaland*, 50 F.4th 1254, 1273 (9th Cir. 2022); *see also All. for the Wild Rockies v. U.S. Forest*

9   *Serv.*, 907 F.3d 1105, 1121-22 (9th Cir. 2018). Full vacatur is the ordinary remedy when a rule

10  violates the APA, and courts deviate "only when equity demands." *Pollinator Stewardship*

11  *Council v. U.S. Env'tl. Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (internal quotation marks

12  omitted); *see also All. for the Wild Rockies*, 907 F.3d at 1121 ("When equity demands, . . . the

13  regulation can be left in place while the agency reconsiders or replaces the action, or to give the

14  agency time to follow the necessary procedures."); *Coal. to Prot. Puget Sound v. U.S. Army*

15  *Corps of Eng'rs*, 466 F. Supp. 3d 1217, 1226-27 (W.D. Wash. 2020), *aff'd* 843 F. App'x 77, 80

16  (9th Cir. Feb. 11, 2021) (finding partial vacatur appropriate where the relevant "equities [were]

17  unclear").

18       Thus, the circumstances in which a remand without vacatur is appropriate are "rare" or

19  "limited." *Cal. Cmties Against Toxics v. U.S. Env'tl. Prot. Agency*, 688 F.3d 989, 992 (9th Cir.

20  2012); *Humane Soc'y v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010). Nevertheless, a district

21  court ultimately possesses "broad latitude" in fashioning equitable relief "when necessary to

22  remedy an established wrong." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 524 F.3d

23  917, 936 (9th Cir. 2008). To that end, "courts may decline to vacate agency decisions when

REPORT AND RECOMMENDATION - 14

1    vacatur would cause serious and irremediable harms that significantly outweigh the magnitude of

2    the agency's error." *Klamath-Siskiyou Wildlands Ctr. v. NMFS*, 109 F. Supp. 3d 1238, 1242

3    (N.D. Cal. 2015).

4        **B.**     **Motions to Strike**

5            As an initial matter, on reply, WFC seeks to strike portions of Defendants' submitted

6    declarations. (Pl.'s Reply at 12-16.) Specifically, WFC argues that the Court should strike

7    various portions of the declarations of: (1) NMFS Branch Chief Barre; (2) NMFS Branch Chief

8    Purcell; (3) ATA Member Olson; (4) NMFS Acting Assistant Regional Administrator Keaton;

9    (5) ATA Member Fujioka; and (6) ADFG Fisheries Scientist Evenson. (*Id.* at 13.) As a result,

10   WFC argues that none of its own experts—specifically Dr. Lacy, Dr. Luikart, and/or Dr.

11   Radtke— have been challenged by credible evidence from Defendants and that Defendants have

12   otherwise failed to present evidence rebutting the proposed impacts to the SRKW's viability

13   anticipated from the sought relief. (*Id.* at 16, 19.)

14           Defendants did not formally file an opposition or response to WFC's requests to strike

15   their declarants, but offered rebuttal at oral argument. (*See* dkt. ## 141, 143.) In sum,

16   Government Defendants argued that WFC's challenges are a "red herring" that unduly focuses

17   on their declarants' qualifications rather than the substance of their declarations. (*See* dkt. # 143

18   at 5:14-20.) ATA and the State of Alaska similarly contended their respective declarants were

19   qualified to opine on their submitted topics, that the relevant standards for admitting the

20   declarations are not rigid, and that there is no risk of prejudice to consideration of the

21   declarations because this remains a non-jury matter.[8] (*See id.* at 7:3-8:6, 8:9-9:17.)

22

23   [8] At oral argument, the Court discussed the possibility of an evidentiary hearing as to the parties'
     declarants. (*See* dkt. # 143 at 11:7-12, 69:20-70:17, 74:2-9, 77:1-9.) But based on the record before the
     Court, and given Defendants' opportunity to respond at oral argument, the Court finds an evidentiary
     hearing is not necessary to adjudicate Plaintiff's motions to strike.

1              *i.*      *Legal Standards*

2         In opposing summary judgment, when a party relies upon evidence that is inadmissible,

3    such evidence can be stricken by the court. *See* Fed. R. Civ. P. 56(c)(2); Local Civil Rule 7(g);

4    *see also Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can only

5    consider admissible evidence in ruling on a motion for summary judgment.") (citation omitted).

6    A declaration used to support or oppose a motion must be based on personal knowledge, set out

7    facts that would be admissible in evidence, and show that the declarant is competent to testify to

8    the matters stated. Fed. R. Civ. P. 56(c)(4).

9         Under the Federal Rules of Evidence, all relevant evidence is admissible unless, *inter*

10   *alia*, the Federal Rules of Evidence provide otherwise. Fed. R. Evid. 402. The Federal Rules of

11   Evidence allow for opinion testimony from both lay and expert witnesses. Fed. R. Evid.

12   701, 702. A lay witness must provide "evidence . . . sufficient to support a finding that the

13   witness has personal knowledge of the matter." Fed. R. Evid. 602. "It is necessary that a lay

14   witness's opinions are based upon . . . direct perception of the event, are not speculative, and are

15   helpful to the determination of factual issues before the jury." *United States v. Freeman*, 498

16   F.3d 893, 905 (9th Cir. 2007) (citation and internal quotations omitted).

17        Federal Rule of Evidence 702 applies to expert witnesses and provides in relevant part:

18        A witness who is qualified as an expert by knowledge, skill, experience, training,
          or education may testify in the form of an opinion or otherwise if: (a) the expert's
19        scientific, technical, or other specialized knowledge will help the trier of fact to
          understand the evidence or to determine a fact in issue; (b) the testimony is based
20        on sufficient facts or data; (c) the testimony is the product of reliable principles and
          methods; and (d) the expert has reliably applied the principles and methods to the
21        facts of the case.

22   Fed. R. Evid. 702. Therefore, it follows that for expert testimony to be admissible under Rule

23   702, it must satisfy three requirements: (1) the expert witness must be qualified; (2) the

REPORT AND RECOMMENDATION - 16

1    testimony must be reliable; and (3) the testimony must be relevant. *See Daubert v. Merrell Dow*

2    *Pharm., Inc.*, 509 U.S. 579, 589-91 (1993). The proponent of expert testimony has the burden of

3    establishing that the admissibility requirements are met by a preponderance of the evidence. *Id.*

4    at 592 n.10; *see also Lust v. Merrell Dow Pharms. Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

5                    ii.        *NMFS Branch Chiefs Barre and Purcell*

6            First, WFC argues that NMFS Branch Chiefs Barre and Purcell are upper management

7    NMFS employees who oversee biologists working in NMFS programs, but that they do not have

8    qualifications to opine on impacts and benefits of fisheries and hatcheries on SRKW and

9    Chinook salmon. (Pl.'s Reply at 13.) WFC notes that Ms. Barre and Ms. Purcell have not

10   provided qualifications to opine on: (1) impacts to prey availability from closing fisheries or

11   halting the prey increase program; (2) genetic impacts to wild Chinook salmon from the prey

12   increase program and related consequences on the SRKW; and (3) the SRKW in general. (*Id.* at

13   13-14.)

14          Relevant to WFC's challenges, the Court must determine whether Ms. Barre and Ms.

15   Purcell are qualified as experts by their "knowledge, skill, experience, training or education." *See*

16   Fed. R. Evid. 702. An expert is considered qualified to provide an opinion if the expert has

17   "sufficient specialized knowledge to assist the jurors in deciding the particular issues in the

18   case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999). Because Rule 702

19   "contemplates a *broad conception* of expert qualifications," only a "*minimal foundation* of

20   knowledge, skill, and experience" is required. *Hangarter v. Provident Life & Accident Ins. Co.*,

21   373 F.3d 998, 1015-16 (9th Cir. 2004) (internal quotations and citation omitted, emphasis in

22   original). Consequently, a "lack of particularized expertise goes to the weight of [the] testimony,

23

not its admissibility." *United States v. Garcia*, 7 F.3d 885, 890 (9th Cir. 1993) (citing *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984).

Here, the Court declines to strike the declarations of NMFS Branch Chiefs Barre and Purcell. Notably, Ms. Barre's duties at NMFS have included leading the recovery program for the SRKW since 2002, which has included working on the endangered listing of the SRKW, designating SRKW critical habitat, and finalizing and implementing a recovery plan for the SRKW, in addition to her work on ESA consultations concerning fisheries actions. (*See* Third Barre Decl. at ¶ 1 (citing First Barre Decl. (dkt. # 43-3) at ¶¶ 1-4; Second Barre Decl. (dkt. # 93-3) at ¶¶ 1-4).) Equally, Ms. Purcell's NMFS background includes work with hatchery operators across the Pacific Northwest to ensure hatchery programs do not jeopardize ESA-listed species, with specific experience evaluating salmon and steelhead hatchery programs since 2002. (Third Purcell Decl. at ¶ 1 (citing First Purcell Decl. (dkt. # 43-5) at ¶¶ 1-4; Second Purcell Decl. (dkt. # 93-5) at ¶¶ 1-4).) Based on the record before the Court, it is clear both Ms. Barre and Ms. Purcell "possess the minimal foundation of knowledge, skill, and experience" from their education, employment, and experience to opine on the SRKW and the Chinook salmon.[9] *See Hangarter*, 373 F.3d at 1015-16.

WFC argues that Ms. Barre and Ms. Purcell provide no factual support, or unreliable factual support, for most of their opinions. (Pl.'s Reply at 14.) Specifically, WFC notes that, though Ms. Barre critiques Dr. Lacy's opinions and makes her own predictions about prey availability based on the fisheries and the prey increase program (*see* Third Barre Decl. at

---

[9] Tellingly, WFC has not previously sought to strike NMFS Branch Chiefs Barre's or Purcell's past submitted declarations based on their qualifications.

1   ¶¶ 9-17), she failed to cite factual support for her conclusions and instead "parrots" the 2019

2   SEAK BiOp for others.[10] (Pl.'s Reply at 14.)

3          The Court disagrees. Pursuant to Rule 702(b), the requirement that expert testimony be

4   based on "sufficient facts or data" requires the Court to engage in "an analysis of the sufficiency

5   of underlying facts or data that is quantitative rather than qualitative." *United States v. W.R.*

6   *Grace*, 455 F. Supp. 2d 1148, 1152 (D. Mont. 2006); *see also* Advisory Committee Notes to

7   2000 Amendments to Fed R. Evid. 702. The requirement "is not intended to authorize a trial

8   court to exclude an expert's testimony on the ground that the court believes one version of the

9   facts and not the other." *W.R. Grace*, 455 F. Supp. 2d at 1152.

10          Here, Ms. Barre and Ms. Purcell both provided relevant factual support for their opinions,

11   including *inter alia* the 2019 SEAK BiOp itself, a Risk Assessment completed by the Pacific

12   Fishery Management Council ("PFMC") Salmon Fishery Management Plan on impacts to

13   SRKW, NMFS's internal status update on the SRKW and prey increase program, and NMFS's

14   other related consultation for PST-funded SRKW hatchery production. (*See* Third Barre Decl. at

15   ¶ 15, Ex. A; Second Purcell Decl., at ¶ 8, Ex. B; Third Purcell Decl. at ¶¶ 4-6, Exs. 1-2.) In any

16   case, the factual support provided by both Ms. Barre and Ms. Purcell for their opinions otherwise

17   goes to the weight, and not their overall admissibility. *See Kennedy v. Collagen Corp.*, 161 F.3d

18   1226, 1230-31 (9th Cir. 1998) ("Disputes as to the strength of [an expert's] credentials, faults in

19   [her] use of [a particular] methodology, or lack of textual authority for [her] opinion, go to the

20   weight, not the admissibility, of [her] testimony." (citation and internal quotation omitted)).

21

---

22   [10] WFC additionally charges that Ms. Purcell provides "multiple impermissible legal opinions," but cites
    only to Ms. Purcell's statement that "NMFS completes all relevant ESA and NEPA reviews ensuring that
    those programs comply with substantive ESA requirements, as well as procedural obligations under
23   NEPA." (Pl.'s Reply at 14 n.2 (citing Third Purcell Decl. at ¶ 5).) Though WFC, as well as this Court,
    disagrees with this characterization of NMFS's fulfillment of its duties in this case, the Court declines to
    strike this portion of Ms. Purcell's declaration.

REPORT AND RECOMMENDATION - 19

1    WFC additionally argues that Ms. Barre and Ms. Purcell's declarations are: (1) improper

2    hearsay; (2) testimony without foundation; and (3) improper lay opinions, and that nearly all

3    portions aside from their introductions are improper. (Pl.'s Reply at 14.) Though WFC highlights

4    portions of the challenged declarations it claims constitutes "impermissible hearsay," WFC fails

5    to specifically elaborate or provide substantive argument on its hearsay, foundation, and

6    improper lay opinion challenges. (See *id.*) It is not enough to present scant argument and leave

7    the Court to do counsel's work. Without more to these challenges, WFC's conclusory assertions

8    are insufficient to strike Ms. Barre's and Ms. Purcell's declarations on these bases. *See e.g.*,

9    *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) (noting the Court will

10   "review only issues which are argued specifically and distinctly" in a party's brief).

11               iii.        *NMFS Assistant Regional Administrator Keaton and ATA Member Olson*

12          Next, WFC argues that the opinions of NMFS Acting Assistant Regional Administrator

13   Keaton and ATA Member Olson should also be stricken as unqualified and unreliable expert

14   testimony, or impermissible lay testimony lacking personal knowledge, because they are not

15   economists. (Pl.'s Reply at 14-15.) WFC notes that Mr. Olson is an attorney and troller who

16   failed to provide any qualifications for his economic opinions, and that both Mr. Olson and Mr.

17   Keaton misused economic terms in attempting to challenge the accuracy of WFC's economic

18   evidence. (*Id.*)

19          The Court declines to strike the declaration of NMFS Acting Assistant Regional

20   Administrator Keaton. With regard to his qualifications, though Mr. Keaton is not an economist,

21   he has set forth that his current duties include managing NMFS's Sustainable Fisheries Division,

22   which includes providing technical and policy advice and assisting in the preparation and review

23   of regulatory documents concerning the fisheries. (*See* Keaton Decl. at ¶ 1.) Prior to his current

administrator role, Mr. Keaton served as the head of NMFS's Sustainable Fisheries Division's

Monitoring Branch, and he has worked for NMFS for over 20 years conducting management of

federal fisheries in Alaska including implementation of the Salmon FMP and other FMPs. (*See*

*id.* at ¶ 2.) Based on his relevant management, policy, and fisheries experience, Mr. Keaton is

sufficiently qualified to opine on the Chinook salmon commercial troll fishery and potential

economic impacts to the fishery.

As to the reliability of Mr. Keaton's opinion, the Supreme Court has noted that the

reliability inquiry is a "flexible one," and while the Supreme Court has suggested several factors

helpful in determining reliability, trial courts are generally given "broad latitude in determining

the appropriate form of the inquiry."[11] *United States v. Wells*, 879 F.3d 900, 934 (9th Cir. 2018)

(quoting *Kumho Tire*, 526 U.S. at 150); *see also Messick v. Novartis Pharm. Corp.*, 747 F.3d

1193, 1196 (9th Cir. 2014) (finding Rule 702 should be applied with a "liberal thrust" favoring

admission) (quoting *Daubert*, 509 U.S. at 588). The reliability inquiry favors admission of

testimony as "[s]haky but admissible evidence is to be attacked by cross examination, contrary

evidence, and attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558,

564 (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 596).

To estimate economic impacts to the Chinook salmon troll fleet, Mr. Keaton analyzed the

"best information available to NMFS," including the number of troll permits issued to the Alaska

troll fleet, the ex-vessel value of the troll fleet, and a report published by the McDowell Group

---

[11] In relevant part, *Daubert* suggested several reliability factors a trial court may examine to determine the reliability of expert testimony, including: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; (4) the existence and maintenance of standards and controls; and (5) whether the theory or technique enjoys general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592-94; *see also Mukhtar v. California State Univ., Hayward*, 299 F.3d 1053, 1064 (9th Cir. 2002).

on the economic impact of the PST on the troll fleet.[12] (*See* Keaton Decl. at ¶¶ 31-41.) Mr.

Keaton concluded that based on his review of these reports, and accounting for ex-vessel value,

he estimated the total annual economic output of the Chinook salmon commercial troll fishery in

the winter and summer seasons to be approximately $29 million. (*Id.* at ¶ 41.) Based on such

review, the Court finds that Mr. Keaton's economic opinion is based on sufficient factual data to

be found reliable given his policy and regulatory experience with the fishery under Rule 702. *See*

*Kumho*, 526 U.S. at 149.

Conversely, ATA Member Olson does not appear to have relevant qualifications to opine

on the economics at issue in this case. Mr. Olson represents that he is an ATA member, a

commercial salmon troller, and an attorney, but that for most of his 27 years of commercial

trolling, between 40 to 70 percent of his income is dependent on fishing. (Third Olson Decl. at

¶¶ 2-5.) This background comports with Mr. Olson's previously submitted declarations. (*See*

First Olson Decl. (dkt. # 23) at ¶¶ 2-4, 6, 8-10; Second Olson Decl. (dkt. # 39) at ¶¶ 2-4, 6, 8-10.)

Mr. Olson now sets forth for the first time in the record that he has "extensive familiarity

with natural resource economics, including economic impact analyses." (Third Olson Decl. at

¶ 11.) From this, Mr. Olson goes on to specifically rebut several of Dr. Radtke's opinions as to

the economic impacts of the Southeast Alaska Chinook salmon troll fishery, ultimately

concluding that "the economic harms to Southeast Alaska fishers and communities vastly exceed

the impacts estimated by WFC's declarants." (*See id.* at ¶¶ 12-44.) But as noted above, Mr.

Olson's overall background and work history do not support "a minimal foundation" to provide

---

[12] ADFG calculates "ex-vessel value" by multiplying the number of salmon caught by the average weight
by the average price per pound. (Keaton Decl. at ¶ 33.)

1   an expert opinion regarding the economics at issue in this case. The Court will thus not consider

2   any such portions of his declaration.[13]

3                iv.        *ATA Member Fujioka and ADFG Fisheries Scientist Evenson*

4         Last, WFC argues the declarations of ATA Member Fujioka and ADFG Fisheries

5   Scientist Evenson should be stricken because Mr. Fujioka does not identify any expertise that

6   would qualify him to opine on assessing the impacts of shutting troll fisheries or to criticize Dr.

7   Lacy's opinion. (Pl.'s Reply at 15.) Similarly, WFC argues Ms. Evenson failed to set forth any

8   experience in fish genetics or population viability analysis modeling to opine on the impacts to

9   the SRKW from enjoining the fisheries, or to opine on the impacts to the Chinook salmon and

10  fisheries from enjoining the prey increase program. (*Id.* at 15-16.)

11        ATA Member Fujioka represents that he is a commercial salmon troller, with a

12  bachelor's degree in engineering and applied sciences, but claims he has "an extensive

13  background in data analysis." (Fujioka Decl. at ¶ 2.) Mr. Fujioka's declaration, however, fails to

14  elaborate any further on his background in data analysis, but instead submits he is a member of

15  the Board of Directors of the Seafood Producers Cooperative and a member of the Sitka Fish and

16  Game Advisory Committee. (*Id.* at ¶¶ 6, 11.) Nevertheless, he does not identify any other

17  specialized experience in data analysis that would qualify him to provide an expert opinion on

18  impacts to the fisheries from closure or to rebut Dr. Lacy's population viability analysis. (*See id.*

19  at ¶¶ 21-35.) The Court therefore precludes Mr. Fujioka's opinions and will not consider them.

20        Ms. Evenson has served as fisheries scientist for the ADFG since January 2020 and

21  represents that she has over two decades worth of experience in fisheries research, natural

22

23  ───────────────
[13] Likewise, Mr. Olson is similarly unqualified to provide any economics opinions based on his personal knowledge of the Southeast Alaska Chinook salmon troll fisheries, and thus, remains unqualified to render any of his economics testimony as lay opinion. *See* Fed. R. Evid. 602.

1    resource policy development and implementation, including serving as a Policy Advisor at the

2    ADFG. (Evenson Decl. at ¶¶ 2-5.) Relevantly, Ms. Evenson has served on the Pacific Salmon

3    Commission's Chinook Technical Committee, and conducted research programs on

4    implementation of salmon hatchery policies to protect wild stocks, Chinook salmon genetic

5    mixed stock analyses of fishery catches, execution of the Chinook chapter of the PST, and a

6    Southeast Alaska Chinook Salmon Fishery Mitigation program. (*Id.* at ¶¶ 3, 5.)

7         Based on her background and experience, Ms. Evenson's has sufficiently demonstrated

8    she is qualified to opine on fish genetics and impacts to the viability of SRKW and Chinook

9    salmon from enjoining the prey increase program. Any further reservations as to Ms. Evenson's

10   lack of particularized expertise in these areas goes to the weight of her opinion, and not its

11   admissibility.

12        **C.      Remedy**

13        The Court has determined that NMFS violated the ESA based on its reliance on uncertain

14   and undeveloped mitigation and its failure to determine whether the mitigation itself would

15   jeopardize threatened Chinook salmon, and that NMFS violated NEPA by making these

16   decisions without any of the required reviews or public processes. (*See* R. & R. at 25-38.) As

17   noted above, the presumptive remedy for such violations is vacatur of the 2019 SEAK BiOp and

18   the ITS for the Southeast Alaska fisheries. *See Haaland*, 29 F.4th at 1177; *All. for the Wild*

19   *Rockies*, 907 F.3d at 1121-22. Despite this presumption, WFC has only requested partial vacatur

20   of: (1) the ITS to the extent it authorizes "take" of SRKW and Chinook salmon from commercial

21   harvests of Chinook salmon in the winter and summer seasons of the Southeast Alaska fisheries;

22   and (2) vacatur and enjoinment of the prey increase program. (*See* Pl.'s Mot at 10.)

23

REPORT AND RECOMMENDATION - 24

1                    *i.        Vacatur*

2          To determine whether vacatur is appropriate, the Ninth Circuit has set out three primary

3    considerations. First, a court is to "weigh the seriousness of the agency's errors against the

4    disruptive consequences of an interim change that may itself be changed." *Nat. Resources Def.*

5    *Council v. U.S. Envt'l Protec. Agency*, 38 F.4th 34, 51 (9th Cir. 2022) (citing *Nat'l Fam. Farm*

6    *Coal. v. U.S. Envt'l Protec. Agency*, 960 F.3d 1120, 1144 (9th Cir. 2020); *Pollinator*

7    *Stewardship Council*, 806 F.3d at 532). Second, a court is to consider "the extent to which either

8    vacating or leaving the decision in place would risk environmental harm." *Id.* at 51-52 (quoting

9    *Nat'l Fam. Farm Coal*, 960 F.3d at 1144). Third, a court is to examine "whether the agency

10   would likely be able to offer better reasoning [and] . . . adopt the same rule on remand, or

11   whether such fundamental flaws in the agency's decision make it unlikely that the same rule

12   would be adopted on remand." *Id.* at 52 (quoting *Pollinator Stewardship Council*, 806 F.3d at

13   532).

14         WFC argues that its partial vacatur request focuses on the most harmful aspects of

15   NMFS's unlawful actions, while minimizing disruptive consequences, because it will only affect

16   fisheries that have the most impact on the SRKW and threatened Chinook salmon. (Pl.'s Mot. at

17   21.) WFC contends that halting the winter and summer commercial troll season harvests would

18   increase prey available to SRKWs by around 4.8 percent.[14] (Pl.'s Mot. at 21-22 (citing Third

19   Lacy Decl. at ¶¶ 8-9).) WFC additionally requests vacatur of those portions of the 2019 SEAK

20   BiOp that adopt, and purport to consult on, the prey increase program because NMFS did not

21   evaluate whether it would jeopardize threatened salmon or comply with NEPA. (*Id.* at 22.)

22

23   _____

[14] WFC argues that its sought relief would not impact or affect other subsistence, recreational, or sport
fishing addressed in the 2019 SEAK BiOp for Chinook salmon, the spring troll fishery season, or other
authorized "take" of Chinook salmon or marine mammals. (Pl.'s Mot. at 22.)

1    Defendants counter that remand without vacatur is the more appropriate solution as WFC

2 misrepresents the "narrow" scope of its sought relief as the Southeast Alaska troll fishery is

3 allocated an average of 73.78 percent of the overall limit for Treaty Chinook salmon in Alaska,

4 and because it underestimates economic impacts on the troll fishery and Southeast Alaska

5 communities. (NMFS's Resp. at 10-11 (citing Keaton Decl. at ¶¶ 18-19, 36, 40); ATA's Resp. at

6 3-4, 7-12; State of AK's Resp. at 3-7 (citing Evenson Decl. at ¶¶ 12-15, 21, Second

7 Vincent-Lang Decl. at ¶¶ 2, 4).) Defendants further argue that vacatur of the prey increase

8 program would immediately cut off funding aimed at replenishing the SRKW food supply,

9 which remains a critical tool to SRKW recovery. (NMFS's Resp. at 11 (citing Third Barre Decl.

10 at ¶ 23); ATA's Resp. at 10, 12; State of AK's Resp. at 11-13.)

11    The Court will consider the relevant factors in turn:

12    1.    Seriousness of Agency Error and Disruptive Consequences

13    First, violations that undermine important congressional objectives of the underlying

14 statute are found to be serious. *See, e.g.*, *W. Watersheds Project v. Zinke*, 441 F. Supp. 3d 1042,

15 1083 (D. Idaho 2020) ("[T]he seriousness of . . . deficiencies . . . should be measured by the

16 effect the error has in contravening the purposes of the statutes in question . . . .") (citation and

17 internal quotations omitted); *see also Wild Fish Conservancy v. Nat'l Park Serv.*, 2014 WL

18 3767404, at *3 (W.D. Wash. July 31, 2014) (finding failure to consider viable alternative of

19 reduced hatchery releases a serious NEPA violation). On this aspect, the Court previously

20 determined that NMFS erred due to its reliance on uncertain and indefinite mitigation measures

21 to find no jeopardy to the SRKW, and its failure to address the prey increase program in its

22 jeopardy analysis for the threatened Chinook salmon ESUs. (*See* R. & R. at 27-34.) NMFS

23

1   additionally failed to provide the proper NEPA procedures for the issuance of the ITS in the

2   2019 SEAK BiOp and in adopting the prey increase program. (*See id.* at 34-38.)

3          Government Defendants argue that the issues identified by the Court are not serious

4   enough errors to warrant vacatur. (NMFS's Resp. at 12-14.) Government Defendants note that

5   courts have chosen to remand without vacatur in similar instances where "not minor" error has

6   been found, and that the seriousness of the errors here with regard to the prey increase program

7   are diluted because every program funded has been subject to subsequent ESA and NEPA

8   compliance.[15] (NMFS's Resp. at 12-13 (citing *Nat'l Fam. Farm Coal. v. U.S. Envt'l Protec.*

9   *Agency*, 966 F.3d 893, 929 (9th Cir. 2020); *WildEarth Guardians v. Steele*, 545 F. Supp. 3d 855,

10  884 (D. Mont. 2021).)

11         Here, the SRKW have been listed as endangered under the ESA since 2005, and remain

12  at a high risk of extinction. *See* 50 C.F.R. § 224.101(h); AR at 15988-89, 47276 ("[T]he [SRKW]

13  population has declined to historically low levels."). The Puget Sound, the Lower Columbia

14  River, the Upper Willamette River, and the Snake River fall-run Chinook salmon ESUs are all

15  also each listed as threatened under the ESA. *See* 50 C.F.R. § 223.102(e). Section 7(a)(2) of the

16  ESA requires federal agencies to ensure their actions do not jeopardize the continued existence

17  of endangered species, and its consultation requirements are purposed to prevent violations of

18  that mandate. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011).

19  NMFS's errors in relying on uncertain and indefinite mitigation measures to find no jeopardy to

20

21  [15] Government Defendants additionally argue that the NEPA violations do not rise to the level of serious
    error because it was procedural, rather than substantive, error and that remand itself will allow NMFS to
22  remedy the violations by releasing new NEPA analyses and determinations. (NMFS's Resp. at 13-14.)
    However, courts consider NEPA violations, other than "mere technical or procedural formalities,"
23  serious. *See Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1244-45. Furthermore, this contention
    ignores that the Court has also found substantive violations of the ESA occurred with regard to both
    NMFS's no jeopardy finding for the SRKW and failure to address the prey increase program in its
    jeopardy analysis for the Chinook salmon ESUs. (R. & R. at 33-34.)

1    the endangered SRKW, failure to address the prey increase program in its jeopardy analysis for

2    the threatened Chinook salmon ESUs, and failure to conduct necessary NEPA analyses are

3    therefore sufficiently serious violations as they clearly undermine central congressional

4    objectives of the ESA and NEPA. *See Zinke*, 441 F. Supp. 3d at 1083, 1086-87; *Nat. Res.*

5    *Defense Council v. E.P.A.*, 489 F.3d 1364, 1374 (D.C. Cir. 2007) ("The agency's errors could

6    not be more serious insofar as it acted unlawfully, which is more than sufficient reason to vacate

7    the rules.").

8         Moreover, Government Defendants' cited authority is distinguishable. In *Nat'l Fam.*

9    *Farm Coal*, the Ninth Circuit found remand without vacatur was appropriate because the "EPA's

10   error—failing to consider harm to monarch butterflies caused by killing target milkweed" was

11   not serious "in light of EPA's full compliance with the ESA and substantial compliance with

12   FIFRA [the "Federal Insecticide, Fungicide, and Rodenticide Act"]." 966 F.3d at 929. And in

13   *WildEarth Guardians*, the district court remanded without vacatur in that case because with

14   "limited exception, the record reflected that Federal Defendants met their statutory obligations"

15   in planning for and implementing a revised forest management plan.[16] 545 F. Supp. 3d at 863,

16   884. No similar full or substantial compliance with the ESA or NEPA on the noted violations has

17   been demonstrated by Defendants in this case.

18        As for "disruptive consequences," the "court largely should focus on potential

19   environmental disruption, as opposed to economic disruption." *N. Plains Res. Council v. U.S.*

20   *Army Corps of Eng'rs*, 460 F. Supp. 3d 1030, 1038 (D. Mont. 2020); *see also In re Clean Water*

21   *Act Rulemaking*, 568 F. Supp. 3d 1013, 1028 (N.D. Cal. 2021) ("[O]ur court of appeals has

22

23   [16] In addition, the district court in *WildEarth Guardians* noted the seriousness of the ESA violations in that case did not favor vacatur due to the environmental harm that would result from vacatur of the revised forest management plan, as a previous and less protective forest management plan would assume its place, and because the errors were limited in scope. 545 F. Supp. 3d at 884.

1    focused more on environmental consequences when considering whether to vacate EPA rules

2    . . . .”). “The ESA . . . did not seek to strike a balance between competing interests but rather

3    singled out the prevention of species [extinction] . . . as an overriding federal policy objective.”

4    *Env’t Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 891 (9th Cir. 2022) (citation

5    and internal quotations omitted). Courts thus “tip” the scale in favor of protecting listed species

6    in considering vacatur. *Klamath-Siskiyou Wildlands Ctr.*, 109 F. Supp. 3d at 1242 (citing *Sierra*

7    *Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987); *see also N. Plains Res. Council*, 460 F.

8    Supp. 3d at 1037-38. Nevertheless, when weighing the appropriateness of vacatur, it also

9    remains common for courts to consider the economic consequences of vacatur. *See e.g.*, *Cal.*

10   *Cmties. Against Toxics*, 688 F.3d at 993-94; *Cook Inletkeeper v. Raimondo*, 541 F. Supp. 3d 987,

11   993 (D. Alaska 2021) (“While Plaintiffs contend that the primary consequences to be considered

12   when assessing the disruptive impact of vacatur are environmental harms, the Ninth Circuit has

13   explicitly considered the economic consequences of vacatur . . . .”).

14          First, with regard to disruptive consequences from vacatur of the ITS, there does not

15   appear to be any environmental disruption stemming from disallowing Chinook salmon harvest

16   permitted by the ITS. Instead, closing the troll fisheries in the manner requested would increase

17   prey available to SRKW. (*See* Third Lacy Decl. at ¶¶ 8, 10.) Though there is uncertainty as to

18   how much prey would ultimately reach the SRKW, the record before the Court suggests that

19   closure of the fisheries meaningfully improves prey available to the SRKW, as well as SRKW

20   population stability and growth, under any scenario. (*Id.* at ¶ 11.)

21

22

23

1        Nonetheless, vacatur of the ITS will result in disruptive economic consequences for the

2 Chinook salmon troll fishery and the economy of Southeast Alaska.[17] WFC estimates an

3 economic impact of around $9.5 million loss in generated annual income in the winter and

4 summer seasons, which WFC estimates would impact about 2.6 percent of the Southeast Alaska

5 seafood industry. (*See* First Radtke Decl. at ¶ 31.) Defendants estimate that the annual economic

6 output of the Chinook salmon commercial troll fleet for the winter and summer seasons fishery

7 to be approximately $29 million. (Keaton Decl. at ¶¶ 40-41.) Several Southeast Alaska

8 communities would also be impacted given their economic reliance on the commercial troll

9 fishery seasons for income, the loss of tax revenue to these communities, and because of existing

10 cost barriers to entry into other salmon fisheries. (*See* Keaton Decl. at ¶¶ 31, 41; Phillips Decl. at

11 ¶¶ 1-9; Second Vincent-Lang Decl. at ¶¶ 4-5, 7.) Though the Court does not take such economic

12 consequences lightly, in this case, they do not overcome the seriousness of NMFS's violations

13 given the presumption of vacatur, the harm posed to the SRKW by leaving the ITS in place and

14 the Court's mandate to protect the endangered species. *See Nat'l Fam. Farm Coal.*, 960 F.3d at

15 1144-45 (vacating pesticide registrations due to EPA's FIFRA violations despite economic

16 impact on farmers who would be required to purchase alternative seeds and pesticides); *see also*

17 *Coal. to Prot. Puget Sound*, 466 F. Supp. 3d at 1225-26.

18        Next—as to disruptive consequences from vacatur of the prey increase program—there

19 appears to be pronounced environmental and economic disruption. The primary limiting factor

20 for SRKW is prey abundance and availability, and a substantial portion of the SRKW's diet

21 consists of Chinook salmon. *See* AR at 47276, 47278, 47282-83, 47286-87, 47434. It is clear

22

23

---

[17] As noted by Government Defendants, vacatur of the ITS in and of itself does not result in a prohibition on fishing, but instead, there is no exemption under Section 9 of the ESA in the event "take" occurs. (NMFS's Resp. at 19-20 (citing 16 U.S.C. § 1536(o)(2); Keaton Decl. at ¶ 31).)

REPORT AND RECOMMENDATION - 30

from the record, including WFC's own experts, that the SRKW require a rapid increase in the abundance of Chinook salmon. (*See* Third Giles Decl. at ¶ 18 ("SRKW need an immediate increase in the abundance of Chinook available to them to avoid functional extinction, as the current low birth rate, with high early mortality is simply unsustainable"); Third Lacy Decl. at ¶¶ 5-6.) Hatchery produced Chinook salmon benefit the SRKW as they support such needed prey availability and contribute to the salmon stocks consumed by the SRKW. (*See* AR at 47286, 47447; Third Barre Decl. at ¶ 11 ("[T]he whales do not distinguish between hatchery produced or wild fish.") As such, a certain and definite increase in prey is available to the SRKW from the prey increase program.

The prey increase program—though previously uncertain and indefinite in the 2019 SEAK BiOp—has also now been funded and begun providing prey the past three years.[18] (*See* Third Purcell Decl. at ¶ 3 ("[T]he prey increase program is on track to provide the benefits to SRKWs that were anticipated in the [2019 SEAK BiOp] on the effects of domestic actions associated with implementing the [2019 PST].");  *id.* at ¶¶ 3, 5, Exs. 1-2; Third Barre Decl. at ¶ 13 ("[W]e anticipate increases in prey abundance are near to or being realized as we reach the 3-5 year maturation time frame following each year of implementation."); Second Rumsey Decl. at ¶¶ 7-11.) Over $5.4 million of funds were distributed by NMFS in the 2022 fiscal year for the prey increase program, with more than 19 million juvenile Chinook salmon released. (*See* Third Purcell Decl. at ¶ 3.)

A disruption to the prey increase program, or its funding, thus appears primed to result in gaps in prey abundance that would lead to increased risk to the health of the SRKW and threaten

---

[18] For all three fiscal years since the 2019 SEAK BiOp, Congress has appropriated funds for implementation of the prey increase program. (*See* Second Rumsey Decl. at ¶¶ 8-10.)

any future operation of the program. (*See* Third Barre Decl. at ¶¶ 16-17 ("[D]isrupting the prey increase program . . . could manifest in the whales foraging for longer periods, traveling to alternate locations, or abandoning foraging efforts."); Third Purcell Decl. at ¶ 9 ("Without continued funding, hatchery operators would likely not spawn addition[al] adult fish next fall to provide increased prey to SRKW."); *see also Native Fish Soc. v. Nat'l Marine Fisheries Serv.*, 2014 WL 1030479 at *4 (D. Or. March 14, 2014) ("In addition to the fact that vacatur would potentially cause serious harm to the species in the near term, vacatur would also be disruptive to the future operation of the Sandy Hatchery by potentially eliminating the possibility of collecting future broodstock . . . .").) Vacatur of the prey increase program would also presumably require the current stock of salmon to be disposed of in some manner, which would be a considerable setback to any future resumption of the program while NMFS attempts to cure the ESA and NEPA violations with the 2019 SEAK BiOp. *See Inst. for Fisheries Res. v. U.S. FDA*, 499 F. Supp. 3d 657, 670 (N.D. Cal. 2020) (finding remand without vacatur appropriate where farm stock of salmon would be presumably destroyed in the interim while FDA reconsidered environmental assessment on remand).

In addition, it appears that vacatur of the prey increase program would have resulting impacts to unrelated fisheries. The prey increase program serves as the environmental baseline for other Puget Sound and PFMC salmon fishery BiOps and Pacific Northwest FMPs, which rely on the program to stay above a Chinook salmon abundance threshold to limit the effects the fisheries have on the SRKW.[19] (*See* AR at 47203-47204 ("[A]lthough the funding initiative is

---

[19] In 2021 and 2020 PFMC BiOps, NMFS assumed that "funding for the conservation program for Puget Sound Chinook salmon and SRKW will continue" as described in the 2019 SEAK BiOp (AR at 47202-47204) "associated with domestic actions related to the 2019 PST Agreement and the program will be implemented during the duration of the new Chinook salmon regime under the 2019 PST agreement." (Evenson Decl. at ¶ 9.)

1    relevant to NMFS'[s] consideration of the SEAK fishery . . . it will likewise be an essential

2    element of [NMFS's] review of future fisheries in Puget Sound and the southern U.S. . . . .

3    Fundamentally, all U.S. fisheries may be affected by decisions made in the event that funding is

4    not provided."); Evenson Decl. at ¶ 9 ("Enjoining the SRKW prey increase program until the

5    Court enters its final order on relief as requested in the Plaintiff's motion will likely have

6    cascading impacts to commercial and recreational fisheries off the coast of Washington, in Puget

7    Sound and other areas.").) Thus, vacatur of the SRKW prey increase program would increase the

8    prospect that Chinook salmon abundances would fall below thresholds specified in other BiOps

9    authorizing fisheries not at issue in this action.

10          On this factor, the Court concludes that the ESA and NEPA violations previously found

11   by the Court are sufficiently serious and that Defendants have not demonstrated that the

12   disruptive consequences of vacating the ITS contained in the 2019 SEAK BiOp in the manner

13   sought by WFC outweighs the seriousness of the violations. Conversely, in the absence of the

14   prey increase program, there would be significant disruptive consequences resulting in a risk of

15   Chinook salmon abundance falling to levels associated with an increased risk to SRKW viability.

16   Therefore, despite the seriousness of NMFS's ESA and NEPA violations with regard to the prey

17   increase program, the disruptive consequences of vacatur of the prey increase program would

18   ultimately put the SRKW at further risk of extinction.

19                              2.    Risk of Environmental Harm

20          Next, the Court is to "consider the extent to which either vacating or leaving the decision

21   in place would risk environmental harm." *Nat'l Fam. Farm. Coal.*, 960 F.3d at 1144-45. Though

22   the parties dispute the effect and extent of resulting benefit that vacatur of the ITS would have on

23   the SRKW, it is undisputed that prey abundance and availability remains a primary factor in

1   helping to restore the SRKW population. (*See* AR at 47276, 47278, 47282-83, 47286-87, 47434;

2   *see also* Third Giles Decl. at ¶ 18; Third Lacy Decl. at ¶¶ 5-6.) Chinook salmon caught in the

3   Southeast Alaska troll fishery are from stocks consumed by the SRKW (*see* Evenson Decl. at

4   ¶ 14, Ex. A), and no party here suggests that there would not be at least some benefit to the

5   SRKW from additional prey availability. The risk of environmental harm to the SRKW from

6   leaving the ITS in place, and by otherwise not allowing for an increased amount of prey to

7   benefit the SRKW, therefore counsels in favor of vacatur of the ITS.

8        On the contrary, vacatur of the prey increase program would assuredly result in

9   environmental harm to the SRKW by eliminating a targeted source of prey. As considered above,

10   the prey increase program was specifically designed to support the SRKW and has been

11   implemented since the 2019 SEAK BiOp issued to increase SRKW prey abundance. (*See* Third

12   Barre Decl. at ¶ 5 ("The prey increase program . . . provides a meaningful increase in prey

13   abundance and benefits SRKWs.").) Without the increased prey provided by the prey increase

14   program, there would be risk of environmental harm to the SRKW's recovery. (*See* Third Barre

15   Decl. at ¶¶ 16 ("In the absence of the intended prey increase, there would be lower overall

16   abundance of Chinook salmon and there could be an elevated risk of Chinook salmon abundance

17   falling to the low abundance levels associated with increased risk to the health of the

18   SRKWs."), 23 ("Enjoining or disrupting the prey increase program would result in fewer

19   Chinook salmon available to SRKW, and increase the risk for harm to SRKW through

20   behavioral and physiological impacts.").)

21        Still, the environmental harm factor is difficult to fully quantify. There is an inherent

22   conflict in this case from the Chinook salmon, a threatened species, serving as priority prey for

23   the endangered SRKW. (*See* Third Barre Decl. at ¶ 22 ("Conservation and recovery of SRKW

1   and their Chinook salmon prey is complex and challenging because . . . we have endangered

2   predators relying on prey, some of which are also threatened or endangered.").) Wild salmon

3   populations are clearly important to the long-term maintenance of the prey populations available

4   to the SRKW, but hatchery production helps to offset the overall historical decline in the

5   abundance of wild salmon, which are sorely needed by the SRKW as prey. *See* AR at 47447.

6   Though it is clear that hatchery production poses some risk to wild salmon populations, *see* AR

7   at 30274, 47286, 47422-24, 47447, such risks can be mitigated to limit any potential negative

8   impacts. (*See* AR at 47424, 47447 ("[H]atchery programs are often modifying various program

9   elements to be able to adaptively manage the program in ways that minimize effects on listed

10  species and allow operators to achieve program goals."); *see also* Third Purcell Decl. at ¶ 7

11  ("Optimal pHOS will depend upon multiple factors, such as the importance of the population to

12  ESA recovery and the fitness differences between hatchery-origin and natural-origin fish.").)

13       Despite the potential environmental harm to the Chinook salmon from the prey increase

14  program, the Court concludes that such risk can conceivably be mitigated to minimize negative

15  effects on the threatened Chinook salmon. But significant interruption of the prey increase

16  program would result in a certain environmental harm to the SRKW by eliminating a targeted

17  source of prey. Such interruption would clearly result in an irreparable negative impact on the

18  recovery of the severely limited SRKW population. *See Ctr. for Food Safety v. Vilsack*, 734 F.

19  Supp. 2d 948, 951 (N.D. Cal. 2010) ("[T]he Ninth Circuit has only found remand without

20  vacatur warranted by equity concerns in limited circumstances, namely serious irreparable

21  environmental injury.").

22

23

1

         3.    <u>Same Rule on Remand</u>

2

        Finally, the Court is to look at "whether [NMFS] would likely be able to offer better

3

reasoning or whether by complying with procedural rules, it could adopt the same rule on

4

remand, or whether such fundamental flaws in the agency's decision make it unlikely that the

5

same rule would be adopted on remand." *Nat'l Fam. Farm. Coal.*, 960 F.3d at 1145 (quoting

6

*Pollinator Stewardship Council*, 806 F.3d at 532).

7

        This factor, though admittedly uncertain, appears to favor vacatur of the ITS and the prey

8

increase program because there is no guarantee the same rule on remand could reissue. NMFS

9

will need to explore, and may indeed require, additional or alternative mitigation measures to

10

meet its ESA and NEPA obligations in a new BiOp. For example, on remand, NMFS will need

11

to consult and consider alternatives not previously explored in the 2019 SEAK BiOp—such as

12

reduced salmon harvests in the Southeast Alaska fisheries in lieu of increased hatchery

13

production. (*See* Pl.'s Reply at 26.) Consequently, "it does not appear 'likely' as opposed to

14

possible" that NMFS will produce the same determination on remand. *Cook Inletkeeper*, 541 F.

15

Supp. 3d at 991-92; *Pollinator Stewardship Council*, 806 F.3d at 532 (finding vacatur

16

appropriate where "a different result may be reached" on remand).

17

        Yet, this factor does not fully counsel in favor of vacatur. With the prey increase

18

program, NMFS now appears poised on remand to remedy deficiencies in the 2019 SEAK BiOp

19

with more specific and definite consideration of the mitigation measures now that they have been

20

funded and in place, and the impacts of the program on the threatened Chinook salmon ESUs can

21

be better quantified and qualified. (*See* Third Purcell Decl. at ¶¶ 3-5, Ex. 2; Second Rumsey

22

Decl. at ¶¶ 7-11.) NMFS also represents that its subsequent site-specific NEPA reviews on the

23

prey increase fund allocations that have occurred since the 2019 SEAK BiOp could be

1   incorporated into a new BiOp. (*See* NMFS's Resp. at 14 (citing Third Purcell Decl. at ¶ 5, Ex.

2   2).) It thus appears NMFS will be able to "offer better reasoning" on remand for the continued

3   operation of the prey increase program. *See Nat'l Family Farm Coal.*, 966 F.3d at 929.

4          In conclusion, given a consideration of the relevant factors and the presumption of

5   vacatur, the Court finds that vacatur of the ITS in WFC's requested manner is appropriate to

6   provide for an increase in prey availability and abundance for the SRKW. However, remand

7   without vacatur of the prey increase program is warranted given the serious and certain risk to

8   prey abundance and availability that would result to the SRKW. *See Nat'l Wildlife Fed'n v. Nat'l

9   Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1129 (D. Or. 2011) (finding vacatur inappropriate

10  where it would remove beneficial measures providing protection for the listed species); *see also

11  Defenders of Wildlife v. Salazar*, 776 F. Supp. 2d 1178, 1187-88 (D. Mont. 2011) ("Even when

12  the rule suffers from some legal deficiency, relying on equity to leave ESA protections in

13  effect—rather than strip them away—while the agency revisits the issue makes sense . . . .").

14          ii.      Injunction

15          WFC has additionally requested that the prey increase program be enjoined.[20] (Pl.'s Mot.

16  at 30-33.) Though the Court has determined that the appropriate remedy for the prey increase

17  program should be remand without vacatur, for purposes of creating a record on this Report and

18  Recommendation, the Court additionally concludes that an injunction on the prey increase

19  program should not be granted.

20

21

22  _____

    [20] WFC represents they have requested an injunction, in addition to remand with vacatur, because it is
23  unclear whether NMFS would implement the prey increase program without a new BiOp and because
    vacatur would not ensure NEPA compliance. (Pl.'s Mot. at 30.) However, NMFS has repeatedly
    represented it could not continue implementing the prey increase program if it were vacated. (NMFS's
    Resp. at 23; *see also* dkt. # 93 at 43.)

1       On the injunction request, WFC centrally claims the prey increase program will cause

2 irreparable injury as it will "further inhibit the prospects of continued survival, much less

3 recovery" of threatened Chinook salmon and that the NEPA violations independently necessitate

4 an injunction. (Pl.'s Mot. at 31 (quoting Third Luikart Decl. at ¶ 20).) Government Defendants

5 argue that no form of injunctive relief is warranted because NMFS has analyzed the effects of the

6 prey increase program on the threatened Chinook salmon at the site-specific level and that

7 potential inhibition of the "prospects of continued survival" of the threatened Chinook salmon is

8 not irreparable harm. (NMFS's Resp. at 22.) Defendants additionally argue that WFC's request

9 would ultimately inhibit an action designed by NMFS to benefit the SRKW by providing them

10 prey, running counter to WFC's asserted concern regarding the SRKW, while simultaneously

11 interfering with other salmon fishery BiOps and FMPs. (*Id.* at 22-23; ATA's Resp. at 12; State of

12 AK's Resp. 13-14.)

13       A plaintiff seeking permanent injunctive relief must satisfy a four-factor test by showing:

14 (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary

15 damages, are inadequate to compensate for that injury; (3) that, considering the balance of

16 hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the

17 public interest would not be disserved by a permanent injunction. *Nat'l Wildlife Fed'n v. Nat'l*

18 *Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018). However, the ESA narrows the

19 preliminary injunction inquiry when an ESA-listed species is involved as it "removes the latter

20 three factors in the four-factor injunctive relief test from [the Court's] equitable discretion." *Id.* at

21 817. Therefore, the Court is to decide only whether the movant has demonstrated irreparable

22 injury. *Id.* at 817-818.

23

1        On this aspect, WFC must therefore demonstrate that irreparable injury "is *likely* in the

2   absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22

3   (2008) (emphasis in original). The "possibility" of irreparable harm cannot support an

4   injunction. *Id.; but see Nat'l Wildlife Fed'n*, 886 F.3d at 817-19 (noting that an "extinction-level

5   threat" to a listed species is also not required).

6        Where "a less drastic remedy" than an injunction is "sufficient to redress [the] injury, no

7   recourse to the additional and extraordinary relief of an injunction [i]s warranted." *Monsanto v.*

8   *Geerston Seed Farms*, 561 U.S. 139, 165-66 (2010) (citation omitted). Here, because the Court

9   has determined that remand without vacatur of the prey increase program is the most appropriate

10  interim solution given the certain risk of harm to the SRKW posed by any potential disruption of

11  the prey increase program, the Court recommends that no injunction on the prey increase

12  program should issue.

13       Moreover, WFC has failed to demonstrate that irreparable injury is "likely" to the

14  threatened Chinook salmon. As considered above, though the Court acknowledges the risk

15  hatchery salmon pose to wild Chinook salmon populations, hatchery influence can be mitigated

16  to minimize effects, and NMFS has set forth evidence in the record that the prey increase

17  program has undergone site-specific evaluations as disbursements have occurred since the 2019

18  SEAK BiOp. (*See* Third Purcell Decl. at ¶ 5, Ex. 2.) WFC also fails to credibly address how

19  irreparable injury to the SRKW would not instead result as a consequence of enjoining the prey

20  increase program.

21              **IV.    CONCLUSION**

22       For the foregoing reasons, the Court recommends that Plaintiff's Motion (dkt. # 127) be

23  GRANTED in part and DENIED in part. Specifically, the Court recommends that: (1) the 2019

1   SEAK BiOp be REMANDED to NMFS to remedy the ESA and NEPA violations previously

2   found by this Court (dkt. ## 111, 122); and (2) portions of the 2019 SEAK BiOp that authorize

3   "take" of SRKW and Chinook salmon resulting from commercial harvests of Chinook salmon

4   during the winter and summer seasons (excluding the spring season) of the troll fisheries be

5   VACATED. The Court further recommends that WFC's request that portions of the 2019 SEAK

6   BiOp that adopt and consult under Section 7 of the ESA on the prey increase program be

7   vacated, and/or enjoined, be DENIED. A proposed Order accompanies this Report and

8   Recommendation.

9         Objections to this Report and Recommendation, if any, should be filed with the Clerk and

10   served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and

11   Recommendation is signed. Failure to file objections within the specified time may affect your

12   right to appeal. Objections should be noted for consideration on the District Judge's motions

13   calendar for the third Friday after they are filed. Responses to objections may be filed within

14   **fourteen (14)** days after service of objections. If no timely objections are filed, the matter will be

15   ready for consideration by the District Judge on **December 30, 2022**.

16         The Clerk is directed to send copies of this Order to the parties and to the Honorable

17   Richard A. Jones.

18         Dated this 13th day of December, 2022.

19

20   MICHELLE L. PETERSON
    United States Magistrate Judge

21

22

23