HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILD FISH CONSERVANCY,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>SCOTT RUMSEY, *et al.*,<br><br>　　　　Defendants,<br><br>　　and<br><br>ALASKA TROLLERS ASSOCIATION,<br><br>　　　　Defendant-Intervenor,<br><br>　　and<br><br>STATE OF ALASKA,<br><br>　　　　Defendant-Intervenor. | Case No. 2:20-cv-417-RAJ-MLP<br><br>DEFENDANTS' RESPONSE TO PLAINTIFF'S OBJECTIONS TO REPORT AND RECOMMENDATION |

*Defendants' Response to Plaintiff's Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

**TABLE OF CONTENTS**

TABLE OF AUTOHRITIES ................................................................................................. ii

TABLE OF ACRONYMS ................................................................................................... iii

INTRODUCTION ................................................................................................................ 1

ARGUMENT ....................................................................................................................... 2

    I.    Plaintiff's Challenges to the Findings Are Misplaced. ................................ 2

        A.  NMFS Is Conducting Site-Specific Reviews for Each Disbursement. ....... 2

        B.  Plaintiff Fails to Show that the Prey Increase Program Will Harm Salmonids ........... 4

        C.  Plaintiff Fails to Recognize that the Prey Program Provides a Meaningful Increase in Food ................................................................................... 5

    II.   Plaintiff Errs in Its Attempt to Tip the Scales in Favor of Vacatur. ............. 6

    III.  Plaintiff's Recycled Assertions About Injunction Fail. ................................. 7

CONCLUSION .................................................................................................................... 8

*Defendants' Response to Plaintiff's Objections to Report and Recommendation*

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

Case No. 2:20-CV-417-RAJ-MLP         i

# TABLE OF AUTOHRITIES

**Cases**                                                              **Page**

*Inst. for Fisheries Res. v. U.S. Food & Drug Admin.*,
    499 F. Supp. 3d 657 (N.D. Cal. 2020) ............................................................................. 7

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000) ........................................................................................ 7

*Monsanto v. Geerston Seed Farms*,
    561 U.S. 139 (2010) ........................................................................................................ 8

*Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*,
    275 F. Supp. 2d 1136 (C.D. Cal. 2002) .......................................................................... 7

*Nat'l Wildlife Fed. v. NMFS*,
    839 F. Supp. 2d 1117 (D. Or. 2011) ............................................................................... 7

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ............................................................................................................ 8

**Regulations**

50 C.F.R. § 402.16 .................................................................................................................. 4

*Defendants' Response to Plaintiff's Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP          ii

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

## TABLE OF ACRONYMS

| | |
|---|---|
| BiOp | Biological Opinion |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy Act |
| NFH | National Fish Hatchery |
| NMFS | National Marine Fisheries Service |
| pHOS | Proportion of Hatchery-Origin Spawners |
| PNI | Proportionate Natural Influence |
| pNOB | Proportion of Natural-Origin Broodstock |
| SEAK | Southeast Alaska |
| SRKW | Southern Resident Killer Whales |

*Defendants' Response to Plaintiff's Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP            iii

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

# INTRODUCTION

In this case, Plaintiff has insisted that a central part of its organizational mission is to ensure the well-being of Southern Resident Killer Whales (SKRW). Dkt. # 91-6 ¶¶ 6, 8-10. Nevertheless, Plaintiff has asked the Court to shut down a National Marine Fisheries Service (NMFS) prey increase program that is aimed squarely at supplementing the SRKW food supply. Dkt. # 127 at 10. The Report and Recommendation recognized the environmental harm that will flow to endangered SRKW if the parts of NMFS's 2019 Biological Opinion (BiOp) pertaining to the prey increase program are vacated or if that program is permanently enjoined. Dkt. # 144 at 30-34. Accordingly, the Report and Recommendation properly recommends that these two forms of remedy not be granted. *Id.* at 37.

Plaintiff has lodged objections to those recommendations and asks the Court to reject them. Dkt. # 151 at 15. But even putting aside the continued inconsistency between Plaintiff's purported mission and its request to shut down the prey increase program, Plaintiff's objections to the Report and Recommendation suffer from at least two flaws. First, Plaintiff fundamentally misunderstands NMFS's site-specific analysis of those hatcheries that have received funds as part of the prey increase program. *Id.* at 10-11. Contrary to Plaintiff's assertions, NMFS has analyzed each site-specific disbursement to ensure compliance with both the Endangered Species Act (ESA) and National Environmental Policy Act (NEPA). Dkt. # 133-3 (Third Purcell Decl.) ¶ 5. Thus, NMFS has and will continue "to limit any potential negative impacts" to wild salmon. Dkt. # 144 at 35.

Second, Plaintiff muddies the waters regarding the benefits of the prey increase program. Plaintiff contends that there is no evidence "demonstrating that the prey increase program will provide a net benefit to SRKWs." Dkt. # 151 at 11. But as the Report and Recommendation stated, "[h]atchery produced Chinook salmon benefit the SRKW as they support such needed prey availability and contribute to the salmon stocks consumed by the SRKW." Dkt. # 144 at 31. The equation is straightforward: more fish in the right places and at the right times will meaningfully increase prey availability.

Defendants' Response to Plaintiff's Objections to
Report and Recommendation

Case No. 2:20-CV-417-RAJ-MLP     1

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1    In the face of these foundational flaws, Plaintiff's arguments about vacatur and
2 injunctive relief collapse. *See* Dkt. # 151 at 13-14. The disruptive consequences of vacating the
3 prey increase program—namely significant harm to SRKW—outweighs the errors, even if they
4 are not minor. Further, Plaintiff has not come close to showing irreparable harm to wild salmon
5 as a result of the continued implementation of the program. In fact, NMFS has taken steps to
6 ensure that any adverse effects of hatchery salmon are considered in site-specific analyses.

7    For these reasons, the Court should affirm and approve the parts of the Report and
8 Recommendation that address the prey increase program, which will continue to provide a
9 much-needed supplement to the SRKW food supply.

## ARGUMENT

### I.  Plaintiff's Challenges to the Findings Are Misplaced.

Plaintiff raises objections to three aspects of the Report and Recommendation's findings on the prey increase program: the impact to salmonids; the site-specific reviews of hatchery production; and the impact to SRKW. *Id.* at 8-11. Defendants' response will first describe the ongoing site-specific reviews because those reviews help ensure that the potential impacts to salmonids are evaluated and minimized.

### A.  NMFS Is Conducting Site-Specific Reviews for Each Disbursement.

As an initial matter, it is important to place NMFS's site-specific review in context. NMFS has established a set of criteria for choosing the hatcheries that receive funding through the prey increase program. Those criteria include a requirement that none of the additional production can jeopardize the survival and recovery of any ESA-listed species, including salmon and steelhead, and a requirement that all hatchery production be reviewed under the ESA and NEPA *before* funding can be utilized. Dkt. # 93-4 (Second Purcell Decl.) ¶ 8; Third Purcell Decl. ¶ 4. Pursuant to these criteria, NMFS has analyzed each disbursement to ensure compliance with the ESA and NEPA. *See* Third Purcell Decl. ¶ 5. This analysis takes different forms depending on the type of ESA and NEPA analysis that has already been completed for each hatchery. In some cases, the effects of an increase in production at the selected hatchery has been fully evaluated in previously completed ESA and NEPA documents because either the

*Defendants' Response to Plaintiff's Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP        2

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1 prior analysis considered a range of production and the increase falls within that range, or the
2 hatchery has reduced production following the original reviews and thus the increase falls
3 within the bounds of the previous analysis. *Id.* In other cases, NMFS has supplemented previous
4 analysis and/or reinitiated consultation. *Id.* To be clear, in all the scenarios, NMFS staff has
5 conducted a site-specific analysis to ensure that the increased production *at each facility* fully
6 complies with the ESA and NEPA.

7       Plaintiff's misstatements regarding the site-specific analyses severely undercut its
8 arguments for vacatur and injunctive relief. According to Plaintiff, NMFS has determined that
9 some disbursements do not require any ESA or NEPA review. Dkt. # 151 at 10. This appears to
10 be a reference to the chart in the Second Purcell Declaration, which included some boxes with
11 "N/A" in the ESA and NEPA columns. Second Purcell Decl. at 189-190 (Att. C). Plaintiff fails
12 to mention that those entries relate to money that was to be spent on either overhead or marking
13 trailers, which are pieces of equipment used to mark hatchery fish to distinguish them from wild
14 fish. *Id.* Both of these items have already been considered as part of the ESA and NEPA
15 analyses for the operation of the hatcheries themselves, thus removing the need for any
16 additional ESA or NEPA compliance. Plaintiff also mistakenly assigns significance to the
17 government's statement that NEPA may not be triggered. Dkt. # 151 at 10. While NMFS made
18 that argument for the funding program, that is distinct from whether NMFS has ensured NEPA
19 compliance for the site-specific hatchery programs receiving funds.

20       Next, Plaintiff suggests that "a BiOp" on production at the Little White Salmon National
21 Fish Hatchery (NFH), Carson NFH, Spring Creek NFH, and Dworshak NFH "does not evaluate
22 increased production under the prey increase program." *Id.* First, Plaintiff has the facts wrong—
23 NMFS completed its BiOp on the first three NFHs in 2007 but completed the BiOp on the
24 Dworshak NFH in 2017. *See* Third Purcell Decl. at 26 (Att. 2) (referring to Att. 2a for the first
25 three and Att. 2b for Dworshak). In addition, before disbursing prey increase program funding
26 for each of these four NFHs, NMFS reviewed the existing BiOps to determine whether they
27 fully evaluated the potential effects of increased production on ESA-listed species. Thus, NMFS
28 was not simply relying on the 2007 and 2017 BiOps, but rather assessing anew whether the

Defendants' Response to Plaintiff's Objections to
Report and Recommendation

Case No. 2:20-CV-417-RAJ-MLP       3

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

increase in production would trigger reinitiation of ESA consultation per 50 C.F.R. § 402.16. For example, in 2022, NMFS funded the release of 2 million smolts from the Spring Creek NFH. Third Purcell Decl. at 22 (Att. 1). Combined with the existing 10.5 million currently produced by the NFH, this was less than the 15.1 million that was evaluated in the 2007 BiOp. *Id.* at 51 (Att. 2a).

In addition to mischaracterizing the salience and scope of the site-specific analyses, Plaintiff erroneously suggests that NMFS "cannot cure a failure to consult at the programmatic level" through site-specific analyses. Dkt. # 151 at 10. But this statement ignores the fact that NMFS has considered the aggregate effects as part of its site-specific analyses. *See* Third Purcell Decl. ¶ 7 ("[W]e consider the cumulative impacts of all other hatchery programs that may be contributing to [proportion of hatchery-origin spawners (pHOS)] for a particular population."); *id.* at 992-99 (Att. 2e). Moreover, the site-specific analyses that have occurred and will continue to occur will help ensure ESA and NEPA compliance while the new programmatic analysis is completed.

In sum, the Report and Recommendation correctly relied upon NMFS's site-specific analyses to support its conclusion that the prey program should continue during the remand.

**B. Plaintiff Fails to Show that the Prey Increase Program Will Harm Salmonids.**

Plaintiff contends that the continuation of the prey increase program will increase pHOS, which in turn will harm threatened Chinook salmon. Dkt. # 151 at 8-10. This assertion is misguided and ignores NMFS's consideration of this exact issue in the site-specific analyses described above.

Plaintiff relies here on Dr. Luikart's First and Third Declarations, but those assessments fail to grapple with the nuances of the prey increase program. In his First Declaration, Dr. Luikart's calculation for pHOS in the Lower Columbia River tributaries incorrectly assumed that all the adult fish returning to the Columbia River basin would return to a small number of tributaries in one area. Second Purcell Decl. ¶ 18. "In fact, the prey increase program is designed to augment a portfolio of stocks that are important to SRKW, so by design it is much broader in geographical span." *Id.* More fundamentally, Dr. Luikart's analysis is oversimplified.

*Defendants' Response to Plaintiff's Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP                    4

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1  Though hatchery-origin fish can pose a risk, "[o]ptimal pHOS will depend upon multiple factors, such as the importance of the population to ESA recovery and the fitness differences between hatchery-origin and natural-origin fish." Third Purcell Decl. ¶ 7. Thus, as NMFS has engaged in its site-specific ESA evaluations, it has considered: where the fish are being released; the origin of the broodstock being used by the hatchery program; how many wild fish are incorporated into the broodstock; whether surplus hatchery fish will be removed at weirs to control pHOS; and the role of the affected populations in the recovery of an evolutionarily significant unit. *Id.* ¶ 8; *see id.* ¶ 7 ("NMFS considers these [multiple] factors in its site-specific ESA evaluations."). It appears that Dr. Luikart has not reviewed these analyses by NMFS, and thus his generalized statements about harm to salmon miss the mark.

NMFS has also been working with the hatchery operators to implement tools that allow it to increase prey for SRKW while simultaneously reducing genetic risks to ESA-listed salmon. Second Purcell Decl. ¶ 19. For example, during development of a BiOp on hatchery programs in the Green/Duwamish River Basins, NMFS "worked with the hatchery operators to implement some key changes in the fall Chinook hatchery program" that the agency expects will substantially increase proportionate natural influence.[1] *Id.* Those changes included the creation of an area focused on natural production, where only natural-origin fish are passed above the weir, and hatchery-origin fish are removed at collection facilities when abundance reaches a certain level. *Id.*

The Report and Recommendation properly concluded that risks from hatchery-origin fish "can be mitigated to limit any potential negative impacts." Dkt. # 144 at 35.

**C. Plaintiff Fails to Recognize that the Prey Program Provides a Meaningful Increase in Food.**

Contrary to Plaintiff's assertions, the Report and Recommendation also properly concluded that a disruption to the prey increase program would harm SRKW. *See* Dkt. # 151 at 11-12. Plaintiff begins its attack on this part of the Report and Recommendation with what

---

[1] A population's proportionate natural influence (PNI) is determined based on pHOS and the proportion of natural-origin fish incorporated into the broodstock (pNOB).

*Defendants' Response to Plaintiff's Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP    5

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1   appears to be a self-defeating statement—Plaintiff contends that the declarations of Allyson
2   Purcell and Lynne Barre "do not provide analyses on how the proposed hatchery *increases*
3   actually *increase* prey availability for SRKWs." *Id.* (emphasis added). In any event, the
4   declarations clearly show that an increase in fish from the hatcheries funded by the program will
5   result in more prey. Indeed, SRKW "do not distinguish between hatchery produced or wild
6   fish," and, based on implementation records, the prey increase program is "on track" to provide
7   the "meaningful increase in prey." Dkt. # 133-2 (Third Barre Decl.) ¶ 11; Third Purcell Decl. ¶
8   3.

9   Plaintiff changes course in the next paragraph when it asserts that the Purcell and Barre
10  declarations do not provide an analysis of the "net result on prey availability." Dkt. # 151 at 11.
11  It is not clear what Plaintiff intends with the addition of the word "net," but to the extent that it
12  refers to a comparison or balancing of the benefit to SRKW and the harm to Chinook salmon,
13  Plaintiff misses the mark because it continues to underestimate the benefits to SRKW, which
14  are tangible, and to overestimate the harm to Chinook salmon, which is being mitigated.

15  **II.     Plaintiff Errs in Its Attempt to Tip the Scales in Favor of Vacatur.**

16  The Report and Recommendation correctly determined that the disruptive consequences
17  of vacating those parts of the BiOp related to the prey increase program outweigh the
18  seriousness of the errors. Dkt. # 144 at 37. In particular, the Report and Recommendation
19  reasoned that remand without vacatur is warranted "given the serious and certain risk to prey
20  abundance and availability that would result to the SRKW." *Id.* Plaintiff's attempt to dispute
21  that conclusion is based on the erroneous arguments discussed above, and therefore should be
22  rejected. *See* Dkt. # 151 at 13-14 (citing Sections III.A.1. – III.A.3). Plaintiff's argument also
23  rests on the flawed assertion that the errors by NMFS are "exceedingly serious." *Id.* at 13. The
24  implementation of the prey increase program as anticipated obviates an "error" that was
25  identified in the 2019 BiOp (*i.e.*, lack of certainty). *See* Dkt. # 149 at 2-3.

26  Plaintiff also paints a distorted picture of the application of NEPA to the prey increase
27  program. Dkt. # 151 at 14. Plaintiff contends that allowing the program to continue during
28  remand would "vitiate" NEPA because "NEPA requires review . . . before a decision is made to

*Defendants' Response to Plaintiff's Objections to*
*Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP                      6

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

1 implement the project." *Id.* But the record shows that the site-specific analyses include
2 determinations under NEPA for each facility, and thus implementation at the hatchery level is
3 consistent with NEPA. Further, Plaintiff's endeavor to analogize this case to others involving
4 NEPA is misplaced because every decision regarding vacatur depends on the particular errors
5 and disruptive consequences. For example, in *Metcalf v. Daley*, 214 F.3d 1135, 1146 (9th Cir.
6 2000), the court's decision to vacate was based in part on the fact that "[u]nlike many of the
7 disputes we are called on to resolve, time here is not of the essence." Here, by contrast, time is
8 of the essence because there is no dispute that prey availability is a priority for SRKW. Also,
9 numerous courts have chosen to remand without vacatur agency actions under the ESA where
10 vacatur would harm species. *See Nat'l Wildlife Fed. v. NMFS*, 839 F. Supp. 2d 1117, 1129 (D.
11 Or. 2011) (holding that "equity can authorize the district court to keep an invalid [action] in
12 place during any remand if it provides protection for listed species within the meaning of the
13 ESA."); *Inst. for Fisheries Res. v. U.S. Food & Drug Admin.*, 499 F. Supp. 3d 657, 670 (N.D.
14 Cal. 2020) ("revoking the approval would presumably require the current stock of salmon to be
15 destroyed, a significant loss of property and animal life that would be wasteful given the real
16 possibility that the [agency] will be able to cure the NEPA and ESA errors on remand"); *Nat.
17 Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1136, 1146 (C.D. Cal. 2002)
18 ("The strong public policy in favor of environmental protection indicates that the Court should
19 resolve uncertainties in estimating the risk of harm from habitat conversion during remand, in
20 the absence of viable critical habitat designations, in favor of retaining the disputed rules.").

21 As the Report and Recommendation aptly noted, a "disruption to the prey increase
22 program, or its funding, thus appears primed to result in gaps in prey abundance that would lead
23 to increased risk to the health of the SRKW and threaten any future operation of the program."
24 Dkt. # 144 at 31-32. Thus, the Court should decline Plaintiff's invitation to vacate those parts of
25 the BiOp that pertain to the timely and essential prey increase program.

26 **III.   Plaintiff's Recycled Assertions About Injunction Fail.**
27 Plaintiff's final contention is a renewed request for the "extraordinary remedy" of
28 permanent injunctive relief shutting down the prey increase program. *Monsanto v. Geerston*

*Defendants' Response to Plaintiff's Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP    7

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

*Seed Farms*, 561 U.S. 139, 165 (2010); *see* Dkt. # 151 at 15-17. This argument sinks when the well-established standard for an injunction is applied.

To obtain a permanent injunction, a plaintiff must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto*, 561 U.S. at 156-57. Plaintiff's primary argument for irreparable injury is that the prey increase program "will likely further increase pHOS levels and thereby further inhibit the prospects for the continued survival, much less recovery." Dkt. # 151 at 16. But a *likelihood* of harm is the standard for a preliminary injunction, not a permanent injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."). The fact is that Plaintiff has not shown irreparable harm. Plaintiff's generalized assertions of harm to wild fish are wholly inadequate. Also, Plaintiff's conclusory statements about a failure to conduct NEPA and public policy are insufficient to show how Plaintiff has been injured and why it is irreparable. Lastly, Plaintiff continues to overlook the site-specific analyses that have occurred. *See supra.*

## CONCLUSION

For these reasons, Defendants respectfully submit that the Court should affirm and approve the parts of the Report and Recommendation that address the prey increase program.

Dated:  January 24, 2023                     Respectfully submitted,

TODD KIM
Assistant Attorney General
S. JAY GOVINDAN
Section Chief

OF COUNSEL:

 /s/ Frederick H. Turner
SHEILA LYNCH                                 FREDERICK H. TURNER
Office of General Counsel                    Senior Trial Attorney

| | |
|---|---|
| National Oceanic and Atmospheric Administration<br>Seattle, WA<br><br>MOLLY E. WATSON<br>Office of General Counsel<br>National Oceanic and Atmospheric Administration<br>Juneau, AK | U.S. Department of Justice<br>Environment and Natural Resources Division<br>Wildlife and Marine Resources Section<br>Ben Franklin Station, P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Phone: (202) 305-0641<br>Fax: (202) 305-0275<br>Email: frederick.turner@usdoj.gov<br><br>COBY HOWELL<br>Senior Trial Attorney<br>U.S. Department of Justice<br>c/o U.S. Attorney's Office<br>1000 SW Third Avenue<br>Portland, Oregon 97204-2902<br>Tel: (503) 727-1023 \| Fax: (503) 727-1117<br>Email: coby.howell@usdoj.gov<br><br>*Attorneys for Defendants* |

*Defendants' Response to Plaintiff's Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP       9

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641

**CERTIFICATE OF SERVICE**

I hereby certify that on January 24, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Western District of Washington by using the CM/ECF system, which will serve a copy of the same on the counsel of record.

/s/ Frederick H. Turner
FREDERICK H. TURNER
Senior Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Phone: (202) 305-0641
Fax: (202) 305-0275
Email: frederick.turner@usdoj.gov

*Attorney for Defendants*

*Defendants' Response to Plaintiff's Objections to Report and Recommendation*

Case No. 2:20-CV-417-RAJ-MLP

10

U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 305-0641