1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
WESTERN DISTICT OF WASHINGTON
AT SEATTLE

WILD FISH CONSERVANCY,

Plaintiff,

vs.

SCOTT RUMSEY, et al.,

Defendants,

and

ALASKA TROLLERS ASSOCIATION
and STATE OF ALASKA,

Intervenor-Defendants.

Case No. 2:20-cv-00417-RAJ-MLP

AMICI CURIAE BRIEF OF ALASKA
CONGRESSIONAL DELEGATION IN
SUPPORT OF DEFENDANTS AND
INTERVENOR-DEFENDANTS

## I.    INTEREST OF AMICI CURIAE[1]

The Amici Curiae are Alaska's members of the United States Congress. The Amici share

a bipartisan interest in ensuring that the nation meets its treaty obligations and protects and

promotes the Pacific Ocean's shared environmental resources in a fair and responsible manner that

does not needlessly disrupt regional fisheries. Amici submit this brief to emphasize their interests

---

[1] Amici state that no counsel for a party authored this brief in whole or in part, and no person made a monetary
contribution to the brief's preparation or submission.

Amici Br. of Alaska Cong. Delegation - 1
No. 2:20-cv-00417-RAJ-MLP


Van Ness
Feldman LLP

1050 Thomas Jefferson Street, NW
Washington, DC 20007
(202) 298-1800

1  in the faithful administration of the carefully balanced policy agreements in the Pacific Salmon

2  Treaty ("Treaty") and to stress the potential impact this Court's decision will have on those

3  interests.

4  ## II.   BACKGROUND AND SUMMARY[2]

5  The Treaty represents decades of international collaboration between the United States and

6  Canada to manage the complexities of Pacific salmon fisheries sustainably, responsibly, and in a

7  manner that mitigates the impacts of those Treaty-protected rights on endangered species. Dkt.

8  144 at 8 (describing U.S. interests and objectives); Dkt. 43-1 at 610 (treaty principles).[3] At the

9  request of the U.S. Pacific Salmon Commissioners,[4] Dkt. 133-4 at 4, Congress has allocated

10  millions of dollars to meet the United States' obligations under the Treaty, including providing

11  funds necessary to implement mitigation and conservation programs. *Id*.

12  Plaintiff, Wild Fish Conservancy, seeks to halt two components of domestic Treaty

13  implementation that, together, are vital to the success of the Treaty's negotiated approach to

14  management: (1) the 2019 Biological Opinion's ("BiOp") incidental take statement ("ITS") for

15  the Southeast Alaska ("SEAK") salmon troll fishery, which allows that fishery to continue

16  operating under limits set by the Treaty; and (2) the prey increase program, which helps

17  incrementally enhance a food source of Southeast Resident Killer Whales ("SRKW") while

18  mitigating Treaty and other fishery impacts. The Magistrate Judge has issued a Report and

19  Recommendation ("R&R") recognizing that the prey increase program Plaintiff seeks to vacate is

20  working; however, it ignores that mitigation when recommending vacatur of the ITS.

21

22

[2] Because the procedural background of this litigation is extensively detailed in the parties' briefing and the Magistrate
23  Judge's Report and Recommendation, it is not repeated here except as necessary to support this brief. The Amici also
agree with Defendants' descriptions of the applicable standards of review.

24  [3] Page numbers refer to the PDF, not the underlying document.

25  [4] The Pacific Salmon Commission is the body formed by the governments of Canada and the United States to
implement the Treaty. The Pacific Salmon Commission is a 16-person body with four commissioners and four
26  alternates from each country representing the interests of commercial and recreational fisheries as well as federal,
state, and tribal governments. Dkt. 43-4 at 3.

Amici Br. of Alaska Cong. Delegation - 2
No. 2:20-cv-00417-RAJ-MLP

**Van Ness**
**Feldman** LLP

1050 Thomas Jefferson Street, NW
Washington, DC 20007
(202) 298-1800

### III.   ARGUMENT

The recommendation in the R&R to vacate the ITS is inconsistent with the Magistrate Judge's own findings, improperly balances the relevant interests and legal authorities, and ignores more pragmatic and appropriate judicial actions. Specifically, the R&R recognizes that the prey increase program Plaintiff seeks to vacate is working, yet ignores the essential mitigation of fishery impacts when recommending vacatur of the ITS. Plaintiff's proposed remedy confuses the applicable balancing test and ignores that, regardless of what occurs on remand, the nation's Treaty obligations will remain unchanged. If this Court enjoins or vacates either of the programs at issue, it will undo the progress Congress has made in conserving endangered species and promoting sustainable fisheries—making remand without vacatur or vacatur held in abeyance the most appropriate judicial action.

### A.   This Court Should Affirm No Vacatur of the Prey Increase Program.

In seeking vacatur and enjoinment of the prey increase program, Plaintiff seeks a remedy that would jeopardize the success of that program and endanger the very species Plaintiff claims it wants to protect. The primary goal of the prey increase program is to provide a four to five percent increase in prey available for SRKW. Dkt. 144 at 11; Dkt. 133-3 at 10-11. Two years ago, the Magistrate Judge found that the program was uncertain, indefinite, and not subject to agency control, Dkt. 111 at 33, but now recognizes that is no longer the case, Dtk. 144 at 31. Congress funds the prey increase program every year with an understanding that the program will both increase prey abundance and enable certain Alaska and Pacific Northwest fisheries to continue, albeit at a reduced level. Given this understanding, Congress is on track to fulfill its commitment to funding the mitigation called for in the 2019 BiOp. *Id.* at 12.

Disrupting the prey increase program now, after careful and deliberate balancing of conservation and allocation interests through the extensive Treaty process, would reverse much of the recognized progress and endanger the wildlife Congress intended to conserve through the Treaty's mitigation and conservation programs. As the R&R concludes, if the program is vacated,



1    "hatchery operators would likely not spawn addition[al] adult fish next fall to provide increased

2    prey to SRKW." Dkt. 144 at 32; Dkt. 133-3 at 5. Hatcheries might also have to release juvenile

3    fish early and without tags that allow for monitoring and managing genetic risk. Dkt. 133-3 at 5-

4    6. This makes them less likely to survive and serve as a food source for SRKWs, and potentially

5    poses a greater risk to endangered species of Chinook salmon. *Id.*; *see also* Dkt. 144 at 32. Based

6    on these potential impacts, the R&R correctly finds that vacating or enjoining the program would

7    put the SRKWs at increased risk. Dkt. 144 at 34.

8       Further bolstering the R&R's conclusion, and of particular interest to the Amici, is that in

9    addition to providing more salmon for SRKWs, the prey increase program is designed to offset

10    Treaty impacts from fisheries. *See* Dkt. 147 at 2 (citing 2019 BiOp at AR47508). The Treaty's

11    fishery limits reflect an effort to "find an acceptable and effective distribution of harvest

12    opportunities and fishery constraints that, when combined with domestic fishery management

13    constraints, would be consistent with the fundamental conservation and sharing objectives of the

14    treaty." Dkt. 43-1 at 200. The Treaty works to balance the interests of fisheries, protected species,

15    and the rights and obligations of impacted states, countries, and tribes. *See id.* at 200-01. The

16    mitigation actions, including the prey increase program, are part of an interdependent management

17    scheme that works to balance and achieve the Treaty's objectives.

18       The R&R also correctly notes that vacatur of the prey increase program would impact

19    fisheries other than those in southeast Alaska because the program serves as an integral component

20    of the environmental baseline for other salmon fisheries operating off the West Coast and in Puget

21    Sound. Dkt. 144 at 32. Those fisheries rely on salmon production from the prey increase program

22    to stay above a Chinook salmon abundance threshold and limit potential fishery impacts on the

23    SRKW. *Id.* at 32-33. As noted in the 2019 BiOp, "[f]undamentally, all U.S. fisheries may be

24    affected by decisions made in the event that funding is not provided," Dkt. 43-1 at 37, and granting

25    the relief Plaintiff seeks would "likely have cascading impacts to commercial and recreational

26    fisheries off the coast of Washington, in Puget Sound and other areas." Dkt. 135 at 4. Vacating or

**Van Ness
Feldman** LLP

1050 Thomas Jefferson Street, NW
Washington, DC 20007
(202) 298-1800

enjoining the prey increase program would also have a significant impact on Tribes in Washington State because they operate most of the hatcheries receiving funding from the prey increase program. *See, e.g.*, Dkt. 133-4 at 19. Because vacating or enjoining the prey increase program would undermine congressional objectives, substitute the Treaty's negotiated policies, cause environmental harm to SRKWs, and disrupt ongoing domestic fisheries, this Court should decline to do so.

### B.     This Court Should Reject the Magistrate's Vacatur of the ITS for the SEAK Salmon Troll Fishery.

The recommendation in the R&R to vacate the ITS for the SEAK Chinook salmon troll fishery misapplies the vacatur standards and fails to consider the Treaty's role in managing the complex web of competing interests and fishery management challenges at issue. If this Court determines sufficient agency error in the ITS, the most appropriate judicial action is either remand without vacatur or vacatur held in abeyance pending resolution of any identified errors on remand.

When determining whether to vacate an invalid agency action, this Court weighs "the seriousness of the agency's errors against 'the disruptive consequences of an interim change that may itself be changed.'" *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 663 (9th Cir. 2022) (quoting *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993) (remanding without vacatur due to unnecessary waste of already invested public resources and harm to agricultural industry))). Generally, when granting injunctive relief, "courts of equity should pay particular regard for the public consequences." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). *See also California Communities Against Toxics*, 688 F.3d at 994 (vacatur unwarranted due to public need for completion of power plant, "economically disastrous" impact of stopping construction on plant, and fact that harms of proceeding were insignificant with mitigation). Seriousness is determined by considering "'whether the agency would likely be able to offer better reasoning or whether by complying with procedural rules, it could adopt the same rule on remand, or whether such fundamental flaws in the agency's decision make it unlikely that the same rule



1050 Thomas Jefferson Street, NW
Washington, DC 20007
(202) 298-1800

1   would be adopted on remand.'" *Ctr. for Food Safety*, 56 F.4th at 663-64 (quoting *Pollinator*

2   *Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015)).

3        Contrary to the R&R, Dkt. 144 at 36, the Treaty, not the National Marine Fisheries Service

4   ("NMFS"), sets SEAK Chinook salmon harvest limits, and one of the Treaty's guiding principles

5   is avoiding undue disruptions to fisheries. Dkt. 43-1 at 609. As described above, the prey increase

6   program, which Congress has funded and which the R&R concludes is working, helps accomplish

7   the Treaty's objectives by mitigating against the already reduced fishing rights of the SEAK

8   Chinook salmon troll fishery. *See*, *e.g.*, Dkt. 43-4 at 13 (FY 2020 Spend Plan for treaty

9   implementation). Yet, when considering the potential environmental harms that might arise from

10  leaving the ITS in place, the Magistrate Judge relied on incorrect calculations, Dkt. 148 at 10

11  (citing Dkt. 135 ¶ 15), and failed to balance or even mention the mitigating benefits of the prey

12  increase program. *See* Dkt. 144 at 26-30. If this Court takes that mitigation into account, the

13  environmental impact associated with not vacating the ITS is negligible. *See* Dkt. 133 at 11

14  (without prey increase program, SEAK fishery estimated to decrease SRKW Chinook salmon prey

15  by average of 0.5%-1.8%). The economic devastation the SEAK fishing communities would

16  experience and the public interests the Treaty aims to protect easily outweigh that negligible

17  environmental impact.

18       Weighing the seriousness of NMFS's perceived errors, the R&R notes that violations

19  "undermin[ing] important congressional objectives of the underlying statute" are serious, Dkt. 144

20  at 26, and that NMFS's "reliance on uncertain and indefinite mitigation measures to find no

21  jeopardy to the SRKW, and its failure to address the prey increase mitigation program"

22  undermined congressional objectives in the Endangered Species Act ("ESA") and the National

23  Environmental Policy Act ("NEPA"). *Id.* at 26-27. This reasoning ignores that the Treaty controls

24  harvest limits for SEAK fisheries and that Congress has reviewed and still continues to fully fund

25  the prey increase program. The mitigation is no longer "uncertain and indefinite," and neither is

26  Congress's intent. On remand, the Treaty still controls, and the 2019 BiOp must reflect the Treaty's

Amici Br. of Alaska Cong. Delegation - 6
No. 2:20-cv-00417-RAJ-MLP



1050 Thomas Jefferson Street, NW
Washington, DC 20007
(202) 298-1800

1  harvest limits and include an ITS for the SEAK Chinook salmon troll fishery. While congressional

2  objectives contained in ESA and NEPA deserve weight, those objectives are not in conflict with

3  those of the Treaty and are appropriately considered here without the need for vacatur.[5] The greater

4  concern, rather, is that vacatur would undermine Congress's complementary objectives under the

5  Treaty, which distinguishes this case from any other case on which the R&R relies, none of which

6  involve treaties.

7        The harm that vacatur would cause outweighs any deficiency in the ITS, because NMFS's

8  asserted violation has been largely remedied and the agency will, more likely than not, justify its

9  decision on remand—this imbalance of detriment should prevent the use of vacatur. *See Am. Water*

10 *Works Ass'n v. EPA*, 40 F.3d 1266, 1273 (D.C. Cir. 1994). Evidence of this harm is well-

11 documented in the record, the R&R, and the briefing of the Defendant and Intervenor-Defendants.

12 Dkt. 144 at 30; Dkt. 149 at 8 (vacatur would result in an estimated $29 million annual loss in an

13 industry that employs hundreds of people); Dkt. 148 at 9; Dkt. 147 at 3, 11-12 (the economic

14 impacts of the remedy will be damning to an entire way of life that has existed for generations).

15 The R&R acknowledges this harm, then applies the vacatur factors in a way that conflicts with

16 both Ninth Circuit and persuasive precedent. The result is a remedy that undermines the objectives

17 of the Treaty and will devastate the troll fishing communities of SEAK.

18       Defendants cite decisions in which the Ninth Circuit, and courts therein, have remanded

19 without vacatur due to competing public interests. Dkt. 149 at 8-9. The application of remand

20 without vacatur as a remedy aligns with the approach of other circuits who use the same *Allied-*

21 *Signal* test. For instance, the D.C. Circuit found vacatur of an ITS unwarranted because it was

22 possible that on remand the agency would correct its error and reach the same result. *Schafer &*

23 *Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1096 (D.C. Cir. 2021). Indeed,

24 courts commonly take such factors into account. *See Cent. Me. Power Co. v. FERC*, 252 F.3d 34,

25

26  ---
[5] For all hatcheries receiving funding through the prey increase program, "NMFS has completed ESA and NEPA analyses or identified existing ESA and NEPA analyses which evaluate all of the effects" of hatchery salmon production. Dkt. 133 at 13.

Amici Br. of Alaska Cong. Delegation - 7
No. 2:20-cv-00417-RAJ-MLP



1050 Thomas Jefferson Street, NW
Washington, DC 20007
(202) 298-1800

48 (1st Cir. 2001) (no vacatur due to public interest in assuring power); *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021) ("Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so") (citation omitted); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs*, 781 F.3d 1271, 1291 (11th Cir. 2015) (relevant consideration in vacatur analysis is impact of mitigation on extent and implications of the agency's error); *California Communities Against Toxics*, 688 F.3d at 992; *Oceana, Inc. v. Pritzker*, 125 F. Supp. 3d 232, 255 (D.D.C. 2015) (remanding but declining to vacate a BiOp for seven fisheries); *Pub. Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 110-15 (D.D.C. 2014) (declining to vacate BiOp and remanding the matter for issuance of an ITS).

Alternatively, this Court could remand and hold any vacatur in abeyance to avoid disruptive consequences. *Anacostia Riverkeeper, Inc. v. Wheeler*, 404 F. Supp. 3d 160, 189 (D.D.C. 2019) (staying vacatur of flawed Clean Water Act pollution limits and citing cases with similar stays); *Indep. U.S. Tanker Owners Comm. v. Dole*, 809 F.2d 847, 855 (D.C. Cir. 1987); *Ctr. for Biological Diversity v. Raimondo*, No. 18-cv-112-JEB, 2022 WL 17039193, at *2 (D.D.C. Nov. 17, 2022) (holding vacatur of BiOp in abeyance to "allow the federal lobster fishery some stability to keep operating, while all stakeholders continue their shared work of implementing corrective measures to secure the future of the right whale in the long term."). Given this authority and the significant harm that would result from vacatur of the ITS, this Court should remand without vacatur or order that any vacatur be held in abeyance pending resolution of any remaining errors on remand.

## IV.   CONCLUSION

Based on the foregoing and arguments in the briefs of Defendant and Defendant-Intervenors, this Court should remand without vacating or enjoining the prey increase program or vacating the ITS for the SEAK salmon troll fishery.



1050 Thomas Jefferson Street, NW
Washington, DC 20007
(202) 298-1800

1     DATED:  The 13th day of March, 2023.

2                                         VAN NESS FELDMAN LLP

3

4                                         *s/ Tyson Kade*
                                        Tyson Kade, WSBA No. 37911

5                                         1050 Thomas Jefferson Street, NW, 7th Floor
                                        Washington, DC 20007-3877

6                                         T: 202-298-1800
                                        E: tck@vnf.com

7                                         *s/ Charlene Koski*
                                        Charlene Koski, WSBA No. 43178

8                                         1191 Second Avenue, Suite 1800
                                        Seattle, WA 98101

9                                         T: 206-623-9372
                                        E: cbk@vnf.com

10                                         *Attorneys for Amici Curiae*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Amici Br. of Alaska Cong. Delegation - 9
No. 2:20-cv-00417-RAJ-MLP



1050 Thomas Jefferson Street, NW
Washington, DC 20007
(202) 298-1800