HONORABLE RICHARD A. JONES

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| WILD FISH CONSERVANCY,<br><br>    Plaintiff,<br><br>v.<br><br>SCOTT RUMSEY, *et al.*,<br><br>    Defendants,<br><br>and<br><br>ALASKA TROLLERS ASSOCIATION, and STATE OF ALASKA,<br><br>    Defendant-Intervenors. | Case No. 2:20-cv-00417-RAJ-MLP<br><br>PLAINTIFF'S RESPONSE TO AMICI CURIAE BRIEF OF ALASKA CONGRESSIONAL DELEGATION IN SUPPORT OF DEFENDANTS AND INTERVENOR-DEFENDANTS |

## I.  INTRODUCTION.

Wild Fish Conservancy ("Conservancy") appreciates the Alaska Congressional Delegation's ("Amici") concerns about economic impacts to Southeast Alaska commercial salmon fishers. The Amici Brief, however, simply rehashes arguments already addressed long after the parties briefed these issues, thereby threatening to further delay relief. The Conservancy respectfully requests that the Court grant its requested relief as expeditiously as possible. Notably, the summer commercial troll fishery season commences on July 1 and preparations begin well-beforehand. All parties would benefit from prompt certainty on relief issues.

PLAINTIFF'S RESPONSE TO
BRIEF OF AMICI CURIAE - 1
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

In arguing that the National Marine Fisheries Service's ("NMFS") unlawful actions should be left in place, Amici provide an incomplete description of the Administrative Procedure Act's ("APA") vacatur standards and fail to overcome the presumption to set aside illegal agency actions. Notably, NMFS violated the Endangered Species Act's ("ESA") obligation to ensure its actions will not jeopardize the continued existence of Southern Resident killer whales ("SRKW") and Chinook salmon by approving Southeast Alaska salmon fisheries in reliance on the legally deficient 2019 biological opinion ("2019 SEAK BiOp"). Dkt. 111 at 33–34. NMFS's errors are not technical, but rather pervasive violations requiring significant further evaluations to comply with the ESA and the National Environmental Policy Act ("NEPA"); efforts that NMFS optimistically estimates it can complete by November 2024. Dkt. 150 ¶ 5. No party can predict what harvest levels NMFS will approve on remand or what mitigation or restrictions will be required to ensure against jeopardy. Amici's proposal that the fisheries be allowed to continue unabated while NMFS evaluates these issues contravenes Congress's policy of "institutionalized caution" embedded in the ESA. *See Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978).

The Conservancy also recognizes the importance of the economic interests upon which the Amici focus. That is why the Conservancy proposes partial vacatur that would leave "take" coverage in place for the vast majority of fisheries authorized by the incidental take statement ("ITS"), even though there is a presumption under the APA that the entire unlawful 2019 SEAK BiOp be vacated. Further, if the relief is granted, the Conservancy is hopeful that it will be able to work with Amici in advocating for federal funding that provides assistance for fishery failures.

II.   ARGUMENT.

A.   **The Court Should Not Allow the Amici Brief to Cause Delay.**

The Amici Brief was filed well-after the parties briefed remedy issues and it does not offer new arguments. The Conservancy is concerned that such filings may delay a final ruling. It is in the parties' interest for the Court to resolve remedy issues as expeditiously as possible, and the Conservancy requests the Court issue its order as quickly as possible to allow all parties to plan for the upcoming summer harvest season that commences on July 1.

PLAINTIFF'S RESPONSE TO
BRIEF OF AMICI CURIAE - 2
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

The "classic role of amicus curiae [is to] assist[] in a case of general public interest, supplement[] the efforts of counsel, and draw[] the court's attention to law that escaped consideration." *Miller-Wohl Co. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982). Amicus briefs should be "timely, useful, or otherwise necessary to the administration of justice." *United States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991). There is no deadline in this Court for amicus briefs. *Wagafe v. Biden*, No. 17-CV-00094-LK, 2022 U.S. Dist. LEXIS 27279, at *8 (W.D. Wash. Feb. 15, 2022). However, such briefs are generally to be filed contemporaneously with those of the parties. *See* Fed. R. App. P. 29(a)(6); Sup. Ct. R. 37(3).

The Amici do not draw the Court's attention to issues that have otherwise escaped consideration, but instead rehash arguments already addressed. The Amici Brief was filed nearly five months after remedy briefing before the Magistrate Judge and six weeks after the parties had fully briefed objections to the R&R. *See* Dkt. Nos. 138, 156. Introducing new briefs now—briefs that offer no new argument or information—threatens to unnecessarily delay needed relief.

Delay in resolving the outstanding relief issues could harm the various issues at stake in this matter. The summer season of the commercial troll fisheries is set to commence on July 1 and constitutes the largest harvest of Chinook salmon in Southeast Alaska. *See* AR 14906–07; Dkt. 135 ¶ 11; Dkt. 127-4 at 11. The Conservancy has an interest in obtaining relief prior to the opening of that fishery; notably, Dr. Giles has explained that "SRKW need an immediate increase in the abundance of Chinook available to them to avoid functional extinction." Dkt. 127-1 ¶ 18. The fishing industry also has an interest in avoiding delay, as they need to plan and invest resources for those fisheries that will be open. The Conservancy therefore requests that the Court reject efforts that, intentionally or otherwise, delay relief in this matter.

**B.       The Amici Brief's Description of the Vacatur Standard is Incomplete.**

The parties and the R&R thoroughly addressed vacatur under the APA. *E.g.*, Dkt. 144 at 14–15. Amici nonetheless provide more argument on this and suggest that the Conservancy "confuses the applicable balancing test." Dkt. 162 at 3, 5–6. In doing so, the Amici Brief provides an incomplete and, at times, inaccurate, description of the APA's vacatur standards.

PLAINTIFF'S RESPONSE TO
BRIEF OF AMICI CURIAE - 3
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Vacatur is not an injunction as the Amici Brief suggests. *See id.* at 5 (discussing and citing precedent for "injunctive relief"). Vacatur is a "less drastic remedy" relative to the "extraordinary relief of an injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). The APA explicitly directs courts to vacate unlawful agency actions: "The reviewing court **shall . . . set aside** agency action . . . found to be . . . not in accordance with law." 5 U.S.C. § 706 (emphasis added). This language carries a strong presumption that unlawful agency actions be vacated; such relief is withheld "only in limited circumstances." *See Pollinator Stewardship Council v. U.S. Env't Prot. Agency*, 806 F.3d 520, 532 (9th Cir. 2015); *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1053 n.7 (9th Cir. 2010) ("[i]n rare circumstances").

Amici correctly note that, when considering a request for remand without vacatur, the Court is to weigh the seriousness of the agency's errors against the disruptive consequences of an interim change that may itself be changed. *See* Dkt. 162 at 5. However, this is not akin to a traditional equitable balancing test as the Amici suggest. *See id.* at 3, 7. Instead, "[t]he cases in which remand without vacatur was deemed appropriate 'highlight the **significant disparity** between the agencies' relatively minor errors, on the one hand, and the damage that vacatur could cause the very purpose of the underlying statutes, on the other.'" *Puget Soundkeeper All. v. Wheeler*, No. C15-1342-JCC, 2018 U.S. Dist. LEXIS 199358, at *16–17 (W.D. Wash. Nov. 26, 2018) (citation omitted, emphasis added); *see also Klamath-Siskiyou Wildlands Ctr. v. Nat'l Oceanic & Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1242 (N.D. Cal. 2015).

Further, the ESA did not "'strike a balance between competing interests' but rather 'singled out the prevention of [extinction] . . . as an overriding federal policy objective.'" *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 891 (9th Cir. 2022) (citation omitted); *Hill*, 437 U.S. at 194 ("Congress . . . [made] it abundantly clear that the balance has been struck in favor of affording endangered species the highest of priorities[.]"). Once Congress decides "the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them . . . ." *Hill*, 437 U.S. at 194. Courts thus tip the scale in favor of protecting listed species in considering vacatur. *Klamath-Siskiyou*, 109 F. Supp. 3d at 1242; *N. Plains Res.*

PLAINTIFF'S RESPONSE TO BRIEF OF AMICI CURIAE - 4
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

*Council v. U.S. Army Corps of Eng'rs*, 460 F. Supp. 3d 1030, 1037–38 (D. Mont. 2020).

As Amici note, courts consider whether, "on remand, a different result may be reached" in evaluating the seriousness of violations. *See Pollinator Stewardship*, 806 F.3d at 532; Dkt. 162 at 5–6. However, contrary to Amici's suggestion, the Court "cannot simply accept defendants' reassurances that they can readily cure [the] errors." *Klamath-Siskiyou*, 109 F. Supp. 3d at 1244–45. Instead, the relevant inquiry is whether the errors are "technical or procedural formalities" because, in such instances, it is more likely the same conclusion will be reached on remand. *See id.*; *Nat'l Family Farm Coal. v. U.S. Env't Prot. Agency*, 966 F.3d 893, 929 (9th Cir. 2020); *California v. U.S. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1106, 1125 (N.D. Cal. 2017); *Pollinator Stewardship*, 806 F.3d at 532–33.

While Amici correctly note that economic impacts are "disruptive consequences" that may be considered, the "[C]ourt largely should focus on potential environmental disruption, as opposed to economic disruption." *N. Plains Res. Council*, 460 F. Supp. 3d at 1038. In fact, the Ninth Circuit generally orders remand without vacatur only where vacatur would itself cause environmental harm. *E.g.*, *Ctr. for Food Safety v. Regan*, 56 F.4th 648, 668–69 (9th Cir. 2022) (remanding without vacatur and ordering new decisions within 180 days where vacatur would have resulted in use of more harmful pesticides); *Cal. Cmtys. Against Toxics v. U.S. Env't Prot. Agency*, 688 F.3d 989, 993–94 (9th Cir. 2012) (declining to vacate where vacatur would cause more air pollution); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995) (declining to vacate over concerns "regarding the potential extinction of an animal species").

C.   **The Amici Brief Fails to Overcome the Presumption of Vacatur of the ITS.**

The Amici Brief rehashes various issues already addressed by the Defendants in arguing that the Court should reject the R&R's recommended partial vacatur of the ITS. These arguments fall far short of meeting the burden to overcome the APA's presumption for vacatur.

Amici suggest the prey increase program is being fully implemented and mitigating the fisheries, making NMFS's errors less serious. *See* Dkt. 162 at 3, 6. The undisputed evidence proves **this is false**. The prey increase program was supposed to release 20 million smolts

PLAINTIFF'S RESPONSE TO
BRIEF OF AMICI CURIAE - 5
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

annually. AR 47203, 47506. NMFS's own documents show the program is releasing **less than half** that. *See* Dkt. 133-3 at 24 (this document uses "PST"—Pacific Salmon Treaty—to identify funding for the prey increase program). In a blatant attempt to hide this failure, NMFS includes entirely unrelated smolt releases funded by the State of Washington. *See id*. Nothing in the record suggests that Washington will continue those releases or that they mitigate harvests under the 2019 Pacific Salmon Treaty. The Court previously found that NMFS cannot rely on the prey increase program because, *inter alia*, the 2019 SEAK BiOp lacks a detailed plan on how the program would be implemented to mitigate harm to the SRKW. *See* Dkt. 111 at 28. For the State releases, there is no plan whatsoever suggesting they mitigate the fisheries. Washington's recent smolt releases therefore cannot be relied upon as mitigation for the harm caused to SRKWs from harvests conducted under the ITS issued for the Pacific Salmon Treaty. *See id.*

Amici, in arguing the errors are not serious, asserts that NMFS cannot restrict fisheries beyond the limits of the Pacific Salmon Treaty. *See* Dkt. 162 at 3, 6. This remarkable position would exempt Alaska's fisheries from the ESA, allowing them to drive species to extinction. There is no support for this argument. The Treaty is an agreement with Canada "that set[s] upper limits on intercepting fisheries." AR 47194. Either "Party may choose voluntarily to apply more constraints . . . than are specifically required by the [Treaty]. In fact, it was clearly understood throughout the negotiations that U.S. ISBM fisheries have and would continue to be managed to meet the requirements of the ESA . . . ." AR 47212; *see also* AR 47368 (describing the "clear understanding" that more restrictive measures may be imposed to "meet domestic objectives, such as those required to meet the ESA obligations").

Amici argue that the economic impact to commercial salmon fishers outweighs NMFS's errors. *See* Dkt. 162. While some economic impact will occur, it is substantially mitigated by the proposed partial vacatur. *See* Dkt. 156 at 11–13. The presumptive remedy is vacatur of the entire 2019 SEAK BiOp and its ITS. *See Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 843 F. App'x 77, 80 (9th Cir. 2021). The proposed partial vacatur, however, has no effect on the vast majority of fisheries authorized by the ITS. *See* Dkt. 156 at 11–13. Further,

PLAINTIFF'S RESPONSE TO
BRIEF OF AMICI CURIAE - 6
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Amici, as members of Congress, are uniquely suited to reduce economic impacts; Congress is responsible for appropriating funds to assist with fishery failures, including those resulting from "judicial action." *See* 16 U.S.C. §§ 1861a(a) (authorizing fisheries disaster relief), 1864(b)(1) (authorizing funds "subject to the availability of appropriations"), 1864(d) (defining catastrophic regional fishery disaster). Amici's predicted economic impacts are particularly speculative given their role in securing financial assistance for those affected by the proposed vacatur.

Amici contend the "environmental impact associated with not vacating the ITS is negligible." Dkt. 162 at 6. However, modeling by Dr. Lacy, a conservation scientist relied upon in the 2019 SEAK BiOp, demonstrates the proposed vacatur would have a meaningful impact on the viability of SRKWs. *See* Dkt. 127-2 ¶¶ 8–12; AR 47278, 47282, 47502–03. Defendants, on the other hand, have not offered any evidence to show the impact to SRKWs they predict would result. Alaska's own data show that most Chinook salmon harvested in the fishery are from stocks considered high priority prey for SRKWs and only seventeen percent are from stocks that are not used as prey by SRKWs. *See* Dkt. 135-1 at 6. Thus, as the R&R noted, it is undisputed that the proposed vacatur would benefit ESA-listed species. *See* Dkt. 144 at 33–34.

Amici fail to overcome the presumption that the unlawful ITS be vacated. The Conservancy respectfully requests that the Court partially vacate the ITS for the reasons stated in the R&R and the Conservancy's briefs. *See* Dkt. 144 at 24–37; Dkt. 156.

**D.    The Amici Brief Fails to Overcome the Presumption of Vacatur of the Prey Increase Program.**

Amici urge the Court to decline vacatur of the prey increase program, but they fail to explain how the supposed disruptive consequences of vacatur outweigh NMFS's substantial errors. In fact, Amici do not mention those errors. The prey increase program should be vacated because no party has overcome the APA's presumption that this unlawful action be vacated.

NMFS adopted the prey increase program without any of the required NEPA procedures; e.g., no public notice or opportunity for public input, no consideration of alternatives, and no analysis of cumulative impacts, including those associated with other hatchery programs. *See*

PLAINTIFF'S RESPONSE TO BRIEF OF AMICI CURIAE - 7
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Dkt. 111 at 37–38. These are plainly very serious NEPA violations. *See, e.g.*, *Klamath-Siskiyou*, 109 F. Supp. 3d at 1245 ("[A] failure to analyze cumulative impacts will rarely—if ever—be so minor an error as to satisfy this first *Allied-Signal* factor." (citation omitted)); *Wild Fish Conservancy v. Nat'l Park Serv.*, No. C12-5109-BHS, 2014 U.S. Dist. LEXIS 105689, at *7–8 (W.D. Wash. July 31, 2014) (failure to consider alterative was serious NEPA violation, despite agency's protestation that "further evaluation will not change the outcome of its determination"); *Se. Alaska Conservation Council v. U.S. Forest Serv.*, 468 F. Supp. 3d 1148, 1151–54 (D. Alaska 2020) (finding violations serious that undermined NEPA's "fundamental objectives"). Moreover, NMFS adopted the prey increase program without first determining whether it may jeopardize the continued survival of threatened salmonids—a violation that goes to the "heart of the ESA." *See* Dkt. 111 at 31–33; *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011). The Amici Brief does not grapple with the seriousness of these violations whatsoever.

Instead, the Amici Brief focuses only on the supposed disruptive consequences, arguing that vacatur of the prey increase program would reduce prey for SRKWs. *See* Dkt. 162 at 3–5. As the Conservancy has explained, there is no credible study or evidence showing that the program will provide a net benefit to SRKWs, but there is significant evidence showing the program will harm Chinook salmon, which are the primary prey for SRKWs. *See* Dkt. 151 at 8–11. To the extent that the equities are unclear, the Court should impose the APA's presumptive remedy of vacatur. *Coal. to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 466 F. Supp. 3d 1217, 1226 (W.D. Wash. 2020) (ordering vacatur where "the equities [were] unclear").

For the reasons identified in the Conservancy's prior briefing, the Defendants and the Amici do not overcome the APA's presumption that the prey increase be vacated. *See* Dkt. 151. Allowing NMFS to continue implementing this program developed without any required NEPA review simply because NMFS argues that it benefits SRKWs would "vitiate" NEPA. *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 523, 536 (D.C. Cir. 2018).

### III. CONCLUSION.

The Conservancy respectfully requests the Court grant its requested relief. *See* Dkt. 127.

PLAINTIFF'S RESPONSE TO
BRIEF OF AMICI CURIAE - 8
Case No. 2:20-cv-00417-RAJ-MLP

KAMPMEIER & KNUTSEN PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

CORR CRONIN, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600

Respectfully submitted this 13th day of March 2023.

| | |
|---|---|
| K<small>AMPMEIER</small> & K<small>NUTSEN</small>, PLLC | C<small>ORR</small> C<small>RONIN</small>, LLP |
| By: s/ Brian A. Knutsen<br>Brian A. Knutsen, WSBA No. 38806<br>Emma A. O. Bruden, WSBA No. 56280<br>1300 S.E. Stark Street, Suite 202<br>Portland, Oregon 97214<br>Tel: (503) 841-6515 (Knutsen)<br>     (503) 719-5641 (Bruden)<br>Email: brian@kampmeierknutsen.com<br>     emma@kampmeierknutsen.com<br><br>Paul A. Kampmeier, WSBA No. 31560<br>811 First Avenue, Suite 468<br>Seattle Washington 98104<br>Tel: (206) 858-6983<br>Email: paul@kampmeierknutsen.com | Eric A. Lindberg, WSBA No. 43596<br>Benjamin C. Byers, WSBA No. 52299<br>1001 Fourth Avenue, Suite 3900<br>Seattle, Washington 98154<br>Tel: (206) 625-8600<br>Email: elindberg@corrcronin.com<br>     bbyers@corrcronin.com |

PLAINTIFF'S RESPONSE TO BRIEF OF AMICI CURIAE - 9
Case No. 2:20-cv-00417-RAJ-MLP

K<small>AMPMEIER</small> & K<small>NUTSEN</small> PLLC
1300 S.E. Stark Street, Suite 202
Portland, Oregon 97214
(503) 841-6515

C<small>ORR</small> C<small>RONIN</small>, LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154
(206) 625-8600